**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HUGUETTE ULYSSE<br>403 St. Johns Place, Apt. 4B<br>Brooklyn, NY 11238<br><br>Plaintiff,<br><br>v.<br><br>WASHINGTON METRO TRANSIT<br>POLICE OFFICER DERRICK<br>STOKES, in his individual capacity<br>2807 Pumpkin Street<br>Clinton, MD 20735<br><br>and<br><br>WASHINGTON METRO TRANSIT<br>POLICE OFFICER NADIM AL-<br>HINAWI, in his individual capacity<br>1707 Kenyon Street NW<br>Washington, D.C. 20010<br><br>Defendants. | Civil Action No.<br><br>**COMPLAINT**<br>**JURY TRIAL DEMANDED** |

**NATURE OF ACTION**

1.   Plaintiff Huguette Ulysse, an African-American woman, was unlawfully subjected to excessive force by Metro Transit Police Department ("MTPD") Officers Derrick Stokes and Nadim Al-Hinawi (collectively "Defendants")[1] when Defendants threw her to the ground, exposed her bare breasts to public view at a crowded Metro station, wrenched her arms

---

[1] Ms. Ulysse brings this action against the Metro Transit Police Department officers who stopped and arrested her at the Fort Totten Metro Station in Washington, D.C. on May 21, 2018—Officer Stokes and Officer Al-Hinawi. Ms. Ulysse has provided the first names of these officers based upon her information and belief. Ms. Ulysse intends this Complaint to relate to Officers Stokes and Al-Hinawi who arrested her on May 21, 2018.

behind her back so forcefully that she required medical attention, and threatened her with a taser, all for purported fare evasion that Defendants never attempted to confirm had even taken place. Defendants then arrested Ms. Ulysse without probable cause for fare evasion. In order to justify a use of force so excessive that it led bystanders to plead with Defendants to stop, Defendants also arrested Ms. Ulysse for resisting arrest, although there was no probable cause to believe she had resisted. Ms. Ulysse brings this action pursuant to 42 U.S.C. § 1983 to seek redress for the violation of her right under the Fourth Amendment to the United States Constitution to be free from unreasonable seizures, and for assault and battery, false arrest and imprisonment, negligence, and intentional and negligent infliction of emotional distress.

2. In recent years, local advocacy groups have documented the MTPD's and the Washington Metropolitan Area Transit Authority's ("WMATA") increased use of excessive force in attempting to enforce laws against fare evasion. *See, e.g.*, *UNFAIR: Disparities in Fare Evasion Enforcement by Metro Police*, Washington Lawyers' Committee for Civil Rights and Urban Affairs, Sept. 13, 2018; *#ItsNotFare: It's Time to End Excessive Criminal Penalties for Fare Evasion!*, ACLU of the District of Columbia, available at https://www.acludc.org/en/itsnotfare-its-time-end-excessive-criminal-penalties-fare-evasion. These groups have also reported that communities of color have been disproportionately targeted as fare evasion suspects. *See id.*

3. Ms. Ulysse fell victim to this use of excessive force and targeting on May 21, 2018, during an unlawful detention and arrest by Defendants at the Fort Totten Metro Station ("Metro Station"). As she exited the Metro Station, Officer Stokes asked Ms. Ulysse, who was visibly wearing headphones at the time, for her SmarTrip card, and within seconds, he threw her to the ground; caused her top to come off, exposing her naked breasts to the crowded Metro

Station; and forcibly held her down, preventing her from pulling up her top to cover her breasts from further public view. Officer Stokes did not tell Ms. Ulysse why she was being restrained. While she was on the ground, Officer Stokes violently twisted her arm behind her back and held her face down, kneeling on top of her.

4. As Officer Stokes continued to hold Ms. Ulysse face-down on the ground, Officer Al-Hinawi arrived. He took Ms. Ulysse's arm and twisted it sharply behind her back, causing her to cry out in extreme pain. Officer Al-Hinawi told Ms. Ulysse that he had a gun, and he repeatedly threatened to shoot her without provocation or justification. Both officers then exposed Ms. Ulysse's naked breasts to bystanders at the Metro Station and arrested her without probable cause.

