1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

HUGUETTE ULYSSE                    :
                                   :
        Plaintiff,                 :
                                   :
        v.                         :
                                   :CASE NO.:1:10-cv-01465 CJN
METRO TRANSIT POLICE OFFICER :
DERRICK STOKES, et al.             :
                                   :
        Defendants.                :
_____

ZOOM VIDEOCONFERENCE
DEPOSITION OF DERRICK STOKES
FRIDAY, SEPTEMBER 25TH, 2020
11:01 a.m. - 7:03 p.m.

Jeaninn Y. Alexis, Stenographer

**2**

APPEARANCES:
ON BEHALF OF THE PLAINTIFF:
YIYANG WU, ESQUIRE
(Via Teleconference.)
    Relman, Dane & Colfax PPLC
    1225 19th Street, N.W.
    Suite 600
    Washington, D.C. 20036
    202.728.1888
    Ywu@relmanlaw.com

ON BEHALF OF THE DEFENSE:
JANICE L. COLE, ESQUIRE
(Via Teleconference.)
    Senior Counsel II
    600 Fifth Street, N.W.
    Washington, D.C. 20001
    202.962.2543
    Jcole@wmata.com

**3**

                    I N D E X

        DEPOSITION OF DERRICK STOKES

        FRIDAY, SEPTEMBER 25TH, 2020

EXAMINATION BY:                          PAGE
MS. WU                          4

EXHIBITS:    DESCRIPTION:               PAGE
Exhibit 1    PowerPoint Fare Evasion      100
Exhibit 2    Answers to Interrogatories   133
Exhibit 3    SmartTrip card printout      136
Exhibit 4    Property log                 147
Exhibit 5    Logbook                      148
Exhibit 6    Defendant's 18-20        156
Exhibit 7    Video M001               159
Exhibit 8    Defendant's 13-18        165
Exhibit 9    Form 313                 271
Exhibit 10   Cobolt Report            279
Exhibit 11   Use of Force paperwork   286
Exhibit 12   Document                 292

**4**

                P-R-O-C-E-E-D-I-N-G-S:
        Whereupon,
                DERRICK STOKES,
        the deponent herein, called for oral examination in
        the matter pending, being first duly sworn to tell the
        truth, the whole truth, and nothing but the truth,
                testifies as follows:
                (11:01 a.m.)
            MS. WU:  Counsel, before we begin, I notice
        that it says recording, and I thought it was audio.
        But now I'm wondering, is this being recorded by
        video?
            MS. COLE:  This may be a question for the
        court reporter, I -- we did not seek it to be video
        recorded.  I imagine this is something for the
        stenographer's purposes.  But maybe the court reporter
        can answer that.
            MS. WU:  Madam Court Reporter, can you
        answer that question?
            THE REPORTER:  I don't know why it says
        recording.  I don't know why it says recording.  As
        you know, I'm writing it down, so I don't know how --

**5**

        I don't know.  I'm so sorry, I really don't.
            MS. COLE:  We can ask the reporting services
        afterwards.  But, you know, obviously the transcript
        came --
            THE REPORTER:  Of course.
            MS. COLE:  Okay.  But, for the record, I am
        objecting to the video recording of the deposition, if
        that is what is happening.  And not just for today,
        but for yesterday as well, for Sergeant Al Hinawi.
            MS. WU:  I would like to put on the record
        that all parties confirm that -- stipulate to
        having -- conducting this deposition remotely,
        including the administration of the oath remotely.
            THE DEPONENT:  That's correct.
                EXAMINATION
            BY MS. WU:
            Q   Good morning, Officer Stokes.  I introduced
        myself briefly before we went on the record.  But just
        now that we are on the record again, my name is,
        Yiyang Wu.  I represent the plaintiff, Huguette
        Ulysse.  And I will be taking your deposition today.
            Could we just start with you stating your

**6**

1  full name for the record?

2      **A   Derrick Stokes.**

3      Q   And what is your date of birth?

4      **A   11/9/1980.**

5      Q   Do you have a middle name?

6      **A   Yes.  Lacey.**

7      Q   And how do you spell that?

8      **A   L-A-C-E-Y.**

9      Q   Have you ever testified at a deposition

10  before?

11      **A   No.**

12      Q   Have you ever testified in front -- as part

13  of a court proceeding before?

14      **A   Yes.**

15      Q   How many times have you testified as part of

16  a court proceeding?

17      **A   I'm not sure how many times.**

18      Q   More than five times or around that?

19      **A   More than five, yes.**

20      Q   So this is similar but a little different

21  from a court proceeding, so I will go over a couple of

22  ground rules to make sure that we are all on the same

**7**

1  page and that, you know, we can be as efficient as

2  possible throughout this process.

3          Okay?

4          So the first is verbal answers are required.

5  Sometimes it is easy to just say um-hum, or do a shake

6  of the head or a nod of the head, but for the court

7  reporter's purposes, I need you to give a yes or no

8  answer or a verbal answer.

9          Understood?

10      **A   Yes.**

11      Q   The second is to ask you to let me finish my

12  question before you start to answer it.  Again, this

13  is for the court reporter's purposes.  If people speak

14  over each other it is hard for the court reporter to

15  record it down.  And I will certainly try to do the

16  same with you, I will try to let you finish your

17  answer before I ask my with next question.

18          Does that make sense?

19      **A   Yes.**

20      Q   If you don't understand my question, please

21  just ask me to clarify or ask me to rephrase it.

22  However, if you do answer it, I will assume that you

**8**

1  understood it.

2          Makes sense?

3      **A   Yes.**

4      Q   We are starting at 11:00 and we will

5  certainly take a break for lunch.  And throughout the

6  day, if you have a request for a break, just let me

7  know.  I only have one caveat to that, which is if I

8  have a question pending I want to ask you to answer my

9  question before we take the break.

10          Makes sense?

11      **A   Yes.**

12      Q   Okay.  And then finally, Ms. Cole, who is

13  representing -- who I understand is representing you

14  for purposes of this deposition, she may launch

15  objections from time to time for my questions.  If she

16  objects, you will still need to answer my question

17  unless she expressly instructs you not to answer my

18  question.

19          Understood?

20          MS. COLE:  That is correct, Officer.

21          THE DEPONENT:  Yes.

22

**9**

1          BY MS. WU:

2      Q   Okay.  Is there any reason why you cannot

3  give truthful and accurate testimony today?

4      **A   No.**

5      Q   What did you do to prepare for this

6  deposition?

7          MS. COLE:  Objection to the extent it asks

8  for any conversations between counsel and defendant.

9          Otherwise, you may answer.

10          BY MS. WU:

11      Q   So I don't want to you to tell me any

12  conversations you had with Ms. Cole.  However, I would

13  like to know, you know, what you did to prepare for

14  this deposition.  And if you met with Ms. Cole, that

15  is not giving me any communications.

16          So I will ask the question again.

17          What, if anything, did you do to prepare for

18  this deposition today?

19          MS. COLE:  Same objection.

20          You may answer.

21          THE DEPONENT:  I reviewed my arrest

22  paperwork and DVR footage.

10

```
BY MS. WU:
    Q    You said arrest paperwork and what, I'm
sorry?
    A    DVR footage.
    Q    DVR?
    A    David, Victor, Robert.  DVR.
    Q    DVR footage.  Got you.
         Your sound is coming a little bit muffled
from my perspective.  I don't know if there is any way
to push a little bit closer to the microphone.
    A    Is that better?
    Q    Bit better for me.  Thank you.
         Did you also meet with your attorney?
    A    Yes.
    Q    Did you tell anybody that you were going to
be taking this deposition?
    A    Yes.
         MS. COLE:  Objection.
         You can answer.
         BY MS. WU:
    Q    Who did you tell?
         MS. COLE:  Objection.
```

11

```
         You can answer.
         THE DEPONENT:  I told my chain of command so
they can set up for this location so I can actually do
the deposition.
         BY MS. WU:
    Q    Anybody else?
    A    No.
    Q    And who is your chain of command?  Who did
you tell?
    A    Sergeant Whitfield, Sergeant Cohens-Minor.
    Q    And what did you tell Sergeant Whitfield?
         MS. COLE:  Objection.
         You can answer.
         THE DEPONENT:  I told him I would need a
private and secure location to do my deposition.
         BY MS. WU:
    Q    Did you tell him anything about the
matter -- the subject matter of this case?
         MS. COLE:  Objection.
         You can answer.
         THE DEPONENT:  No.
```

12

```
         BY MS. WU:
    Q    And how about Sergeant Cohens-Minor, did you
ta k to him or her about the substance of the
allegations in this case?
         MS. COLE:  Objection.
         You can answer.
         THE DEPONENT:  No.
         BY MS. WU:
    Q    And how many times did you meet with your
attorney?
         MS. COLE:  Objection.
         You can answer.
         THE DEPONENT:  I can't recall the exact
number.  I can't recall the exact number of times.
         BY MS. WU:
    Q    Then I will just rephrase my question.
         How many times did you meet with your
attorney to prepare for this deposition?
         MS. COLE:  Objection.
         You can answer.
         THE DEPONENT:  Again, I cannot -- I can't
recall the exact number of times.
```

13

```
         BY MS. WU:
    Q    Okay.  Was is more than five times?
         MS. COLE:  Objection.
         You can answer.
         THE DEPONENT:  Yes, it was more than five
times.
         BY MS. WU:
    Q    More than ten times?
         MS. COLE:  Objection.
         You can answer.
         THE DEPONENT:  I'm not sure if it was more
than ten.
         BY MS. WU:
    Q    Thanks for letting me know what you are sure
of and not sure of.
         When was the last time you met with your
attorney?
         MS. COLE:  Objection.
         You can answer.
         THE DEPONENT:  Yesterday.
         BY MS. WU:
    Q    And how long did you meet for?
```

14

1    A    A little under two hours.
2    Q    You mentioned that you reviewed arrest
3  paperwork, and we will go through a lot of documents
4  over the course of today.  But if you could, be a
5  little more specific about what paperwork you
6  reviewed.
7    A    MTPD report.  MPD Cobalt report.
8    Q    Any other documents that you reviewed?
9    A    I also reviewed a few general orders.
10   Q    What numbers?
11   A    I don't recall the numbers.  I can get the
12 titles.
13   Q    Okay.  That's helpful.
14   A    Arrest Procedure and Use Of Force.
15   Q    Any other general orders that you reviewed?
16   A    No.
17   Q    Did you review any statements taken either
18 by -- given either by you or Sergeant Al Hinawi?
19   A    Yes, I reviewed my statements.
20   Q    Did you review Sergeant Al Hinawi's
21 statements?
22   A    No.

15

1    Q    Have you reviewed any deposition
2  transcripts?
3    A    No.
4    Q    So we've talked about the MTPD report, the
5  MPD Cobalt report, two general orders and your
6  statements.
7         Any other documents you recall reviewing?
8    A    No.
9    Q    And then you said you watched DVR footage.
10 How many videos have you watched?
11   A    I'm not sure of the exact number of videos.
12   Q    Okay.  Did you watch surveillance videos?
13        MS. COLE:  Objection to form.
14        You can answer.
15        THE DEPONENT:  The DVR video, I guess that
16 would be the surveillance video, WMATA camera's video.
17 Yes.
18        BY MS. WU:
19   Q    Great.  And I know the surveillance -- there
20 are different angles for different cameras.  So I
21 think that's what I'm trying to ask:  How many camera
22 viewpoints did you watch?

16

1    A    I'm not sure of the exact number of camera
2  angles.
3    Q    Did you watch more than one, though?
4    A    Yes, more than one.
5    Q    Do you believe you watched all of the camera
6  angles on the DVR?
7        MS. COLE:  Objection.  Form and foundation.
8        You can answer.
9        THE DEPONENT:  I believe so.
10        BY MS. WU:
11   Q    And how many times have you watched the
12 surveillance footage?
13   A    Again, I can't give an exact number of how
14 many times.  More than once.
15   Q    And when was the last time you watched it?
16        MS. COLE:  Objection to form and foundation.
17        THE DEPONENT:  The last time I watched the
18 WMATA DVR footage?  Maybe last week.
19        BY MS. WU:
20   Q    Have you watched any WMATA footage other
21 than from the Fort Totten Metro Station in -- as part
22 of this case?

17

1    A    No.
2        MS. COLE:  Objection to form and foundation.
3        BY MS. WU:
4    Q    And when was the -- the first time you
5  watched the WMATA footage, was that after this case
6  had been initiated or before?
7    A    Before.
8    Q    And how soon after the incident itself did
9  you watch the footage for the first time?
10   A    Maybe a week.
11   Q    And who gave you that footage to watch?
12 Unless it was -- actually, yes, let me ask that
13 question:  Who gave you that footage to watch?
14   A    I made --
15        MS. COLE:  Objection to form.
16        You may answer.
17        THE DEPONENT:  I received that video from
18 the DVR unit after I made a request for it.
19        BY MS. WU:
20   Q    Do you remember who from the DVR unit you
21 made a request from?
22   A    No, I do not.

18

1  Q   Was that request by email or by phone, or
2  how did you make the request?
3  A   **It's part of our reporting module in the**
4  **MTPD report writing program, you just click a box for**
5  **a DVR request.**
6  Q   And when it comes back to you is that also
7  through the module or do they send it via email or
8  otherwise?
9  A   **A physical copy is then delivered to the**
10 **district.**
11 Q   Did you watch the surveillance footage with
12 anyone else present?
13 MS. COLE:  Objection to form.
14 THE DEPONENT:  No.
15 BY MS. WU:
16 Q   Other than you, who else --
17 I am sorry, did I interrupt you?
18 A   **No.**
19 Q   Other than you and your lawyers, who else
20 are you aware of has watched the WMATA footage?
21 A   **I'm not sure.**
22 Q   You don't know anybody else who has watched

19

1  the WMATA footage, other than you and your lawyers?
2  A   **Yes.**
3  Q   The WMATA footage that you watched, did it
4  have audio?
5  A   **No.**
6  Q   Have you taked about the WMATA footage with
7  anybody else other than your lawyers?
8  MS. COLE:  Objection.
9  You can answer.
10 THE DEPONENT:  No.
11 BY MS. WU:
12 Q   Did you watch any videos other than the
13 WMATA footage?
14 A   **Yes.**
15 Q   What other video did you watch?
16 A   **Cell phone recordings.**
17 Q   And how many cell phone recordings did you
18 watch?
19 A   **I'm not sure of the number of -- more than**
20 **one.**
21 Q   Did any of those cell phone recordings have
22 audio?

20

1  A   **Yes.**
2  Q   How many?
3  A   **One.**
4  Q   And when was the first time you heard that
5  cell phone video with audio?
6  A   **Yesterday.**
7  Q   That's the first time you heard it?
8  A   **Yes.**
9  Q   And did you watch that video more than once?
10 A   **Yes.**
11 Q   Okay.  How many times did you watch that
12 video?
13 A   **Maybe three times.**
14 Q   And did you watch cell phone video without
15 audio?
16 A   **Yes.**
17 Q   And when was the first time you watched that
18 cell phone video without audio?
19 A   **I don't remember.**
20 Q   Was it in the past week?
21 A   **No.**
22 Q   And when was the last time you watched that

21

1  cell phone video?
2  A   **I'm sorry, say that again.**
3  Q   When was the final time you watched that
4  cell phone video without audio?
5  A   **I'm not sure.  It's been longer than --**
6  **longer than a month.**
7  Q   Okay.  We have talked about the WMATA
8  surveillance footage, and it sounds like one cell
9  phone video with audio and one without audio.
10 Any other videos or clips that you watched?
11 A   **No.**
12 Q   Did you listen to any recordings in
13 preparation for this deposition?
14 MS. COLE:  Objection to form.
15 You can answer.
16 THE DEPONENT:  No.
17 BY MS. WU:
18 Q   So you didn't listen to any radio runs?
19 MS. COLE:  Objection to form.
20 You can answer.
21 THE DEPONENT:  No.
22

22

BY MS. WU:

Q   Have -- can you think of anything else that you reviewed or watched in preparation for this deposition?

A   No.

Q   Okay.  So before I go too much further, you know, obviously, we are doing this deposition remotely.  If we were doing this in person I would ask you to turn off your cell phone, and that, you know, I would know that you don't have access to any other private methods of communication like a computer or email.  So I will ask you to do the same for the duration of this deposition, that you will turn off your cell phone and that you will refrain from any private means of communication for the duration of the deposition.

There's one exception to that, which is how I'm going to get you exh bits.  I've sent you -- and I understand that you received a share file link, and that's where exhibits will be dropped.  So you don't have to have your email open to do that, you would just have that share file, you know, loaded on your

23

computer, and when you refresh -- when you click refresh the next exhibit will show up.

Does that all make sense to you and can you agree to those terms?

A   Yes.

Q   Thank you.

Do you have a work email address, Officer Stokes?

A   Yes.

Q   And what is that?

A   DSTOKES@WMATA.com.

Q   And did anyone ask you to search your email address as part of this case?

MS. COLE:  Objection to the extent it seeks attorney/client privileged communication, which you will not answer to.

BY MS. WU:

Q   Have you searched your email address in relation to this case?

MS. COLE:  You may answer.

THE DEPONENT:  No.

24

BY MS. WU:

Q   Have you searched your computer hard drive in relation to this case?

A   No.

Q   And have you searched your paper files in relation to this case?

A   No.

Q   Did you send or receive any email notifications from your work email address?

A   Can you rephrase that one?

Q   Your work email address, the DSTOKES@WMATA.com, are you aware of any emails that are related to Huguette Ulysse that went in or out of your work email address?

A   No.

Q   So whenever -- if you communicated -- and I want to set aside any communications from your lawyer, but if you communicated about anything having to do to Huguette Ulysse, you did not do it via email from your work address?

A   No.

Q   Do you -- did you communicate about this

25

case from your personal email address?

A   No.

Q   Have you saved anything related to this case on your office computer?

A   No.

Q   And have you saved anything related to this case on your home computer?

A   No.

Q   Do you have a notebook that you generally keep with you on duty?

A   Yes.

Q   And what's the purpose of keeping that notebook on you?

A   To jot down information as needed.

Q   What type of information would you jot down?

A   I guess, for example, if I get a BOLO lookout over the radio I would quickly jot it down in my notebook to have it handy.

Q   Did you carry a notebook with you as of May 2018?

A   Yes.

Q   Did you write any handwritten notes in your

26

1  notebook in connection to Huguette Ulysse?
2      **A   No.**
3      Q   When you typically -- effect an arrest, is
4  that something you --
5      MS. COLE:  Objection to form.  Foundation.
6      You can answer.
7      THE REPORTER:  Can you say that again?  Can
8  you ask that question one more time?
9      When you typically --
10     BY MS. WU:
11     Q   -- effect an arrest, do you typically write
12  notes in your notebook related to that arrest?
13     **A   Yes.**
14     Q   And what type of notes, typically, would you
15  write?
16     MS. COLE:  Objection to form.
17     You can answer.
18     THE DEPONENT:  I would write the MTPD report
19  numbers that I would get from my dispatchers.
20     MS. WU:  Does anyone hear a phone ringing?
21     MS. COLE:  Yes.
22     MS. WU:  Officer, is it you?

27

1      THE DEPONENT:  There is one -- I can go
2  check and see.
3      (Recess taken at 11:28 a.m.)
4          (11:32 a.m.)
5      BY MS. WU:
6      Q   I think you were answering my question of
7  what typically would be in your notebook about an
8  arrest that you effected.  And you had said one thing
9  that would be in there is your -- is the MTPD report
10  number.
11      Anything else you would jot down in your
12  notebook?
13     **A   The MTPD report numbers.  Any place I was**
14  **transporting the arrestee, if it wasn't going straight**
15  **to whatever the local jurisdiction precinct was.**
16     **That's typically it.**
17     Q   And the reason you didn't have those notes
18  for this case?
19     **A   I didn't have to write them down.  We**
20  **were -- I got the report numbers over the radio and we**
21  **went, pretty much, straight to the hospital.  So I**
22  **didn't have to actually write that down.  We didn't do**

28

1  a lot.
2      Q   How is it -- how is this situation different
3  in terms of you getting the MTPD report number from
4  the radio versus a typical circumstance where you
5  would write it down?
6      MS. COLE:  Objection to form.
7      You can answer.
8      THE DEPONENT:  The difference was in the
9  duration of it.  Like from arrest to transport, it
10  didn't take very long.  So it was easy to remember
11  those numbers without having to write them down.
12     BY MS. WU:
13     Q   And by from arrest to transport do you --
14  what do you mean by from arrest to transport?
15     **A   Once you come across and say you have one**
16  **person arrested, that's when you would get your report**
17  **numbers.  So like from making that notification that I**
18  **had someone under arrest to making the transport a lot**
19  **of time didn't pass.  So I didn't have to write the**
20  **numbers down, I could actually remember them.**
21     Q   And when you say making a transport, do you
22  mean making a transport to the hospital or to the jail

29

1  or --
2      **A   Yeah.  To the hospital.**
3      Q   To the hospital.
4      And when you say that you called -- you
5  called -- I can't remember what phrase you said.  Is
6  it you call it in or how do you say you are making an
7  arrest?
8      **A   You would do it over the radio.**
9      Q   You would make the -- you would call the
10  arrest in over the radio?
11     **A   Yes.**
12     Q   Okay.  And what would you say to call it in?
13     **A   I have one -- we use a code, and that code**
14  **would be a 1095.**
15     Q   Okay.  And then when you say that over the
16  radio, 1095, what would happen next?
17     **A   The dispatcher would give you your MTP**
18  **report numbers.**
19     Q   And did this happen in this case?  You
20  called it in with a 1095 and the dispatcher gave a MTP
21  report number?
22     **A   Yes.**

30

1    Q    And do you recall receiving the report
2  number from the from the MTPD?  I mean from the
3  dispatcher?
4    **A    Yes.**
5    Q    And where were you located when you received
6  the MTP report number?
7    **A    At the Fort Totten Metro station.**
8    Q    Were you still -- had you put handcuffs on
9  Ms. Ulysse at that point?
10   **A    Yes.**
11   Q    Were you in a vehicle by that point, or were
12 you still outside of the vehicle?
13   **A    I don't remember.**
14   Q    We will go back to that.
15        Other than the notebook, do you have any
16 other paper files related to this case?
17       MS. COLE:  Objection.  Form, foundation.
18       THE DEPONENT:  No.
19       BY MS. WU:
20   Q    Are you an social media?
21       MS. COLE:  Objection.
22       He can answer.

31

1        THE DEPONENT:  Yes.
2        BY MS. WU:
3    Q    Did you -- did you make any posts about this
4  incident?
5        MS. COLE:  Objection.
6        You can answer.
7        THE DEPONENT:  No.
8        BY MS. WU:
9    Q    Do you -- have you made any posts about
10 arrests or stops that you have made in the past?
11   **A    No.**
12   Q    Have you searched your social media to see
13 if there is any posts relevant to this case?
14   **A    No.**
15   Q    Are you aware of any handwritten notes from
16 any other WMATA officer in connection with this case?
17   **A    No.**
18   Q    Are you aware of any emails from any other
19 officer that they wrote in connection with this case?
20   **A    No.**
21   Q    Are you aware of any other reports generated
22 by any other officer in connection with this case?

32

1    **A    No.**
2    Q    Where are you currently employed?
3    **A    WMATA.**
4    Q    And what's your position?
5    **A    Transit Police Officer.**
6    Q    And how long have you been a transit police
7  officer at WMATA?
8    **A    Fourteen years.**
9    Q    Have you held any other title while working
10 at WMATA?
11   **A    No.**
12   Q    Always -- always -- your title was always
13 transit police officer, including in May 2018?
14   **A    Yes.**
15   Q    Have the scope of your duties changed at all
16 between what they were in May 2018 and currently?
17   **A    No.**
18   Q    Are you still in the same district?
19   **A    Yes.**
20   Q    Do you supervise anybody?
21   **A    No.**
22   Q    And what would you describe the scope of

33

1  your duties as being in May 2018?
2    **A    A patrol officer.  Again, assigned a section**
3  **of the metro to patrol during that day.  Basically**
4  **traveling from the stations in my sector and observing**
5  **any crimes that may occur, while helping any patrons**
6  **that may need assistance.**
7    Q    And when you travel between stations, is it
8  on the metro itself or in a vehicle?
9    **A    That changes day to day.  It's depending on**
10 **what I get assigned.**
11   Q    So during roll call, you will learn if you
12 are going to be traveling via metro versus in a
13 vehicle?
14   **A    Yes.**
15   Q    Understood.
16        And who do you currently report to?
17   **A    Sergeant Cohens-Minor.**
18   Q    And who did you report to as of May 2018?
19   **A    Sergeant Muller.**
20   Q    Is that Robert -- I'm sorry.  What is his
21 first name, if you know?
22   **A    I can't think of his first name.**

34

Q   That's okay.

How long was Sergeant Muller your supervisor for?

MS. COLE:  Objection to form.

You can answer.

THE DEPONENT:  Over five years.

BY MS. WU:

Q   Do you remember what year to what year he was your supervisor?

A   No, I do not.

Q   Had he been your supervisor for a period of years prior to May 2018?

A   Yes.

Q   Before you worked for WMATA, did you hold any other law enforcement position?

A   No.

Q   And I don't need a very long summary, but if you could, just tell me what work you did prior to becoming a WMATA officer.

A   Before I became to WMATA I was in the United States Army.  And before that I worked at a pizzeria.

Q   How long were you in the army for?

35

A   Four and a half years.

Q   And straight from the army you were hired by WMATA?

A   Yes.

Q   You said that your supervisor, as of May 2018, was Sergeant Muller.  What relationship, if any, did you have to Sergeant Nadeem Al Hinawi in May 2018?

A   He was the sergeant in the same police district that I was working -- that I was part of.

Q   So would you say you reported to him?

MS. COLE:  Objection to form.

You can answer.

THE DEPONENT:  He was not my direct supervisor so I wouldn't report to him, no, but he was a sergeant at the district.

BY MS. WU:

Q   And what do you mean by direct supervisor?

A   When you say report, any issue that I would have, I would go to Sergeant Muller for them.  I wouldn't go to Sergeant Al Hinawi.

Q   I understand.

And is there some sort of squad concept as

36

well, in the districts?

A   Yes.

Q   And is there a supervisor of that squad?

A   Yes.

Q   And so who was the supervisor of your squad?

A   Sergeant Muller.

Q   And so Officer Hinawi would have had his own squad within the district?

A   Yes, Sergeant Al Hinawi would have his own squad.

Q   Understood.

Were you and Sergeant Al Hinawi ever in the same squad?

A   No.

Q   Did you and Sergeant Al Hinawi work in the same district?

A   Yes.

Q   Did you work out of the same office or station?

MS. COLE:  Objection to form.

You can answer.

THE DEPONENT:  Yes.

37

BY MS. WU:

Q   Which one?  Station or office?

A   It's the District 1 station.

Q   You both worked out of the same District 1 station?

A   Yes.

Q   And how long have -- had you worked together in the same station?  Or from when to when?

A   I'm not sure.

Q   For years?

A   A few years, maybe more than -- more than five.

Q   And a similar question to the one I asked about Sergeant Muller:  As of May 2018, had you worked together with Sergeant Al Hinawi for a number of years?

A   Yes.

Q   Did you and Sergeant Al Hinawi ever hang out outside of work hours?

A   No.

Q   Do you know Sergeant Al Hinawi's family?

A   No.

38

1    Q   When was the last time you spoke to Sergeant
2  Al Hinawi?
3    **A   I believe it was Tuesday.**
4    Q   And what was the subject of that
5  conversation?
6    MS. COLE:  Objection.
7    You can answer.
8    THE DEPONENT:  General.  Hello, how are you
9  doing?
10    BY MS. WU:
11    Q   Does Sergeant Al Hinawi still work out of
12  your same station?
13    **A   No.**
14    Q   What was the reason that -- sorry.
15    Where did you see him?
16    **A   At the District 2 station.**
17    Q   Is that where Sergeant Al Hinawi works now?
18    **A   Yes.**
19    Q   What was the purpose of you being at the
20  District 2 station?
21    **A   The District 2 station houses our shooting**
22  **range, so I had to go qualify with my weapon.  And**

39

1  **also, I gave some equipment to Sergeant Al Hinawi, a**
2  **laptop.**
3    Q   Why did you give him a laptop?
4    **A   I'm sorry?**
5    Q   Why did you give him a laptop?
6    **A   In case he needed to use it in reference to**
7  **the depositions.**
8    Q   And prior to last Tuesday, when was the last
9  time you spoke to Sergeant Al Hinawi?
10    **A   I'm not sure.**
11    Q   Other than this case, have you ever been a
12  party in any lawsuit or court proceeding either as a
13  plaintiff or a defendant?
14    MS. COLE:  Objection.
15    You can answer.
16    THE DEPONENT:  No.
17    BY MS. WU:
18    Q   Have you ever been arrested for or convicted
19  of a crime?
20    MS. COLE:  Objection.
21    You can answer.
22    THE DEPONENT:  No.