5. Ms. Ulysse had done nothing to warrant being seized and arrested by Defendants or that would justify their use of force against her. After her unlawful arrest, the United States Attorney's Office for the District of Columbia declined to prosecute and dropped all charges against Ms. Ulysse.

6. Ms. Ulysse sustained physical injuries that required medical attention and treatment as a result of Defendants' conduct. Ms. Ulysse also suffered emotional injuries, including embarrassment, fear, and emotional distress. She brings this action as a result.

## PARTIES

7. Plaintiff Huguette Ulysse is a 25-year-old African-American woman who currently resides in New York City. At the time of the incident giving rise to the claims here, Ms. Ulysse resided in Washington, D.C.

8. Defendant Officer Derrick Stokes resides in Maryland and is an officer with the Metro Transit Police Department ("MTPD"), the police force that operates in public transit

facilities in the Washington, D.C. metropolitan area run by WMATA. During the events in question, Officer Stokes was on duty as an MTPD officer, wearing an MTPD uniform, and acting under color of law as a police officer.

9. Defendant Officer Nadim Al-Hinawi resides in Washington, D.C. and is an officer with the MTPD, the police force that operates in public transit facilities in the Washington, D.C. metropolitan area run by WMATA. During the events in question, Officer Al-Hinawi was on duty as an MTPD officer, wearing an MTPD uniform, and acting under color of law as a police officer.

## JURISDICTION AND VENUE

10. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because it arises under the Constitution and laws of the United States. The Court has supplemental jurisdiction over Ms. Ulysse's state law claims pursuant to 28 U.S.C. § 1367.

11. This Court also has jurisdiction pursuant to 28 U.S.C. § 1332, because Ms. Ulysse is diverse from both Defendants – Ms. Ulysse is a citizen of New York while Defendant Officer Stokes is a citizen of Maryland and Defendant Officer Al-Hinawi is a citizen of Washington, D.C. – and the amount in controversy exceeds $75,000.

12. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred within this District.

## FACTUAL BACKGROUND

13. On the morning of May 21, 2018, Ms. Ulysse travelled on a Metrorail train operated by WMATA. Ms. Ulysse boarded the train at the Greenbelt station and rode for four stops to the Fort Totten Metro Station in Northeast, Washington, D.C. She exited the Fort Totten Metro Station through the WMATA turnstile using her SmarTrip card. As was readily visible,

she was wearing headphones at the time.

14.     Although Ms. Ulysse had done nothing wrong, as she exited the Metro Station, Defendant Officer Stokes approached her and stopped her without justification. Ms. Ulysse was wearing headphones and could not hear surrounding noise. Before she could fully remove her headphones, Officer Stokes demanded that she give him her SmarTrip card, and within seconds, he grabbed her and forced her to the ground. Officer Stokes held Ms. Ulysse on the ground, kneeling over her, violently twisting her hand behind her back, and pushing down on her shoulder to keep her pinned to the ground. Ms. Ulysse cried out for help, saying repeatedly that she had done nothing wrong and that Officer Stokes was hurting her. Hearing Ms. Ulysse's cries and obvious bewilderment at why she was being held to the ground, Officer Stokes did not let up, ask whether she had paid her fare, or use her SmarTrip card to determine whether she had paid. Instead, Officer Stokes continued to hold her to the ground, scraping Ms. Ulysse's shoulder and causing a contusion on her chest.

15.     Ms. Ulysse was wearing a tube top secured by a tight elastic band around the top. After forcing her to the ground, Officer Stokes restrained her in such a way that made her shirt come off, exposing her bare breasts to everyone at the crowded Metro Station.

16.     Officer Stokes would not move to allow Ms. Ulysse to pull her shirt up.

17.     During this time, Ms. Ulysse experienced severe physical pain to her chest, shoulder, and arm as a result of Officer Stokes's conduct, and humiliation as she was held face-down on the ground outdoors, with her breasts against the concrete and a large man kneeling on top of her.