40

1    BY MS. WU:
2    Q   And you previously said that you have
3  testified in court before.  Can you describe the
4  nature of those testimonies?
5    **A   In relation to arrests I've had -- arrests**
6  **I've made and citations I've written.**
7    Q   And so for arrests, what courthouse would
8  that be in?
9    MS. COLE:  Objection to form.
10    You can answer.
11    THE DEPONENT:  Multiple -- multiple court
12  locations.
13    BY MS. WU:
14    Q   D.C. Superior?
15    **A   Yes.**
16    Q   Any others?
17    **A   Maryland and Virginia.  All three of the**
18  **jurisdictions that WMATA operates in, I have testified**
19  **in those courts.**
20    Q   And what type of courthouse or what type of
21  court would that be in?
22    **A   Depends on the citation.  Traffic citations**

41

1  **tend to be in Silver Spring and the criminal citations**
2  **tend to be in Rockville.**
3    Q   Did you say criminal citations?
4    **A   Yes.**
5    Q   What is the difference between a criminal
6  citation and I guess arrest that we had just been
7  ta king about?
8    MS. COLE:  Objection to form and foundation.
9    BY MS. WU:
10    Q   If any, if any difference.
11    **A   There is no difference.**
12    Q   Okay.  Has a court ever made findings
13  regarding the credibility of your testimony in any of
14  those cases?
15    MS. COLE:  Objection.
16    You may answer.
17    THE DEPONENT:  No.
18    BY MS. WU:
19    Q   Never made a finding either way?
20    MS. COLE:  Same objection.
21    You can answer.
22    THE DEPONENT:  No.

---

**42**

BY MS. WU:

Q   How many times have you gone to court for a criminal citation situation?

**A   I can't give you a specific number. Hundreds.**

Q   How many times have you gone through the process of a D.C. criminal citation?

**A   I can't give you a direct number. Probably hundreds of times.**

Q   Hundreds of times for D.C. criminal citation?

**A   Yes.**

Q   And how many of the D.C. criminal citations would involve fare evasion?

**A   Again, hundreds. I would -- over a span of a 14-year career, I can't give you a number of -- you know what citations were related to just fare evasion.**

Q   Would it be more than a hundred?

**A   Yes.**

Q   And how many times would you have gone through the criminal citation process for resisting arrest?

---

**43**

MS. COLE:  Objection.  Foundation.

THE DEPONENT:  I don't know.

BY MS. WU:

Q   You don't -- you don't know -- you can't recall how many arrests you have made --

I'm sorry.  Let me rephrase that.

You can't recall how many criminal citation processes you have gone through with respect to resisting arrest?

**A   No, I can't recall.**

Q   And if I said how many times have you gone through the D.C. process for resisting arrest criminal citations?

MS. COLE:  Objection.  Foundation.

THE DEPONENT:  No, I can't recall how many times.

BY MS. WU:

Q   Is it less than ten?

**A   No.**

Q   Okay.  So more than ten.

In the hundreds, again, like you said, for fare evasion?

---

**44**

MS. COLE:  Objection.  Foundation.

You can answer.

THE DEPONENT:  No.  Not in the hundreds for resisting.

BY MS. WU:

Q   Okay.  So somewhere between ten and a hundred, to the best of your recollection?

**A   Yes.**

Q   Can you explain the process of what you would do in D.C. if you had a criminal citation case after you had, you know, booked the arrest?

**A   The process for a criminal citation in D.C.? I would take a copy of my paperwork and any evidence that I would have to the building on 500 C Street.  I would give it to the receptionist at the desk.  She would take that evidence, take my paperwork.  And get my contact information and would have the attorney subpoena me if I was needed for court.**

Q   Any other part of the process?

**A   No.**

Q   And so you would have -- you would go one time down to turn over, you said, your paperwork and

---

**45**

evidence, and the next time you would typically be needed is if you go a subpoena for court you would show up at court?

Did I get that right?

**A   Yes.**

Q   And then how soon after, typically, would you go down to give your paperwork and evidence?

**A   We would get -- typically it was seven days before a -- we had until seven days before the court day was issued to the arrestee.**

**What I typically -- it's common practice to do it the very next day.**

Q   When you say that you have until seven days, are you thinking about some sort of rule or regulation?

**A   I believe it's a policy with D.C., we have to have it in at least seven days before the court date.  With our MTPD, traditionally, we will turn in our paperwork the very next day.**

Q   Since you worked at WMATA, other than this case, have you had any complaints made against you regarding your duties as a WMATA officer?

46

1      MS. COLE:  Objection.

2      To the extent that you are seeking by this

3  question, Counsel, any information beyond which the

4  parties have agreed and represent was an agreement in

5  terms of limitation on the scope to similar

6  activities, such as the work claimed here for similar

7  claims, unlawful arrests, excessive force, assault and

8  battery, I object as beyond the scope of what the

9  parties had agreed to and what was represented to the

10  court.

11      MS. WU:  Are you -- may he answer my

12  question?

13      MS. COLE:  I'm going to let him.

14      I'm making a representation that it's beyond

15  the scope of what to -- to court.

16      MS. WU:  We can deal with that off the

17  record.

18      I'm going to ask the question of Officer

19  Stokes again, just to be clear.

20      BY MS. WU:

21      Q    Since you have worked at WMATA, other than

22  this case, have you had any complaints made against

47

1  you regarding your duties as a WMATA officer?

2      

19      BY MS. WU:

20      Q    Other than the complaint related to an

21  individual

48

1  WMATA officer?

2      MS. COLE:  Objection.  You may answer.

3      THE DEPONENT:  No.

4      BY MS. WU:

5      Q    And my question was not limited to citizen

6  complaints.

7      Have you had any other complaints, period,

8  regarding your duties as a WMATA officer?

9      MS. COLE:  Objection.

10      You can answer.

11      THE DEPONENT:  No.

12      BY MS. WU:

13

49

1      You may answer.

2      THE DEPONENT:  No.

3      BY MS. WU:

4      Q    And who is -- and were you involved in the

5  arrest of Huguette Ulysse on the morning of May 21st,

6  2018?

7      A    Yes.

8      Q    And what was your role?

9      MS. COLE:  Objection to form.

10      You may answer.

11      THE DEPONENT:  I was the arresting officer.

12      BY MS. WU:

13      Q    So I'm going to ask you a lot of questions

14  about the morning of May 21st, 2018, when Ms. Ulysse

15  was arrested.

16      Why don't we just start with you giving me a

17  run down of the circumstances leading to her arrest?

18      MS. COLE:  Objection to form.

19      You may answer.

20      THE DEPONENT:  I observed Ms. Ulysse,

21  surveyed by exiting the station by following closely

22  behind the patron that was in front of her.  I went to

**50**

1  stop Ms. Ulysse, asked to see her Smart-Trip card.
2  She said no, started to wa k away. I grabbed
3  Ms. Ulysse by the arm. She resisted. She was
4  informed she was under arrest and then she was
5  arrested.
6      Transported to Providence Hospital and then
7  transported to 4th District for processing.
8      Q   Anything else?
9      **A   No.**
10     Q   Okay. All in all, what type of time elapsed
11  between you first observing Ms. Ulysse and her being
12  transported to the 4th District?
13     MS. COLE: Objection.
14  You may answer.
15     THE DEPONENT: Maybe a little more than
16  three hours.
17     BY MS. WU:
18     Q   And what was Ms. Ulysse charged with?
19     **A   Fare evasion and resisting arrest.**
20     Q   So you were the arresting officer of
21  Ms. Ulysse on charges of fare evasion and resisting
22  arrest?

**51**

1      **A   Yes.**
2      Q   At what point during the encounter that you
3  just described do you contend that you had probable
4  cause to arrest Ms. Ulysse?
5      **A   Once I --**
6      MS. COLE: Objection to form.
7  You can answer.
8      THE DEPONENT: Once Ms. Ulysse exit the
9  station without paying the fare.
10     BY MS. WU:
11     Q   You had probable cause to arrest Ms. Ulysse
12  once she exited the station without paying for her
13  fare?
14     **A   Yes.**
15     Q   And when you say once she exited the
16  station, can you be a little bit more specific? Do
17  you mean exited the entire Fort Totten metro station
18  or what do you mean?
19     **A   Once she passed through the fare gates, I --**
20  **following closely behind the person in front of her,**
21  **without paying the fare.**
22     Q   Officer Stokes, would you mind just

**52**

1  adjusting the camera on your laptop so I can see the
2  entirety of your face?
3      **A   I'm not sure where the microphone was that,**
4  **so I was trying to clear up -- okay.**
5      **Can you still hear me clearly?**
6      Q   I can hear you very clearly?
7      **A   Okay.**
8      Q   Thank you. Maybe just adjust it down a
9  little bit more so I can see your mouth.
10     I appreciate it.
11     So in terms of where -- you know,
12  technically, after she exited the turnstyles she is
13  still in the station. But when you say you had
14  probable cause once she left the station, do you mean
15  once she -- as soon as she exited the turnstyles?
16     **A   Once she moved from the pay side to the**
17  **unpaid side without paying the fare.**
18     Q   And what was the probable cause that you had
19  once she moved from the pay -- sorry -- the unpaid --
20  sorry -- once she moved passed the turnstyle?
21     **A   I'm sorry. Can you say that again?**
22     Q   Yes. What is your basis for believing you

**53**

1  had probable cause to arrest as soon as Ms. Ulysse
2  exited the turnstyle?
3      **A   Once I observed her pass through the gates**
4  **by following the lady in front of her without paying**
5  **the fare, paying the established fare.**
6      Q   Anything else?
7      **A   No.**
8      Q   When you first approached Ms. Ulysse, did
9  you do it as an arrest?
10     **A   No.**
11     Q   Did you do it as a voluntary contact?
12     **A   No.**
13     Q   Do you -- what did you do it as?
14     MS. COLE: Objection. Asked and answered.
15  You may answer again.
16     THE DEPONENT: I did it as a stop for the
17  probable cause I had for the fare evasion.
18     BY MS. WU:
19     Q   And when you are coming towards me to speak
20  into the microphone I'm losing your face again. So,
21  if you could, just try to keep your face stationary.
22  That would be helpful. Thank you.

54

1    Previously you testified that -- you said
2  that she was informed that she was under arrest.  Just
3  for the record, who informed her that she was under
4  arrest?
5    **A   I did.**
6    Q    And when did you inform her that she was
7  under arrest?
8    **A   Once she walked away from the stop and I**
9  **grabbed her by the arm.**
10    Q    Did you inform her she was under arrest
11  before you grabbed her by the arm?
12    **A   No.**
13    Q    Did you inform her she was under arrest when
14  you were on the ground?
15    **A   No.**
16    Q    So you informed her that she was under
17  arrest some point after you grabbed her arm and some
18  time before you wound up on the ground?
19    **A   Yes.  Before she pulled us to the ground I**
20  **informed her she was under arrest.**
21    Q    And what words did you use to inform her she
22  was under arrest?

55

1    **A   "You are under arrest".**
2    Q    Anything else?
3    **A   No.**
4    Q    So then I will just walk through it a little
5  bit more slowly.
6    The first question I have is your
7  justification for stopping Ms. Ulysse.  If I
8  understand your testimony previously, your
9  justification for stopping -- for stopping Ulysse was
10  that you observed her walking closely behind someone
11  through the turnstile.
12    Is there any other reason that you stopped
13  Ms. Ulysse?
14    MS. COLE:  Objection.  Foundation.
15    You may answer.
16    THE DEPONENT:  I observed Ms. Ulysse exit
17  the station without paying the fare by following
18  closely behind the person that was in front of her,
19  and that's when I went to stop her.
20    BY MS. WU:
21    Q    Yeah.  So my question -- I think it's
22  getting to the same thing but it's a little different,

56

1  which is:  What are all the reasons that you stopped
2  Ms. Ulysse?
3    MS. COLE:  Objection to form.
4    You may answer.
5    THE DEPONENT:  I just observed Ms. Ulysse
6  commit fare evasion by not paying the fare as she
7  exited the station.
8    BY MS. WU:
9    Q    Any other reasons for stopping her?
10    **A   No.**
11    Q    And you said previously that when you did
12  stop her, it was an investigative stop.  Why was it
13  not in an arrest posture?
14    MS. COLE:  Objection.  Foundation.
15    You may answer.
16    THE DEPONENT:  With fare evasion, I have the
17  discretion to write a citation instead of going
18  straight to the arrest.  Part of that process is
19  gathering information.
20    BY MS. WU:
21    Q    Part of what process is gathering
22  information?

57

1    **A   The investigative process, I have to gather**
2  **certain information because I have the option of**
3  **writing a citation instead of making an arrest.**
4    Q    So part of your consideration or your
5  discretion between writing a citation or arrest, part
6  of that process is you gathering more investigative
7  information.
8    Is that correct?
9    **A   Yes.**
10    Q    Okay.  And where -- where -- how do you know
11  that part of the process for deciding whether or not
12  to arrest versus write a citation is to gather
13  investigative information?
14    MS. COLE:  Objection.  Form and foundation.
15    You can answer.
16    THE DEPONENT:  There's certain information
17  that's required for the citation.  I would need,
18  again, name, date of birth information, and I would
19  also need the information from the Smart-Trip card.
20    BY MS. WU:
21    Q    And I will try to rephrase my question.  My
22  question is more about sort of how you understand this

**58**

to be the case.

How do you understand that part of the process for you as deciding between arresting or issuing a citation is investigation?

MS. COLE: Objection to form.

You can answer.

BY MS. WU:

Q   Is it a policy, is it a training, is it a custom?

**A   It is covered by the MTPD arrest procedures general order.**

Q   And what does it say in the general order?

**A   I can't remember the -- verbatim.**

Q   If you can, just summarize what you are thinking about so we can try to locate it.

**A   The general order?**

Q   No.  The section of the general order that you are referring to when I ask you what is your basis for thinking that -- you know, when analyzing whether or not to arrest versus issue a ticket, part of the process is investigative.

MS. COLE: Objection.  Form and foundation.

**59**

You can answer.

THE DEPONENT: Not quite sure I understand that question.  It seems like you are asking me what -- what's the exact, I guess, paragraph or location inside of the said general order.  I can't recall that from memory, like where exactly is that located inside that general order.

BY MS. WU:

Q   Even if you can't locate that general paragraph, could you summarize what you are referring to?

Officer, I'm going to ask you to lean back a little bit more or move the computer a bit.

**A   I don't know.  There must be a disconnect. I don't really understand what you are asking me.**

Q   That's fine.  So let me back up.

When you have probable cause to arrest someone for fare evasion, is it true that you can take one of three steps:  You can arrest them, you can issue a citation or you could do nothing at all, you could let them go?

Is that true?

**60**

MS. COLE: Objection to form.

You can answer.

THE DEPONENT: Well, doing nothing is not one of the possibilities that I have.  I have to do something.  I have given the options.  In order to -- I can write a citation or do the arrest, but doing nothing is not one of those options.

BY MS. WU:

Q   Okay.  So let's start with the fact that doing nothing is not one of those options.  How do you know that?  What are you referring to when you say that?

**A   D.C. Code.  By law, in the District of Columbia, as a police officer, I must take action.**

Q   Is there a provision in the D.C. Code that says you must take action once you have seen -- you have seen a crime of fare evasion?

MS. COLE: Objection to form.

You can answer.

THE DEPONENT: It's for any crime.  It's not lock -- specifically for fare evasion.  If I see a crime in my presence in the District of Columbia, I

**61**

have a duty to act.

BY MS. WU:

Q   Okay.  And sitting here today, do you know what portion of the D.C. Code that is?

**A   I don't know the exact Code number, no.**

Q   That's okay.  If you were to -- if you were to look at the D.C. code, would you be able to find it for me later?

**A   Yes.**

Q   Okay.  I'm going to ask you to step back a little bit again.

Other than the portion of the D.C. Code, have you been trained that if you see a crime being committed you are obligated to either, you know, arrest or issue a citation?

MS. COLE: Objection to form.

You may answer.

THE DEPONENT: As a police officer, if a crime happens then I have to do something.  I have to take action in some way.

BY MS. WU:

Q   I understand that's what you are saying is

**[Top-left column — page 62]**

■
■ ▬▬▬▬▬▬▬▬▬
■ ▬▬▬▬▬▬▬▬▬
■ ▬▬▬▬▬▬▬▬▬
■ ▬▬▬▬▬▬
5       **A   Yes.**
6       Q   And which trainings?
7       **A   We do yearly MRI training that we review**
8   **laws in the different jurisdictions that we work in,**
9   **so it would be yearly.**
10      Q   Would it be in written material given in the
11  MRI trainings?
12      **A   Yes.**
13      Q   Okay.  And by written material, what do
14  you -- what type of writ in material do you get at
15  your MRI trainings?
16      **A   We get PowerPoint presentations.**
17      Q   And you get copies of the PowerPoint
18  presentations, slides to take home?
19      **A   Not all the time, no.  Sometimes it's a**
20  **review, classroom review.  We don't get the PowerPoint**
21  **presentations to take with us, no.**
22      Q   Understood.

63

1       Any other materials that you know of,
2   written training materials, that would have covered
3   the rule that if you see a crime happening you have to
4   either arrest or issue a ticket citation?
5       **A   Not that I can recall, no.**
6       Q   And who would have those PowerPoint slides?
7   Would it be the training division?
8       MS. COLE:  Objection to form and foundation.
9   You can answer.
10      THE DEPONENT:  I don't know.
11      BY MS. WU:
12      Q   But you would -- you wouldn't have a copy of
13  those slides, would you?
14      So we have talked about that training, we
15  have covered this, we talked about the D.C. Cobalt
16  covers -- MPD -- I'm sorry, MTPD written policy and
17  protocol that would say that if you see a crime taking
18  place you would have to either arrest or issue a
19  ticket.
20      MS. COLE:  Objection to form.
21      You can answer.
22      THE DEPONENT:  Not that I can recall.

**[Top-right column — page 64]**

64

1       BY MS. WU:
2       Q   Okay.  I guess, taking a step back on to
3   trainings, did you say there are -- is it a MIR
4   training every year?
5       **A   Yes.**
6       Q   And what does MIR stand for?
7       **A   Mandatory In-service Review.**
8       Q   Okay.  And what is the requirement as to a
9   patrol officer pleading MIR?
10      **A   Sorry.  Can you say that again?**
11      Q   Yeah.  What type of requirement does an
12  officer have with respect to the MIR?
13      **A   We have a --**
14      MS. COLE:  When you say -- objection for a
15  second.
16      The term of art, just so you know, Counsel,
17  is M-I-R.  "Mir" is a little confusing.
18      MS. WU:  I'm sorry, I was trying to -- MIR
19  is helpful.
20      BY MS. WU:
21      Q   So let me just rephrase the question, which
22  is:  What obligation does a patrol officer have

**[Bottom-right column — page 65]**

65

1   vis-a-vis doing MIR trainings?
2       MS. COLE:  Objection.
3       You may answer.
4       THE DEPONENT:  We attend -- it's yearly.  We
5   do it once a year.
6       BY MS. WU:
7       Q   And who coordinates it?
8       **A   I'm not sure.  Maybe the training division.**
9       Q   Do you get to select the trainings you
10  attend as part of the MIR?
11      **A   No.**
12      Q   Who selects it for you?
13      **A   I don't know.**
14      Q   Okay.  And how many hours does a patrol
15  officer have to do of MIR every year?
16      **A   MIR lasts four days, so it's usually four**
17  **eight-hour days.**
18      Q   And when you said that as part of your MIR
19  training you recall being trained on the -- you know,
20  that if you see a crime being committed you have to
21  either issue a citation or an arrest.
22      Do you recall the last year in which you

66

1  attended a training at MIR in which they said that?

2       MS. COLE:  Objection.  Form and foundation.

3  Improper characterization.

4       You may answer.

5       THE DEPONENT:  Can you repeat the question?

6



BY MS. WU:

10     Q   Sure.  And I am going to ask you to take

11  a -- you know, maybe move your chair a little bit back

12  so I can see your face.

13     My question was simply a summary of where we

14  had left it, which is that if you see a crime taking

15  place, you have to either issue a citation or effect

16  an arrest.

17     Did I summarize your prior testimony

18  correctly?

19  **A   In the District of Columbia, if a crime**

20  **occurs, I'm required to take action.  We are talking**

21  **about, in this case, a fare evasion.  I have an option**

22  **in fare evasion either to write a citation or to make**

68

1  an arrest.

2     Q   And what is -- how do you decide between

3  making an arrest and issuing a citation?

4  **A   During the investigative process if the**

5  **individual stops, is cooperative, provides the**

6  **information I need to fill out the citation, I will**

7  **issue the citation.**

8     Q   And if the individual is not cooperative?

9  **A   Well, they take the option of giving a**

10  **citation off the table, so my only other option at**

11  **that point is to arrest.**

12     Q   So what you just summarized for me, that

13  understanding, where is your basis for knowing that?

14     MS. COLE:  Objection to form.

15     You may answer.

16     THE DEPONENT:  I thought I answered this

17  one.

18     It is covered with the MTPD training, and

19  also covered in our general orders, I believe, the one

20  in relationship to making an arrest.

21     BY MS. WU:

22     Q   I just want to make sure we are on the same

69

1  page.  You did say that those were some of the

2  sources.  But my question was a little different,

3  which is what just described, which is that, you make,

4  you know, you have an investigative process and if the

5  individual is cooperative, then you can issue a

6  citation.  If the individual is not cooperative, then

7  you have no choice but to arrest.

8     Where -- is that written somewhere that you

9  are aware of?

10     MS. COLE:  Objection to form.

11     You may answer.

12     THE DEPONENT:  My apologies.  I feel as

13  though I answered this already.  I don't know any

14  other way to explain it to you.

15     Can you rephrase it in some way?

16     BY MS. WU:

17     Q   Have you ever seen written anywhere the

18  policy that if a subject is cooperative, you issue a

19  citation.  If a subject is not cooperative, you

20  arrest?

21     MS. COLE:  Objection to form.

22     You can answer.

70

BY MS. WU:

Q    So this would be yes or no:  Have you ever seen something written that says that?

A    I believe it's covered in our MTPD general orders.

Q    And the general order you think would state that is the arrest one?

A    I believe so.

Q    Okay.  Any others?  Any other general orders?

A    None that I can think of, no.

Q    And any other training materials?

A    That I can think of, no.

Q    All right.  Any written manual or policy?

A    No.

Q    Okay.  Earlier you used the term investigative process, and you said you need to have certain information to write a citation.  What information do you need to write a citation?

A    We would need a name, a date of birth, and an address.

Q    Okay.  Is there any other information you

71

need to collect as part of the investigative process that we have been descr bing in order to come to a decision on what to do with a fare evader, a fare evasion crime that you have seen?

MS. COLE:  Objection to form.

But you can answer.

THE DEPONENT:  In relation to fare evasion, if the person has a Smart-Trip card we would collect the Smart-Trip card information also.  The name, date of birth, address, Smart-Trip; that would be enough to issue a citation.

BY MS. WU:

Q    Just for the record.  I think I know but just let me know.

A    On the back of the SmartTrip card there's serial numbers.  We could use the serial number also.

Q    So as part of the investigative process to determine whether or not to issue a citation or to arrest, do you just need the collect that, the serial number of the SmartTrip card or do you need to run it or do anything with it?

MS. COLE:  Objection to form.

72

You may answer.

THE DEPONENT:  At the point of issuing the citation, all we would need is the serial numbers.

BY MS. WU:

Q    Okay.  So in order to issue a citation you don't have to run the serial number; is that correct?

A    Correct.

Q    In order to effect an arrest, do you need to run the serial number?

MS. COLE:  Objection.  Foundation.

BY MS. WU:

Q    You may answer.

A    No.

Q    Okay.  And what is -- where -- your testimony is that you don't need to run the serial number to issue a citation or to make an arrest; have you seen that written somewhere, like a policy or a training?

MS. COLE:  Objection.  Foundation.

You can answer.

THE DEPONENT:  No.

73

BY MS. WU:

Q    You have never seen that?

A    No.

Q    So where does your understanding that you don't need to run the SmartTrip serial number come from?

MS. COLE:  Objection.  Foundation.

You can answer.

THE DEPONENT:  Well, once you observe the fare evasion, you don't need to run the serial numbers in order to issue a citation for fare evasion.  Witnessing it is probable cause enough to issue the citation.

BY MS. WU:

Q    And my question is has anyone told you that?  You said you didn't see it written, so has anyone told you that?

MS. COLE:  Objection.  Foundation.

You can answer.

THE DEPONENT:  My training, MTPD training.

BY MS. WU:

Q    And the MIR training or the basic training?

74

1      **A   It would have been covered in both.**
2      Q    This would be orally stated to you in your
3   basic training and in MIR trainings?
4      MS. COLE:  Objection to form.
5      You can answer.
6      THE DEPONENT:  Yes.
7      BY MS. WU:
8      Q    When was the last time in an MIR training it
9   was verbally stated to you that you don't need to run
10  the serial number in order to effect an arrest or a
11  citation for fare evasion?
12     MS. COLE:  Objection.  Form, foundation and
13  proper characterization of facts.
14     You can go ahead.
15     THE DEPONENT:  I'm sorry.  Can you repeat
16  that question?
17     BY MS. WU:
18     Q    Yes.  When was the last time in an MIR
19  training that you recall attending were you verbally
20  told what we just discussed, which was that you do not
21  need to run a serial number in order to issue a
22  citation or to arrest someone because probable cause

75

1   of watching it is enough?
2      MS. COLE:  Objection.  Form.
3      You may answer.
4      THE DEPONENT:  I can't give you a date on
5   the exact last time that training would have been at
6   MIR.  I just can't.
7      BY MS. WU:
8      Q    Okay.  Do you recall who said it?
9      MS. COLE:  Objection.  Form, foundation.
10     You may answer.
11     THE DEPONENT:  No.
12     BY MS. WU:
13     Q    Do you recall who said it at your basic
14  training?  I know that was a long time ago?
15     MS. COLE:  Objection.  Form, foundation.
16     You may answer.
17     THE DEPONENT:  No.
18     BY MS. WU:
19     Q    You said that it would be sufficient to have
20  observed someone walking closely behind someone
21  without paying the established fare.  So I want to
22  dive into that a little bit more.

76

1      Is there a term for somebody walking closely
2   behind someone?
3      **A   Describe the name or the term used for fare**
4   **evasion?  When we see someone follow someone closely?**
5      Q    Yes.
6      **A   Okay.  Refer to it as a piggyback.**
7      Q    And is this a common phrase that officers
8   use?
9      **A   Yes.**
10     Q    And what is -- can you tell me what
11  piggybacking is?
12     **A   It's when -- it's when someone exits though**
13  **the fare gate following closely behind the person**
14  **that's in front of them without processing their card,**
15  **and actually exiting out on the card on the person in**
16  **front of them.  Exiting or entering on the card of the**
17  **person in front of them.**
18     Q    Is there a definition of how close the
19  person needs to be in order to be piggybacking?
20     **A   It's close enough that both parties can exit**
21  **the gate -- exit or enter through the gate on one**
22  **cycle, as in one opening and closing of the barriers.**

77

1      Q    And I guess my question is:  Is there an
2   actual -- you know, within inches within feet, what is
3   the definition of piggybacking?
4      MS. COLE:  Objection.  Asked and answered.
5      You can answer.
6      THE DEPONENT:  Yeah.  There is no number as
7   in feet or distance.  Just close enough that both
8   parties can exist on one cycle of the barriers opening
9   and closing.
10     BY MS. WU:
11     Q    And how are you able to tell -- if there is
12  no magic number of how close they are, how are you
13  able to tell that two people are going in the same
14  cycle?
15     **A   By observation.  As in you can see one**
16  **person tap the card on the target, the barriers would**
17  **open, two people exit out before the barriers would**
18  **open and close on a SmartTrip card, just tap as the**
19  **person passes through.**
20     **So if the barriers open on one card, two**
21  **people pass through, and you don't see the barriers**
22  **cycle for second person that can be indicative of a**

78

1 fare evasion, of piggyback.

2 Q So I'm also a customer of WMATA and I have a

3 little bit of experience on this, but I want to ask

4 you about it.

5 Is it possible for the barriers to stay open

6 between two successful swipes of a fare card?

7 MS. COLE: Objection to form.

8 You may answer.

9 THE DEPONENT: That is a possibility. That

10 didn't happen in this case, but that is a possibility.

11 BY MS. WU:

12 Q Was it a possibility as of May 2018, though?

13 MS. COLE: Objection to form and foundation.

14 You can answer.

15 THE DEPONENT: No.

16 BY MS. WU:

17 Q It was not a possibility as of May 2018 for

18 the -- for two successful swipes to occur without the

19 fare gates closing in between? Or are you saying it

20 wasn't a possibility for Ms. Ulysse?

21 A The wasn't a possibility in this case, with

22 Ms. Ulysse.

79

1 Q Okay. But as of May 2018, the same thing is

2 true as it is now, which it is a possibility in

3 general for the fare gates to not close in between two

4 cycles of smart card transaction?

5 MS. COLE: Objection to form.

6 You may answer.

7 THE DEPONENT: Anything is a possibility.

8 Again, like it wasn't a possibility in this case.

9 BY MS. WU:

10 Q So let's focus on this case: How are you so

11 sure that is not what happened with Ms. Ulysse?

12 And I want to focus you on what you were

13 observing, you know, as -- prior to the initial

14 approach, not what you knew later.

15 A During my observation, it wasn't a very --

16 it wasn't a very busy rush hour crowd. There was

17 only -- they were only two individuals in that fare

18 gate at the time that this happened.

19 And, again, I observed when the lady in

20 front of Ms. Ulysse, she tapped -- she waved her hand

21 over the gate, tapped the gate, the gates opened for

22 her. And then I observed Ms. Ulysse move her hand

80

1 over top of the target. Also, the gates didn't cycle.