18.     Onlookers were horrified by Officer Stokes's conduct. Recognizing, as was objectively obvious at the time, that Ms. Ulysse posed no safety threat, bystanders pleaded with

Officer Stokes to calm down and to let Ms. Ulysse cover herself. Instead of responding to these reasonable concerns, Officer Stokes drew a Taser and threatened bystanders with it.

19.     Ms. Ulysse was terrified by the presence of a weapon, and she could not determine from her position on the ground whether it was a Taser or a gun. For the remainder of the time Ms. Ulysse was on the ground, Officer Stokes kept the Taser in his hand, poised above Ms. Ulysse or aimed at bystanders. From the time Officer Stokes drew the Taser and throughout the interaction, Ms. Ulysse feared for her life.

20.     One bystander removed his shirt to give to Ms. Ulysse to cover her breasts, and a WMATA employee standing nearby brought it to Officer Stokes. Initially, Officer Stokes did nothing with the shirt, neither using it to cover Ms. Ulysse nor allowing Ms. Ulysse to put it on to cover herself.

21.     As Officer Stokes was holding Ms. Ulysse down, Officer Al-Hinawi arrived. He immediately knelt down next to Officer Stokes, over Ms. Ulysse. Officer Al-Hinawi also failed to use Ms. Ulysse's SmarTrip card to determine whether she had paid her fare. He did not ask Ms. Ulysse whether she had paid, and he did not immediately cover Ms. Ulysse's breasts from public view, as a reasonable officer would have done.

22.     While kneeling over her, Officer Al-Hinawi threatened to physically harm Ms. Ulysse, telling her that he had a gun and would shoot her if she said or "tried" anything. He then said that if he could not shoot her, he would make sure that Officer Stokes would shoot her.

23.     As a result of Defendants' conduct, Ms. Ulysse feared for her life.

24.     Although Ms. Ulysse was not moving, Officer Al-Hinawi intentionally took her arm and twisted it sharply behind her back, hurting her arm and leading her to cry out in extreme pain. Ms. Ulysse had not done anything to Officer Al-Hinawi to warrant him violently twisting

her arm.

25.  Defendant Officer Al-Hinawi then handcuffed Ms. Ulysse behind her back. Officer Al-Hinawi applied the handcuffs so tightly that they left visible bruises and abrasions on Ms. Ulysse's wrists. After handcuffing her, Defendants purposefully pulled Ms. Ulysse's torso up, fully exposing her bare breasts to bystanders. Ms. Ulysse tried to turn back to the ground to cover herself, crying audibly and asking for help.

26.  After Officer Stokes had threatened several African American bystanders with a Taser when they urged him to allow Ms. Ulysse to cover herself, Defendants then allowed a white bystander to help Ms. Ulysse put on the shirt that an African American man had given her.

27.  Ms. Ulysse was then detained in a police car, while in handcuffs. Defendants seized her property, including her wallet, which contained her SmarTrip card and photo identification. Even while holding her in their car, and having her SmarTrip card in their possession, Defendants failed to take any steps to confirm whether she had paid her Metro fare. Without conducting any investigation or making any efforts to confirm any suspicions that they may have had, Defendants arrested her for purported fare evasion and resisting arrest.

28.  Defendants' use of force against Ms. Ulysse, which included violently pinning her to the ground, forcibly twisting her arm, kneeling on her, and threatening her with weapons, was unreasonable. The offense that Ms. Ulysse was purportedly suspected of committing, fare evasion, is a minor and non-violent charge. Ms. Ulysse was not resisting arrest. Ms. Ulysse also posed no safety threat – she is physically smaller than Defendants, she was not armed, and at no point did she threaten Defendants or anyone else. No reasonable officer in Defendants' position could have believed it was necessary to handle her in such a forcible and violent way in order to determine whether she had committed fare evasion or to effectuate an arrest.

29. Nor did Defendants have probable cause to believe that Ms. Ulysse had failed to pay her fare or that she had committed any other offense. Ms. Ulysse was simply walking through the Metro Station and did not do anything to suggest that she had broken any laws. She exited the Fort Totten Metro Station through the WMATA turnstile using her SmarTrip card and did nothing that warranted being stopped or detained by police officers. Any alleged suspicion Officer Stokes may have had in initially approaching Ms. Ulysse concerning whether she paid her fare could have been resolved in a matter of seconds by bringing Ms. Ulysse's SmarTrip card to the Metro Station booth to determine when it had last been used.