2 She exited out. The gates closed. I mean by them

3 just being the only two people there, it made it

4 easier to observe and see what happened.

5 Q So apart from what you just testified, is

6 there any other reason you believe that it is not a

7 poss bility -- you believed that it was not a

8 poss bility that there were two successful cycles

9 without the fare gates closing in between?

10 A In this case, no, that was not a

11 possibility.

12 Q My question is different: Other than what

13 you just, which is that you saw two people going

14 through the gate, the same turnstyle, and it not being

15 very busy otherwise, and that you saw the first person

16 successfully swipe, is there any other reason behind

17 your conclusion, your initial conclusion, that there

18 was no possibility that there were two successful

19 swipes of SmartTrip cards without fare gates closing

20 in between?

21 MS. COLE: Objection. Form. Foundation.

22 Multiple questions.

81

1 Go ahead.

2 THE DEPONENT: From my observation -- the

3 possibility of two fare cards being used successfully

4 in this situation, in this case? No.

5 BY MS. WU:

6 Q My question is: Give me all the reasons

7 that, from your observation, the answer is no.

8 MS. COLE: Objection to form. You may

9 answer.

10 THE DEPONENT: Yes. My answer is no. There

11 was no possibility of two cards being successfully

12 used.

13 BY MS. WU:

14 Q I understand that you -- I understand your

15 testimony that there was no poss bility of two

16 successful cards being used without the gates closing

17 in between. I understand that's your testimony. I

18 want you to give me all the reasons your observation

19 led you to that conclusion.

20 A The -- again, the fare gates operating with

21 the first card, stayed open, two patrons coming out.

22 The gate didn't cycle in between the two. Both made

82

¹ it out under one cycle.

²      I don't know what else you are -- probably I
³ don't understand your question. Don't know any other
⁴ way to explain that to you.

⁵      BY MS. WU:

⁶      Q   Okay. Any -- other than what you just said,
⁷ is there any other reason you believed that there was
⁸ no way Ms. Ulysse's card was -- Ms. Ulysse had --
⁹ was -- had a successful swipe but just -- there was no
¹⁰ fare gate closed in between?

¹¹      MS. COLE:  Objection.

¹²      BY MS. WU:

¹³      Q   I'm just trying to get the universe of your
¹⁴ observations that led you to believe that there is no
¹⁵ possibility that you are sure of, sitting here today.

¹⁶      MS. COLE:  Objection to form.

¹⁷      You may answer.

¹⁸      THE DEPONENT:  No.

¹⁹      BY MS. WU:

²⁰      Q   Okay.

²¹      (Recess taken at 12:43 p.m.)

²²                          (12:53 p.m.)

83

¹      BY MS. WU:

²      Q   Officer Stokes, during the break did you
³ communicate with anybody?

⁴      A   No.

⁵      Q   Officer Stokes, before the break we were
⁶ talking about the definition of piggybacking. And my
⁷ question to you is: Have you ever seen the definition
⁸ of piggybacking written anywhere?

⁹      A   Yes.

¹⁰      Q   Where?

¹¹      A   I can't recall the first time I've seen the
¹² definition of piggybacking, but it would have been
¹³ during my initial FTL phase of training in the Metro
¹⁴ Transit Police.

¹⁵      Q   Since then, have you had occasion to see the
¹⁶ definition of piggybacking written anywhere else?

¹⁷      A   Yes.

¹⁸      Q   Where?

¹⁹      A   The last week.

²⁰      Q   Where. Where did you see it last week?

²¹      A   It would have been during a depo prep with
²² my lawyer.

84

¹      Q   Okay. I don't want to hear any
² communications you had with your lawyer.

³      Do you recall where you saw a definition of
⁴ piggybacking? What type of document?

⁵      A   I guess I can't answer it because that
⁶ document is in relation to when I spoke to my lawyer.

⁷      Q   Well, it's not, unless it is a
⁸ correspondence that the lawyer wrote to you. Is that
⁹ what we are talking about? Your lawyer wrote you
¹⁰ something, or are you saying that you reviewed a
¹¹ document that your lawyer gave you?

¹²      A   Correct.

¹³      Q   The latter?

¹⁴      A   The latter.

¹⁵      Q   Okay. Do you, sitting here, do you remember
¹⁶ what that document looked like? What type of document
¹⁷ that was?

¹⁸      A   No.

¹⁹      Q   Okay. Any other places where you've had
²⁰ occasion to see a definition of piggybacking in
²¹ writing?

²²      A   No.

85

¹      Q   Okay. And in the occasions you have seen
² the definition of piggybacking in writing, can you
³ summarize again what you have seen as the definition
⁴ of piggybacking?

⁵      A   So when a person exits or enters through the
⁶ fare gates following closely behind the person in
⁷ front of them without paying the established fare.

⁸      Q   Now turning specifically to your
⁹ observations of Ms. Ulysse, how far away from the
¹⁰ turnstyle were you when you made those observations?

¹¹      A   I know I was standing at the entrance to the
¹² station. I don't know exactly how far that is from
¹³ the fare gates, though.

¹⁴      Q   Were you able to, from where you were, touch
¹⁵ the fare gate that Ms. Ulysse passed through?

¹⁶      A   No.

¹⁷      Q   How many steps would you have needed to take
¹⁸ in order to touch the fare gate that Ms. Ulysse passed
¹⁹ through?

²⁰      A   I don't know.

²¹      Q   So would you say you were about 5 feet away
²² from the turnstyle that Ms. Ulysse passed through?

86

1      A   I --
2      Q   We can say approximate.
3      A   **Approximately 5 feet away.  No.**
4      Q   What would you approximate it as?
5      A   **From the entrance to the station to the fare**
6   **gate?  Actually, I don't know, ma'am.  I can't give an**
7   **approximate on that.**
8      Q   When I said 5 feet and you said no, was my
9   estimate too small or too big?
10     A   **It was too small.**
11     Q   So you think you were greater than 5 feet
12  away from the turnstyle that Ms. Ulysse exited from?
13     A   **Yes.**
14     Q   Okay.  And were you able to see -- and so
15  you weren't able to see any reading on the turnstyle
16  as to whether or not a SmartTrip card was processed;
17  is that correct?
18     A   **Yes.**
19     Q   Did you see whether she swiped her card at
20  the turnstyle?
21     A   **No.**
22        MS. COLE:  Objection to form.

87

1         You may answer.
2         THE DEPONENT:  No.
3         BY MS. WU:
4      Q   No, you didn't see or no she did not swipe?
5      A   **What happens is they place their hand on**
6   **SmartTrip target.  I don't know if she had a SmartTrip**
7   **card in her hand or not.  I just saw her hand do the**
8   **motion of over the target.**
9      Q   So you were not able -- you are not able to
10  say one way or the other whether or not she had a
11  SmartTrip card in her hand; is that correct?
12     A   **Correct.**
13     Q   Did you suspect that she did not have a
14  SmartTrip card in her hand?
15     A   **No.**
16     Q   You didn't have a suspicion one way or the
17  other on whether she said a SmartTrip card in her
18  hand?
19     A   **Correct.**
20     Q   What was the distance between her and the
21  person preceding her in the turnstyle?
22        MS. COLE:  Objection.  Asked and answered.

88

1         You can answer again.
2         THE DEPONENT:  She was directly behind her,
3   inside the fare gate at the same time.
4         BY MS. WU:
5      Q   And what distance would you say she was
6   directly behind her, inches?
7         MS. COLE:  Same objection.
8         You may answer.
9         THE DEPONENT:  Maybe a foot.
10        BY MS. WU:
11     Q   And so when you say directly behind her, do
12  you mean within a foot?  What do you mean by directly?
13     A   **Within a foot.**
14     Q   Within a foot.  But again, that is not the
15  definition of piggybacking.  You are just saying you
16  saw -- you think she was within a foot of the person
17  in front of her?
18        MS. COLE:  Objection.  Form.
19        You may answer.
20        THE DEPONENT:  Yes.
21        BY MS. WU:
22     Q   From where you were standing, were you able

89

1   to see whether or not the fare gates closed between
2   Ms. Ulysse and the person in front of her?
3      A   **Yes.**
4      Q   And did they?
5      A   **No.**
6      Q   Sitting here now, do you know one way or the
7   other whether Ms. Ulysse swipe registered on the
8   turnstyle?
9      A   **Yes.**
10     Q   And what is the answer?
11     A   **I'm sorry.  Did her card swipe through the**
12  **turnstyle?  She tapped a SmartTrip card but did not**
13  **have the funds necessary to open up the gates.**
14     Q   Right.  So my question is, and I think
15  you've answered it, do you know now whether her swipe
16  registered on the turnstyle?
17        MS. COLE:  Objection to the form and
18  foundation.
19        You may answer.
20        BY MS. WU:
21     Q   I'm asking whether or not he knew.
22     A   **I'm sorry.  What did you say?**

90

1    Q   Do you know, sitting here right now, whether
2  or not Ms. Ulysse's swipe registered on the turnstyle?
3        MS. COLE:  Objection to form and foundation.
4  You may answer.
5        THE DEPONENT:  Yes.
6        BY MS. WU:
7    Q   You do know?
8    A   Yes.
9    Q   And did it?
10       MS. COLE:  Same objection.
11  You may answer.
12       THE DEPONENT:  Her SmartTrip card did read
13  on the gate but did not have enough money to open the
14  gate, to exit the gate.
15       BY MS. WU:
16   Q   Step back a little bit:  How did you know
17  that it did read on the gate but that she did not have
18  enough funds?  Where did you get that information?
19   A   After the -- I got the information from the
20  back of her SmartTrip card.  That -- a copy of it
21  was -- I needed it to give it to -- to turn in with my
22  paperwork, my arrest paperwork, a copy of her

91

1  SmartTrip history.
2    Q   When was the first time that you found out
3  that Mr. Ulysse's SmartTrip was read on the gate but
4  there was no money in it?  Who gave you -- when you
5  said who -- someone gave you a copy?
6        MS. COLE:  Objection.  Foundation.
7  Mischaracterization.
8        You can answer.
9        THE DEPONENT:  A copy of the smart trip
10  card's history.  Is that what you're asking about?
11       BY MS. WU:
12   Q   A copy of the SmartTrip card.  Did you say a
13  copy of the SmartTrip card history was given to you a
14  day after?
15   A   Yes.  The SmartTrip card's history.
16   Q   Okay.  Did you ever receive a photocopy of
17  the SmartTrip card itself?
18   A   I took a copy of the SmartTrip card.
19   Q   Did you take a photo of the SmartTrip card?
20   A   I took a photo of Mr. Ulysse's SmartTrip
21  card, yes.
22   Q   And when did you take the photo of

92

1  Ms. Ulysse's SmartTrip card?
2    A   At the 4th District precinct when I was
3  processing the arrest.
4    Q   Where -- how did you take a photo?  With
5  what did you take a photo?
6    A   With my work phone, my WMATA phone.  My work
7  phone.
8    Q   Is that the same phone you have right now?
9    A   No.
10   Q   And which phone -- when did you change
11  phones?
12   A   Changed phones last week.
13   Q   The photo that you took on your phone, did
14  you send that to anybody?
15   A   To my lawyer, yes.
16   Q   Did you send that to anybody else?
17   A   To Sergeant Muller.
18   Q   And how did you send that to Sergeant
19  Muller?
20   A   Through text on the work phone.
21   Q   You sent the photo via text to Sergeant
22  Muller's work phone?

93

1    A   Yes.
2    Q   And when -- did you also send that text at
3  the -- when you were in the 4th District?
4    A   Yes.
5    Q   So you took a photo of it and you sent it to
6  Sergeant Muller instantaneously or at some point?
7    A   It was --
8        THE REPORTER:  May you repeat that question,
9  please?  My -- the connection was a little messed up.
10  I didn't catch that question, I'm so sorry.
11       BY MS. WU:
12   Q   It's okay.  I will try.
13       What, if anything, did you do between you
14  sending to Sergeant Muller and sending it to your
15  counsel?
16       THE REPORTER:  Okay.  Perfect.
17       THE DEPONENT:  Well --
18       BY MS. WU:
19   Q   And why did you take --
20   A   I asked if Ms. Ulysse had a SmartTrip card.
21  I told him yes and he asked for a copy.
22   Q   This was a phone call that you had on your

94

1  work phone?
2      A   Yes.
3      Q   How did you retrieve the SmartTrip card in
4  order to take the photo?
5      A   It was taken from Ms. Ulysse on the search
6  after the arrest.
7      Q   It was taken from Ms. Ulysse.  Okay.
8          When you retrieved the SmartTrip card in
9  order to take the photo, who did you retrieve it from?
10         MS. COLE:  Objection to form, foundation.
11  You can answer.
12         THE DEPONENT:  No one.  I had the property
13  with me when I went to the 4th District.
14         BY MS. WU:
15     Q   And where was -- was the SmartTrip card
16  still within her wallet when you arrived at the 4th
17  District?
18     A   No.
19     Q   Where was her SmartTrip card?
20     A   It was in the brown bag that contained all
21  of her property.
22     Q   It was separately contained in a brown bag,

95

1  not in a wallet; is that correct?
2      A   Correct.
3      Q   Was there a wallet also in the brown bag?
4      A   Yes.
5      Q   Okay.  So you had in your possession when
6  you arrived at the 4th District, a brown bag that
7  included Ms. Ulysse's wallet and Ms. Ulysse's
8  SmartTrip card.
9          Is that fair?  Is that true?
10     A   Yes.  That contained all of Ms. Ulysse's
11  stuff.
12     Q   Okay.  And then Sergeant Muller calls you
13  and asks you to take a picture of the SmartTrip card,
14  so you took it out of the brown bag and snapped a
15  photo; is that right?
16     A   Yes.
17     Q   And then what did you do with the SmartTrip
18  card after you took the photos?
19     A   I placed it on MTPD's property book at the
20  4th District.
21     Q   You physically placed the SmartTrip card on
22  the MPD property log?

96

1      A   Yes.
2      Q   You physically took the SmartTrip card and
3  you put it on top of the log?
4      A   No.  I logged in her property.  I --
5          Okay.  I placed all of Ms. Ulysse's property
6  on D.C.'s property book as in I logged all of her
7  items inside the book.  Her property was then placed
8  inside of MTPD's plastic property bags and turned over
9  into the intake officer at MTPD.
10     Q   And I know -- we will get to this a little
11  bit.  I see the photo of a property page from MPD.
12  When --
13         Did you take that photo?
14     A   Yes.
15     Q   And when did you take that photo?
16     A   After this case started.
17     Q   When you -- did you go to MPD in order to
18  take that photo?
19     A   Yes.
20     Q   And which district did you go to?
21     A   4th District.
22     Q   And did you, in fact, see Ms. Ulysse's

97

1  SmartTrip card in the property bag?
2      A   No.
3      Q   And did you see a property log reflecting
4  Ms. Ulysse's SmartTrip card at the 4th District?
5      A   No.
6      Q   Okay.  So the last you heard of it, you put
7  something on a log reflecting that a SmartTrip card
8  went in; is that correct?
9      A   Yes.
10     Q   Okay.  And you put the SmartTrip card in; is
11  that correct?
12         MS. COLE:  Objection to form.
13         You may answer.
14         THE DEPONENT:  Yes.
15         BY MS. WU:
16     Q   Okay.  And then you don't know what happened
17  afterwards?
18     A   No.
19     Q   Okay.  I'm jumping ahead of myself.  We are
20  back on fare evasion.
21         So as of the day of May 21st, did anybody
22  tell you any readout of the SmartTrip card and whether

**98**

or not there was sufficient fare on it?

A  **On the day of May 21st?**

Q  Correct.

A  **I don't recall anyone telling me the readout on the SmartTrip card.**

Q  So the first time that you heard about the SmartTrip card not having sufficient fare was the very next day when you got a SmartTrip card printout; is that correct?

MS. COLE:  Objection.  Form. Characterization.

You may answer.

THE DEPONENT:  I don't remember anyone telling me on the 21st.  I can't say they did or they didn't.  I don't recall anyone on the 21st saying -- giving me any information on the SmartTrip readout.

BY MS. WU:

Q  So the first time that you recall hearing about whether or not the SmartTrip card had sufficient funds is the next day when somebody gave you the SmartTrip card printout; that is right?

A  **Yes.**

**99**

MS. WU:  We are going to try our hand at the first exh bit.  So if you can -- you might have been logged out of your share file by now, so if you want to just, you know, minimize this and go over to the share file and make sure that you still have access to it, and I will pull up what I believe is Exhibit 1, which is --

Janice, just so you know, the difference between me and Ms. Cole, I will share my screen.

Also, you know, if you refresh the share file, they should be populated in there.

MS. COLE:  So I'm seeing fare evasion training slots.

Is that it?

MS. WU:  Yes, that's it.

MS. COLE:  Okay.

MS. WU:  Officer Stokes, do you see it?

THE DEPONENT:  Refresh?  Get back in.

MS. WU:  I do apologize, though.  We will have to do some head turning.

MS. COLE:  You know you can manipulate this.

**100**

MS. WU:  I don't think I can.  I'm in a website.

MS. COLE:  I just meant prior to uploading them.

MS. WU:  Officer Stokes, let me know when you are ready.

THE DEPONENT:  I'm ready.  I have it.

(Stokes Deposition Exhibit 1 marked for identification.)

(Document tendered to the Deponent.)

BY MS. WU:

Q  Okay.  Do you recognize this document?

MS. COLE:  Objection.  Foundation.

You can answer.

BY MS. WU:

Q  I'm asking him if he recognizes it. I'm sorry?

A  **Yes.**

Q  Okay.  And what do you recognize it as?

A  **It looks like a PowerPoint on fare evasion.**

Q  When was the first time you saw this document?

**101**

A  **Maybe last week was the last time I can remember seeing this document.**

Q  Okay.  And was it in the presence of your attorney when you saw this document the first time?

A  **Yes.**

Q  Okay.  Have you ever taken fare evasion training like this one?

MS. COLE:  Objection to form and foundation.

You can answer.

THE DEPONENT:  I don't remember seeing this in any fare evasion training.

BY MS. WU:

Q  My question is a little different, and I'm going to ask you to take a step back again.

But have you ever take in a similar fare evasion training?

MS. COLE:  Objection to form, foundation.

You can answer.

THE DEPONENT:  I've taken fare evasion training, yes.

BY MS. WU:

Q  You and any of those fare evasion trainings,

102

1  did you have a PowerPoint presentation?
2      **A   I don't recall.**
3      Q   Okay.  And when was the last time you recall
4  taking a fare evasion training?  Was it in an MIR?
5      **A   Yes.**
6      Q   Was it in the past --
7      I apologize if you hear my dog outside.
8      Was the fare evasion training you took in
9  the last two years?
10     **A   Yes.**
11     Q   And who was the instructor of the fare
12 evasion training?
13     **A   It would be Ms. Cole, the attorney.**
14     Q   Ms. Cole did a fare evasion training for
15 officers in the MIR setting?
16     **A   Yes.**
17     Q   Do you recall the materials she had with her
18 to -- as part of the training?
19     **A   No.**
20     Q   You don't recall?
21     **A   I don't recall.**
22     Q   Do you remember how long the training was?

103

1      **A   I don't recall that either.**
2      Q   Was it longer than -- was it longer than
3  half an hour?
4      **A   Yes.**
5      Q   Was there a sign-in sheet for attending the
6  fare training -- fare evasion training?
7      **A   I don't remember.  I don't recall.**
8      Q   Was there a written examination afterwards?
9      **A   No.**
10     Q   Would it have been part of an agenda that
11 you would have attended a fare evasion training?
12     **A   Part of an agenda?  I don't understand that**
13 **question.**
14     Q   An agenda, that at the beginning of each day
15 of MIR training that indicates what trainings you are
16 about to attend.
17     MS. COLE:  Objection.  Form, foundation.
18 Mischaracterization as to MIR.
19     THE DEPONENT:  Yes.
20     BY MS. WU:
21     Q   Maybe schedule is a better word than agenda.
22     Do you receive a schedule that indicates the

104

1  trainings that you will be taking that day?
2      **A   Yes.**
3      Q   And so would there be some record of you
4  having taken a fare evasion training at -- in the past
5  two years?
6      **A   Yes.**
7      Q   Where would that -- who would have that?
8      **A   I don't know.**
9      Q   Would training division have it?
10     **A   Again, I don't know.  Possibly.  I don't**
11 **know.**
12     Q   Has anyone asked you to search in your
13 documents for any records of trainings that you
14 attended?
15     **A   No.**
16     Q   This training that I have in Exhibit 1, it
17 says the instructors are Officer Seesock and Officer
18 Hunt.
19     Do you see that?
20     **A   Yes.**
21     Q   Do you recognize those names?
22     **A   Officer Seesock, yes.  I don't remember**

105

1  Officer Hunt.
2      Q   Have you ever had occasion to take a
3  training from Officer Seesock?
4      **A   Yes.**
5      Q   What type of training did you take from
6  Officer Seesock?
7      **A   He would cover fare evasion, citation**
8  **writing and report writing.**
9      Q   And when did you take the training from
10 Officer Seesock?
11     **A   That would have been during my initial**
12 **training with the department.**
13     Q   When you started with the department; is
14 that right?
15     **A   When I started with the department, yes.**
16     Q   Okay.  So is it that sitting here today you
17 don't recognize these slides themselves, but you did
18 take a training with Officer Seesock when you began at
19 the department, that covered fare evasion?
20     MS. COLE:  Objection to form.
21     You may answer.
22     THE DEPONENT:  Yes.  I took training with

## 106

1  Officer Seesock, and I don't recall seeing these
2  slides.
3        BY MS. WU:
4     Q   I'm going to just page through these slides,
5  and I want you to tell me if your training with
6  Officer Seesock differentiated from the slides I'm
7  going to show you.  And please tell me if someone is
8  different in that.
9        Okay?
10    **A   Yes.**
11    Q   Okay.  So I will get to page 5.
12       And I do apologize.  I can zoom out.  Maybe
13  if I go like this.  Does this help?  No.
14       Well, I will read it out loud to you,
15  Officer, and you will let me know if I am misstating
16  it.
17       The title of this slide is what is not fare
18  evasion.  And it says:  Customers who report to a
19  WMATA employee that they have lost their fare card or
20  do not have sufficient funds to exit station are not
21  guilty of fare evasion.  Therefore, cannot be issued a
22  citation or warning notice, per WMATA's SOP Number 20.

## 107

1        And there's two bullet points.  One is about
2  a lost fare card and the second bullet point says:
3  Insufficient funds to exit.  Customers will be advised
4  to proper fare and also allowed to exit the station.
5     Do you see that?
6     **A   Yes.**
7     Q   My first question is SOP No. 20.  Do you
8  know what that refers to?
9     **A   No.**
10    Q   Is it your -- so the line that says:
11  Insufficient funds to exit, customers will be advised
12  to proper fare and allowed to exit the station.
13       What does that mean to you?
14       MS. COLE:  Objection.  Form, foundation.
15       You may answer.
16       THE DEPONENT:  It doesn't -- I mean, I don't
17  see a different meaning in it.  It means what it says
18  here.  WMATA's SOP.
19       BY MS. WU:
20    Q   And you don't know what the SOP is?
21    **A   Yes.  Transit police officers, we are not**
22  **governed by the SOPs, we go by general orders.  And I**

## 108

1  **generally don't cover these SOPs.**
2     Q   Is it your understanding that customers with
3  insufficient fares to exit the station, but who report
4  it to a WMATA employee, that then they are not guilty
5  of fare evasion?
6        MS. COLE:  Objection.  Form, foundation.
7        You may answer.
8        THE DEPONENT:  No, I don't agree with this
9  SOP.
10       BY MS. WU:
11    Q   Okay.  You don't agree that it is WMATA
12  policy that customers with insufficient fares to exit,
13  but who report to a WMATA employee that they don't
14  have the fares are not guilty of fare evasion?
15       MS. COLE:  Objection.  Form.
16  Characterization.  Foundation.
17       You may answer.
18       THE DEPONENT:  Again, this SOP may cover
19  with other WMATA employees.  But, again, as a transit
20  officer, I am not governed by these SOPs.  I don't --
21       BY MS. WU:
22    Q   Okay.  So stepping away from the SOPs, I'm

## 109

1  asking you right now, sitting here, if someone tells
2  the WMATA employee that they don't have sufficient
3  fare, is that person committing fare evasion?
4        MS. COLE:  Objection.  Form, foundation.
5        THE DEPONENT:  By just telling someone they
6  don't have sufficient fare they have not committed
7  fare evasion because they have not exited the station
8  without paying at that point.
9        BY MS. WU:
10    Q   And once they exit the station, even if they
11  have told someone that they do not have sufficient
12  fare, is that fare evasion, in your mind?
13       MS. COLE:  Objection.  Form, foundation.
14       You may answer.
15       THE DEPONENT:  That is fare evading,
16  according to D.C. Code.  They exited the station
17  without paying the established fare.
18       BY MS. WU:
19    Q   And would your answer be the same for your
20  understanding in May of 2018?
21    **A   Yes.**
22    Q   Okay.  So the next slide, which is Slide 6,

110

1  it continues, what is not fare evasion.
2      And it says:  Special precautions pertaining
3  to correctly distinguishing fare evasion via the ADA
4  gate.
5      And I will direct your attention to the
6  second bullet point, which says:  The utmost of
7  precautions should be utilized in such instance to
8  ensure malice (criminal intent) on the subject's part.
9      Do you understand that to be the policy of
10 WMATA, that there needs to be precaution exercised to
11 ensure criminal intent or malice on the subject's
12 part?
13     MS. COLE:  Objection.  Form, foundation.
14 You may answer.
15     THE DEPONENT:  Can you repeat that?  I want
16 to make sure I understand the question that's being
17 asked.
18     BY MS. WU:
19     Q   The sentence that's starts:  The utmost of a
20 precaution should be utilized in such an instance to
21 ensure malice, criminal intent, on the subject's part.
22     Is that your understanding of the current

111

1  policy of WMATA on fare evasion?
2      MS. COLE:  Objection.  Form, foundation.
3      You may answer.
4      THE DEPONENT:  No.
5      BY MS. WU:
6      Q   Do you understand that any -- in
7  investigating fare evasion you should be looking for
8  malice or criminal intent?
9      A   No.  Malice is not necessary for fare
10 evasion.
11     Q   Okay.  And how do you know that?
12     A   Well, fare evasion is general intent.
13     Q   And how do you know that?
14     A   Through training and my understanding of the
15 D.C. Code.
16     Q   Through a training led by Ms. Cole?
17     MS. COLE:  Objection.
18     THE DEPONENT:  Training -- as my time as an
19 MTP police officer, from training in my expanse.
20     BY MS. WU:
21     Q   When you refer to a training that you rely
22 on to understand that malice is not part of the

112

1  requirements, was it a training that Ms. Cole gave to
2  you?
3      MS. COLE:  Objection.
4      You may answer.
5      THE DEPONENT:  Yes.
6      BY MS. WU:
7      Q   Okay.  So this isn't saying that you need to
8  have malice.  This is saying that the policy is
9  that --
10     Sorry.  Let me take that back.
11     This is saying -- this isn't saying that you
12 need to have malice.  This is saying the utmost of
13 precaution should be utilized to ensure malice on the
14 subject's part.
15     So are you aware of any WMATA policy that
16 asks officers to be using the utmost of precaution to
17 be utilized in such an instance to ensure malice on
18 the subject's part.
19     So are you aware of any WMATA policy that
20 asks officers to be using the utmost of precaution to
21 evaluate whether or not there is malice on the
22 subject's part?

113

1      MS. COLE:  Objection.  Form, foundation.
2      You may answer.
3      THE DEPONENT:  I'm not aware of any WMATA
4  policy that requires -- that ensures that malice is
5  involved in fare evasion.
6      BY MS. WU:
7      Q   Do you recall if the training you took with
8  Officer Seesock covered malice?
9      A   I can't recall.
10     Q   And the testimony you just said that you
11 don't believe that there is a policy to exercise
12 utmost precaution to see if there is malice from the
13 fare evader.
14     Is that your understanding as of May 2018,
15 too?
16     A   Yes.
17     Q   Okay.
18     I'm now on Page 10 of the presentation of
19 the exhibit, and it says -- the title is:  WMATA Fare
20 Media.
21     And there is some language about
22 piggybacking here.  And previously you had testified

114

1   that you did see some documentation earlier this past
2   week of definitions of piggybacking.
3       Is this the document you saw with
4   definitions of piggybacking?
5       A   Yes.
6       Q   Okay.  Any other -- so you said that you --
7   str ke that.
8       I'm going to close this exh bit.
9       So we have covered that you observed what
10  you believe to be Ms. Ulysse fare evading.  And then I
11  believe your testimony is that you went to stop her.
12      Can you spell that out for me?  What does it
13  mean to have gone to stop her?
14      A   Well, I went to -- I approached Ms. Ulysse
15  waving my hand, and said:  Ma'am, I need to see your
16  SmartTrip card.
17      She said, no, and tried to walk away.
18      Q   So when you -- the first thing you said to
19  Ms. Ulysse was ma'am, I need to see your SmartTrip
20  card?
21      A   Yes.
22      Q   Anything else that you said to Ms. Ulysse on

115

1   that initial approach?
2       A   No.
3       Q   And did she say anything else other than no
4   in that initial contact with you?
5       A   No.
6       Q   When you first spoke to her, how far away
7   were you from her?
8       A   Face to face.  Maybe -- like very, very
9   close.
10      Q   So you were to her front?  Your head was in
11  front of hers when you said, ma'am, I need to see your
12  SmartTrip card?
13      A   I was standing slightly to the side of her
14  and she turned to look at me.  And that's how we spoke
15  face to face, she turned to look at me.
16      Q   When she exited the fare -- the turnstyle,
17  did she have anything in her ears?
18      A   I didn't see anything in her ears, no.
19      Q   Did you make any attempt to contact
20  Ms. Ulysse prior to your statement of, Ma'am, I need
21  to see your SmartTrip card?
22      MS. COLE:  Objection to form.  Foundation.