30. Instead of conducting this simple inquiry, Defendants did nothing to attempt to confirm any suspicions that they may have had and arrested Ms. Ulysse without probable cause to believe she had failed to pay her fare or committed any other offense.

31. After her unlawful seizure, police officers took Ms. Ulysse to the emergency room at Providence Hospital to receive treatment for the injuries she sustained during her unlawful arrest and detention. As a result of Defendants' forcible and violent conduct, Ms. Ulysse's wrist was cut and bruised, and she had a large abrasion on her shoulder.

32. The doctor Ms. Ulysse saw at Providence Hospital diagnosed her with muscle strain and sinus tachycardia, a condition associated with an increase in catecholamine, a chemical in the brain that is elevated by stress and fright. Ms. Ulysse was given a prescription for a muscle relaxant and told to schedule a follow-up appointment within 72 hours.

33. Two days later, Ms. Ulysse went to George Washington University Hospital to follow up and receive treatment for continued pain in her torso and shoulder sustained as a result of Defendants' conduct. The doctor observed a chest wall contusion and limited mobility in her shoulder because of pain. Ms. Ulysse received a sling for her arm and prescriptions for Naprosyn

and Valium.

34.    After Defendants arrested Ms. Ulysse for fare evasion and resisting arrest, they referred her case to the United States Attorney's Office for the District of Columbia for prosecution. The United States Attorney's Office declined to proceed with the prosecution and dropped all charges against Ms. Ulysse.

## INJURY TO PLAINTIFF

35.    Ms. Ulysse sustained physical and emotional injuries as a result of Defendants' unconstitutional and tortious conduct. During the unlawful seizure, in which Ms. Ulysse suffered deprivation of her constitutional rights, Ms. Ulysse experienced significant pain and sustained physical injuries, for which she required medical treatment at two hospitals.

36.    Ms. Ulysse's unlawful detention and the unlawful force Defendants used against her also caused Ms. Ulysse to suffer significant embarrassment, fear, and emotional distress. In addition to the way Defendants spoke to and treated her, it was particularly humiliating to be forced to lie on the ground with her breasts exposed during a busy morning at the Metro Station. Defendant Al-Hinawi's repeated threats to shoot her caused her to fear for her life, which further exacerbated her emotional injuries. The fact that Defendants arrested her without probable cause or justification compounded her emotional distress.

37.    As a result of the severe emotional distress Ms. Ulysse experienced, she stopped riding the Metro and instead walked 90 minutes to work each day. This commute ultimately became too taxing and Ms. Ulysse moved away from Washington, D.C. and relocated to New York.

38.    These psychological and physical damages caused injury to Ms. Ulysse in an amount in excess of $75,000.

39. Through the actions described above, Defendants acted unreasonably; intentionally; maliciously; with willful, wanton, callous, and reckless disregard for Ms. Ulysse's constitutional and civil rights.

## CAUSES OF ACTION

### COUNT ONE
### (Against All Defendants)

**Violation of Fourth Amendment to the United States Constitution, Unreasonable Seizure (42 U.S.C. § 1983)**

40. Ms. Ulysse repeats and incorporates by reference all allegations contained in paragraphs 1 through 39 as if fully set forth herein.

41. Defendant Officer Stokes violated Ms. Ulysse's Fourth Amendment right to be free from unreasonable seizures when he arrested her with excessive force and without probable cause. Acting under color of law as a uniformed police officer, Officer Stokes used excessive force in arresting Ms. Ulysse, including by forcing her to the ground, kneeling on top of her to pin her down, exposing her breasts, preventing her from covering her chest, twisting her arm behind her back, and roughly and tightly handcuffing her. This use of force was unreasonable, as the suspected criminal conduct – fare evasion – was minimal; and Ms. Ulysse, a small woman, was not armed and at no time posed a physical threat to the officers. This unreasonable use of force caused physical injury to Ms. Ulysse.