116

1       You can answer.
2       THE DEPONENT:  Waving my hand and saying
3   ma'am.
4       BY MS. WU:
5       Q   Okay.  so your first contact with Ms. Ulysse
6   was not, ma'am, I need to see your SmartTrip card.  It
7   was "ma'am"?  Just ma'am?
8       A   Can you repeat your question?
9       Q   I'm just trying to get every contact or
10  attempted contact you tried to make with Ms. Ulysse
11  after you saw her -- what you think is fare evading.
12      A   One I saw her fare evade I attempted to stop
13  her, waving my hand, "Ma'am".  When and get maybe less
14  than a foot away from her, "Ma'am, I need to see your
15  SmartTrip card".
16      She looked at me and she said, "no".
17      Q   And when -- so you said you eventually got
18  to within a foot of her.  So that first contact you
19  made with her, how far away were you from her?
20      A   My first attempt to stop her?  She had just
21  exited the fare gate.  I don't know the distance
22  between -- again, I'm at the entrance to the station

117

1   and she is coming out of the fare gate.  So I can't --
2   I don't know the exact distance.
3       Q   Okay.  And at some point she gets within a
4   foot of you and is that -- and that's when you say,
5   ma'am, I need to see your SmartTrip card; is that
6   right?
7       A   Yes.
8       Q   Okay.  Did you write down anywhere that the
9   statement that you -- the statements that you just
10  told me, the "Ma'am" and the "Ma'am, I need to see
11  your SmartTrip card"?
12      A   Yes.
13      Q   Okay.  Where did you write it down?
14      A   My MTPD report.
15      Q   Aside from saying, "no", did Ms. Ulysse do
16  anything, make any other gestures --
17      A   She said --
18      Q   -- that you recall?  I'm sorry.
19      A   She said no.  She raised her hand
20  dismissively and walked away.
21      Q   Did she have anything in her hand?
22      A   Not that I recall, no.

---

118

1    Q    And when you say dismissively, what do you
2    mean by that?
3    **A    As in, no, and to wave me away.**
4    Q    So her hand was not raised, it was waving?
5    **A    Just like a -- in this motion. It's kind of**
6    **hard to explain it. It's a no and then this motion.**
7    Q    So I actually can't see your motion. Maybe
8    take a step back and then you may have to just
9    describe it for the court reporter.
10   **A    It was no. And her hand did like this.**
11   Q    Okay. So her hands started with her palm
12   towards her and with the palm away from her?
13   **A    From midlevel, about right here. Said, no.**
14   **And moved out this way.**
15   Q    Did you ever, prior to --
16   MS. COLE:  For the record, indicating the
17   hand moving away from the body towards the -- further
18   away from the body.
19   BY MS. WU:
20   Q    And so that is what you meant by dismissing
21   dismissively is you interpreted her hand gesture to be
22   dismissive; is that correct?

---

119

1    **A    Yes.**
2    Q    Okay. Before you actually touched her, did
3    you ever know that she had headphones in her ear?
4    **A    I didn't see anything in her ear, no.**
5    Q    Okay. So sitting here today, are you aware
6    of whether or not she had headphones in her ears?
7    **A    No.**
8    Q    Is Ms. Ulysse obligated to present her fare
9    card to you?
10   **A    Yes.**
11   Q    And under what written document is she
12   obligated to present her fare card to you?
13   MS. COLE:  Objection to form and foundation.
14   You may answer.
15   THE DEPONENT:  I just saw Ms. Ulysse fare
16   evade. Fare evasion. That would give me the probable
17   cause to make a stop.
18   Also, on the back of each SmartTrip card, it
19   is written that you have to surrender that SmartTrip
20   card to WMATA personal that asks you for it.
21   So, yeah, so the probable cause for the fare
22   evasion and also she had to show the card. Any person

---

120

1    using a WMATA SmartTrip card has to present it to a
2    WMATA personnel.
3    Q    So let me start backwards. Let me start
4    with the SmartTrip card.
5    Is it your understanding that anybody who
6    is -- who has a SmartTrip card, regardless of whether
7    or not there is suspicion that they have, you know,
8    attempted any sort of crime, that they would be
9    obligated to show -- to present a fare card to an MTPD
10   officer?
11   MS. COLE:  Objection to form, foundation.
12   BY MS. WU:
13   Q    I'm sorry. What was your answer?
14   **A    Yes.**
15   Q    And have you had a training on that? Have
16   you seen that written out -- written as a policy
17   somewhere?
18   **A    It's written on the back of the actual**
19   **SmartTrip card.**
20   Q    Yeah. I understand that it's written on
21   there. I'm asking if you had any further training or
22   if there's any sort of policy that -- any written

---

121

1    policy about it.
2    **A    No.**
3    Q    And then going back to the first of the two,
4    you said you had probable cause to, because you saw
5    her fare evade.
6    Why does that make her obligated to present
7    her fare card to you?
8    **A    It was a stop for criminal offense that**
9    **happened in my presence. The SmartTrip card was part**
10   **of my -- some more investigation.**
11   Q    At what point was Ms. Ulysse not free to
12   leave?
13   **A    The moment I stopped her, she was not free**
14   **to leave.**
15   Q    And when you say the moment you stopped her,
16   when is -- what was the moment in which you stopped
17   her?
18   **A    When Ms. Ulysse stopped and I asked for her**
19   **SmartTrip card, and she said no and she tried to**
20   **leave.**
21   Q    So at the moment that she stopped, even
22   before you asked her for her SmartTrip card, she was

---

122

1    not free to leave?
2        A   Correct.
3        Q   If you -- okay.  I think you answered this.
4        How many seconds passed between your
5    statement to Ms. Ulysse, "Ma'am, I need to see your
6    SmartTrip card.", and when you grabbed her arm?
7        A   I don't know.  When she said, no, and
8    attempted to walk away and I grabbed her arm, I don't
9    know how much time, how many seconds passed in
10   between.
11       Q   How many seconds, though, right?  A short
12   amount of time, would you agree with me?
13       A   It was a short amount of time.
14       Q   How many seconds passed between you first
15   saying, "ma'am", and you grabbing her arm?
16       A   From the point I said, Ma'am, I need to see
17   your SmartTrip card, her replying with, no, and then
18   I'm grabbing her arm.  It was very quick.
19       Q   And I'm not missing any other steps that
20   took place in between those; right?  You just
21   summarized everything that happened in those seconds?
22       A   Yeah.  I observed the fare evasion, I

123

1    approach her waving.  "Ma'am".  I got about a foot
2    away from her.  "Ma'am, I need to see your SmartTrip
3    card."  She turned said and said no.  Attempted to
4    walk away.  That's when I grabbed her arm.  I don't
5    know how much time -- how many seconds passed in
6    between that.
7        Q   When you grabbed her arm, was Ms. Ulysse
8    running?
9        A   No.
10       Q   Okay.  Could you have gotten in front of her
11   again?
12       A   No.  The quickest way to stop her was to
13   reach and grab her arm.
14       Q   Right.  My question was a little bit -- I
15   said: Could you have gotten in front of her again?
16       MS. COLE:  Objection.  Form, foundation,
17   characterization.
18       You may answer.
19       THE DEPONENT:  No.  I said the quickest way
20   to stop her was to just reach out and grab her.
21       BY MS. WU:
22       Q   I understand that was the quickest way of

124

1    doing it.  I'm asking was it possible for you to have
2    gotten in front of her?
3        Is your answer no?
4        MS. COLE:  Objection to form of question.
5        You may answer.
6        THE DEPONENT:  No.
7        BY MS. WU:
8        Q   Okay.  And why is there no way you could
9    have gotten in front of her, again?
10       MS. COLE:  Objection.  Form.
11       You may answer.
12       THE DEPONENT:  She stopped, so she is not
13   free to go.  So I want to stop her as quickly as
14   possible.  The quickest way to do that was to reach
15   out and grab her by the arm.
16       BY MS. WU:
17       Q   Is there any reason that you can tell me
18   that you could not have gotten in front of her again?
19       MS. COLE:  Objection.  Form, foundation.
20       You may answer.
21       THE DEPONENT:  I wanted to stop her as soon
22   as possible.

125

1        BY MS. WU:
2        Q   Other than that, any other?
3        A   No.
4        Q   Is it your practice of putting your hands on
5    someone if they fail to respond to your first verbal
6    conversation with them?
7        MS. COLE:  Objection to form and foundation.
8    Characterization.
9        You may answer.
10       THE DEPONENT:  Sorry.  Can you repeat that?
11       BY MS. WU:
12       Q   Is it your practice to put your hands on
13   someone if they did not pay any attention or if they
14   failed to respond to your first directive to them?
15       MS. COLE:  Same objection.
16       THE DEPONENT:  No.
17       BY MS. WU:
18       Q   It's your practice?
19       A   No.
20       Q   Well, you have, in the past, put your hands
21   on someone if they fail to pay attention to your first
22   directive to them; right?

126

1      MS. COLE:  Objection.  Foundation.
2  Characterization.
3      You may answer.
4      THE DEPONENT:  No.  The only time I put
5  hands on anyone if when they try to leave a stop that
6  they cannot leave.  If I have them legally stopped and
7  they attempt to leave that stop then, yes, I will put
8  my hands on them.
9      BY MS. WU:
10     Q   So have you or have you not put your hands
11  on someone because they failed to pay attention or
12  respond to your first verbal directive to them?
13     MS. COLE:  Objection.  Asked and answered.
14  You can answer again.
15     THE DEPONENT:  No.  I only placed my hands
16  on someone who attempted to leave a stop that they
17  legally cannot leave.
18     BY MS. WU:
19     Q   And just to summarize your justification for
20  grabbing Ms. Ulysse's arm at that point is that she
21  was legally not free to leave and it was the quickest
22  way to get to her.

127

1      Is that right?
2      MS. COLE:  Objection.  Form,
3  characterization, foundation.
4      You may answer.
5      THE DEPONENT:  Yes.  Ms. Ulysse was stopped
6  for fare evasion and she was not free to leave.  She
7  attempted to walk away.  And yes, that's why I grabbed
8  her by the arm.
9      BY MS. WU:
10     Q   And so between you seeing -- and so from --
11  at the grabbing of the arm, the probable cause that
12  you have was -- was your view of her walking through
13  the turnstyle?  That's it; right?
14     MS. COLE:  Objection.  Form, foundation.
15     You may answer.
16     THE DEPONENT:  After I saw Ms. Ulysse's fare
17  gate I had the probable cause to stop her.  When she
18  tried to leave from that stop that's when I grabbed
19  her, yes.
20     BY MS. WU:
21     Q   I need you to step back a little bit.  Also,
22  I know we have gone for a little bit of time now, but

128

1  sometimes I feel l ke you're not -- l ke you have to
2  listen to my exact question that I'm asking.  It was a
3  little different from what you're answering.
4      So my question here was when -- at the point
5  wow grabbed your arm, the reasonable -- sorry -- the
6  probable cause that you had came from your view of
7  Ms. Ulysse's walk through the turnstyle, nothing more;
8  is that right?
9      MS. COLE:  Objection.  Form,
10  characterization, foundation.
11     You may answer.
12     THE DEPONENT:  Yes.  I think I'm answering
13  your question correctly.
14     BY MS. WU:
15     Q   It's a yes or no question, so that's why I
16  am trying to say --
17     MS. COLE:  Objection.  Form, foundation.
18     You may answer.
19     THE DEPONENT:  My justification for stopping
20  Ms. Ulysse was for the fare evasion that I observed.
21     BY MS. WU:
22     Q   Right.  So your justification for stopping

129

1  Ms. Ulysse was for her walking through the turnstyle
2  in a way that you saw fare evasion; is that correct?
3  Yes or no?
4      MS. COLE:  Objection.  Foundation.
5      You can answer.
6      THE DEPONENT:  I stopped Ms. Ulysse for fare
7  evasion.
8      I think I'm answering your question.
9      BY MS. WU:
10     Q   My question is a yes or no answer.  So if
11  it's not a yes or no answer, you are not answering my
12  question.
13     MS. COLE:  Objection.  Form, foundation.
14     Answer as best you can, Officer.
15     THE DEPONENT:  That's the best answer I can
16  give you, ma'am.
17     BY MS. WU:
18     Q   So the record is going to be that you cannot
19  give me a yes or no answer to my question of the
20  probable cause that you had at the point where you
21  grabbed Ms. Ulysse's arm was your view of her wa king
22  through the turnstyle.  And the answer, for the

### 130

1  record, is that you can't give me a yes or no answer;
2  is that right?
3      MS. COLE:  Objection.  Form, foundation,
4  characterization.
5      You can answer.
6      THE DEPONENT:  Yes.  I can't give you a yes
7  or no answer to that question.
8      BY MS. WU:
9      Q   Okay.  So you grabbed her arm, and I believe
10 your testimony was that she resisted.  Can you tell me
11 what you mean by she resisted?
12     **A   I reach out, I grab Ms. Ulysse's arm.  As I**
13 **am reaching out and telling her you can't leave yet.**
14 **I grab her by the arm, she immediately started to yell**
15 **and scream and started to pull away from my grasp.  At**
16 **that point, I told her she was under arrest.  She**
17 **continued to pull and that's when she pulled us both**
18 **down to the ground.**
19     Q   What did she scream and yell?  What words
20 did she scream or yell?
21     **A   "Get off me."  Dusty -- she screamed a lot.**
22 **That's the one that stood out, that I can remember the**

### 131

1  **most.  Get off me.  She yelled some other phrases but**
2  **I can't recall them right now.**
3      Q   And you said she was told she was under
4  arrest.  Did you tell her she was under arrest?
5      **A   Yes.**
6      Q   And what words did you use to tell her she
7  was under arrest?
8      **A   "You are under arrest".**
9      Q   That's it?
10     **A   Yes.**
11     Q   Okay.  And what did she say in response,
12 other than what you just said, which was -- I think
13 you said "get off of me," that you can recall?
14     **A   Yelling.  That's the one thing I can**
15 **remember distinctly.  But she was yelling loudly.  She**
16 **continued to yell and pull away.**
17     Q   We previously talked about reasons for
18 deciding to arrest versus issuing a citation for fare
19 evasion.  Why did you decide to arrest Ms. Ulysse
20 here?
21     **A   When I approached Ms. Ulysse at the scene**
22 **fare evasion, went in to investigate to gather that**

### 132

1  **information to write the citation.  When she said no**
2  **and walked away, I had no time to get that information**
3  **for a citation, so I had to make the arrest.**
4      Q   Okay.  Any other reason for arresting her,
5  deciding to arrest her?
6      MS. COLE:  Objection.  Form, foundation.
7      You may answer.
8      THE DEPONENT:  No.
9      BY MS. WU:
10     Q   For the length of time that Ms. Ulysse was
11 on the ground, you had her -- she was under arrest.
12     Is that right?
13     **A   Yes.**
14     Q   Okay.  And she was arrested -- you didn't
15 tell her what she was under arrest for.  You just said
16 "you are under arrest"; is that right?
17     **A   Yes.**
18     Q   What was she, in fact, under arrest for on
19 the time that she was on the ground?
20     **A   She was under arrest for fare evasion and**
21 **resisting.**
22     Q   She was also under arrest for resisting

### 133

1  arrest as a -- for the time -- as of the time she was
2  on the ground?
3      **A   Yes.**
4      Q   Okay.  I'm going to turn your attention to
5  Exhibit No. 2, which is going to be Officer Stokes'
6  interrogatory responses.
7      Just give a moment for my paralegal to load
8  that and then you can refresh.
9      Do you see it, Officer Stokes?
10     (Stokes Deposition Exh bit 2 marked for
11 identification.)
12     (Document tendered to the Deponent.)
13     **A   No, ma'am.  Let me refresh it again.**
14     Q   Refresh it again.
15     **A   Okay.  I got it.**
16     Q   Okay.  Let me go ahead and share my screen.
17     Do you see my screen?  Do you recognize
18 Exh bit 2?
19     **A   Yes.**
20     Q   And what is it?
21     **A   Defendant Stokes' answers to plaintiff**
22 **interrogatories.**

134

Q   And have you seen this before?

**A   Yes.**

Q   I'm going to scroll down to Interrogatory Response No. 5.  Okay.

So the question is:  Describe all steps you took to investigate whether plaintiff paid her fare on the morning of May 21st, 2018.

So I'm going to focus your attention on the investigative steps you took prior to placing her under arrest.

Okay?  Does that make sense to you?

**A   Yes.**

Q   Okay.  The answer here, you will see, it says:  See Answer to Interrogatory No. 4.  No. 4, which is incorporated herein.  Additionally, Officer Stokes became aware of additional evidence corroborating that plaintiff failed to pay her fare the morning of May 21st, 2018, when he obtained plaintiff's SmartTrip usage history, which showed that plaintiff had not paid her Metro fare that morning.

So I just want to focus on that second sentence.  We have already established that you became

135

aware of this additional evidence some time after she had already been placed in arrest; is that right?

**A   Yes.**

Q   Okay.  So your evaluation of probable cause would not have included that information; right?

**A   Sorry.  Can you repeat that?  I want to make sure I understand.**

Q   Your evaluation of probable cause would not have included that information; is that right?

**A   Yes.**

Q   Now, taking a step back onto the entire encounter and what investigative methods you took during the entire encounter, did you ever run her SmartTrip card at the scene?

**A   No, I did not.**

Q   Did you speak to any witnesses and take statements from witnesses on the scene?

**A   No.**

Q   Did you take down any names of any people on the scene other than Ms. Ulysse?

**A   No.**

Q   Did you take any cellphone video footage

136

from anyone?

**A   No.**

Q   Did you take down any names of station employees?

**A   No.**

Q   Okay.  So your probable cause, leaving the scene that day was what we have previously discussed, which is that you viewed Ms. Ulysse going through the fare turnstyle, piggybacking; is that right?

**A   Yes.**

MS. WU:  Next exh bit will be Exhibit 3, I believe, which is the SmartTrip card printout.  66 through 67.  Just give us a moment.  Okay.  I should be there, Officer Stokes, if you just want to refresh now.  Let me know when you see it and I will share my screen again.  But this is a short one.

(Stokes Deposition Exhibit 3 marked for identification.)

(Document tendered to the Deponent.)

**A   Yes, I see it.**

Q   Okay.  For the record, Exh bit 3 is Defendant's -- Bates stamped 66 through 67.

137

My first question is:  Have you seen Defendant's 66 before?

**A   Yes.**

Q   Okay.  Who -- do you know who created it?

**A   I did.**

Q   You created this?  Okay.  And how did you create it?

**A   It was the information typed up that I sent to Sergeant Muller, to text.**

Q   So you created the document that we are looking at itself or you just provided the information?

**A   I provided the information.**

Q   Okay.  I guess my question is:  Did, you know, choose the font?  Did you type this all out?  What was your role for this document, for this page?

**A   For the page with Ms. Ulysse's information?**

Q   Defendant's 66, yes.

**A   I provided the information in the document.**

Q   Apart from providing the information in the document, did you create this document?  Did you type it out yourself?

138

1    A   No.
2    Q   Do you know who created it?
3    A   No.
4    Q   Okay.  And the first time you saw this
5    document, was it in preparation for this deposition or
6    was it back then when the incident occurred?
7    A   Preparation for this.
8    Q   You said that you provided the information
9    to create this document and you only provided that to
10   Sergeant Muller, nobody else; is that right?
11   A   And my attorney.
12   Q   And your attorney.
13       You, sitting here today, you don't know
14   whether or not Sergeant Muller created this or your
15   attorney created this or somebody else did; right?
16       MS. COLE:  Objection.
17       You may answer.
18       BY MS. WU:
19   Q   I'm sorry.  Did you answer?
20   A   Correct.
21   Q   What does MTP stand for?
22   A   Metro Transit Police.

139

1    Q   And so what is that number after MTP?
2    A   It is the -- the number, that's the record
3    to the -- for the paperwork.  You would need this MTP
4    number as a -- to look up this arrest paperwork, to
5    look up this report paperwork.
6    Q   I think we -- way back when we started this
7    deposition, you talked a little bit about what you
8    would collect in your notebook, and you said that you
9    would get a number from dispatch.
10       Is that what this number would be?
11   A   Yes.
12   Q   Got it.  And how did you, sitting at
13   District 4, how you did you have this MTP number?
14   A   I got it from dispatch, over the radio.
15   Q   You got it from dispatch sitting at District
16   4 or back at Fort Totten?
17   A   I got it at Fort Totten.
18   Q   And then you just memorized it and then
19   texted it from District 4?
20   A   Yes.
21   Q   And what does CCN mean?
22   A   CCN is a case reference number for D.C.'s

140

1    paperwork.
2    Q   Okay.  And so the number following CCN, to
3    your understanding, is the reference number of D.C.'s
4    paperwork?
5    A   Yes.
6    Q   And how did you get that number?
7    A   Once you get to 4th District you would call
8    D.C.'s dispatch, and they would give you a CCN number.
9    Q   So did you call D.C.'s dispatch when you
10   were in the 4th District, in order to get the CCN
11   number?
12   A   Yes.
13   Q   And part of what you sent over to Sergeant
14   Muller, did it include this line that said arrested
15   5/21/2018?
16   A   No.
17   Q   Do you know if MPD ever created a police
18   report?
19   A   Yes.  I would have been the one to do the
20   police report.  That's the Cobalt report.
21   Q   MPD?
22   A   Oh, MPD?  Yes.  I would have did the MPD

141

1    report also.
2    Q   So is there an MPD report for this case?
3    A   Yes.  That is what the CCN number would
4    reference.
5    Q   So if I forget to ask this later when we
6    look at the report, will you let me know which one is
7    an MPD report?
8    A   Yes.
9    Q   Have you seen an MPD report?
10   A   Yes.
11   Q   Did you also convey to Sergeant Muller that
12   2/17/1994?
13   A   No.
14   Q   Do you recognize that number?
15   A   Ms. Ulysse's date of birth.
16   Q   But in your text message, you didn't include
17   that information?
18   A   No.
19   Q   I'm going to scroll down to Defendant's 67.
20       Do you recognize this document?
21   A   Yes.
22   Q   Did you take this picture?

142

1    A    Yes.
2    Q    Previously, we talked about you snapping a
3  picture at a District 4, having retrieved a SmartTrip
4  card from a brown bag.
5        Is this the photo that you took?
6    A    Yes, this is a photo of Ms. Ulysse's
7  SmartTrip card.
8    Q    Were you the one that put Ms. Ulysse's
9  SmartTrip card into the brown bag?
10    A    Yes.
11    Q    Who gave you Ms. Ulysse SmartTrip card to
12  put into the brown bag?
13    A    I don't recall.  An MPD officer did the
14  initial search, and I believe she handed it to me and
15  that's when I put it in the bag.
16    Q    Okay.  So your recollection, which you are
17  not -- it sounds like you are not positive of, is that
18  an MPD officer gave you the SmartTrip card and you
19  directly put it into the bag; is that correct?
20    A    Yes.
21    Q    Okay.  So other than the MPD officer and
22  you, are you aware of anybody else touching the

143

1  SmartTrip card between Ms. Ulysse's arrest and being
2  at District 4?
3    A    I don't recall anyone else touching the
4  card.  I'm not sure.
5    Q    Okay.  Is this photo saved on your computer?
6    A    No.
7    Q    Is that your finger at the top left of this
8  photo?
9    A    Yes.
10    Q    And did you take a photo of the front of the
11  card?
12    A    No.
13    Q    Why not?
14    A    I didn't need anything from the front of the
15  card.
16    Q    Can you describe the front of the card?
17        MS. COLE:  Objection.  Foundation.
18        You can go ahead.
19        THE DEPONENT:  No.  But I've -- SmartTrip
20  card.
21        BY MS. WU:
22    Q    Was there anything notable on the front of

144

1  this SmartTrip card, any sort of decal or any sort of
2  wear and tear, anything else that would distinguish
3  the front of the SmartTrip card in your memory?
4    A    No.
5    Q    So let's talk about the logbook at District
6  4.  What exactly do you recall writing in the logbook?
7  What words?
8    A    I've placed all of Ms. Ulysse's property.
9  Everything that was on her person at the time of her
10  arrest was listed in the logbook.
11    Q    So did you write out the word "SmartTrip
12  card" on the logbook?
13    A    Yes.
14    Q    Have you seen a copy of the logbook?
15        MS. COLE:  Objection to form.
16        You may answer.
17        THE DEPONENT:  I've seen the logbook, yes.
18        BY MS. WU:
19    Q    When did you see the logbook?
20    A    I don't recall when.  It was some time after
21  this case started.
22    Q    It was some time after the lawsuit?

145

1    A    Yes.
2    Q    Was it at the same time that you took photos
3  of property?  Of property slips or envelopes?
4    A    Yes.
5    Q    Okay.  Did you take a photo of the logbook?
6    A    I took a photo of a page from the logbook,
7  yes.
8    Q    Okay.  And on the logbook it said,
9  "SmartTrip card"?
10    A    I don't remember everything that was listed
11  on that page.
12    Q    Okay.  But your recollection, sitting here
13  today, is that you wrote "SmartTrip card" on the
14  logbook?
15    A    Yes.
16    Q    Can we -- I think we are on Exhibit 4; is
17  that right, Joelle?
18        MS. JOELLE:  Yes, that's right.
19        MS. WU:  Okay.  I am going to go ahead an
20  order -- can we do Defendant's 25 as Exhibit 4, and
21  Defendant's 226 as Exhibit?
22        BY MS. WU:

146

1    Q   And while Joelle is preparing that FOR you,
2  Officer Stokes, just make sure I understand:  Is it
3  your understanding that the MPD officer who took the
4  SmartTrip card from Ms. Ulysse's person -- she took
5  the SmartTrip card from Mr. Ulysse's person after the
6  search incident to arrest?
7        MS. COLE:  Objection.  Form.
8        You may answer.
9        THE DEPONENT:  I don't recall if -- yes.  I
10  don't recall anyone else touching the SmartTrip card.
11  I think that the officer gave it to me and that's when
12  I put it in the bag.
13        BY MS. WU:
14    Q   Right.  And you understand that the officer
15  got it from a search incident to her arrest, from
16  Ms. Ulysse's body?
17        MS. COLE:  Objection.  Form, foundation.
18        You may answer.
19        THE DEPONENT:  To my memory, yes.
20        BY MS. WU:
21    Q   And she would have given you the SmartTrip
22  card by -- like outside of the station; right?

147

1    A   Yes.
2    Q   Where were you?  Were you guys in the
3  vehicle?
4    A   No.
5    Q   Were you outside of the vehicle?
6    A   Yes.
7    Q   Let's see if 4 and 5 are up.  I believe they
8  are.  So let's just click on 4 first.
9        So Exhibit 4 is Defendant's 225.
10        Is this the property log that you spoke
11  about, Officer Stokes?
12        (Stokes Deposition Exhibit 4 marked for
13  identification.)
14        (Document tendered to the Deponent.)
15    A   This is a photo of the property bag.
16    Q   So not the property log, though; right?
17    A   Right.
18    Q   And then let me just go quickly to Exhibit
19  5.  Is this the photo?  Is this the photo of the
20  property log that you were talking about, Officer
21  Stokes?
22        (Stokes Deposition Exhibit 5 marked for

148

1  identification.)
2        (Document tendered to the Deponent.)
3    A   Yes.
4    Q   Okay.  So this is in the logbook from MPD;
5  is that right?
6    A   Yes.
7    Q   Okay.  What part of this document is your
8  handwriting?
9    A   None of it.
10    Q   Okay.  Including searching Officer --
11  including the name Stokes here.
12    A   Yes.
13    Q   So I believe that your testimony previously
14  was that you wrote things into a logbook.  So this is
15  not what you wrote into the logbook; is that right?
16    A   Yes.
17    Q   But you did write stuff into a logbook?
18    A   Yes.
19    Q   Have you seen the stuff that -- the contents
20  of what you wrote in the logbook since you wrote it?
21    A   No.
22        MS. COLE:  Objection to form.

149

1        You can answer.
2        BY MS. WU:
3    Q   Okay.  So we do not have -- you do not have
4  any photo or information pertaining to the logbook
5  entries that you wrote --
6    A   No.
7    Q   -- is that right?
8    A   No.
9    Q   Did you ask for it when you went to MPD and
10  took the photos that are now Defendant's 225 and 226?
11    A   Yes.
12    Q   And what did they say?
13    A   They couldn't account for missing pages that
14  was in that logbook and they did not know where it was
15  at.
16    Q   And who did you speak to when you asked for
17  this information?
18    A   I don't remember the name.
19    Q   Okay.  And you would agree with me that on
20  Exhibit 5, there is no word -- there is no SmartTrip
21  card logged in the property listed below section; is
22  that correct?