42. Defendant Officer Al-Hinawi violated Ms. Ulysse's Fourth Amendment right to be free from unreasonable seizures when he arrested her with excessive force and without probable cause. Acting under color of law as a uniformed police officer, Officer Al-Hinawi used excessive force in arresting Ms. Ulysse, including by twisting her arm sharply behind her back, threatening to shoot her, turning her to expose her breasts to the public, and roughly and tightly

handcuffing her. This use of force was unreasonable, as the suspected criminal conduct – fare evasion – was minimal; and Ms. Ulysse, a small woman, was not armed and at no time posed a physical threat to the officers. This unreasonable use of force caused physical injury to Ms. Ulysse.

43. Defendants also violated Ms. Ulysse's Fourth Amendment rights by arresting her without probable cause. Without identifying any facts that would give rise to probable cause to believe she had failed to pay her fare, and without probable cause to believe she was resisting arrest, Defendants improperly arrested Ms. Ulysse.

## COUNT TWO
## (Against All Defendants)

### Assault and Battery

44. Ms. Ulysse repeats and incorporates by reference all allegations contained in paragraphs 1 through 39 as if fully set forth herein.

45. Officer Stokes intentionally and unlawfully attempted by his actions to cause harmful and offensive physical contact with Ms. Ulysse, including by forcing her to the ground, kneeling over her with his hands on her back to pin her down, exposing her breasts and refusing to allow her to cover herself, and twisting her arm behind her back. Ms. Ulysse did not consent to this offensive contact, and in engaging in these intentional acts, Officer Stokes caused harmful and offensive bodily contact to Ms. Ulysse for which she sustained physical injury. Officer Stokes threatened by words and actions to do physical harm to Ms. Ulysse, including by holding a Taser pointed at her, above her body, throughout the encounter.

46. Officer Al-Hinawi intentionally and unlawfully attempted by his actions to cause harmful and offensive physical contact with Ms. Ulysse, including by roughly twisting her arm behind her back, injuring her shoulder; turning her in such a way that her breasts were exposed to

11

onlookers; and handcuffing her tightly, injuring her wrists. Ms. Ulysse did not consent to this offensive contact, and in engaging in these intentional acts, Officer Stokes caused harmful and offensive bodily contact to Ms. Ulysse for which she sustained physical injury. Officer Al-Hinawi threatened through words to do physical harm to Ms. Ulysse, including by telling her that he would shoot her if she said or "tried" anything.

## COUNT THREE
### (Against All Defendants)

### Negligence

47. Ms. Ulysse repeats and incorporates by reference all allegations contained in paragraphs 1 through 39 as if fully set forth herein.

48. To the extent Defendants failed to appreciate that Ms. Ulysse's bare breasts were exposed to the busy Metro Station and that they further exposed her by turning her after handcuffing her, they were negligent in this failure.

49. Defendants had a duty to act as reasonably prudent officers would, and to avoid "unnecessary and wanton severity," D.C. Code § 5-123.02, in arresting Ms. Ulysse. Defendant Officer Stokes breached that duty when he caused Ms. Ulysse's top to come off during the arrest and did not let her cover herself before Officer Al-Hinawi arrived. After Officer Al-Hinawi arrived, Defendants breached their duty to Ms. Ulysse when they continued to prevent her from covering herself and when, after she was handcuffed, they turned her in such a way that exposed her breasts to the public at the crowded Metro Station. If their failure to recognize that Ms. Ulysse's breasts were exposed was inadvertent, that inadvertence was negligent. It was clear from a view of Ms. Ulysse's back that her breasts were uncovered, and onlookers repeatedly said she was exposed. One onlooker even removed his own shirt and gave it to a WMATA employee, who brought it to Officer Stokes.

50. This breach of duty caused physical damage to Ms. Ulysse, forcing her exposed breasts against the concrete with the additional weight of Officer Stokes pushing down on her back, and resulting in pain and bruising to her chest.

## COUNT FOUR
### (Against All Defendants)

### Negligent Infliction of Emotional Distress

51. Ms. Ulysse repeats and incorporates by reference all allegations contained in paragraphs 1 through 39 as if fully set forth herein.