150

1    A   No.  I don't see a SmartTrip card on this
2    log, but, again, I didn't make this entry.
3       Q   And then I think you previously testified
4    this, but you also looked in the property slip and you
5    did not see a SmartTrip card in there; right?
6    A   Right.
7       Q   Okay.  Let me go back to Exhibit 4.
8       To your knowledge, does this still exist at
9    MPD?
10   A   Yes.
11      MS. COLE:  Objection.  Foundation.
12      BY MS. WU:
13      Q   And what do you recall -- I don't see the
14   contents of this, so what do you recall was in this
15   bag?
16   A   A Massachusetts identification card.
17      Q   Anything else?
18   A   No.
19      Q   Do you have any knowledge of why they would
20   have -- why the Massachusetts I.D. would have been put
21   separately, by itself?
22      MS. COLE:  Objection.  Foundation.

151

1    Speculation.
2       You may answer.
3       THE DEPONENT:  No.
4       BY MS. WU:
5       Q   And do you know if civilians can view the
6    evidence in the evidence bag?
7       MS. COLE:  Objection.  Foundation.
8       You may answer.
9       THE DEPONENT:  No.
10      BY MS. WU:
11      Q   Was anyone present with you when you logged
12   the property at District 4?
13   A   Officer Jones went with me to District 4,
14   but I don't recall if she was next to me as I was
15   putting property.
16      Q   Do you think Officer Jones has any -- are
17   you aware of any personal knowledge Officer Jones
18   would have with respect to what you logged and gave to
19   District 4?
20   A   No.
21      Q   You are not aware of any personal knowledge?
22   A   Not aware, no.

152

1       Q   Did you tell anybody, specifically, that you
2    turned a SmartTrip card over to District 4?
3    A   No.
4       Q   And I think I know the answer, but why did
5    you turn over the SmartTrip card to District 4?
6    A   It was part of Ms. Ulysse's property, and to
7    put all her property in one location.
8       Q   Have you, on other occasions, kept evidence
9    related to an MTPD arrest?
10      MS. COLE:  Objection to form.
11      You may answer.
12      THE DEPONENT:  I'm not quite sure I
13   understand what you mean.
14      Did I keep evidence as --
15      BY MS. WU:
16      Q   Yeah.  My question was not clear, I'm sorry.
17      Have you ever, on prior occasions, not given
18   it to the booking precinct, but rather kept it within
19   MTPD's storages?
20   A   Yes.
21      Q   Okay.  And is that a change in policy that
22   causes -- or what -- why will sometimes it be turned

153

1    over to the precinct and sometimes be kept at MTPD?
2    A   It kind of depends on what the situations
3    are.  It kind of fluctuated.  If you would need
4    immediate access to it, it will be easier to get it
5    from our property instead of trying to go back through
6    D.C. and get it through their property clerk.  That's
7    just one example.
8       Q   Any other examples that you can think of?
9    A   Sometimes, for whatever reasons, on D.C.'s
10   end or any of our other jurisdictions end, they might
11   not be accepting property or taking that type of
12   property.
13      Q   Okay.  Any other reasons?
14   A   No, none that I can think of.
15      Q   Okay.  And so in this particular instance in
16   May of 2018, was it an option to have kept the
17   SmartTrip card within MTPD's storages?
18   A   Yes.
19      Q   And did you -- were you the one that made
20   the decision not to?
21   A   Yes.
22      Q   Why?

154

1    A   Well, I felt the photo with the DVR footage
2  would have been enough evidence without me having to
3  keep the physical SmartTrip card.
4    Q   And in other cases of fare evasion that led
5  to arrests, do you have a particular practice of
6  keeping the SmartTrip card within MTPD, or giving it
7  to the precinct, or both circumstances happening?
8    A   Both circumstances happened.
9    Q   Other than the officer who conducted the
10 searches and arrest and you, are you aware of anybody
11 else who had physical custody of the SmartTrip card
12 before it was handed over to District 4?
13   A   I can't recall if anyone else had the
14 SmartTrip card before it went to District 4.
15   Q   I don't know this is a bit of a silly
16 question, but if you didn't have the SmartTrip card in
17 front of you, are you able to memorize Ms. Ulysse's --
18 the number of it?  Like, would you be able to
19 recognize the numbers on Ms. Ulysse's SmartTrip card?
20   A   No.
21        MS. WU:  Okay.  Exhibit 6 will be
22 Defendant's 18 through 20.

155

1        MS. COLE:  Counsel, let's just briefly touch
2  on logistics.  It's almost 2:30.  When are we thinking
3  about taking that break?
4        MS. WU:  I would love -- I think this
5  exh bit will be very quick, and then I would love to
6  play one video, so we don't have to do all the videos
7  all at once.  So if I can get through that, which I
8  think is 15 minutes at most, can we take a break then?
9        MS. COLE:  Okay.
10       BY MS. WU:
11   Q   I believe this one will be fast, but I guess
12 it depends on Officer Stokes, your knowledge of it.
13 So now it is now uploaded.  We are on Exhibit 6.
14       Am I still sharing my screen?  No.  Let me
15 share my screen again.
16       So Exh bit 6, for the record, is Defendant's
17 18 through 20.
18       My first question to you is that previously
19 you testified that you take -- you took the evidence
20 to the U.S. Attorney's office with respect to this
21 case.
22       Is this one of the documents you took to the

156

1  U.S. Attorney's office?
2        (Stokes Deposition Exhibit 6 marked for
3  identification.)
4        (Document tendered to the Deponent.)
5    A   Yes.
6    Q   And similarly, previously you testified that
7  you've received the next day of SmartTrip card
8  printout summary.
9        Is this the same document that you received
10 the next day?
11   A   Yes, I believe so.
12   Q   And you don't know who created it; right?
13   A   No.
14   Q   Do you have -- you know how to read it?  Is
15 there something you are an -- you know, you can help
16 me decipher?  It's okay if you say no.  I'm just
17 curious.
18   A   No.  Not an expert on deciphering this, no.
19   Q   Okay.  Have you seen this photo before --
20 you were the one who -- U.S. Attorney's office, but
21 you don't know how to decipher it; is that right?
22   A   I have very limited knowledge on how to read

157

1  this.  Entry, exit, inverted.  I can tell you what
2  that means.
3    Q   Okay.  What does entry, exit, inverted mean?
4    A   Entry, exit, inverted, it happens when
5  someone actually touches their SmartTrip card to a
6  target, doesn't it have enough money to open the fare
7  gates.  So each time a SmartTrip card touches a
8  SmartTrip target it is recorded with the system.  And
9  --
10   Q   Can you tell me anything else?
11   A   If you look over at the value, SmartTrip
12 value remaining, that tells you how much fare was on
13 the card.
14   Q   Where do you see SmartTrip value remaining?
15   A   It says SV.  Then it has the words
16 "remaining" underneath.
17   Q   So SV stands for smart trip value?
18   A   Yes, ma'am.  Remaining.
19   Q   Okay.
20   A   And the numbers underneath it, that is the
21 value on the SmartTrip card.
22   Q   Okay.  And what does ALP value used mean?

158

1    A   I'm not familiar with that one.
2    Q   Or SV changed?
3    A   No, I don't know that one either.
4    Q   Okay.  Did anyone tell you a conclusion to
5    draw from the SmartTrip printout history or did you
6    drew your conclusion that Ms. Ulysse or that the
7    SmartTrip showed fare evasion from what you just read
8    out to me, this entry/exit info and the SV remaining?
9    A   No.  I can tell -- well, fare evasion
10   occurred from the -- from my own interpretation of it.
11   Like, I understand what the entry/exit inverted means
12   and I understand what the SmartTrip value remaining.
13   Q   Did anybody talk to you about any
14   conclusions to draw from this printout?
15   A   No.  Not to my knowledge, no.
16   Q   Okay.  We can set this aside.  The next
17   exhibit is going to be a video, MOO1.  I think it's
18   just best if I stream it and we all just watch
19   together on the share screen.  But I think you will
20   need to put it into the share file for the court
21   reporter's purposes.
22        Sorry.  Indulgence.  Share stream.  And, you

159

1    know what, I'm told I need to make sure I share my
2    audio.  Oh, no, no.  There is no audio.
3        Okay.  Can you guys see the video on the
4    share screen now?
5        MS. COLE:  Yes.
6        THE DEPONENT:  Yes.
7        BY MS. WU:
8    Q   Okay.  For the record, this is video MOO1.
9    And I have keyed it to 1 minute 43 seconds.  And I
10   represent to you that there is nothing pertaining to
11   this arrest prior to 1 minute 43 seconds.
12        So I'm just going to play this video maybe
13   about a minute of this -- about ten seconds of this
14   video, and I will ask you a couple of questions and
15   then I'll play the rest of this; I'll play the
16   remaining clip of this video.
17        Okay?
18        (Stokes Deposition Exhibit 7 marked for
19   identification.)
20        (Document tendered to the Deponent.)
21   A   Yes.
22   Q   Okay.  So I stopped the video at 1:58.

160

1        Can you describe what you just saw in the
2    video?
3        A   Yes.  I just saw Ms. Ulysse exit through the
4    fare gate in a piggyback manner, without paying the
5    established fare.
6        Q   And how close was Ms. Ulysse to the person
7    in front of her?
8        A   From the video, I couldn't tell.  I still
9    can't give you how many feet or whatever.
10       Q   Are you visible in the video right now?
11       A   Yes.
12       Q   Where are you?
13       A   I'm at the entrance to the station.
14       Q   So would the top left of the video footage
15   be right?
16       A   Top left of the video footage, correct.
17       Q   And does this refresh your recollection of
18   how far away you were from the turnstyles?
19       A   Yes.
20       Q   Okay.  And how far away were you?
21       A   Again, I don't know the distance.  If you
22   are looking for like certain feet or anything like

161

1    that, I can't tell you.
2        Q   Would you agree that it was far?
3        MS. COLE:  Objection.  What did you say?
4    Sorry.
5        BY MS. WU:
6        Q   I said would you agree that it was far.
7        MS. COLE:  Oh.  Objection to form.
8    Characterization.
9        You may answer.
10       THE DEPONENT:  No.
11       BY MS. WU:
12       Q   Do you not agree?
13       A   No.
14       Q   Okay.  And now I'm going to play from 1:58
15   and I'll stop at -- well, maybe I'll just move a
16   little bit.  Maybe I'll start at -- well, sorry, guys.
17   Give me a second.
18       I'm going to go from 1:50 and I want you to
19   be watching on the top left-hand corner of this video.
20   Okay?
21       And so I stopped the video at 2:07.  Can you
22   describe what you saw in this section of the video?

162

1    **A   What did I see in this video?**
2    Q    This section of the video that we just
3    watched.
4    **A    In this section of the video I can't see**
5    **anything going on in that top-left corner.**
6    Q    Did you see the other people in the top-left
7    corner other than Ms. Ulysse and you?
8    **A   Yes.**
9    Q    And having watched this video, is there --
10   were you able to see where -- where you are to the --
11   in relation to Ms. Ulysse when you first approach her?
12   What direction you approached from?
13           MS. COLE:  Objection.  Form, foundation.
14   You may answer.
15           THE DEPONENT:  From this video angle, I can
16   barely tell what's going on in the upper-left corner.
17           BY MS. WU:
18   Q    We can show it one more time just to make
19   sure.  I'm going to start at 1:58 this time.  Okay.
20           And I'm going to stop again at 2:08 -- 2:09.
21           Are you able to tell which direction you
22   approached Ms. Ulysse from.

163

1           MS. COLE:  Counsel, I don't know what you
2    played, but it didn't show the movement.  It just went
3    from one screen grab to another screen grab; is that
4    correct?
5           MS. WU:  That is not correct.
6           BY MS. WU:
7    Q    Officer Stokes, did you see movement in
8    between?
9    **A    This video is jumping from points to points.**
10   **It's not playing.**
11   Q    Okay.  I will try that again.  I'm sure it's
12   the technology.
13           Tell me if it is jumping again.
14           Okay.  I showed from 1:50 to 2:06.  Was it
15   jumping this time?
16           MS. COLE:  It appeared to play, from my
17   perspective.
18           THE DEPONENT:  If played.
19           BY MS. WU:
20   Q    So my question is just are you able to tell
21   from this video from which direction you approached
22   Ms. Ulysse?

164

1    **A   Yes.**
2    Q    And which -- were you to the front of her or
3    to the side of her?
4           MS. COLE:  Objection as to form.
5           You may answer.
6           THE DEPONENT:  From the -- from her right
7    side.
8           BY MS. WU:
9    Q    Okay.  So having watched this video, we will
10   watch other videos when we get back off break, I just
11   want to see if there is any testimony that you wish to
12   change or clarify from previously when you were not
13   watching the videos.
14           MS. COLE:  Objection to form, foundation.
15           THE DEPONENT:  No.
16           MS. WU:  Okay. I think this is a good time
17   for a half hour break, so we can start back here at
18   3:10.
19           MS. COLE:  Will do.
20           (Recess taken at 2:39 p.m.)
21                        (3:14 p.m.)
22

165

1           BY MS. WU:
2    Q    Good afternoon, Officer Stokes.  Before I
3    begin, did you communicate with anybody during your
4    break?
5    **A   No.**
6    Q    Okay.  I'm going to turn your attention to
7    what has been marked as Plaintiff's Exh bit 8.  For
8    the record, Plaintiff's Exhibit 8 is Defendant's Bates
9    stamp 13 through 14.
10           Officer Stokes, let me know when you are
11   ready to discuss.
12           (Stokes Deposition Exh bit 8 marked for
13   identification.)
14           (Document tendered to the Deponent.)
15   **A   Okay.  I got it.  I can see.**
16   Q    Okay.  Do you recognize this document?
17   **A   Yes.**
18   Q    And what is it?
19   **A   Well --**
20   Q    I think you just said that you had to give
21   this to Sergeant Muller.  Can you explain how it came
22   about that you ended up typing up the statement?

166

1    A    It was in reference to a -- to a customer
2   complaint.
3    Q    And who asked you to draft this statement?
4    A    Sergeant Muller.
5    Q    Were you asked or were you told to draft
6   this statement?
7    A    I was told.
8    Q    And you were told my Sergeant Muller?
9    A    Yes.
10   Q    And did that conversation happen in person,
11  on the phone, via email?
12   A    In person.
13   Q    And what -- was it the same day as the
14  incident, or the day that it is dated or some other
15  day?
16   A    The day it is dated, May 28th.
17   Q    So he told you to write it on May 28, and
18  then you wrote it that day; is that right?
19   A    Yes.
20   Q    Did he give you any instructions about what
21  to include or not include in the statement?
22   A    No.

167

1    Q    Did you leave anything out of the statement?
2    MS. COLE:  Objection to form.  Foundation.
3    THE DEPONENT:  I've include everything that
4   I can remember up to the point that I wrote the
5   statement.
6    BY MS. WU:
7    Q    Okay.  And are there any drafts of this
8   statement?
9    A    No.
10   Q    You don't have any prior versions of this
11  statement saved anywhere?
12   A    No.
13   Q    Did you submit any versions of this
14  statement before submitting Exhibit 8?
15   A    No.
16   Q    Did you show this statement to anyone else
17  before you turned it in?
18   A    No.
19   Q    And you submitted it to Sergeant Muller; is
20  that right?
21   A    Yes.
22   Q    Did you submit it in person, via email?

168

1    A    In person.
2    Q    What was the conversation that you had when
3   you submitted it?
4    MS. COLE:  Objection.  Form, foundation.
5    THE DEPONENT:  Here's my statement.
6    BY MS. WU:
7    Q    Did you say anything else to Sergeant Muller
8   when you gave him the statement?
9    A    No.
10   Q    Did you have any discussions with Sergeant
11  Al Hinawi prior to turning in your statement?
12   MS. COLE:  Objection.
13   You may answer.
14   THE DEPONENT:  No.
15   BY MS. WU:
16   Q    Did Sergeant Al Hinawi have occasion to see
17  the statement before you submitted it?
18   MS. COLE:  Objection.  Form, foundation.
19   You can answer.
20   THE DEPONENT:  No.
21   BY MS. WU:
22   Q    Are you aware that Sergeant Al Hinawi

169

1   submitted a statement?
2    A    I don't know.
3    Q    Did you had any discussions with Sergeant Al
4   Hinawi about his statement?
5    A    No.
6    Q    Had you discussed this statement with
7   anybody before you submitted it?
8    A    No.
9    Q    Had you watched the surveillance footage
10  before you wrote the statement?
11   MS. COLE:  Objection to form.
12   You may answer.
13   THE DEPONENT:  No.
14   BY MS. WU:
15   Q    You had not watched any videos as of May
16  28th, 2018?
17   A    No.
18   BY MS. WU:
19   Q    Had you gotten information about the
20  SmartTrip card before writing the statement?
21   A    Yes.
22   Q    So other than what you viewed at the scene,

170

1  what you, yourself, observed at the scene and the
2  information about that SmartTrip card, was there
3  anything else that you relied on in writing this
4  statement?
5          MS. COLE:  Objection to form.
6          You may answer.
7          THE DEPONENT:  No.
8          BY MS. WU:
9      Q   So I'm going to just ask you some clarifying
10  questions about the statement itself.  If you want to
11  take some time to read it over, you are free to.  And
12  then let me know when you're ready.  Or if you have
13  read it before, I'm happy to begin whenever you are
14  ready.
15      A   One moment.
16          Okay.
17      Q   Okay.  So the first sentence of the
18  statement says:  On May 21st, 2018 at 08:50 hours, I
19  observed a black female customer, later identified as
20  Ms. Ulysse, exit the Fort Totten metro station located
21  at the 550 block of Galway Street Northeast, by
22  following closely, making no attempts to process a

171

1  valid metro SmartTrip card as she was exiting the
2  metro rail system.
3          My question is:  What do you mean when you
4  wrote that she made no attempt to process a valid
5  metro SmartTrip card as she was exiting the metro rail
6  station?
7      A   That -- I wrote this statement on the 28th,
8  so before I actually had to write the statement, I did
9  gather some more information.  So after reviewing the
10  SmartTrip history, and seeing that it was entry
11  inverted for three days prior to the incident, that's
12  when that statement came from, making no attempt to
13  process a SmartTrip card.
14      Q   Okay.  So by making no attempt, you don't
15  mean whether or not you saw her swipe or put her hand
16  up on the swipe button or anything having to do with a
17  swipe; is that right?
18      A   Correct.
19      Q   And then we can go about half way down the
20  page where the sentence begins:  Ms. Ulysse continued
21  to struggle, and began to shout get off of me.
22          Do you see that?

172

1      A   Yes.
2      Q   So my first question is:  Can you describe
3  more specifically what you mean by "she continued to
4  struggle" here?
5      A   The pulling away from my grasp.  I had to
6  tell her she was under arrest, and the pulling us down
7  to the ground.
8      Q   Well, so -- the pulling away from you down
9  to the ground, was there any previous action of
10  resisting arrest before that?
11          MS. COLE:  Objection to form.  Foundation.
12          You may answer.
13          THE DEPONENT:  Once I grabbed Ms. Ulysse by
14  the arm and I informed her she was under arrest, and
15  she still continued to pull, pull away, pulling us to
16  the ground.
17          BY MS. WU:
18      Q   So the first act of struggle or
19  resisting arrest is her resisting your grab of her arm
20  and pulling you to the ground; is that right?
21      A   After informing her that she was under
22  arrest, yes.

173

1      Q   And she didn't take any actions of resisting
2  arrest before you informed her that she was under
3  arrest; correct?
4          MS. COLE:  Objection to form.  Foundation.
5          THE DEPONENT:  No.
6          BY MS. WU:
7      Q   And then the sentence continues:  She began
8  to shout, "get off of me" and "why are you doing this"
9  while trying to violently pull away from my grasp.
10          Are "get off of me" and "why are you doing
11  this", to the best of your recollection, direct quotes
12  of what she said as she was going -- as she was going
13  to the ground?
14      A   From the best of my knowledge, at the time
15  of writing this statement, yes.
16      Q   Okay.  And then what do you -- can you
17  describe more specifically what you meant by "while
18  trying to violently pull away from my grasp."  Why do
19  you describe it as violent?
20      A   I was holding Ms. Ulysse with just -- with
21  one hand on her -- my left hand on her left arm, and
22  she yanks away from my grasp using all of her weight,

174

```
1   all of the strength that she can muster, and pulling
2   us down toward the ground.  That's how I describe it.
3       Q    And how do you know that she used all of the
4   strength she could muster and all of the weight?
5       MS. COLE:  Objection to form, foundation.
6       You can answer.
7       THE DEPONENT:  As she was pulling away,
8   again, to the point that she pulled herself -- pulled
9   both of us to the point that she was nearly touching
10  the ground, pulling downward very hard, very strong.
11      BY MS. WU:
12      Q    Okay.  So you don't know if she was using
13  all of her weight, but you felt that it was very
14  strong, her pull?
15      Is that right?
16      MS. COLE:  Objection to form.
17      You may answer.
18      THE DEPONENT:  I felt she was using all of
19  her body weight.
20      Again, she pulled downward to the point
21  almost set down on the ground as she was yanking away
22  from my grip.  So...
```

175

```
1       BY MS. WU:
2       Q    And what -- do you believe she was falling?
3       MS. COLE:  Objection to form.
4       You may answer.
5       THE DEPONENT:  No.
6       BY MS. WU:
7       Q    And why do you not believe that she was
8   falling?
9       A    Again, like immediately, when I touched her
10  hand, touched her arm, correction, I grabbed her arm,
11  she yanked away, started yanking down, yelling "get
12  off me."  Pulling.  Yanking down.  Pulling down.  No,
13  I don't believe she was falling.  Actually, no, I know
14  she wasn't falling down.
15      Q    And did you give me all the reasons why you
16  know or don't believe she was falling down?
17      A    Again, yelling, "get off me, get off me,"
18  pulling away from my grasp, holding her by -- using
19  one hand on one arm, her one arm.  Yeah, she was not
20  falling, she was trying to pull away from me.
21      Q    Anything else?
22      A    No.
```

176

```
1       Q    The final sentence of this page says, "I
2   made a concentrated effort to fall in a manner that
3   would not allow my full body weight to land on her,
4   resulting in me taking most of the impact on my left
5   knee when it made contact with the pavement".
6       Did you sustain an injury on your left knee
7   as a result of the fall to the ground?
8       A    No.
9       Q    No.  And can you describe what you mean by
10  you made the concentrated effort to fall in a manner
11  that would not allow my full body weight to land on
12  her?
13      A    When she pulled me off balance, we both
14  started to fall at that point.  I didn't want to land
15  on her, so I shifted my body in a manner that I would
16  hit the ground with my knee and not land on
17  Ms. Ulysse.
18      Q    Thank you.  And I'm going to scroll down to
19  the second page of your statement.
20      The first sentence of which is:  While on
21  the ground, Ms. Ulysse continued to resist arrest by
22  tucking both of her arms underneath her body causing
```

177

```
1   the straps on the tank-top style shirt to come undone
2   and partially exposing her breasts.
3       We previously talked about her struggle
4   to -- when she was pulling you downward causing you to
5   fall on the ground.  Up through this sentence, is
6   there any other evidence of resisting arrest that --
7   by Ms. Ulysse?
8       MS. COLE:  Objection to the form.
9       You may answer.
10      THE DEPONENT:  Sorry?  Can you repeat that
11  one?
12      BY MS. WU:
13      Q    Yeah.  It wasn't a very clear question.  Let
14  me ask it this way:
15      You say here Ms. Ulysse continued to resist
16  arrest.
17      So I'm asking what do you mean by continued
18  to resist arrest?  What was her previous action of
19  resisting arrest?
20      A    When she continued to pull away from my
21  grasp when I informed her that she was under arrest at
22  that point.
```

178

1    Q   Anything else?
2    A   No.
3    Q   What do you mean by tank-top style?
4    A   At the time that I wrote this report, I
5 thought Ms. Ulysse had on a shirt that had straps on
6 it, as a tank top.  Now, after watching the video, I'm
7 getting further information, I now know that I mistook
8 the strap on her purse as a strap that was on to her
9 shirt.  So she was wearing a tube-top with no straps
10 on top of it.
11   Q   In addition to watching the video and that
12 changing your understanding, you said you also got
13 further information.  What other further information
14 did you get?
15   A   That was just in reference to the question
16 now that you are asking me about.  I don't --
17       Can you clarify what you are asking?
18   Q   Yeah.  So you said that as of the time of
19 the statement, you thought that it was a tank top, and
20 that after watching the video and getting further
21 information, you now think it was a tube top and that
22 the strap was a purse.

179

1       So I'm asking what did you mean by getting
2 further information?
3       MS. COLE:  Objection to form.
4       You can answer.
5       THE DEPONENT:  Besides getting the clarity
6 on the style of shirt she was wearing -- yeah, getting
7 clarity on the type of shirt she was wearing, and if
8 that was the cause of her being exposed.
9       BY MS. WU:
10   Q   Other than the videos, how else did you get
11 the clarity?  What else did you see that got the
12 clarity?
13   A   You mean besides watching the video of the
14 event?
15   Q   Yes.
16   A   After watching the video, you know, that's
17 what I --
18   Q   So the only thing that's changing your mind
19 is watching the video; is that right?
20   A   Yes.
21   Q   It's -- going back a second, you said she
22 continued to resist arrest by tucking both of her arms

180

1 underneath her body.
2       Can you describe what you mean by that?
3    A   After Ms. Ulysse pulled us to the ground,
4 she fell down on her right side and then rolled on to
5 her stomach.  And then put both arms underneath her
6 body and refused to give her hands to be placed in
7 handcuffs.  She was under arrest.  Because at that
8 point, she was under arrest.  So that passively
9 resisting --
10   Q   So by the statement what you mean is she
11 rolled and she then put both of her -- then both of
12 her arms were under her body and did not come out from
13 under her body; is that right?
14   A   I would say that she placed -- she tucked
15 her arms underneath her body.  And the resistance
16 continued because she was given orders to place her
17 hands behind her back and she refused to.
18   Q   When did she -- when was she given notice to
19 put her hands behind her back?
20       MS. COLE:  Objection to form.
21       You can answer.
22

181

1       BY MS. WU:
2    Q   Is that in the memo?
3    A   No, it's not written directly as -- directly
4 like that in the memo.  I was giving you the
5 definition of resisting.  That's what you was asking
6 me, what did I put, resisting.  That's why I put
7 continued to resist.  Those were the actions.
8    Q   Okay.  So you don't, sitting here, remember
9 having a conversation of telling her to put her hands
10 behind her back?
11       MS. COLE:  Objection.
12       You may answer.
13       THE DEPONENT:  No.  That's not correct.  I
14 did place her to place her hands behind her back
15 because she was under arrest.  She continued to
16 resist.  That's what the statement --
17       BY MS. WU:
18   Q   That's my question:  When did you tell her
19 to place her hands behind her back?
20   A   While she was -- while she had them tucked
21 underneath of her while we were both on the ground.
22   Q   Okay.  So when -- as she had her hands

182

1 tucked underneath her, what exactly did you say to
2 her?
3    **A   "Give me your hands."**
4    Q   Okay.  And how many times did you say that?
5    **A   I don't recall how many times I said it.**
6 **More than once.**
7    Q   And both times you said exactly the same
8 thing, "give me your hands"?
9    **A   Yes.**
10    Q   Did she say, no, or did she say anything in
11 response?
12    **A   She just continued to yell, scream.  I don't**
13 **know -- I can't recall exactly what she was yelling**
14 **and screaming at that point.**
15    Q   How loudly did you say to give her -- give
16 me your hands?
17       MS. COLE:  Objection to form.
18       You may answer.
19       THE DEPONENT:  Very loud.  Describe how
20 loudly?  I didn't whisper give me your hands up.
21       BY MS. WU:
22    Q   So loud enough that we should be able to

183

1 hear it on the video, then?
2       MS. COLE:  Objection to form, foundation.
3       THE DEPONENT:  I know it was loud enough for
4 Ms. Ulysse to hear me.
5       Loud enough for video?  I can't tell you.
6       BY MS. WU:
7    Q   Okay.  So we will watch the video and you
8 will let me know when you hear it, when you hear that
9 statement.
10       So I understand that now you do not believe
11 that the straps on her tank-top style shirt came
12 undone, so -- but do you -- would you agree that her
13 breasts her partially exposed?
14       MS. COLE:  Objection.  Characterization.
15       You may respond.
16       BY MS. WU:
17    Q   Officer Stokes, can you step back a little
18 bit again?  I'm sorry.
19    **A   Again, just to clarify the question, are you**
20 **asking this in relationship to at the moment of -- on**
21 **the 21st or as I would have known when I wrote the**
22 **statement on the 28th?**

184

1    Q   I'm asking what you meant when you wrote
2 this sentence of causing her breasts to become
3 partially exposed.
4       Do you agree that -- what did you mean when
5 you wrote that statement?
6    **A   It was in conjunction with the tank.  Like,**
7 **I thought the -- again, I thought the shirt had straps**
8 **on it, so I believed that the straps popping had**
9 **something to do with potentially exposing her breasts.**
10 **That's not the case.  It was a tube-top shirt.**
11       **When I wrote this statement, I was answering**
12 **it in direct relation to a complaint.  The complaint**
13 **made mention of her breast being exposed, and that's**
14 **why it is included in this -- included in my**
15 **statement.**
16    Q   So is your testimony that as of May 21st,
17 2018, you were not aware that her breasts had become
18 partially exposed?
19       MS. COLE:  Objection to form.
20       You may answer.
21       THE DEPONENT:  On the 21st, I did not know
22 that her breasts were exposed.