52. To the extent Defendants' exposure of Ms. Ulysse's naked breasts was caused by a negligent failure to recognize that Ms. Ulysse was exposed, that negligence also inflicted emotional distress on Ms. Ulysse.

53. Ms. Ulysse was in the zone of danger of Defendants' conduct – she was physically under Officer Stokes, and both Officer Stokes and Officer Al-Hinawi at times physically hurt her by wrenching her arm behind her back and shoving her face-down into the ground. Defendants' actions put Ms. Ulysse in danger of physical injury, and as a result, she feared for her safety, as demonstrated by her crying and telling bystanders that she was afraid Defendants would kill her.

54. As a result of Defendants' conduct, Ms. Ulysse suffered the physical impact of having her naked breasts pushed against the ground and exposed to the crowd. She suffered severe emotional distress, with consequences including an inability to ride the Metro, causing her to walk 90 minutes each way to work.

## COUNT FIVE
## (Against All Defendants)

### Intentional Infliction of Emotional Distress

55.     Ms. Ulysse repeats and incorporates by reference all allegations contained in paragraphs 1 through 39 as if fully set forth herein.

56.     Defendant Officer Stokes's conduct in unlawfully arresting Ms. Ulysse, forcing her to the ground, kneeling on top of her and holding her down, exposing her breasts on a Monday morning in a crowded Metro station, not allowing her to cover up, handcuffing her in a painful manner, and turning her in such a way that her breasts were exposed, was extreme and outrageous, and it intentionally or recklessly caused Ms. Ulysse severe emotional distress, as reflected in her inability to take the Metro thereafter.

57.     Defendant Officer Al-Hinawi's conduct in unlawfully arresting Ms. Ulysse, twisting her arm sharply behind her back and turning her in such a way that her breasts were exposed, all while causing her to fear for her life by threatening to shoot her, was extreme and outrageous, and it intentionally or recklessly caused Ms. Ulysse severe emotional distress, as reflected in her inability to take the Metro thereafter.

58.     Defendants' conduct was such that an average member of the community, on hearing about it or witnessing it, would exclaim that it was outrageous, as demonstrated by the horrified reactions of onlookers during the assault.

59.     A reasonable person in Defendants' position would have known that emotional distress and physical harm would result from their actions.

## COUNT SIX
## (Against All Defendants)

### False Arrest and Imprisonment

60. Ms. Ulysse repeats and incorporates by reference all allegations contained in paragraphs 1 through 39 as if fully set forth herein.

61. Defendants arrested Ms. Ulysse against her will without probable cause to believe she had committed a crime, and without a reasonable, good faith belief that they did have probable cause.

62. No reasonable officer could have believed that probable cause to arrest existed where an officer's initial investigatory stop never yielded any information to support the suspicion of failing to pay her fare, and where there was no probable cause to believe that Ms. Ulysse had resisted arrest.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court grant her the following relief:

(1) enter a declaratory judgment that the foregoing acts violated Plaintiff's Fourth Amendment rights under the United States Constitution;

(2) award compensatory damages to Plaintiff of no less than $75,000, in a specific amount to be determined by the jury that would fully compensate Plaintiff for her injuries caused by the conduct of Defendants alleged herein;

(3) award punitive damages to Plaintiff in an amount to be determined by the jury that would punish Defendants for their willful, wanton, and reckless conduct alleged herein and that would effectively deter Defendants from engaging in similar conduct in the future;

  (4)  award any and all costs and attorneys' fees incurred in this action that are available under law; and

  (5)  order such relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues triable as of right.

Dated: May 20, 2019        Respectfully submitted,

               /s/ Jia M. Cobb
               Jia M. Cobb
               Yiyang Wu
               RELMAN, DANE & COLFAX PLLC
               1225 19th Street, NW, Suite 600
               Washington, DC 20036
               Telephone: (202) 728-1888
               Facsimile: (202) 728-0848
               jcobb@relmanlaw.com
               ywu@relmanlaw.com

               *Attorneys for Plaintiffs*