185

1       BY MS. WU:
2    Q   Okay.  And so the first time that you
3 learned that her breasts were exposed as part of the
4 complaints that came in; is that right?
5       MS. COLE:  Objection.  Form, foundation.
6       THE DEPONENT:  Yes.
7       BY MS. WU:
8    Q   And the complaint, do you recall if the
9 complaint came by a name by the woman of Rona
10 Soleymon?
11    **A   I don't remember the name of the complaint,**
12 **no.**
13    Q   When you were writing this, what did you
14 mean by partially exposed?  Is that the language that
15 came from Ms. Soleymon's complaint?
16    **A   No.  What I meant by partially is if her**
17 **breasts were exposed, which I wasn't sure they were**
18 **exposed on the 21st at all, Ms. Ulysse's body**
19 **position, she was face down on the ground.  So it**
20 **couldn't have been a lot of exposure from her body**
21 **position on the ground, because she was laying on her**
22 **stomach during this arrest.**

---

**186**

1     Q   So your use of the term partially here is

2 speculating, based on the fact that she was on her

3 stomach?

4     MS. COLE: Objection to form, foundation.

5     You may answer.

6     THE DEPONENT: Yes.

7     BY MS. WU:

8     Q   The reason Ms. Ulysse's breasts became

9 exposed was due to her tucking her arms underneath her

10 body or is that something that you no longer agree

11 with now that you know about the tank-top?

12     MS. COLE: Objection. Characterization,

13 form, foundation.

14     You may answer.

15     THE DEPONENT: I believe Ms. Ulysse's breast

16 became exposed due to her pulling and tugging us down

17 to the ground. At any point in that it could have

18 happened. I don't know when it happened. I wasn't

19 aware that it actually happened on the date that the

20 arrest occurred.

21     Q   Let me break that, the answer, down.

22     What have you since learned that causes you

---

**187**

1 to -- I guess to know that her breasts became

2 partially exposed?

3     **A   At the time that I wrote this statement, it**

4 **was only the written complaint that I've received.**

5 **Like I hadn't saw any video or anything to this point.**

6     Q   So after reviewing the video, that is the

7 further information that led you to the conclusion

8 that Ms. Ulysse's breast were, in fact, partially

9 exposed?

10     **A   Yes.**

11     Q   And what -- and -- and so did something from

12 the video cause you to believe that the reason her

13 breasts became exposed was her struggling and going to

14 the ground?

15     **A   I guess her struggling led to that.**

16     Q   Do you recall later -- and we will get to

17 this, but do you recall at some point a T-shirt is

18 placed over Ms. Ulysse's body?

19     MS. COLE: Objection to form.

20     You may answer.

21     BY MS. WU:

22     Q   I'm sorry. Did you answer?

---

**188**

1     **A   Can you say the question again?**

2     Q   Yeah. Do you recall if, at some point, a

3 shirt was placed over Ms. Ulysse's body?

4     **A   Yes.**

5     Q   Okay. And is your testimony that you still

6 do not know that her breasts were partially exposed,

7 as of the shirt being put on her?

8     MS. COLE: Objection to form.

9     You may answer.

10     THE DEPONENT: Yes.

11     BY MS. WU:

12     Q   And so why was a T-shirt put on her?

13     MS. COLE: Objection. Foundation.

14     You may answer.

15     THE DEPONENT: At that point, on the 21st,

16 at that point, I didn't know why we were putting a

17 T-shirt over top of her. I never saw her breasts. I

18 didn't think they were exposed or had no knowledge of

19 them being exposed at that point.

20     BY MS. WU:

21     Q   You didn't hear anything from the crowd

22 saying that her breasts were exposed?

---

**189**

1     **A   I don't recall hearing anything from the**

2 **crowd, no.**

3     Q   When you first learned that the complaint

4 included an allegation about Ms. Ulysse's breasts

5 being exposed, did you have any conversations with

6 anybody about that?

7     MS. COLE: Objection.

8     Other than counsel, to which you are

9 instructed not to answer.

10     BY MS. WU:

11     Q   That's right. Other than counsel.

12     **A   No.**

13     Q   Have you told anybody, other than counsel,

14 that the first time you realized Ms. Ulysse's breasts

15 were exposed were as a result of the citizen

16 complaint?

17     MS. COLE: Objection to form.

18     You may answer.

19     THE DEPONENT: I'm sorry. Say that again.

20     BY MS. WU:

21     Q   Other than counsel, and now me, have you

22 told anybody else that you did not realize that

---

**190**

1    Ms. Ulysse's breasts were exposed until you got a
2    citizen's complaint the next day, or whenever it was
3    later on?
4    **A    Yes.**
5    Q    Who did you tell that to?
6    **A    No, I'm sorry.  No, I meant no, I didn't**
7    **tell anyone about that.  I didn't know until I got the**
8    **complaint.**
9    Q    Right.  My question is:  Did you tell anyone
10   that you didn't know until you got the complaint,
11   other than your counsel?
12   **A    I told Sergeant Muller when he gave me the**
13   **initial complaint.**
14   Q    You told Sergeant Muller that you did not
15   know that her breasts were exposed until you got the
16   complaint; is that right?
17   **A    Yes.**
18   Q    Okay.  And when -- how did you -- where were
19   you when you had that conversation?
20   **A    I can't remember.**
21   Q    Was it in person?
22   **A    Yes.**

**191**

1    Q    Was anybody else around?
2    **A    No.**
3    Q    Did you put in writing anywhere that you did
4    not know her breasts were exposed until you got it
5    from the complaint?
6    **A    No.**
7    Q    Anybody else other than Sergeant Muller that
8    you told?
9    **A    No.**
10   Q    Do you recall putting -- scratch that.
11   Okay.  So let's go to the next sentence.
12   I'm sorry, it's the same -- it is the next sentence:
13   Ms. Ulysse continued her disorderly behavior, causing
14   a large, hostile crowd to gather and shout obscenities
15   and threats towards me.  One of them -- sorry.  One
16   male observer kneeled down less than five feet away,
17   yelling for me to calm down, while another male
18   wearing a white T-shirt and eye patch appeared over my
19   left shoulder and yelled that I better get the fuck
20   off of her.
21   Do you see that?
22   **A    Yes.**

**192**

1    Q    What did you mean when you used the term
2    disorderly behavior by Ms. Ulysse?
3    **A    The continued yelling and screaming.**
4    Q    Anything else?
5    **A    No.**
6    Q    And when you say a large, hostile crowd, I
7    know you can't give me an exact number, but what would
8    you characterize as to how many people were in the
9    crowd?
10   **A    I don't know how many people were there.  It**
11   **was -- it was a large crowd.**
12   Q    And what do you mean by hostile?
13   **A    Shouting and yelling profanities and**
14   **threats, from the crowd.**
15   Q    Other than the one statement in this, the
16   "get the fuck off of her," do you recall any other
17   statements which included profanities?
18   **A    Can you rephrase that question?**
19   Q    Yeah.  You have one example of a profanity,
20   "get the fuck off of her," I'm asking if you
21   specifically remember any other profanities or any
22   other statements with profanities.

**193**

1    **A    I recall hearing the cursing.  I can't give**
2    **you quotes that I heard from the crowd, like a direct**
3    **quote.  I can't remember a quote from the crowd.**
4    Q    Okay.  And do you recall if there were
5    multiple people cursing or just one person or what?
6    **A    It sounded like multiple people cursing.**
7    Q    And were you able to lift your head and
8    identify who it was that was cursing?
9    **A    No.**
10   Q    Other -- can you identify any specific
11   threats you heard?
12   **A    You mean besides the get the fuck off of**
13   **her?  Are you asking besides get the fuck off of her?**
14   Q    I see.  It says "I better get the fuck off
15   of her," which you interpret as a threat.
16   Yes.  Besides the get the fuck off of her,
17   any other threats that you recall?
18   **A    Again, like I can't recall the exact, you**
19   **know, wording from the crowd.**
20   Q    Okay.  And the -- the "I better get the fuck
21   off of her."  What is the threat there?
22   MS. COLE:  Objection.  Foundation.

194

1       You may answer.
2       THE DEPONENT:  The individual had made
3  that -- made that threat came behind me while I was
4  down with Ms. Ulysse, came over to my blind side,
5  kneeled over top of me, said "get the fuck off her,"
6  clenched up fists.
7       Q    Did he say "get the fuck off of her" or did
8  he say "you'd better get the fuck off of her"?
9       **A    It was "get the fuck off of her."**
10      Q    Was the -- so the person who said get the
11 fuck off of her was a male wearing a white T-shirt and
12 an eye patch; is that right?
13      **A    Yes.**
14      Q    Okay.  Do you have any other description of
15 him?
16      **A    No.  None that I can think of right now.**
17      Q    What was his race?
18      **A    Black.**
19      Q    Do you recall what color pants he was
20 wearing?
21      **A    No.**
22      Q    Okay.  And he -- and then there's a separate

196

1  TASER from the holster with my right hand and held it
2  at low ready.  This caused both men to quickly back
3  away and provided me with space necessary to reassess
4  the situation.
5       What does it mean to hold the TASER at low
6  ready?
7       **A    Low ready is to have it in a position that
8  you are ready, that you can use it if the situation
9  calls for it.**
10      Q    Is it activated?
11      **A    Yes.**
12      MS. COLE:  Objection to form.
13      You may answer.
14      BY MS. WU:
15      Q    Is there a laser point on it?
16      **A    Yes.**
17      MS. COLE:  Objection to form.
18      BY MS. WU:
19      Q    Is there a switch you have to click to --
20 outside of just un-holstering it is there a switch you
21 have to click to turn it into low ready?
22      MS. COLE:  Objection to form.

195

1  male observer on this statement who says -- you say he
2  kneeled down less than five feet away yelling for me
3  to calm down.
4       Is that -- can you descr be that person?
5  You can't descr be them?
6       **A    No.  I can't remember what they looked like,
7  no.**
8       Q    Okay.  Did you feel like the man -- like the
9  man who yelled for you to calm down, do you associate
10 him as one of the hostile crowd?
11      **A    Yes.**
12      Q    Okay.  Did shout any obscenities that you
13 are aware of?
14      **A    That I'm aware of, no.**
15      Q    Did he shout any threats that you are aware
16 of?
17      **A    No.**
18      Q    And you can't identify what he was wearing;
19 right?
20      **A    No.**
21      Q    The next sentence says:  Fearing for my
22 safety I ordered both men to back away as I drew my

197

1       You can answer.
2       THE DEPONENT:  Yes.
3       BY MS. WU:
4       Q    And then all -- what would you need to do to
5  turn it from low ready to actually being deployed?
6       **A    I would have to pull the trigger on the CEW.**
7       Q    And when you say held it at low ready, what
8  direction was the TASER pointed?
9       **A    Towards the ground.**
10      Q    Was Ms. Ulysse on the ground?
11      MS. COLE:  Objection to form.
12      You may answer.
13      THE DEPONENT:  Ms. Ulysse was on the ground
14 but the TASER was pointed in a safe direction where it
15 wouldn't discharge.  If it was to discharge, it
16 wouldn't have hit anyone.
17      BY MS. WU:
18      Q    So the laser pointer was -- the laser point
19 was at no point pointed on to Ms. Ulysse's body?
20      **A    No.**
21      Q    And why did you point it away from
22 Ms. Ulysse's body?

198

1    A   Again, at the low ready.  So I pointed it in
2  a safe direction so if it were to discharge it would
3  not hit anyone.  But I had it in hand in case I needed
4  to deploy it.  It was no -- yeah.  That's basically
5  what low ready is.
6    Q   So the reason why low ready does not point
7  at somebody in particular is because of the fear that
8  it could accidently discharge; is that right?
9       MS. COLE:  Objection to form.  Foundation.
10      You may answer.
11      THE DEPONENT:  Sorry.  Can you repeat that?
12  BY MS. WU:
13   Q   Yes.  I said the reason why low ready is not
14  pointed at a particular individual is to prevent
15  against the fear of it accidentally discharging, if it
16  were a laser pointed at somebody; is that right?
17      MS. COLE:  Same objection.
18      THE DEPONENT:  Yes.
19  BY MS. WU:
20   Q   And even if it wasn't pointed at Ms. Ulysse,
21  how far away from Ms. Ulysse was the TASER?
22   A   I can't give a distance.  I am not sure how

199

1  far away it was pointing from Ms. Ulysse.
2    Q   But you were straddling Ms. Ulysse at that
3  point; right?
4    A   Yes.
5    Q   The next sentence:  The man in the white
6  shirt stated "I ain't afraid of no damn TASER" and
7  then told a third man to take off his shirt.
8       Can you describe the third man?
9    A   No.
10   Q   Can you -- do you have any understanding of
11  why the man told the other man to take off his shirt?
12   A   No.
13   Q   Next sentence:  Deciding the environment is
14  still unsafe to place Ms. Ulysse in handcuffs, I
15  secured her on the ground with my left hand, had my
16  TASER at low ready with my right hand, and I continued
17  to monitor the crowd for other threats until back up
18  officers could arrive.
19      Why -- what are all the reasons that you
20  thought the environment was still unsafe to place
21  Ms. Ulysse in handcuffs, given the fact that both men
22  you describe above quickly backed away?

200

1    A   Well, the individual that said get the fuck
2  off of her, he still had an aggressive posture.  He's
3  on his toes ready to bounce, fists balled up.  He
4  looked as if at any moment, he could have -- if he had
5  have charged in, if I had attempted to put cuffs on
6  Ms. Ulysse, I wouldn't have been able to protect her
7  or protect myself.  So I thought it was better to keep
8  the TASER at the low ready until back up arrived.
9    Q   And how did you call for back up?
10   A   Over the radio.
11   Q   Did -- how far away was the man in the white
12  shirt after he backed -- backed away?
13   A   Don't know the exact distance.  Close enough
14  to still be a threat.
15   Q   Less than three feet?
16      MS. COLE:  Objection.
17      Counsel, you need to clear what point you
18  are asking.
19      MS. WU:  I did.
20  BY MS. WU:
21   Q   I said when he backed away, how far was he?
22   A   Again, I can't give you the exact distance

201

1  of how far he was when he backed away.
2    Q   And you said close enough to still be a
3  threat.  What distance is still close enough to still
4  be a threat in your mind?
5       MS. COLE:  Objection.  Foundation.
6       You can answer.
7       THE DEPONENT:  Close enough that if he were
8  to -- were to make an attack that I wouldn't have the
9  time enough to respond to it.
10      BY MS. WU:
11   Q   So sitting here today, you can't put a
12  distance to your statement of close enough to be a
13  threat?
14   A   Again, I would define it as close enough
15  that if he were to approach or to attack that I
16  wouldn't have enough time to respond to it.
17   Q   So you can't put a numerical number on that?
18   A   No.
19   Q   Other than your assessment of that white
20  T-shirt wearing male, you know, still having an
21  aggressive posture, was there any other reason why you
22  decided the environment was still unsafe to put

---

202

Ms. Ulysse in handcuffs?

A   The male subjects were the -- one reason.
Again, there was a large crowd.  That was another
reason, also.  And with Ms. Ulysse still continuing to
struggle and resist on the ground, also.  Those are
the three main factors that determined it was still
unsafe to try to place her in handcuffs.

Q   Okay.  So let's take that in turn:  So the
first is the males.  And by males, who do you mean?

A   The individual that said get the fuck off of
her.  From his posture, his -- still had that
aggressive posture, like he was looking for a fight or
preparing himself to fight.

The other male that took his shirt off, I
have no reason why -- I don't know why he took his
shirt off, but I know he did it at the orders of the
first male that said get the fuck off me -- get the
fuck off her; correction.

Q   Is that it for the males?

A   That's for the males, correct.

Q   Okay.  And then the second was the crowd was
still large.  What about being in a crowd being large

---

203

caused you to believe that the environment was still
unsafe to place Ms. Ulysse in handcuffs?

A   It was dividing my attention from -- I had
to keep an eye on the crowd.  I see the guys, they are
the most obvious, the most immediate threat that I see
to myself.  But I still had to monitor the crowd
because I don't know where any other threats would
come from.

So watching the crowd and watching these
individuals, and still trying to maintain control of
Ms. Ulysse, that's why I didn't think it was safe to
try to place handcuffs.

Q   Other than the two males you just described,
was there anybody else in the crowd that you believe
posed a danger to you, that you can descr be?

A   I believe the entire crowd posed some
danger.  I couldn't identify -- I can't single out
anyone to and identify them individually.  Like the
crowd as a whole presented danger.

Q   And were you able to hear anything the crowd
was saying to you?

MS. COLE:  Objection to form.  Foundation.

---

204

You may answer.

THE DEPONENT:  I can't remember anything
l ke any distinct phrases or quotes, but the crowd
itself, there was a lot of yelling, a lot of cursing.
A lot of yelling and cursing towards me.

BY MS. WU:

Q   And you recall any other features of anybody
else in the crowd; right?

A   Correct.

Q   The man -- the man who, you know, was
directed to take his shirt off, do you now know that
he was directed to take his shirt off because
Ms. Ulysse's breasts were partially exposed?

MS. COLE:  Objection.  Form, foundation,
characterization.

You may answer.

THE DEPONENT:  No, I still don't know why he
was told to take his shirt off, no.

BY MS. WU:

Q   Have you read any of the declarations that
have been submitted as part of this case?

A   No.

---

205

Q   And then the third category you said was
Ms. Ulysse's actions herself.  What of Ms. Ulysse's
actions made you decide the environment was still
unsafe to place Ms. Ulysse in handcuffs?

A   She was still trying to -- she was toss --
you know, she was struggling as in tossing and
turning, still screaming.

Q   And that makes it unsafe to place her in
handcuffs?

A   It's in combination with three events.
There's no one single thing that made it unsafe.  Like
all three of those elements made the entire situation
unsafe.

So you have a resisting arrestee, at least
two guys that are making threats and showing signs
that they may by aggressive at any moment.  I have a
crowd that is yelling and cursing also.  Those three
elements all together is what made it unsafe, not one
in particular.

Q   And what do you mean when you say tossing
and turning?

A   I don't have a better way of describing

206

tossing and turning.  I think that kind of describes
itself.

Q    Is it different from what you previously
said of her putting her hands under her body?

MS. COLE:  Objection.  Form.

You may answer.

THE DEPONENT:  It's not different.  It's all
in the same instance.

BY MS. WU:

Q    The same instance?  Is that what you said?

A    It's all in the same instance, the same
situation.

Q    Okay.  I'm just trying to get a definition
of tossing and turning, but if you feel that you can't
give me one, that's fine.

A    I'm sorry.  I didn't understand the
question.

Yes, I can only describe the tossing and
turning as continuing to move from side to side.  Not
staying still.  As in moving side to side,
occasionally trying to push herself upright, rise up
from the ground.  That's the best way I can describe

207

it.

Q    The last paragraph says that once a backup
officer arrived, Sergeant Al Hinawi CR23, Ms. Ulysse
was safely placed in handcuffs.

What does CR23 mean?

A    That is his -- like a badge number for
sergeants starts with CR and then a number.

Q    Okay.

An observer from the crowd offered a blue
button up shirt to cover Ms. Ulysse with prior to
bringing her to her feet.

I think that's supposed to say prior to
bringing her to her feet.

Is that still your recollection, that it was
a blue button up shirt that Ms. Ulysse was covered
with?

A    It was a blue shirt.  I don't recall if it
was button up or not, it was a blue shirt.

Q    You can't recall if it was a button up?

A    Correct.

Q    And was it a different shirt from the shirt
the man took off himself earlier?

208

MS. COLE:  Objection to form, foundation.

You may answer.

THE DEPONENT:  On the 21st at the time this
was happening, no, I didn't know.  After watching the
video, it was the same shirt.

BY MS. WU:

Q    Did you assist in putting it on her?

MS. COLE:  Objection to form.

You can answer.

THE DEPONENT:  From my positioning, I was
still behind Ms. Ulysse.  So, like, I have didn't
do -- if you are asking me like did I put it over her
head to cover her up with it, no, I didn't assist in
that portion of it.  But once someone got it over her
I would -- you know, where I'm at, would pull it down
further.  But like the back or something.

BY MS. WU:

Q    So someone else put it over her head but you
assisted in pulling the shirt down once it was over
her head; is that right?

A    Once it got to, you know, where it was
actually positioned on her body, whenever it got close

209

to there, yes, I would assist in that portion.

Q    And who put it over her head?

A    It was a -- it was an observer from the
crowd, I believe a white female.  A white female from
the crowd.

Q    Would you characterize her as part of the
hostile crowd?

MS. COLE:  Objection to form.

You may answer.

THE DEPONENT:  She was in the crowd, yes.

BY MS. WU:

Q    So yes, you would characterize her as one of
the hostile people in the crowd?

MS. COLE:  Objection to form.
Mischaracterization.

THE DEPONENT:  No.  She was amongst the
crowd that was hostile.  I can't say she, in
particular, was a hostile individual.

BY MS. WU:

Q    You don't know one way or the other or she
was not hostile?

A    She was in the crowd.  Again, I can't say

210

1  **that she was a hostile individual in the crowd, no.**
2      Q   Okay.  And, again, you don't know -- as of
3  May 21st, you don't know why they are putting the
4  shirt over her?
5      **A   Correct.**
6      Q   And it finally says:  Ms. Ulysse was
7  escorted to the patrol.
8      Actually, I take it -- let me back up.
9      So when you use the word "cover" Ms. Ulysse
10  here, an observer from the crowd offered a blue button
11  up shirt to cover Ms. Ulysse with prior to bringing
12  her to her feet.
13      What do you mean by "cover" Ms. Ulysse?
14      MS. COLE:  Objection, form.
15      You can answer.
16      THE DEPONENT:  Putting the shirt on
17  Ms. Ulysse.
18      BY MS. WU:
19      Q   If there was no reason to put a shirt on
20  Ms. Ulysse, why did you let a civilian come close to
21  her?
22      MS. COLE:  Objection.  Foundation.

211

1      You may answer.
2      THE DEPONENT:  Again, I didn't know why a
3  shirt was even being put on her.
4      BY MS. WU:
5      Q   Did you ask any questions, like, why is this
6  shirt being put on her?
7      **A   No.**
8      Q   Did you ever ask anybody why this shirt was
9  being put on her?
10      **A   No.**
11      Q   And the last sentence is:  Ms. Ulysse was
12  escorted to the patrol car for transport to Providence
13  Hospital because she complained of wrist injury.
14  Ms. Ulysse was treated, released, and taken to 4D for
15  processing.
16      Does 4D mean the 4th District?
17      **A   Yes.**
18      Q   Now that we have gone through the statement,
19  other than what was in the statement and then what you
20  told me in the course of this conversation, sitting
21  here, do you recall any other statements that you made
22  to Ms. Ulysse between your initial approach of her and

212

1  when she was taken to Providence Hospital?
2      **A   No.**
3      Q   And other than what was in this statement
4  and what you told me, do you recall any other
5  statements that Ms. Ulysse made -- that you heard
6  Ms. Ulysse say, between your initial approach of her
7  and when she was taken to Providence Hospital?
8      **A   No.**
9      Q   And then any actions that Ms. Ulysse took
10  during that time that wasn't in the statement and that
11  we didn't just discuss?
12      MS. COLE:  Objection.  Form, foundation.
13      You may answer.
14      THE DEPONENT:  No.
15      BY MS. WU:
16      Q   And other than what was in the statement and
17  what you just told me, do you recall any other
18  statements that you heard from the crowd before
19  Ms. Ulysse was taken to Providence Hospital?
20      **A   No.**
21      Q   And other than the tank-top issue, the
22  tank-top sentence, and the blue button up sentence, is

213

1  there any statement in this statement that you now
2  disagree with?
3      MS. COLE:  Objection to form.
4      You may answer.
5      THE DEPONENT:  No.
6      BY MS. WU:
7      Q   Is it your testimony that Ms. Ulysse wound
8  up on the ground because she pulled you onto the
9  ground, and -- because she pulled you onto the ground?
10      **A   Yes.**
11      Q   And it's your testimony that you had no role
12  in Ms. Ulysse winding up on the ground?
13      **A   Yes.**
14      Q   That you did not exercise any force in
15  Ms. Ulysse winding up on the ground?
16      **A   Yes.**
17      Q   And can you describe the position of your
18  feet at the time that Ms. Ulysse began to pull?
19      MS. COLE:  Objection to form.
20      You may answer.
21      THE DEPONENT:  No.
22

214

1    BY MS. WU:
2    Q    Were your feet planted at the time
3  Ms. Ulysse began to pull, or were they in a moving
4  position?
5        MS. COLE:  Objection to form.
6        You may answer.
7        THE DEPONENT:  My feet were planted when
8  Ms. Ulysse started to pull away.  Yes.
9        BY MS. WU:
10    Q    And can you describe the position of your
11  hands at the time Ms. Ulysse begun to pull?
12    A    My left hand was ahold of her left arm.
13    Q    And what about your right hand?
14    A    Down to my side.
15    Q    And Ms. Ulysse was not holding on to you,
16  you were holding on to her; is that right?
17        MS. COLE:  Objection to form.
18        You can answer.
19        THE DEPONENT:  Yes.
20        BY MS. WU:
21    Q    And you said you were holding on to her left
22  arm; is that right?

215

1    A    Yes.
2    Q    Were you holding on to any part of her
3  shirt?
4    A    No.
5    Q    During the fall down to the ground, did you
6  at any point hold any part of her shirt?
7    A    No.
8    Q    If you were getting pulled to the ground and
9  in a way that you, you know, you had to maneuver your way
10  to avoid landing on her, why didn't you just let go?
11        MS. COLE:  Objection.  Foundation.
12        You may answer.
13        THE DEPONENT:  The speed in which it
14  happened.  It was -- it was quick.  Like, as soon as I
15  grabbed her arm, she immediately started yanking away,
16  and I was pulled off balance and pulled to the ground.
17  It was really quick.
18        BY MS. WU:
19    Q    So it happened so fast that you were not
20  able to let go of her --
21        MS. COLE:  Objection.  Foundation,
22  characterization.

216

1        You can answer.
2        THE DEPONENT:  It was quick.  It was quick.
3  We were falling down to the ground.  I still got ahold
4  of her arm.  And also I can't let Ms. Ulysse go
5  because she is not free to go at this point in time
6  because she is under arrest.  So I couldn't let
7  Ms. Ulysse go.
8        BY MS. WU:
9    Q    So your statement is I guess twofold.  The
10  first is that you could not let her go because you
11  physically -- it was too quick for you to let her go;
12  is that right?
13        MS. COLE:  Objection.  Characterization.
14        You may answer.
15        BY MS. WU:
16    Q    It's a yes or no.  Is that right?
17    A    Yes.
18    Q    Okay.  And then the second reason you could
19  not let her go was because legally, since you had
20  arrested her, you could not let her go at that point;
21  is that right?
22    A    Yes.

217

1    Q    And your basis for thinking the legal one is
2  the same set of written policies we ta ked about
3  earlier, the general order and the trainings from MIR;
4  is that right?
5        MS. COLE:  Objection.  Characterization.
6        You may answer.
7        THE DEPONENT:  Also the D.C. Code covering
8  fare evasion, the probable cause, that she was under
9  arrest; those factors also.
10        BY MS. WU:
11    Q    And remind me, the general order is the
12  arrest order, and then the D.C. codes you just
13  mentioned are fare evasion and probable cause; is that
14  right?
15    A    Reference the D.C. Code and in reference to
16  the fare evasion, yes.
17    Q    Right.  And the general order that you
18  referred to -- you are referring to, is the arrest
19  general order; right?
20    A    Yes.
21    Q    Any others?
22    A    No.

218

1    MS. COLE:  Objection.  Form.
2    You may answer.
3    BY MS. WU:
4    Q    I understand that your testimony is that you
5  did not push her to the ground, that she pulled you to
6  the ground.
7        Based on what you had observed and what had
8  happened up to this point, would pushing her to the
9  ground been a reasonable use of force, in your
10 opinion?
11       MS. COLE:  Objection.  Foundation.
12 Speculative.
13       You may answer.
14       THE DEPONENT:  I'm not quite sure I
15 understand that question.
16       BY MS. WU:
17    Q    Sure.  So assuming that -- I'm trying to
18 make sure I let you know that I understand you do not
19 believe that you pushed her to the ground.
20       My question is:  Based on everything that
21 had occurred up to that point, if you had pushed her
22 to the ground or you'd witnessed somebody else pushing

219

1  her to the ground, would that have been a reasonable
2  use of force; in your opinion?
3        MS. COLE:  Objection.  Foundation, form and
4  speculation.
5        You may answer.
6        THE DEPONENT:  That's not a yes or no
7  question.  Are you looking for a yes or no answer?
8  Because I don't have a yes or no answer for you for
9  that question.
10       BY MS. WU:
11    Q    Are you familiar with what constitutes a
12 reasonable use of force under the law?
13    A    Yes.
14    Q    And are you, in your day to day as an
15 officer, making decisions on whether or not a certain
16 use of force would be appropriate, given the factual
17 circumstances?
18       MS. COLE:  Objection to form.
19       You may answer.
20       THE DEPONENT:  Yes.
21       BY MS. WU:
22    Q    So my question is:  Under the circumstances

220

1  we have here, had you pushed her to the ground, would
2  that have been a reasonable use of force, in your
3  opinion?
4        MS. COLE:  Objection.  Form, foundation,
5  speculative.
6        You may answer.
7        THE DEPONENT:  So using the same facts of
8  this as I saw the fare evasion, made the stop based
9  on my probable cause.  She refused to stop and tries
10 to walk away.
11       You are asking me if someone would some have
12 pushed her to the ground, you are asking me if that
13 would have been a reasonable amount of force?
14    Q    Yes.
15    A    The reasonable amount of force, the
16 definition of it, what I have been told, is the force
17 necessary to effect a stop or to effect an arrest.
18 With that being the basis, if pushing someone down
19 would be the reasonable amount of force necessary to
20 make -- that was the only way they can make the stop
21 or make the arrest -- see that's why -- I don't know
22 if I can give you a yes or no for that.  If it was the

221

1  reasonable -- if that's a reasonable thing to do in
2  that situation.
3    Q    Well, you have the same set of facts that
4  you just discussed; right?  You do have probable cause
5  and the person is -- has said, no, and is walking
6  away.  At that moment, is pushing her to the ground
7  the amount of force necessary to effect an arrest?
8        MS. COLE:  Objection.  Form, foundation,
9  speculative.
10       You may answer.
11       BY MS. WU:
12    Q    And if you -- if you don't know what a
13 reasonable amount of force, that's fine.  I think the
14 facts are exactly as you laid them out.
15    A    If that was the force necessary to make the
16 arrest then, yes, it would be reasonable.
17    Q    Are you aware that the question of whether
18 or not it's a reasonable use of force is the factual
19 question of whether or not -- if that force was
20 necessary to effect the arrest?  So your answer is
21 circular; right?
22       MS. COLE:  Objection.  Argumentative.

222

BY MS. WU:

Q  If you know what constitutes a reasonable amount of force -- is your answer that you can't answer my question?

**A  I cannot give you a yes or no for that question.  That seems what you are looking for.  I don't have a yes or no for that.**

Q  Okay.  And what facts would you need to know in order to determine whether or not pulling -- pushing someone to the ground would be the amount of force necessary to effect an arrest?  What other facts would you need?

MS. COLE:  Objection.  Form, foundation. You can answer.

THE DEPONENT:  Ma'am, I guess I can't answer your question.  I can't tell you if that would be reasonable or not.

BY MS. WU:

Q  You also can't tell me what other facts you would need; right?

**A  I can't answer your question, ma'am.**

Q  Okay.

223

Once you were on the ground with Ms. Ulysse, how long did you stay on the ground for?

**A  I don't know.**

Q  Can you describe the position you took while you were on the ground?

**A  I had my left hand on Ms. Ulysse's left shoulder, I believe, and I was straddled across her thighs.**

Q  So your legs were straddling across her thighs; right?

**A  Yes.**

Q  Okay.  So where were your knees placed?

**A  On the ground, on the -- across the outside of Ms. Ulysse's thighs.**

Q  At any point, were your knees on Ms. Ulysse's back or neck?

**A  No.**

Q  If your knees were on Ms. Ulysse's back or neck, would that have been a reasonable use of force, in your opinion, under the circumstances?

MS. COLE:  Objection.  Form, foundation, speculative.

224

You may answer.

THE DEPONENT:  Say that again.

BY MS. WU:

Q  If your knees were on Ms. Ulysse's neck or back, would that have been a reasonable use of force, in your opinion, under the circumstances?

MS. COLE:  Objection.  Form, foundation, speculative.

You may answer.

THE DEPONENT:  Again, my knees, I never put knees on her back.  My left hand -- my left hand on her left shoulder, I believe.  That was enough, so I wouldn't need to put knees on her back.

BY MS. WU:

Q  So it would have been a problem had you put knees on her back?

MS. COLE:  Objection.  Characterization, form.

You may answer.

THE DEPONENT:  Do I think it would have been a problem?  No.  But it wasn't necessary for my situation, for this arrest.

225

BY MS. WU:

Q  And why wouldn't it have been problem, even if it wasn't necessary for your situation?

**A  If it would have been the force necessary to place Ms. Ulysse in handcuffs, I believe it would have been reasonable to use the amount of force necessary to place her into handcuffs.**

**Again, in this situation, I didn't have to do that.  My knees were on the ground.  My knees never touched her -- I never put my knees on her back.  My left hand on her shoulder was sufficient.**

Q  Were you using your body weight to keep Ms. Ulysse under control?

MS. COLE:  Objection to form.

You can answer.

THE DEPONENT:  My knees were straddling her upper thighs and my hand on her back was enough to keep her under control.

BY MS. WU:

Q  So were you not using your body weight to keep Ms. Ulysse under control?

MS. COLE:  Objection to form.

226

1  You can answer.
2  THE DEPONENT:  No.
3  BY MS. WU:
4  Q   So the only part of your body touching her
5  body was your arm; is that right?
6  MS. COLE:  Objection to form.
7  Characterization.
8  You may answer.
9  THE DEPONENT:  I believe so, yes.
10  BY MS. WU:
11  Q   The force that you used while you were on
12  the ground, is it just -- is your -- is it just the
13  arm on her shoulder or is there any other use of force
14  while you were on the ground?
15  MS. COLE:  Objection to foundation and form.
16  You may answer.
17  THE DEPONENT:  My left hand on Ms. Ulysse's
18  back was --
19  BY MS. WU:
20  Q   Was it?
21  **A   That was the only thing I was doing to**
22  **maintain control of her.**

227

1  Q   And what -- tell me the justification for
2  staying on the ground instead of pulling her up.
3  **A   Again, I had the -- had the crowd.**
4  **Ms. Ulysse was still struggling, tossing and turning**
5  **around, moving her body around.  I had the two**
6  **individuals that knelt down.  One individual that said**
7  **get the fuck off her, I still had him, like a very**
8  **aggressive posture, fists balled up, bouncing back and**
9  **forth on his heels.  Close enough that if he were to**
10  **attack I wouldn't be able to react to it.**
11  **He told another individual to take his shirt**
12  **off, I didn't know why she told this guy to take his**
13  **shirt off.  So I'm watching these individuals,**
14  **watching the crowd, and I have Ms. Ulysse still**
15  **resisting.  So I did not think it was safe to try to**
16  **place her in handcuffs.**
17  Q   If you had two hands available, would you
18  have been able to effect Ms. Ulysse's arrest?
19  MS. COLE:  Objection.  Foundation,
20  speculative.
21  You can answer.
22  THE DEPONENT:  That would be depending on

228

1  the amount of resistance that Ms. Ulysse would have
2  continued to put up.
3  BY MS. WU:
4  Q   Yes.  So I'm saying the amount of resistance
5  you were saying that she was putting up, the way the
6  tossing back and forth.  If you had two hands, would
7  you have been able to arrest her?
8  MS. COLE:  Objection.  Foundation,
9  speculative.
10  You can answer.
11  THE DEPONENT:  I guess the best answer I can
12  give you is maybe.
13  BY MS. WU:
14  Q   Did you ever detain the man in the white
15  shirt?
16  **A   No.**
17  Q   And why not?
18  **A   I had Ms. Ulysse.  I can only arrest one**
19  **person at a time.**
20  Q   After Ms. Ulysse, had you never had an
21  occasion to arrest more than one person at the same
22  incident?

229

1  MS. COLE:  Objection to form.
2  You can answer.
3  THE DEPONENT:  With compliant individuals,
4  yes.
5  BY MS. WU:
6  Q   With noncompliant individuals?
7  **A   No, I have not been able to arrest two**
8  **noncompliant individuals at the same time.**
9  Q   So your testimony is that the white -- the
10  man in the white shirt looked like he was about to
11  punch you, yet you chose to detain Ms. Ulysse for fare
12  evasion over arresting the man who was about to punch
13  you; is that right?
14  MS. COLE:  Objection.  Characterization,
15  foundation.
16  You can answer.
17  THE DEPONENT:  I have never said the man was
18  about to punch me.
19  BY MS. WU:
20  Q   Okay.  The transcript will speak for itself.
21  Is there a WMATA policy to take suspects to
22  the ground to effect arrest?

230

1    MS. COLE:  Objection as to form.
2    You can answer.
3    THE DEPONENT:  Sorry, can you repeat that
4  one?
5    BY MS. WU:
6    Q    Is there a WMATA policy to take subjects to
7  the ground in order to effect arrests?
8    MS. COLE:  Objection to form.
9    You can answer.
10    THE DEPONENT:  No.
11    BY MS. WU:
12    Q    Did you say no?
13    A    No.
14    Q    Okay.
15    You had testified that one person took off
16  his shirt during the incident.  Did more than one
17  person offer to help cover Ms. Ulysse during the
18  incident or just that one?
19    A    I don't know why the individual had took off
20  his shirt.  I don't know the reasons why he took off
21  his shirt.
22    Q    My question is:  Did anybody else take off

231

1  their shirt or say anything about a shirt other than
2  that one individual?
3    A    That individual didn't offer me a shirt at
4  all.  I don't know why that guy took off his shirt.
5    Q    So nobody ever offered you a -- offered a
6  shirt during the entire encounter?
7    A    After watching the video, I did see -- a
8  metro employee did hand me a shirt, yes.
9    Q    He handed you the shirt; right?
10    A    He handed me a shirt, yes.
11    Q    Okay.  So other than the --
12    And describe the metro employee.
13    A    I can't recall what he looks like.
14    Q    Do you know his name?
15    A    No.
16    Q    Other than the metro employee who handed you
17  a shirt, and you had previously testified about a
18  white woman helping with the shirt, did anybody else
19  have or speak about a shirt during the course of the
20  incident?
21    A    No.
22    Q    And you -- after you watched the video, does

232

1  that refresh your memory that a metro employee offered
2  a shirt?
3    A    Yes.
4    MS. WU:  Okay.  I think this is a good place
5  for a break, ma'am.
6    (Recess taken at 4:43 p.m.)
7    (4:58 p.m.)
8    MS. WU:  Officer Stokes, do you officers
9  have a respons bility to make sure that subjects you
10  are detaining are not exposing any sensitive body
11  parts if you are aware that they are exposing them?
12    MS. COLE:  Objection.  Foundation, form.
13    You may answer.
14    THE DEPONENT:  Can you repeat that?
15    BY MS. WU:
16    Q    Do officers have a duty to make sure that
17  the subject that you are detaining is not exposing any
18  private, sensitive body parts if you, in fact, know
19  that those body parts are exposed?
20    MS. COLE:  Objection.  Form, foundation,
21  speculative.
22    You may answer.

233

1    THE DEPONENT:  I don't believe that we have
2  a policy mandating that in particular.  That would all
3  be situational driven.
4    BY MS. WU:
5    Q    So even if there is no policy on point, do
6  you believe that officers have a duty?
7    MS. COLE:  Objection to form, foundation.
8    You may answer.
9    BY MS. WU:
10    Q    Let me rephrase my question:  Do you believe
11  officers have a duty or do you think it's situational
12  whether or not an officer has a duty to make sure that
13  a subject that they are detaining are not exposing any
14  sensitive body parts?
15    MS. COLE:  Objection to form, foundation,
16  characterization.
17    You may answer.
18    THE DEPONENT:  I believe that is a
19  situational -- it depends on, again, l ke I said, the
20  situations of that particular incident that that
21  officer has to deal with.
22

234

BY MS. WU:

Q   Okay.  So in this circumstance I understand you were not aware that Ms. Ulysse's breasts were expose, but all other facts being the same, what -- and you were aware of Ms. Ulysse's breast being exposed, would it have been justified to take any action to cover her?

MS. COLE:  Objection to form, foundation, characterization.

You can answer.

THE DEPONENT:  I believe, again, if the situation permits it, you know, it all comes down to still being situational7.  If you are asking my opinion on this, it becomes situational.  If it's poss ble then yes, an officer should make an attempt to do it, but that's all depending on the factors that's going on in that situation.

BY MS. WU:

Q   Right.  And under the circumstances of this situation, so what we have ta ked about; right?  You have probable cause to arrest her for fare evasion, you wind up on the ground, there is a crowd.  But you

235

know that her breasts are exposed.

Would it be justified to keep her breasts exposed in that context?

MS. COLE:  Objection to form, foundation, characterization.

You may answer.

THE DEPONENT:  In the situation you are proposing, are we eliminating the hostility of the crowd, the two individuals that -- the "get the fuck off me" individual that --

BY MS. WU:

Q   No.  Like I said, we are not eliminating any of it.  It's the exact same situation you have here except for that you actually were aware that her breasts were exposed.  Do you have -- would it be justified to keep them --

MS. COLE:  Objection.  Form, foundation, characterization, speculative.

You may answer.

THE DEPONENT:  Is that a -- in that hypothetical that you are giving me, I think it would be.

236

BY MS. WU:

Q   It would be justified to keep them exposed?

I'm just trying to make sure what would be -- that means.

MS. COLE:  Same objection.

You may answer.

THE DEPONENT:  If they are placed in the same unsafe situation, even with the knowledge, that hypothetical knowledge that her breast was potentially exposed, I think it would be justified to wait until it was a safer situation to cover her up.

BY MS. WU:

Q   And you're basing this on any sort -- any written protocol or policy or your own assessment?

MS. COLE:  Objection to form, foundation.

You may answer.

THE DEPONENT:  That's my own assessment.

BY MS. WU:

Q   Were you involved in Ms. Ulysse being handcuffed?

A   Yes.

Q   Who else was involved?

237

A   Sergeant Al Hinawi.

Q   What conversation, if any, do you recall between you and Sergeant Al Hinawi while on the scene?

A   The conversation that I can recall is discussing taking her to the hospital.

Q   And what do you remember about the conversation about taking her to the hospital?

A   After Ms. Ulysse pulled us to the ground, you know, she fell backwards, down to her -- you know, fell on her back.  I fell on my knee, so didn't have any injuries.  Had a couple of scratches on my knees.

We felt that since we both fell, it would be a good idea to get us both looked at, get us both checked out.

Q   So what you just described, was that a conversation you had with Sergeant Al Hinawi?

A   Yes.  Well, not that I can remember, no.

Q   What role did Sergeant Al Hinawi play in handcuffing Ms. Ulysse?

A   Well, he helped me place the handcuffs on her.  At the scene, I didn't hear Ms. Ulysse make any complaints about handcuffs or make any mention of

238

1   handcuffs.
2       Q   Right.  My question is now after you left
3   the scene, between being in the car all the way
4   through District 4 what, if anything, did you hear
5   Ms. Ulysse say about the handcuffs?
6       A   The first mention of -- actually, no, there
7   was no mentions of -- Ms. Ulysse didn't make any
8   mentions about the handcuffs.
9       Q   What were you just thinking of now, the
10  first mention of what --
11      A   Well, no.  I was replaying events in my
12  head, like no, there's no mention of handcuffs at all.
13      Q   What, if anything, did Ms. Ulysse say about
14  anything that was causing her discomfort, that after
15  she got place into the vehicle and all the way through
16  District 4?
17      A   She made complaints of her wrist once we got
18  to Providence Hospital.
19      Q   Did she say what did she feel about her
20  wrists?
21      A   No, I don't recall.
22      Q   So what do you recall her saying about

239

1   her -- complaining about her wrists?
2       A   It was a vague description of how --
3   something to the effect that my wrist hurt.  Like
4   that.
5       Q   And who did she make the statement to?
6       A   The treating physician there, the doctor.
7       Q   Who else was around?
8       A   I believe Sergeant Al Hinawi was there and
9   Officer Jones.
10      Q   And you; correct?
11      A   And myself, correct.
12      Q   Okay.  Other than her complaint to the
13  treating physician about her wrist, did you hear any
14  other statement that Ms. Ulysse made expressing
15  discomfort from after the scene to the -- when you
16  arrived at 4th District?
17      A   No.
18      Q   Did you ever hear Ms. Ulysse complain about
19  discomfort related to her abrasions that she suffered?
20      A   No.
21      Q   While at the scene, did you hear Ms. Ulysse
22  voice discomfort at all?  Did she give any indication

240

1   to you at any point -- sorry.  Scratch that.
2           Did you have any indication, while on the
3   scene, that Ms. Ulysse was in pain?
4       A   No.
5       Q   You mentioned earlier that you were not
6   injured, but that you sustained a scrape; is that
7   right?
8       A   Yes.
9       Q   Where was the scrape?
10      A   My left knee.
11      Q   And did you ever photograph the scrape?
12      A   No.
13      Q   Do you show anybody?
14      A   I may have shown Sergeant Al Hinawi.  I
15  don't recall if I did or not.
16      Q   Did the scrape bleed at all?
17      A   Very little.  Not -- yeah, very little.
18      Q   Did you seek treatment at Providence
19  Hospital at all?
20      A   No.
21      Q   Did you seek treatment afterwards, through
22  any other source?

241

1       A   No.
2       Q   We have gone through the fact that at some
3   point while on the scene, you drew your TASER and held
4   it at low ready.  What, if anything, did Ms. Ulysse
5   say in reaction to you drawing the TASER?
6       A   I don't remember Ms. Ulysse saying anything
7   about that.
8       Q   What, if anything, did Ms. Ulysse react,
9   verbal or otherwise, in reaction to you drawing the
10  TASER?
11          MS. COLE:  Objection.  Foundation.
12          You may answer.
13          THE DEPONENT:  I don't believe Ms. Ulysse
14  had any reaction to me un-holstering my TASER.
15          BY MS. WU:
16      Q   Did you ever explain to her or talk to her
17  at any point about the drawing of the TASER?
18          MS. COLE:  Objection.  Foundation.
19          You can answer.
20          THE DEPONENT:  No.  I'm not even sure
21  Ms. Ulysse was aware that I un-holstered my TASER.
22

242

BY MS. WU:

Q   When you un-holstered your TASER, did the crowd back up?

A   Yes.

Q   Other than what we had already gone over in your statement, which was from that man in the white shirt, do you recall the crowd saying anything else to you about drawing the TASER?

A   No.

Q   Do you recall saying anything to the crowd about drawing the TASER?

A   No.

Q   Would you agree that displaying a weapon at low ready is a use of force?

A   No.

Q   And why not?

A   The un-holstering of a TASER pointed down in a safe direction is not considered a use of force per our general orders.

Q   Do you have to fill out a use of force form when you deploy -- display a weapon at low ready?

A   For un-holstering the CEW?

243

Q   Yes.

A   Holding it at a low ready?

Q   Yes.

A   No, you don't have to do a use of force report with it.

Q   Did you fill out a use of force report in this case?

A   Yes.

Q   But you did not do it because of the CEW?

A   Yes.

Q   Yes, you did do it because of the CEW or --

A   No, I did not do it for the CEW.

Q   So what uses of force did you fill out the use of force form for?

A   Use of force required -- you have to fill out a use of force form if you transport your arrestee to the hospital.  Certain uses of force as in come-alongs or escorting individuals out doesn't require a use of force unless that person goes to the hospital.

MS. WU:  Well, let's go off the record at 5:20.

244

(Recess taken at 5:20 p.m.)

(5:22 p.m.)

BY MS. WU:

Q   Okay.  So I think we were in the course of discussing the three individuals who we had previously identified by description.  One, the first being the man who said to calm down.

And my question to you, I believe, was:  Do you -- would you characterize him as -- can you tell me all the reasons or all the things that you remember that make you characterize him as hostile?

A   His proximity, while I was trying to effect this arrest.  I gave him several commands to back away.

Again, this guy, he's is an unknown factor.  I don't know what his intentions are.  I'm in a vulnerable position and it's -- again, if he decides to do anything I do not have the time and space to react to it.  So --

Q   Anything else of his actions that make you characterize him as hostile?

A   No.

245

Q   Okay.  He's -- you said that he was very close in proximity.  Was he one of the ones who backed away when you deployed your TASER?

MS. COLE:  Objection to form, characterization.

You may answer.

THE DEPONENT:  When I un-holstered my TASER and pointed it at the low ready, yes, he did back away.

BY MS. WU:

Q   Do you -- did you ever make an attempt to identify that individual by name?

A   No.

Q   And you did not arrest him?

A   No.

Q   Are you aware of any other MTPD officer who stepped in and assisted with his crowd control?

A   No.

Q   Do you recall anything that he did, any actions that he took after the CEW was held at low ready and he backed away?

A   No.

246

1    Q    Then the second individual was the person
2    who was directed to take off the shirt.  Would you
3    characterize him as hostile?
4    **A    Yes.**
5    Q    Can you tell me all the reasons for that
6    characterization?
7    **A    In my experience, someone removing articles**
8    **of clothing are one of the indications they may become**
9    **aggressive.  So I didn't know why he was taking his**
10   **shirt off.  He was directed to take his shirt off by**
11   **the other individual that also made a threatening**
12   **gesture as get the fuck off of her, that individual.**
13   **Again, he was in close proximity, also.**
14   **Close enough that if they decide to launch an attack**
15   **or anything, I would not be able to react in enough**
16   **time to, again, protect Ms. Ulysse or to protect**
17   **myself.**
18   Q    So other than the close proximity and the
19   fact that he took off his shirt, did he take any other
20   action that made you characterize him as hostile?
21   **A    No.**
22   Q    And did he back away when the CEW was

247

1    un-holstered and held at low ready?
2    **A    Yes.**
3    Q    Okay.  And do you recall any actions he took
4    after the CEW was un-holstered and held at low ready?
5    **A    No.**
6    Q    Did you make an attempt to get his
7    information?
8    **A    No.**
9    Q    Did any other MTPD employee assist with
10   holding him?
11   **A    To my knowledge, no.**
12   Q    Do you recall -- and did -- and going back
13   to your statement about how, in your experience,
14   taking off a shirt could be aggressive, did you ever
15   make any inquiries as to why he took off his shirt?
16   **A    No.**
17   Q    And so you have no reason to know, one way
18   or the other, that he took off his shirt in order to
19   be aggressive; is that right?
20       MS. COLE:  Objection.  Form, foundation.
21       You may answer.
22       THE DEPONENT:  Again, I don't know why he

248

1    took off his shirt.
2        BY MS. WU:
3        Q    And he didn't make any statement related to
4    why he took off his shirt that you recall?
5    **A    No.**
6    Q    And his shirt was the one that was
7    eventually on Ms. Ulysse, after you watched the video
8    you found out?
9    **A    After watching the video, yes.**
10   Q    Okay.  And then finally, the man in the
11   white shirt, can you -- we have talked about him
12   several times, but if -- maybe this is a good time for
13   you to tell me all of the actions that you remember
14   this man in the white shirt taking -- you would
15   characterize as hostile?
16   **A    Appeared from behind me on my left side.**
17   **Said get the fuck off her.  When I un-holstered my**
18   **TASER, my CEW, held it at the low ready, he made a**
19   **statement:  Oh, I ain't afraid of no fucking TASER.**
20   **Again, bouncing back and forth on his toes,**
21   **fists clenched.  Still pointing and cursing.  Still in**
22   **a close enough proximity that if he decided to become**

249

1    **aggressive -- again, I was in a vulnerable position,**
2    **down on one knee with one hand on Ms. Ulysse's back.**
3    **No position to protect her or to protect myself in**
4    **that moment.**
5    **So that's why I characterized his actions as**
6    **being hostile.**
7    Q    Anything else?
8    **A    No.**
9    Q    You just said to protect you or Ms. Ulysse.
10   Did you have any grounds to believe that the hostility
11   was directed towards Ms. Ulysse?
12       MS. COLE:  Objection to form, foundation.
13       You may answer.
14       MS. WU:  My question, I -- may I ask what
15   the issue on the form is?  My question was to inquire
16   whether or not there was validation.
17       THE DEPONENT:  Okay.  My proximity to
18   Ms. Ulysse, if the individual would have become
19   aggressive and attacked me, based on my proximity to
20   Mr. Ulysse, she could possibly get hurt in that
21   altercation also.
22

250

BY MS. WU:

Q   So you did not have any indication that they had hostility toward Ms. Ulysse, though; correct?

A   Correct.

Q   Would it be fair to say that the crowd -- that those three individuals were expressing displeasure at the observations of Ms. Ulysse's detention and arrest?

MS. COLE:  Objection.  Foundation.

You may answer.

THE DEPONENT:  I can't speak to the reasons for their hostility.  I don't know what they were thinking at that point in time.

BY MS. WU:

Q   So sitting here right now, you have no understanding one way or the other as to whether or not they were upset at the treatment of Ms. Ulysse?

A   Correct.

MS. COLE:  Objection.  Characterization.

You can answer.

BY MS. WU:

Q   The individual in the white shirt, did he

251

ever make an attempt to fight you?

MS. COLE:  Objection.  Form.

You may answer.

THE DEPONENT:  No.

BY MS. WU:

Q   Okay.  So he was just a threat and you believed that he possibly could fight you?

A   **Given his body language and his gestures, clenched fists, bouncing back and forth on his feet, giving a lot of prefight indicators.**

Q   Did he ever touch you?

A   **No.**

Q   Did he ever interfere with the arrest?

MS. COLE:  Objection.  Legal conclusion.

You may answer.

THE DEPONENT:  Yes.

BY MS. WU:

Q   In what ways did he interfere with the arrest?

A   **Initially, when he came to my side, "get the fuck off her," he continued the behavior after I un-holstered my CEW and held it at the low ready.  The**

252

**prefight indicators he was giving in such a close proximity, it made the situation unsafe for me to continue to try to place Ms. Ulysse in handcuffs.**

Q   Is it a crime to interfere with a law enforcement officer in the scope of his duties?

A   **Sorry.  Repeat that.**

Q   Is it a crime, under the D.C. Code, to interfere with a law enforcement officer in the scope of his duties?

MS. COLE:  Objection to form.

You can answer.

THE DEPONENT:  Yes.

BY MS. WU:

Q   So he was interfering with a law enforcement officer, he was giving prefight indicators, but you did not arrest him; is that correct?

MS. COLE:  Objection.  Foundation.

You may answer.

THE DEPONENT:  My understanding of that code is that they have to -- I'm not sure.  I don't want to answer that because I'm not sure.  I don't have an understanding on that.  I don't know that verbiage on

253

that code.

BY MS. WU:

Q   So my question was:  Did you ever attempt to arrest him or arrest him?

A   **I did not attempt to arrest him, no.**

Q   And did you even get his identification for a later arrest?

A   **No.**

Q   Had you ever seen him before?

A   **No.**

Q   And did -- are you aware of any other MTPD employee who got his information or attempted to arrest him?

A   **No.**

Q   Did you see that people were recording the incident on their cell phones?

A   **I saw people holding their cell phones out. I wasn't aware if they were recording or not.**

Q   Did you see more than one person holding out their cell phone?

A   **Yes.**

Q   At no point during the incident were you

254

1  aware that anyone was recording it on their cell
2  phone?
3      A  No.
4      Q  Did you later find out that people were
5  recording it on their cell phone?
6      A  Yes.
7      Q  And how did you find out?
8      A  After this case started.
9      Q  Were you aware that this case made the news
10 in the immediate aftermath?
11     A  In the immediate aftermath, no.
12     Q  Are you aware of any coverage of
13 Ms. Ulysse's arrest on the news?
14     A  I believe the first I heard of it hitting
15 the news was probably -- and I can't give a random
16 date on it.  Probably three days later, two or three
17 days later.
18     Q  Okay.  So you were aware of it hitting the
19 news two or three days later?
20     A  Yes.
21     Q  Around?
22         Did you discuss the news coverage with

255

1  anybody in your office?
2      A  No.
3      Q  Did you discuss the news coverage with
4  anybody in general?
5      A  My wife --
6      Q  Anybody else?
7      A  No.
8      Q  Did you speak to Sergeant Al Hinawi about
9  the news coverage?
10     A  I don't think so.
11     Q  Can you describe Ms. Ulysse's demeanor at
12 the scene?
13     A  At what point?
14     Q  While she was being held at the scene, was
15 she -- did you see Ms. Ulysse cry?
16     MS. COLE:  Objection.  Compound question.
17         You may answer, if you can.
18     THE DEPONENT:  No, I don't remember seeing
19 her cry.
20     BY MS. WU:
21     Q  Did you see Ms. Ulysse cry at any point on
22 May 21st, 2018?

256

1      A  No, I can't recall.
2      Q  Did you see Ms. Ulysse distraught at any
3  point on May 21st, 2018?
4      A  No.
5      Q  Was your answer, no?
6      A  No.
7      Q  Did you see Ms. Ulysse indicate that she was
8  in pain or uncomfortable at any point on May 21st,
9  2018?
10     A  No.
11     Q  Do you hear anything on May 21st, 2018 that
12 would indicate that Ms. Ulysse was distraught, in
13 pain, or uncomfortable?
14     MS. COLE:  Objection.  Asked and answered.
15         You can answer again.
16     THE DEPONENT:  No.
17     BY MS. WU:
18     Q  Did you play a role in transporting
19 Ms. Ulysse to the police car?
20     A  Yes.
21     Q  What was your role?
22     A  I walked her to the police car.

257

1      Q  Walk me through everything that happened as
2  you were taking her away.
3      A  I remember holding Ms. Ulysse by the arm and
4  walking her to the -- walking her to the police car.
5      Q  Anything else that you recall that happened
6  as you walked her to the police car?
7      A  The crowd started to move with us as we
8  walked her to the police car.
9         Other than that, no.
10     Q  You previously said that you had a
11 conversation with Sergeant Al Hinawi as to where to
12 take Ms. Ulysse.  Did that occur while you were taking
13 her to the police car?
14     A  No.
15     Q  When did that occur?
16     A  That occurred after the MPD officer had
17 searched Ms. Ulysse and we had placed her in the back
18 of the patrol car.
19     Q  Do you recall anyone from the crowd ever
20 giving -- attempting to hand money over at any point?
21     A  I recall seeing that from the video.  I
22 don't recall that on the 21st.

258

1    Q   What, if anything, did you say to her before
2  you -- before she was put in the police car?
3    **A   I don't recall saying anything else to**
4  **Ms. Ulysse.**
5    Q   We have spoken about you saying -- having
6  some comments to Ms. Ulysse at the very beginning
7  during the initial approach.  A comment to, I guess,
8  give me your hands, while she is on the ground.
9        Any other statements that you recall making
10 to Ms. Ulysse before she gets in the car?
11   **A   No.**
12   Q   And how did you -- who made the decision to
13 take Ms. Ulysse to a hospital?
14   **A   Sergeant Al Hinawi.**
15   Q   Not you?
16   **A   Again, it was -- we discussed it as a --**
17 **like a summary of our events.  We talked about it and,**
18 **ultimately, that decision lies on the sergeant, so**
19 **Sergeant Al Hinawi made the decision to take her to**
20 **the hospital.**
21   Q   Did you agree with his decision?
22   **A   Yes.**

259

1    Q   And who made the decision to go to
2  Providence Hospital?
3    **A   It was the closest one.  That would make**
4  **that the determining factor.**
5    Q   Who made the determining factor?
6    **A   The determining factor was the proximity, it**
7  **was the closest hospital to Fort Totten.**
8    Q   And who made the decision to go to
9  Providence Hospital?
10       MS. COLE:  Objection to form, foundation.
11       You can answer.
12       THE DEPONENT:  I believe it was myself.  I
13 think I did.
14       BY MS. WU:
15   Q   From the initial approach to the handcuffing
16 of Ms. Ulysse and taking her to the car, is there any
17 other physical contact between you and Ms. Ulysse that
18 we have not discussed?
19       MS. COLE:  Objection to form.
20       You may answer.
21       THE DEPONENT:  No.
22

260

1        BY MS. WU:
2    Q   And is there any other verbal communication
3  with -- to or from Ms. Ulysse that we haven't yet
4  discussed?
5    **A   No.**
6    Q   What, if any, observations or -- hearing --
7  did you hear Sergeant Al Hinawi make while at the
8  scene?
9        MS. COLE:  Objection to foundation.
10       You can answer.
11       THE DEPONENT:  At what point at the scene?
12       BY MS. WU:
13   Q   During the entire encounter on the scene,
14 while she is on the ground, did you hear any --
15 Sergeant Al Hinawi say anything?
16   **A   Sergeant Al Hinawi gave commands to the**
17 **crowd to back up.**
18   Q   And what do you remember him saying,
19 specifically?
20   **A   I don't know verbatim what he said to the**
21 **crowd.  I know he was telling them to back up.**
22   Q   Any other communications that you heard

261

1  Sergeant Al Hinawi make while Ms. Ulysse was on the
2  ground?
3    **A   No.**
4    Q   Did Sergeant Al Hinawi say anything to
5  Ms. Ulysse?
6        MS. COLE:  Objection to form.
7        You can answer.
8        THE DEPONENT:  No.
9        BY MS. WU:
10   Q   When Ms. Ulysse was on the ground, could you
11 hear everything that Sergeant Al Hinawi said to
12 Ms. Ulysse?
13   **A   Yes.**
14   Q   And how could you hear everything?
15       MS. COLE:  Objection to form.
16       You can answer.
17       THE DEPONENT:  My proximity to Sergeant Al
18 Hinawi, we were very close to each other.
19       BY MS. WU:
20   Q   And could you hear what Ms. Ulysse said as
21 well?
22   **A   Yes.**

262

1    Q   Did you hear Ms. Ulysse saying something
2  about them going to kill her?
3    **A   I don't recall hearing her say that while**
4  **she was on the ground, no.**
5    Q   Do you recall her saying at any point during
6  her detention that she had heard a death threat?
7        MS. COLE:  Objection to form.
8  Characterization.
9        THE DEPONENT:  While we were walking
10  Ms. Ulysse to the police car, she did yell "they are
11  going to kill me."
12        BY MS. WU:
13    Q   How many times did she yell that on the way
14  back to the police car?
15    **A   I only recall hearing it once.**
16    Q   Okay.  So from the initial approach all the
17  way to the 4th District, when you released her, what,
18  if anything, did you hear Ms. Ulysse say about fearing
19  that she would be killed?
20        MS. COLE:  Objection.  Foundation.
21        You can answer.
22        THE DEPONENT:  That's the only time I recall

263

1  her saying something like that on the 21st.
2        BY MS. WU:
3    Q   So you do believe that you were able -- you
4  were in close proximity to her and able to hear
5  everything that she said?
6        MS. COLE:  Objection.  Foundation,
7  characterization.
8        You can answer.
9        THE DEPONENT:  Yes, I believe I was close
10  enough to hear what Ms. Ulysse was saying.
11        BY MS. WU:
12    Q   Would you agree that Ms. Ulysse is shorter
13  than you?
14    **A   Her Massachusetts I.D. had her listed as**
15  **5'7".  I believe I'm 5'9".  So, yes.**
16    Q   Would you agree that Ms. Ulysse is -- weighs
17  less than you?
18    **A   Yes.**
19    Q   How much did you weigh in May 2018?
20    **A   Approximately 230 pounds.**
21    Q   Was -- to your knowledge, was Ms. Ulysse
22  carrying any sort of weapon?

264

1    **A   No.**
2    Q   Anything about Ms. Ulysse herself that would
3  present a danger to you?
4        MS. COLE:  Objection.  Foundation.  Form.
5        You may answer.
6        THE DEPONENT:  I'm sorry, can you repeat
7  that one?
8        BY MS. WU:
9    Q   Anything about Ms. Ulysse herself that would
10  present a danger to you?
11        MS. COLE:  Objection.  Form, foundation.
12        Answer.
13        THE DEPONENT:  Nothing that I could observe,
14  no.
15        BY MS. WU:
16    Q   Anything else that you didn't observe that
17  would present a danger to you?
18        MS. COLE:  Objection.  Foundation.
19        You may answer.
20        THE DEPONENT:  Ms. Ulysse was carrying a
21  small purse.  I mean, anything could have been in the
22  purse.  Nothing that I saw in the purse at that time

265

1  would I -- but I can only speculate what she is
2  carrying on her person.  I don't --
3        BY MS. WU:
4    Q   There is nothing -- even if it were in her
5  purse you would have to go into her purse to grab it;
6  right?  Nothing on -- that was readily access ble, to
7  you, presented -- it would appear that Ms. Ulysse
8  presented a danger to you?
9    **A   Nothing that I can see on her at that time,**
10  **no.**
11    Q   In addition to your CEW, what else were you
12  carrying that day?
13    **A   So you want me to list everything that was**
14  **on my duty belt?**
15    Q   What weapons were you carrying that day in
16  addition to your CEW?
17    **A   CEW, pepper spray, baton and my firearm.**
18    Q   Anything else?
19    **A   No.**
20    Q   And was Sergeant Al Hinawi armed?
21    **A   Yes.**
22    Q   Was there a need for two armed officers to

266

1    arrest Ms. Ulysse?
2         MS. COLE:  Objection.  Form, foundation.
3         You may answer.
4         THE DEPONENT:  From the hostile crowd to the
5    hostile individuals, Ms. Ulysse herself actively
6    resisting, yes, two officers were necessary to make
7    that arrest.
8         BY MS. WU:
9         Q    So your testimony is not that Ms. Ulysse
10   overpowered you such that you needed another officer;
11   is that correct?
12        MS. COLE:  Objection.  Form.
13        You can answer.
14        THE DEPONENT:  No.  Ms. Ulysse did not
15   overpower me.
16        BY MS. WU:
17        Q    Who accompanied you and Ms. Ulysse to
18   Providence Hospital?
19        A    Officer Robin Jones.
20        Q    And is -- does Officer Robin Jones work out
21   of your precinct -- I'm sorry.  Out of your station?
22        A    Yes.

267

1         Q    How long have you worked with Officer Jones?
2         A    For as long as I have been on the
3    department.
4         Q    Have you ever hung out with Officer Jones
5    outside of work hours?
6         A    No.
7         Q    Do you know Officer Jones' family?
8         A    No.
9         Q    Would you consider you and Officer Jones
10   friends?
11        MS. COLE:  Objection to form.
12        You can answer.
13        THE DEPONENT:  Yes.
14        BY MS. WU:
15        Q    How long did Officer Jones stay at the
16   hospital?
17        A    Until Ms. Ulysse was released.
18        Q    Did Officer Jones go with you to District 4?
19        A    Yes.
20        Q    Who made the decision to go to District 4?
21        A    The Fort Totten metro station is situated in
22   the 4th District, so we have to transport our

268

1    arrestees to the -- the district where the offense
2    occurs.
3         Q    Is that a policy?
4         A    Yes.
5         Q    Which policy?
6         A    I don't know the -- I can't give you a
7    number.
8         Q    Is it a general order?
9         A    Yes.
10        Q    And was it you or Officer Jones or someone
11   else that decided to go to District 4?
12        A    It was myself.
13        Q    Prior to being taken to Providence Hospital,
14   did you observe any physical injuries on Ms. Ulysse?
15        A    No.
16        Q    At Providence Hospital, did you observe any
17   physical injuries on Ms. Ulysse?
18        A    No.
19        Q    Did you hear her make any verbal complaints
20   of injuries at the hospital?
21        A    I heard her make a complaint about her
22   wrist.

269

1         Q    Did you take any photographs of her
2    injuries?
3         A    No.
4         MS. COLE:  Objection to foundation.
5         You can answer.
6         BY MS. WU:
7         Q    You are you aware of any other WMATA or MTPD
8    officer that took photographs of Ms. Ulysse's
9    injuries?
10        MS. COLE:  Objection to foundation.
11        You may answer.
12        THE DEPONENT:  No.
13        BY MS. WU:
14        Q    Did Ms. Ulysse complain of any injuries that
15   you could not see on her body?
16        MS. COLE:  Objection to foundation.
17        You may answer.
18        THE DEPONENT:  The only complaint that
19   Ms. Ulysse made was her wrist.
20        BY MS. WU:
21        Q    And so what did you do at the hospital?
22        A    Waited until the doctors released her.

270

1      Q   Anything else you did while you were at the
2   hospital?
3      A   No.
4      Q   And what, if anything, did Ms. Ulysse say to
5   you while you were at the hospital?
6      A   I did not have any discussion with
7   Ms. Ulysse at the hospital.
8      Q   What, if anything, did you say to Officer
9   Jones while at the hospital?
10     A   I don't recall what I talked to Officer
11  Jones about at the hospital.
12     Q   What, if anything, did you say to Sergeant
13  Al Hinawi at the hospital?
14     A   I don't remember any conversation with
15  Sergeant Al Hinawi at the hospital.
16     Q   Okay.  We are going to look at another
17  exh bit.  I believe it is Exhibit 9.  It's going to be
18  Defendant's Bates stamped 77 to 78.
19         I will give my paralegal a second to pull
20  that.  Okay.  It's uploaded.
21         So Exhibit 9 is Defendant's 77 through 78.
22  Take a look and tell me if you recognize this

271

1   document.
2         (Stokes Deposition Exhibit 9 marked for
3   identification.)
4         (Document tendered to the Deponent.)
5      A   Yes.  It's 313 form.
6      Q   And what is a 313 form?
7      A   It is an MTPD report for an individual that
8   is transported to the hospital.
9      Q   And if you scroll down on this two-page
10  document, what sections did you write?
11     A   My signature.
12     Q   On page 1 -- or Page 77 or 78?
13     A   On page 78.
14     Q   Did you write the report of injury directly
15  above your signature?
16     A   No.
17     Q   Do you know who wrote it?
18     A   Sergeant Al Hinawi.
19     Q   Did you have a conversation with Sergeant Al
20  Hinawi that gave him the information to write the
21  report?
22     A   Excuse me.  I'm reading the report to see.

272

1      Q   Sure, of course.
2      A   Okay.  I would have given Sergeant Al Hinawi
3   all of the information except for the last sentence.
4      Q   And the last sentence is:  AO1 refused to
5   ta k to the undersigned official?
6      A   No:  A1 has a laceration to her right
7   shoulder.
8         I'm sorry, the last two sentences.  I see
9   that period right there.
10     Q   Okay.  So you did not know that AO1 had a
11  laceration to her right shoulder, so you did not give
12  that information to Sergeant Al Hinawi?
13     A   Correct.
14     Q   Did you ever see a laceration on
15  Ms. Ulysse's right shoulder?
16     A   No.
17     Q   Did you see a contusion on her chest?
18     A   No.
19     Q   So you have any knowledge one way or the
20  other, on the extent of Ms. Ulysse's injuries?
21         MS. COLE:  Objection to form.
22         You may answer.

273

1         THE DEPONENT:  No.
2      BY MS. WU:
3      Q   Okay. if you come back to Page 77, there is
4   a section entitled:  Hospital Attending Physician's
5   Report.
6         Do you see that?
7      A   Yes.
8      Q   Did you ever speak to any hospital personnel
9   regarding Ms. Ulysse?
10     A   No.
11     Q   Do you see where it says under Physician
12  Remarks:  PT evaluated and treated for acute strain of
13  neck muscle.
14         Do you see that?
15     A   Yes.
16     Q   Were you -- did you know that Ms. Ulysse was
17  evaluated and treated for acute strain of neck muscle?
18     A   After reading this report, yes.
19     Q   Before reading this report?
20     A   No.
21     Q   Do you know how Ms. Ulysse sustained the
22  neck injuries?

274

1      A  No.

2      Q  How long was Ms. Ulysse at Providence

3 Hospital?

4      A  I don't recall the exact timeframe.  Maybe

5 an hour.

6      Q  After she was released or cleared from the

7 hospital, what happened next?

8      A  We went to 4D.  4th District.

9      Q  Did you go directly to 4D or did you make

10 any stops?

11      A  Directly to 4th District.

12      Q  When you got to 4 -- District 4, did you

13 immediately take Ms. Ulysse out of the car or did you

14 hold her in the car for any reason?

15      A  When we arrived at 4D, we wait until the

16 officer is ready to receive a prisoner, and then we go

17 straight inside.  So I don't know how long -- we were

18 probably outside of 4D before we handed Ms. Ulysse off

19 to the department.

20      Q  By we, do you mean you and Officer Jones?

21      A  Yes.

22      Q  Okay.  Do you think that you waited more

275

1 than ten minutes outside of 4D?

2      A  I don't know.

3      Q  Did you have any communications with

4 Ms. Ulysse between the time you left Providence

5 Hospital and the time you actually made it into the

6 building at 4D?

7      A  I'm sorry.  Say that again.

8      Q  Did you have any communications with

9 Ms. Ulysse between the time you left Providence

10 Hospital and you actually made it into the building at

11 4D?

12      A  No.

13      Q  Did you have any communications with

14 Ms. Ulysse at any point after you were in the building

15 at 4D?

16      A  No.

17      Q  Do you recall any substance of the

18 conversations you had with Officer Jones after you

19 left Providence Hospital and before you made it

20 actually into the building at 4D?

21      A  No.

22      Q  I think I got this earlier, but just to make

276

1 sure:  Do you recall the name or any identifying

2 information to the person you turned over the paper

3 bag of Ms. Ulysse's possessions at the precinct?

4      A  That would be -- her possessions would have

5 been placed in an MTPD -- the plastic see-through bag.

6 And then that bag would have been given to MPD.  Not

7 the brown paper bag, not the brown bag.

8      Q  Okay.  So there's two bags; there's a

9 plastic bag and a brown paper bag.  Then you said the

10 plastic bag had her possessions and what did the brown

11 paper bag have?

12      A  The brown bag was used just to collect her

13 possessions at the scene, after the search.  You know,

14 it's just what I had available to keep all her

15 property together.

16      Q  So all of Ms. Ulysse's possessions were in

17 the brown bag until you got to District 4; is that

18 right?

19      A  Right.  And then I would have to log each

20 item individually, place them in see-through MTPD

21 property bag, and then I would give that bag to MPD.

22      Q  And the log individually, is that the same

277

1 as what -- the words on the plastic see-through bag,

2 or are those two different people writing those?

3      MS. COLE:  Objection to form.

4      You can answer.

5      THE DEPONENT:  You would have to write the

6 items on the bag and inside the property log, the

7 property book.

8      BY MS. WU:

9      Q  And by you, do you mean you would write them

10 on the bag as well as on the property log?

11      A  Yes.

12      Q  Okay.  I think my previous question was:  Do

13 you know the name of the person at MPD who you turned

14 the property over or any identifying information about

15 that person?

16      A  No.

17      Q  Do you still see my screen?

18      A  Yes.

19      Q  I'm showing again what's been marked as

20 Exhibit 4, Defendant's 225.

21      Is any of this your handwriting?

22      A  No.

278

1    Q   Okay.  So neither of the -- Exhibits 4 or 5,
2   which is what you retrieved from MPD after the lawsuit
3   began, is in your handwriting; is that correct?
4    A   Yes.
5    Q   What, if anything, did you do after you
6   returned back from the police station?
7    A   I would go to District 1 and start my MTPD
8   event reports.
9    Q   I'm sorry.  Start your what reports?
10    A   I would go to District 1, my district, and
11   start writing our in-house MTPD police reports.
12    Q   And which reports would you have started
13   writing that day?
14    A   I would have started the -- like I said, the
15   MTPD -- our in-house report, which is attached to that
16   MTPD number that we went over earlier, and all the
17   paperwork associated with that report.
18    Q   Any other reports that you started that day?
19    A   No.
20    Q   Let's put another exhibit on.  This would be
21   Exh bit 10, which is going to be Defendant's 29
22   through 41.

279

1        Okay.  It's loaded.
2        Officer Stokes, do you see it loaded?
3        (Stokes Deposition Exh bit 10 marked for
4   identification.)
5        (Document tendered to the Deponent.)
6    A   Yes.
7    Q   It's a long one, and so I guess my first
8   question is:  Is this the report you -- is this one of
9   the reports you would have worked on that day, the day
10   of May 21st?
11    A   Yes.
12    Q   Is this called a Cobalt report?
13    A   Yes.
14    Q   And what is the purpose of a Cobalt report?
15    A   The reporting document for -- the report
16   that you need to fill out in reference to making an
17   arrest.
18    Q   In reference to making an arrest.  Is that
19   what you said?
20    A   Yes.
21    Q   Okay.  And so this report you filled out
22   prior to the internal memo that you generated for

280

1   Sergeant Muller; is that correct?
2    A   Yes.
3    Q   Okay.  Can you page through this report and
4   let me know which sections you authored?  Or if it's
5   all of it, you can let me know that, too.
6    A   Yes, this is a -- I authored all of this
7   report, this whole report.
8    Q   Okay.  The first page, there's a section
9   entitled suspects.
10        Do you see that?
11    A   Yes.
12    Q   I just have a question about the two
13   categories:  Search Plus Performed, which has "no"
14   checked, and Statement Taken, which has "no" checked.
15        Do you see that?
16    A   I'm sorry.  Is that at the suspect --
17    Q   I'm showing it on my share screen.  I don't
18   know if you can see me.
19    A   Yes, I see it.
20    Q   Okay.  To your knowledge, was a search
21   performed incident to arrest?
22    A   Yes.

281

1    Q   Okay.  So why is "no" checked here?  I'm
2   just curious.
3    A   Just a mistake on the paperwork.
4    Q   Okay.  And "no" is checked with Statement
5   Taken, too; right?
6    A   Yes.
7    Q   And, to your knowledge, was a statement
8   taken of Ms. Ulysse?
9    A   No.
10    Q   What does "cleared by arrest" mean, earlier
11   on?
12    A   It's the way the D.C. reporting system in
13   Cobalt operates.  As you see, you have to put -- you
14   fill them out in order.  So you come across suspects
15   first, so you would fill that information out, then
16   you fill out the offense, and then you would clear it
17   because you made an arrest.
18        It's the order in which you have the fill
19   out the blocks in the system.
20    Q   Okay.  And under the -- right above there,
21   it says:  Offense.  Metro.  Failure to pay fare.  35
22   DC-216.

282

1      Is that the statute under which Ms. Ulysse
2  was charged for fare evasion?
3      **A   Yes.**
4      Q   Okay.  And I will scroll down to the second
5  page, and then it says:  Offense Number 2.  And it
6  says:  Resisting Arrest.  22 DC-405.01.
7      Do you see that?
8      **A   Yes.**
9      Q   Is that the statute under which Ms. Ulysse
10  was charged for resisting arrest?
11      **A   Yes.**
12      Q   And then if you go down, there's a section
13  called Property And Items.
14      Do you see that?
15      **A   Yes.**
16      Q   And next to -- under that, it says:  Status,
17  Reason For Custody, Stolen.
18      And then it says:  Metro Fare Media $2.00.
19      What does this mean to you?
20      MS. COLE:  Objection to form.
21      You may answer.
22      THE DEPONENT:  It is -- once you put in

283

1  these -- the code for fare evasion you have to put in
2  a description of which was actually stolen.  And one
3  of the descriptions available to you in the Cobalt
4  system is this Metro Fare Media.
5      Q   And so, to you, what does Metro Fare Media,
6  Stolen, mean?
7      **A   Failure to pay the metro fare.**
8      Q   And media, what does media mean to you?
9      **A   They -- the metro fare.**
10      Q   Media means the metro fare?
11      **A   Yes.**
12      Q   Okay.  And then we will scroll down to the
13  Medical Addendum.
14      And it says:  Injury Description.  Complaint
15  of neck pain and light abrasions on the wrist.
16      So does that refresh your recollection that
17  you were aware that Ms. Ulysse complained of neck pain
18  and light abrasions on the wrist?
19      **A   This report would have been completed after**
20  **I've gotten the 313, so I would have copied any**
21  **information from the 313 to this report.**
22      Q   I'm sorry, I thought you previously

284

1  testified that you completed this report the day of
2  the 21st.
3      **A   This report, yes.**
4      **Ms. Ulysse was also taken to the hospital on**
5  **the 21st.**
6      Q   Oh, so you got the 313 the day of May 21st?
7      **A   Yes.**
8      Q   And so the -- you filling out complaining of
9  neck pain and light abrasions on the wrist, the reason
10  why you knew that was from the 313 report; is that
11  right?
12      **A   Yes.**
13      MS. COLE:  Objection.  Characterization.
14      You may answer.
15      THE DEPONENT:  Yes.
16      BY MS. WU:
17      Q   And then you have Public And Internal
18  Narrative, which is very -- I don't know if you are
19  looking at my version, but it is very small.  So I can
20  hold that up for you.
21      Is this the first write-up of the incident
22  that you have knowledge of creating?

285

1      MS. COLE:  Objection to form.
2      You can answer.
3      THE DEPONENT:  Yes.
4      BY MS. WU:
5      Q   If you want to take a look at it and read it
6  to yourself, and let me know if there is anything that
7  you -- that changes any testimony that you have given
8  me today.
9      **A   Okay.**
10      Q   Is there anything that you read in this
11  paperwork that changes or leads you to want to clarify
12  any of the testimony you gave me today?
13      MS. COLE:  Objection to form.
14      You may answer.
15      THE DEPONENT:  No.
16      BY MS. WU:
17      Q   Okay.  And then the same question for
18  that -- your review of the memo that you wrote for the
19  internal investigation:  Is there anything you read in
20  that that would lead you to change any or want you to
21  clarify any of the testimony you gave today?
22      **A   No.**

286

1      MS. WU:  Okay.  Next exhibit, Exhibit 11
2  will be Defendant's 27.
3      Joelle, are you there?  Are you putting it
4  on?
5      MS. JOELLE:  I'm sorry, could you repeat the
6  exhibit?
7      MS. WU:  Yes, it is Defendant's 27.  That's
8  Exh bit 11, Defendant's 27.
9      Joelle, if you don't have it, that's okay.
10  We can keep going and locate it.
11      MS. JOELLE:  You should be able to refresh
12  now.  I'm sorry about that.
13      MS. WU:  There it is.  No problem.
14      BY MS. WU:
15   Q   Okay.  So Exhibit 11 is Defendant's 27.
16  Another piece of paperwork.
17      Officer Stokes, can you see it?
18      (Stokes Deposition Exhibit 11 marked for
19  identification.)
20      (Document tendered to the Deponent.)
21   A   Yes.
22   Q   Okay.  Do you recognize this document?

287

1   A   Yes.
2   Q   When did you -- who authored this document?
3   A   I did.
4   Q   And when did you author this document?
5   A   On the 21st.
6   Q   So when you got back from the -- from the
7  precinct, is this one of the documents that you worked
8  on?
9   A   Yes.
10   Q   Okay.  And what would you call this
11  document?
12   A   I believe it's the use-of-force paperwork.
13   Q   Okay.  And what's the purpose of completing
14  use-of-force paperwork?
15      MS. COLE:  Objection to form.
16      You can answer.
17      THE DEPONENT:  We fill out a use-of-force
18  paperwork in this instance, when a subject is -- needs
19  transported to the hospital.
20      BY MS. WU:
21   Q   And if you go to the subject information
22  part it says that she was wearing a tan tank-top,

288

1  black sweatshirt -- I'm sorry -- black sweatpants.
2  How did you -- what information did you base this on?
3   A   My personal knowledge at the time.
4   Q   And it says that her height was 5'7" and her
5  weight was 140.  What did you base this on?
6   A   Her Massachusetts I.D. card.
7   Q   Did you take a picture of her Massachusetts
8  I.D. card?
9   A   No.
10   Q   How did you have access to the information
11  on her Massachusetts I.D. card when you completed this
12  paperwork?
13   A   It was part of her -- it was in her
14  property, so I would have it when I placed her
15  property on the MPD books.
16   Q   Right.  I know.  But you are now writing
17  this paperwork after you have relinquished that
18  property; is that right?
19   A   Correct.
20   Q   So how would you know her or who you have
21  this information when you wrote on this?
22   A   I would have it on my copy of the Cobalt

289

1  paperwork.
2   Q   But did you fill out the Cobalt paperwork,
3  or did MPD fill out the Cobalt paperwork?
4   A   No.  I filled out that paperwork.
5   Q   And you filled out the Cobalt paperwork
6  after you have given all of her property to MPD;
7  right?
8   A   Right.  And then I would print a copy of
9  that report and I would have that with me while I'm
10  filling out the MTPD report.
11   Q   I guess my question is:  How would you,
12  sitting at your office filling out the Cobalt report,
13  have the information on -- that was contained on
14  Ms. Ulysse's Massachusetts I.D.?
15      MS. COLE:  Objection.  Foundation, form.
16      You may answer.
17      THE DEPONENT:  I'm not sure I understand
18  your question.
19      I would -- when I'm filling out the
20  paperwork for D.C. -- MTPD's Cobalt paperwork, I'm at
21  the 4th District and I have her property with me while
22  I'm at the 4th District.

290

BY MS. WU:

Q   You previously testified that you filled out the Cobalt paperwork at your office. Sorry, are you -- did I misunderstand you or did you fill out the Cobalt paperwork at MTPD --

A   No.

Q   -- I'm sorry, at MPD?

A   The Cobalt paperwork is filled out at MPD. MTPD, Metro Transit Police paperwork is filled out at our district.

Q   I understand.

So prior to you relinquishing your -- Ms. Ulysse's possessions, you were at the 4th District filling out the Cobalt paperwork; is that correct?

A   Yes.

Q   Okay. And so the -- there's a time stamp on the Cobalt paperwork. That would indicate at what time you were still at District 4; is that correct?

A   Yes.

Q   Okay. I can show you that time stamp just so we are on the same page. Oh, no. Sorry.

Can you see the time stamp of May 21st at

291

12:35?

A   That would be the time that I submitted it for approval. I would actually still be there until one of my officials approved the paperwork, so I was there a little longer than 12:35.

Q   It says that Sergeant Muller approved it at 13:06.

A   Yes. That's when I would be able to leave 4th District.

Q   Okay. And then going back to Exhibit 11, and the statement that you wrote on May 21st, 2018, just take a look and let me know if there is anything that would cause you to want to clarify your testimony today.

A   No.

Q   Okay. And I have -- you have a lot of paperwork.

The final document will be Exhibit 12, and it will be Defendant's 43 through 47.

MS. WU: Joelle, are you able to load that for us?

MS. JOELLE: Yes. You said 43 to 47?

292

MS. WU: Yes.

BY MS. WU:

Q   Okay. They should be uploaded. Officer Stokes, can you see Exhibit 12?

(Stokes Deposition Exh bit 12 marked for identification.)

(Document tendered to the Deponent.)

A   Yes.

Q   And when would you -- who authored Exhibit 12?

A   I did.

Q   And when would you have authored it?

A   On May 21st.

Q   Okay. Another piece of paperwork you completed day of?

A   Yes.

Q   I'll ask you to review the statement on Page 5 of the report. Let me know when you are ready.

A   Okay.

Q   So my first question is on the first paragraph of the report: Is there anything in there that you've read that would cause you to want to

293

clarify any testimony you made today?

MS. COLE: Objection to form.

You may answer.

THE DEPONENT: It's on the second to the last sentence. It's written in reverse order. We actually got to Providence Hospital first and then that's when the complaints of neck and wrist injuries occurred.

BY MS. WU:

Q   Okay. Anything else that you read -- and that was a little bit different, you were correcting what was on this statement. My question is actually: Is there -- after reading this statement, is there any testimony that you gave today that you want to clarify?

MS. COLE: Objection. Form.

THE DEPONENT: No.

BY MS. WU:

Q   Okay. The next paragraph is about a meeting you had with the U.S. Attorney's Office, to no-paper for the arrest.

Do you see that?