# GENERAL ORDER
## Metro Transit Police

| Subject: Arrest Policy | Number: 601 |
|---|---|
| | Effective: 06/01/01 |

## I. Purpose

This Order outlines the Department's policy concerning custodial arrests and the issuance of summonses or citations.

## II. Policy

Members will exercise their lawful powers of arrest in a manner best calculated to discharge the functions of the Metro Transit Police in accordance with the law. Members will arrest persons suspected of criminal acts only when lawful authority permits and never because of personal vindictiveness towards a suspect or because of provocation falling short of a criminal violation. It is incumbent upon members making criminal arrests to objectively assess the facts in each situation eliminating any personal feelings with respect to suspects.

## III. Definition

*Arrest* - It is taking custody of a person, under real or assumed authority, for the purpose of holding or detaining them to answer a criminal charge or civil demand. It may also consist of notification of the purpose to restrain an individual and their submission thereto.

## IV. Procedures

A. Discretion

1. Members are vested with a broad range of discretion when deciding whether or not to make an arrest. This Order is not intended to deprive any member of this discretion, provided it is exercised in accordance with Departmental rules and regulations and in the furtherance of the police mission.

2. The proper exercise of discretion does not relieve the investigating member of his or her responsibility to conduct a thorough preliminary investigation of facts surrounding the event.

3. Members will issue a summons or citation for certain enumerated offenses as an alternative to arrest. When issuing a summons or citation, a search is generally not warranted because it is a non-custodial arrest situation. This procedure does not limit a member's authority to frisk a subject reasonably believed to be armed.

4. A warning is an alternative which may be considered for minor violations which are not repeated or willful.

B. Arrest on Accusation by Citizen
   Members investigating criminal complaints will:

1. conduct a thorough investigation of the alleged offense and determine if it meets the parameters for an arrest,

2. locate and obtain names and addresses of all witnesses and, if possible, obtain statements,

3. attempt to obtain a reliable identification of the suspect,

4. explain the limitations upon a law enforcement officer's power of arrest, if applicable (e.g., a misdemeanor not committed in the officer's presence),

5. determine if the parties will voluntarily respond to the appropriate judicial authority for warrant application. However, neither party may be compelled to respond in non-

0049

custodial arrest situations.

6. supply the information to the victim and/or witness and advise of warrant procedures, if applicable, and

7. effect the arrest for felonies provided sufficient probable cause exists.

C. Release Without Prosecution

The prosecution of an individual does not have to follow merely because an arrest has been initiated. Members may, in the exercise of their discretion, decide not to *place charges*, particularly when information is received which changes the character of a criminal violation. Principles of civil law compel the release of an individual when information is received that exonerates him or her of a crime. Members will, without delay, confer with their supervisor before deferring prosecution and the incident will be documented according to Departmental and jurisdictional guidelines.

D. Processing Arrested Persons

1. Members will, as soon as practical, appraise the suspect of the particular violation for which he or she is being arrested.

2. Members will secure all service weapons prior to processing.

3. Restraining devices will only be removed at the direction of the receiving facility or when the member ensures that the prisoner is properly controlled.

4. Documentation will be submitted to the booking authority and the member will ensure that proper signatures are obtained on paperwork to complete the booking procedures.

5. Members will advise the booking/detention personnel of any prisoner medical or security hazards and, when applicable, document those conditions on the appropriate processing forms.

6. Members are responsible for the personal safety of their prisoner

throughout the booking process.

7. Members are responsible for safeguarding prisoner's personal property and physical evidence until it is relinquished at the booking authority or placed into the custody of the MTPD.

8. Prisoners will be processed without unnecessary delay and afforded an opportunity to make a local telephone call from the detention facility.

9. Members will advise arrested prisoners of their constitutional rights (Miranda Warning) prior to custodial interrogation.

10. Members will not promise immunity, prosecution of a lesser *degree or offer* any inducement to a suspect for any purpose.

11. Members will not suggest, recommend, advise or otherwise counsel anyone concerning the retention of an attorney or bondsman resulting from a Metro Transit Police action, except when advising under Miranda.

*Barry McDevitt*

Barry J. McDevitt
Chief

General Order 601
Page 2

CONFIDENTIAL

0050

# GENERAL ORDER
## Metro Transit Police

| Subject: Contacts, Stops and Frisks | Number: 325 |
|---|---|
| | Effective: 06/01/01 |

## I. Purpose

This Order reviews the authority of members to conduct contacts, stops and frisks and establishes procedures for documenting these encounters.

## II. Policy

Members will ensure that contacts, stops and frisks are conducted in a lawful manner and properly documented.

## III. Definitions

*Contact* - a face-to-face communication with an individual who is free to leave. Members may initiate a contact with a person in any place where the member has a lawful right to be.

*Frisk* - a quick pat down of an individual's outer clothing to detect whether a concealed weapon or other dangerous instrument is being carried.

*Probable cause* - an apparent set of facts that would lead a reasonably intelligent and prudent person to believe that a crime has been, is being or is about to be committed and that the accused is involved.

*Reasonable suspicion* - knowledge, based on specific and articulable facts and rational inferences drawn from those facts, that justifies the stopping of an individual. It is more than a hunch but less than probable cause.

*Stop* - the restraint of an individual's freedom to leave by show of authority or physical force, permissible when said individual is reasonably suspected of being involved in past, present or pending criminal activity.

## IV. Procedures & Responsibilities

A. Contacts

  1. Initiating a contact does not require probable cause, reasonable suspicion or any other specific indication of criminal activity.

  2. Force will not be used to initiate or maintain a contact. Persons contacted will not be detained against their will, frisked or required to answer questions.

  3. Documenting information obtained through a contact is not required unless directed by a supervisor. A Stop/Contact Report (MTP Form 207) will be used when necessary.

B. Stops

  1. General

    a. A stop occurs when a member uses lawful authority to compel an individual to halt, remain in a certain place, or perform a certain act (i.e., walking to a nearby location). The person stopped must reasonably assume that he or she is not free to leave the member's presence.

    b. The purpose of a stop is to determine if sufficient probable cause exists to make an arrest.

    c. Members will identify themselves as law enforcement officers as soon as practicable after making a stop.

    d. Members will use the least coercive means available to effect the stop.

    e. A person stopped may be detained at or near the location of the stop for a reasonable period of time.

    f. The person stopped will be provided with an explanation for his or her detention.

  2. Basis for a Stop

    a. The justification for conducting a stop closely parallels the U.S. Supreme Court decision in Terry v. Ohio.

    b. Members will be aware of the criteria required for initiating a stop and will ensure that all stops are

0051

conducted in conformance with applicable Federal, State and local standards.

3. Use of Physical Force
   a. Lethal force will not be used to effect and/or maintain a stop.
   b. Handcuffs may be used to forcibly detain a stopped subject when necessary.

4. Documenting a Stop
   a. When an individual is stopped without the use of physical force, pertinent details of the incident, to include factors justifying the stop, will be recorded on a Stop/Contact Report.
   b. If physical force is utilized to stop a person, an Event Report will be prepared. This report will be completed regardless of whether an arrest resulted from the stop, and will include factors justifying the stop and pertinent details of the incident.

C. Frisks
   1. General
      a. A frisk is justified when a member reasonably suspects that a stopped individual is armed.
      b. A frisk will be limited to a "patting down" of the outside of a subject's clothing, solely to determine if a weapon is being carried. Outer clothing (i.e., overcoats and jackets) inhibiting a sufficient initial frisk may be opened to permit a closer frisk of concealed layers of clothing.
      c. Items carried by a person frisked (i.e., purse, briefcase) may be removed to a safe distance for the duration of the stop.
      d. If a member reasonably suspects the possibility of harm if an unsearched item is returned to an individual, the contents of same may be briefly inspected.
      e. A member, reasonably knowing the location of a weapon, may immediately reach inside a person's clothing and remove same.

      f. Should a frisk reveal a lawfully possessed weapon, the member will secure same out of the subject's reach for the duration of the stop. When necessary to ensure the member's safety, ammunition may be separated from a firearm prior to its return.

   2. Documenting a Frisk
      a. When a frisk is conducted in the District of Columbia or the Commonwealth of Virginia, an Event Report will be completed and will contain pertinent details of the incident to include factors justifying the frisk.
      b. A frisk conducted in the State of Maryland will be documented on a Maryland State Police Firearms Report (MSP Form 97). This form will be completed in lieu of the Event Report and will contain the same information as required in the Event Report.

D. Miranda Warnings
   1. Miranda warnings are not required prior to general questioning during most stops, stop and frisks, and vehicle stops.
   2. Extended questioning of a suspect during a stop in a "coercive" atmosphere is likely to be interpreted as a custodial interrogation. Therefore, members will carefully assess the need to advise a subject of his or her Miranda rights prior to or during questioning under these conditions.

E. Photographing of Suspects
   1. Members stopping suspects for the purpose of photography will ensure the stop is in compliance with this Order. Photographs will not be arbitrarily obtained; there will be an articulable, definitive justification for detaining an individual for this purpose.
   2. Suspects will not be detained longer than fifteen minutes for the purpose of photography without the authorization of an official.

F. Stop/Contact Reports will be maintained in corresponding files (adult/juvenile) located

General Order 325
Page 2

in the Crime Analysis Division. These reports will be destroyed no later than five years from the date of the original event.

_Barry J. McDevitt_
Barry J. McDevitt
Chief

General Order 325
Page 3

# GENERAL ORDER
## Metro Transit Police

| **Subject:** Conducted Electronic Weapons | **Number:** 132 |
|---|---|
| *Next review date: March 1, 2019* | **Effective:** March 1, 2018 |

### I. Purpose

The purpose of this General Order is to provide members with guidance and direction for the use of Conducted Electronic Weapons (CEWs).

### II. Policy

It is the policy of the Metro Transit Police Department (MTPD) that members use only the level of force reasonably necessary to control or otherwise subdue violent or potentially violent persons or those persons actively resisting in a way that risks injuring an MTPD member, the person involved, or others. In determining whether force is reasonably necessary, members may be forced to make split-second decisions in circumstances that are tense, uncertain and rapidly evolving about the amount of force necessary.

### III. Definitions

***Arcing*** – When a member presses the arcing button along the frame to activate a CEW without deploying the probes, for the purpose of testing the CEW prior to deployment and sometimes referred to as a "spark test."

***Conducted Electronic Weapon (CEW)*** – A general class of devices designed to disrupt a person's sensory and motor nervous system by means of deploying battery powered electrical energy, sufficient to cause temporary Neuro-Muscular Incapacitation (NMI).

***Confetti tags*** – Small identifying tags expelled from a CEW cartridge when a set of probes are discharged. Each confetti tag contains a serial number unique to the specific cartridge used.

***Cycle*** – The period during which electrical impulses are emitted from the CEW following the deployment and activation of a CEW. MTPD CEW Administrators will set CEWs for five-second cycles for probe mode and drive stun mode. In any instance that electrical impulses are not emitted for the full five-seconds following deployment, a member shall consider the shortened emission period as a full cycle.

***Drive Stun Mode*** – The placing of the CEW directly on the subject, causing electrical energy to enter the subject without the use of probes. Drive stun mode remains available for use whether or not cartridges remain in the CEW. Drive stun mode will not cause NMI unless used in combination with a probe.

CONFIDENTIAL                                                          0056

**Laser Painting** – The act of removing the CEW from its holster, pointing it at a subject, and activating the CEW's laser dot to show where the weapon is aimed.

**Less Lethal Force** – Force that is unlikely to cause death or serious injury, but the possibility of a fatality, however remote, does exist.

**Neuro-Muscular Incapacitation (NMI)** – A state of uncontrolled muscle contractions that override an individual's voluntary motor responses.

**Passive Resistance** – A subject's failure to cooperate by giving minimal resistance without actively interfering with, or impeding the officer; examples include going limp, and refusing to obey an order, without combining the refusal with any other action.

**Probes** – Projectiles with wires contained in a CEW cartridge which allow application of the electric impulse.

**Probe Mode** – One of the two modes for a CEW. Pulling the trigger to release the probes from the cartridge to make contact with the subject and achieve Neuro-Muscular Incapacitation (NMI).

**Probe Spread** – The amount of distance between probes fired from a CEW or the distance between a probe and the CEW in drive stun mode.

## IV. Procedures
A. Equipment
1. Members are authorized to carry CEWs only after being qualified to do so by MTPD's Training Division. All qualified members assigned CEWs will complete annual In-Service refresher training.
2. Members shall not carry their MTPD issued CEW when off-duty or when working in a Limited Duty status.
3. Members shall carry MTPD issued CEWs only.
4. MTPD certified CEW Administrators have authorization to conduct minor maintenance, repairs and alterations to the CEW. All other members are prohibited from making any adjustments or changes to the CEW.
5. The Training Division will be responsible for developing a training regime for the authorized equipment as well as maintaining a list of authorized and distributed equipment.
6. The Training Commander will notify members of any technical upgrades or changes from the CEW manufacturer and provide members a seven (7) day grace period to sync their devices to bring them into compliance. Members must synchronize their CEW devices no less than every 30 days.

B. Officer Responsibilities
1. Members will carry the CEW on an MTPD issued duty belt or on an outer vest carrier, in an MTPD issued CEW holster. Members shall wear the

CONFIDENTIAL                                    0057

CEW on their support side, opposite of the firearm.

2. Members working in a plainclothes assignment may choose not to carry their CEW. Members choosing to carry their CEW while working a plainclothes assignment shall wear the CEW on their support side, opposite of the firearm.

3. Members will carry CEWs with the safety in the "on" position.

4. Before taking the CEW into the field, members will verify that the battery strength of the CEW is greater than 20%. If the battery strength is less than 20%, the member will contact the Training Division for a replacement battery.

5. Members will test their CEWs prior to their shift by conducting one five-second arcing (spark) test to determine if their CEWs are functioning. Members shall not pull the trigger during this test and their CEWs will be pointed in a safe direction.

6. Before taking a CEW into the field, members will inspect the device for any obvious damage by checking the laser, light, frame, trigger housing, and safety switch for functionality. Members will report any defects noted in their CEWs to an on-duty supervisor before starting their shift. The supervisor will take control of the defective CEW for delivery to the Training Division.

7. Members are authorized to transport their CEW to and from their duty assignment in the same manner as they transport other MTPD issued equipment. Members are only authorized to temporarily store their CEW device in a MTPD approved wall locker at any of the following locations: Districts I and II; CID; the K-9 facility; the MED facility, or at the SOCC.

8. Members will safeguard their issued CEW as they do all MTPD issued equipment.

9. Members will complete a Use of Force Report for CEW related actions prior to the end of their tour.

C. Sergeant Responsibilities

1. Sergeants will inspect CEW equipment monthly to ensure proper operating condition and document those inspections accordingly.

2. Sergeants will be responsible for determining whether members have timely synchronized their CEWs in according with the Training Commander's directives.

3. Sergeants will respond to the scene of any deployment of a CEW and conduct a preliminary investigation.

4. Sergeants will ensure data is downloaded prior to the end of the member's tour.

5. Sergeants will ensure a use of force report is completed prior to the end of a members tour.

D. Deployment

1. Members' use of their CEWs is comparable to a members' use of an impact weapon in the MTPD use of force continuum.

2. Members may use their assigned CEWs against subjects who are

CONFIDENTIAL                    0058

exhibiting active aggression or who are actively resisting.

3. Members must consider using other, non-lethal force options before deploying a CEW on any subject who: a) is visibly pregnant; b) appears, in the officer's best judgment, to be 13 years of age or younger; or, c) who is elderly.

4. Members may use their CEW against subjects who pose a threat, or a potential threat to themselves or to others, or who are actively resisting. Each cycle of the CEW requires a member to be able to articulate a separate justification.

5. Members will not use more than three (3) CEW cycles against a subject in the course of an encounter. If the subject has been exposed to three cycles and the member still deems the subject a danger, an active threat, or the subject is still actively resisting arrest, members must consider another use of force option.

6. Members will not intentionally use two or more CEWs simultaneously on the same subject.

7. Members will only use the number of CEW cycles which are objectively reasonable to overcome the immediate risk of danger to themselves, to others, or to gain compliance.

8. Members may use a CEW against an animal attacking a member or someone else; if there is an active threat to any person(s) or other animals; or, for reasons of public safety. The member may need to turn the CEW to a horizontal position to achieve the target area along the length of the animal's body. Officer safety is paramount when removing probes from a potentially dangerous animal. The assistance of an Animal Control Officer will be requested in advance of deployment whenever time and circumstances allow.

9. Members will not use CEWs, whether in "probe" or "drive stun" mode, on passively resisting persons who pose no immediate risk of danger to themselves, or others.

   a. Fleeing shall not be the sole justification for a member using a CEW.
   b. Member will not use CEWs on handcuffed subjects unless doing so is necessary to prevent them from causing significant bodily harm to themselves or to others and the member has already used lesser force which failed to produce the desired control effect.
   c. Membes will not use their CEWs on a subject holding a firearm.
   d. Members will not use a CEW against persons who are in physical control of a vehicle in motion (e.g., automobiles, trucks, motorcycles, ATVs, bicycles, scooters,), or who are on other moving mechanical equipment, such as escalators. This prohibition does not preclude members from using their CEWs against persons on board trains or buses.
   e. Members will not use CEWs on persons situated on a station platform in such a way that there is a substantial risk the person will fall onto the track bed.
   f. Members will not use the CEW on any subject known to be standing in, or next to, a body of water.

CONFIDENTIAL                                          0059

g. Members will not use the CEW when a member reasonably believes that a flammable, volatile, or explosive material is present, including but not limited to alcohol-based OC spray, gasoline, natural gas, or propane.

h. When practical, members may give a warning to a person prior to activating the CEW unless doing so would place any person at risk. Warnings may be in the form of verbalization, display, laser painting, arcing, or a combination of these tactics.

E. Use of Force

1. CEW Probes – The CEW probe delivery method is considered less lethal force; however, it should only be used against persons who are exhibiting active aggression or who are actively resisting in a manner that, in the member's judgment, presents a substantial risk of harm or injuries to to the member or others. Members should consider the totality of the circumstances when deploying their CEW.

2. Drive Stun Mode – The CEW drive stun causes pain without NMI. Member must be able to articulate the same level of justification for use of their CEW in drive stun mode as for probe deployment. Members may use the CEW to supplement a probe mode deployment in order to complete the circuit for NMI, or as a countermeasure to gain separation from a subject, so that members may consider other force options. Members will not use the drive stun mode solely as a pain compliance technique against someone who is not a threat to themselves or others, or against passively resisting persons.

F. CEW Probe Removal from Suspects and Medical Requirements

1. Members will render first aid as appropriate, but will not remove any probes.

2. Members will request an EMS response for probe removal and for treatment of the suspect as appropriate. Members will ensure that the suspect is transported to a medical facility for examination and for any further treatment deemed medically necessary. When possible, members will prevent the subject from removing probes that have penetrated his or her skin.

G. CEW Reporting Requirements

1. Supervisors will notate on the daily schedule any members who carry a CEW and ensure this information is entered into CAD.

2. Members who intentionally or unintentionally deploy their CEW will immediately notify Communications. An on-duty official will respond to the scene of the deployment of the CEW and initiate an investigation. The supervisor will also ensure that appropriate notifications, reviews, and reporting requirements are completed.

3. An MTPD Crime Scene Search Officer (CSS) will collect the CEW cartridge, wire leads, probes, and confetti tags found at the scene. The probes will be stored in appropriate sharps container. If a CSS officer is

CONFIDENTIAL

not available in a reasonable amount of time, a supervisor may direct another member to collect the confetti tags and probes.

4. Any member's use of a CEW will be included in an MTPD event report.
5. Members will notify detention facility personnel of any person who has been subjected to a CEW deployment.
6. The Watch Commander will identify an official who will be assigned to download any CEW deployment data no later then the end of that assigned shift, and then attach the CEW data to the matching Use of Force Report. The Watch Commander must authorize in writing any delay by the assigned official in downloading the CEW data beyond the end of the assigned shift. The Watch Commander will document and route all written exceptions through the chain of command to the bureau commander.
7. Members will complete a Use of Force Report for all CEW deployments. The only exception to this requirement occur when a member deploys a CEW in training, during on-duty supervised tests, the member is physically unable to or for any other demonstrative deployment approved by the rank of captain or higher.
8. Members will complete a Use of Force report, prior to the end of their shift, when they laser paint a subject and after arcing a CEW without further deployment.
9. The Commander of theTraining Division will include CEW data in the Annual Use of Force Report.

Ronald A. Pavlik, Jr.
Chief of Police

CONFIDENTIAL

# GENERAL ORDER
## Metro Transit Police

| Subject:   Use of Force | Number:  130 |
|---|---|
| Next Review Date: 01/19/2013 | Effective:  01/19/2012 |

### I.  Purpose
This order establishes the parameters of force available to members and provides a review procedure for use of force incidents.

### II.  Policy
Members will use only the amount of force necessary to affect an arrest, overcome resistance, or protect themselves and/or others from harm. Use of force must be justified. Unnecessary force is prohibited.

### III.  Definitions
***Less-Lethal Force*** - force that is unlikely to cause death or serious injury, but the possibility of a fatality, however remote, does exist.
***Lethal Force*** - force likely to kill or cause serious injury.
***Reasonable Belief*** - The facts or circumstances the member knows, or should know, are such as to cause an ordinary and prudent person to act or think in a similar way under similar circumstances.
***Serious Physical Injury*** - an injury that creates a substantial risk of death, causes serious permanent disfigurement or results in long term loss or impairment of the functioning of any part of the body.
***Use of Force*** - The amount of effort required by the police to compel compliance of an unwilling subject.

### IV.  Procedures
A.  Use of Force - The diagram below represents options that members may use when confronted with a use of force situation.  The decision to use force of any degree must be based upon information known by the member at the time of the encounter. Members will determine the amount of force that is reasonably necessary to overcome the resistance they encounter.



CONFIDENTIAL                                                                 0062

B.  Weaponless Physical Force:
   1.  Active counter measures include pushing, punching and kicking.
   2.  Control holds, applied to an individual's neck, that are intended to compress either the trachea or carotid arteries are prohibited.

C.  Less-Lethal Force Instruments:
   1.  Sworn members are authorized to carry Department issued less-lethal force instruments on or off duty, only after the member has been qualified by the Training Division to carry the instrument, instructed in the proper use of force guidelines, and issued copies of General Orders relating to that topic.
   2.  Handcuffs/Flex-cuffs - Restraining devices that may be applied when a member considers it necessary to protect themselves, citizens, or a subject under police control from harm, while reducing the risk of escape.
   3.  Issued Oleoresin Capsicum (OC) Agent:
      a.  OC is an alternative to hands-on countermeasures and may be used when less severe options would be clearly ineffective.
      b.  Unless otherwise directed by an official, on-duty, uniformed and casual clothes members below the rank of Lieutenant will carry the issued OC.
      c.  OC canisters will be inspected monthly by supervisors for damage/leakage, etc.
      d.  Members who improperly use OC will be subject to disciplinary action.
      e.  Members will notify their supervisor, without delay, of damage, discharge or malfunction of their issued OC canister.
      f.  The Commander, Training Division, is responsible for the issuance and replacement of OC canisters.
   4.  Impact Weapons:
      a.  Impact weapons authorized by the Department include the issued straight police baton, ASP and any other impact weapons approved by the Chief. Slapjacks and blackjacks are not approved. This includes previously approved slapjacks and blackjacks.
      b.  On-duty, uniformed and casual clothes members below the rank of Lieutenant will carry an issued impact weapon unless otherwise directed by an official.
   5.  Less-Lethal Equipment:
      a.  Other less-lethal equipment (i.e., other OC disbursing devices, Ortho-Chlorobenzal Malononitrile (CS) agents, smoke devices, bean bag rounds, stinger grenades, and distraction devices) may be used by members trained in their operation when authorized by the Watch Commander.
      b.  The pepper ball launcher is an OC or kinetic impact alternative when approach to a subject would be inappropriate or ineffective. The pepper ball launcher will be stored in a carrier case with the air bottle firmly attached, the charging handle to the rear, the chamber open and the safety on. The carrying of a pepper ball launcher without pointing at a person does not constitute use of force.

---

CONFIDENTIAL                                                                0063

       c. Bean bag rounds are used with a dedicated 12-gauge shotgun or in the 37/40 mm launcher. The dedicated 12-gauge shotgun will be stored in the case with the chamber empty, action open and bean bag rounds stored on the outer carrier. Prior to loading the gun, the rounds will be inspected to ensure that they are bean bags.

D. Lethal Force:

       a. A member may use lethal force only when they reasonably believe that the action is in defense of human life, including the member's own life, or in defense of any person in imminent danger of serious physical injury.

       b. A member may use lethal force for the destruction of an animal with authorization from the Watch Commander.

E. Reporting and Investigation:

   1. A member will notify their supervisor without delay each time force is used. A comprehensive Use of Force Report (Attachment #1) will be completed as soon as possible.

       a. Supervisors will ensure that each involved member completes a separate Use of Force Report.

       b. The Use of Force Report will be completed prior to the member checking off unless the member is physically not capable at the time of check off.

       c. Supervisors will ensure that a member completes a Use of Force report when handcuffs are used in conjunction with a Stop and Frisk.

       d. This reporting requirement does not apply to the following types of force, unless the action resulted in the death of another person or injury requiring medical treatment:

          1) Officer presence or verbal commands.

          2) Hand control techniques that have little or no chance of causing injuries when controlling or subduing non-compliant or resisting persons. These techniques include touching, gripping or holding, frisking, pain compliance measures, pressure point application, come-a-long, control holds, or other custodial procedures.

          3) Handcuffs when used in conjunction with an arrest or transportation of a prisoner from the processing center to the local jail/central cell block.

          4) Physical removal of demonstrators, i.e. passive resistors.

          5) Firearm at tactical readiness, but not pointed at anyone.

          6) Presence of a police dog.

   2. Supervisors will review all incidents involving the use of force and ensure that an investigation is initiated when the use of force is not in conformance with Metro Transit Police Department General Orders or procedures or results in serious injury or death.

   3. Upon initiating an investigation for incidents involving use of force when not in conformance with MTPD General Orders or procedures will be forwarded OPRI for investigation.

---

General Order 130                                             Page 3

0064

4. The Use of Force Report will be forwarded to the District/Division Commander for review, then to the Records Division where they will be retained separate from other records. A copy of the Use of Force Report will be forwarded to the Commander, Training Division, by the Manager, Records Division.

5. The Commander, Training Division, will prepare an annual review of the use of force incidents to determine patterns which may indicate training needs, equipment upgrades, and/or policy modifications.

6. A member whose use of force results in serious injury or death will be removed from full-duty and placed on administrative duty pending the completion of an investigation.

Michael A. Taborn
Chief

CONFIDENTIAL

# GENERAL ORDER
## Metro Transit Police

| Subject:    Duties and Responsibilities | Number:  215 |
|---|---|
| *Next review date: August 23, 2014* | Effective:  August 23, 2013 |

### I. Purpose
This Order defines members' duties and responsibilities.

### II. Policy
Members will perform their duties in an efficient, courteous and orderly manner employing patience and good judgment at all times.  Members will respond to the lawful order of any supervisor as well as a request for assistance from a citizen and take proper police action whenever required.

### III. Duties
    A. It is each member's duty and responsibility to:
1. Protect Washington Metropolitan Area Transit Authority (WMATA) passengers, employees, revenue, and properties;
2. Prevent crime; and,
3. Preserve the peace.

    B. On-duty members will devote their full time and attention to the business of the Department.

    C. Members, without the prior approval of the Chief, will not communicate any information pertaining to a police incident to anyone but law enforcement personnel or the WMATA General Manager.

    D. Requests from outside the Department for a statement concerning a member's official duties will not be granted unless approved by the Watch Commander.  The Watch Commander will notify the Deputy Chief, Patrol Operations Bureau, of the decision.

    E. Members will display coolness and firmness at all times and will protect each other in times of peril.  Shirking of this responsibility will constitute gross neglect of duty, which may result in disciplinary action up to and including termination.

    F. Members will remain constantly on patrol within their beat and respond immediately to calls for service.

    G. Members will conduct a preliminary investigation into all applicable matters coming to their attention and take the appropriate action to include:
1. Observing all conditions, events, and remarks,
2. Locating and identifying witnesses,
3. Maintaining the crime scene,
4. Interviewing the complainant and the witnesses,
5. Interrogating the suspect,

WMATA 0205

CONFIDENTIAL

6. Arranging for the collection of evidence,
7. Effecting the arrest of the criminal, and
8. Reporting the incident.

H. Members will become thoroughly acquainted with their beat and investigate suspicious activity observed or reported within their jurisdiction.

I. Members will not interfere with the cases of other members without their consent or that of an Official.

J. Members will restore order and disperse crowds using moderate efforts of persuasion, if possible, when a disturbance occurs on WMATA property.

K. Members will not collect money or fare media unless approved by an Official.

L. Members will not malinger or feign illness/disability in order to evade the performance of their duties.

M. Members answering a Departmental telephone will state the name of the Department/Division followed by their rank and surname.

N. Members will provide their name and badge number to persons requesting same.

O. Members will not serve civil process.

P. Unless legally summoned, members will not render assistance or testify in civil cases arising out of the scope of their official duties.

IV. **Responsibilities**

A. General:

1. Members will be in possession of a valid driver's license from their jurisdiction of residence. Any change in the license status will be reported to their supervisor prior to their next tour of duty.

2. On-duty members will carry a notebook and record matters of importance coming to their attention. The notebook will be subject to inspection by supervisory personnel.

3. Members participating in any law enforcement action while off duty will, without delay, notify the Watch Commander. The member will prepare a written account of the event and submit it to their supervisor prior to their next tour of duty.

4. Members will maintain a functional telephone. The phone number will be provided to their supervisor for inclusion in the Alert Notification Roster. Any change will be reported, within twenty-four (24) hours, to a supervisor of their Division and forwarded to the Commander of the Communications Division.

5. Members will ensure their Personnel Information Form (MTPD Form #104) maintained by the Department is accurate and complete. Any change will be reported, within twenty-four (24) hours, to a supervisor of their Division and forwarded to the Sergeant, Administrative Services Bureau, for inclusion in the master file.

6. Members will not contact other offices within WMATA without going through the chain of command.

7. Members will not send reports to outside agencies without prior approval of a Deputy Chief or above.

8. Members will not divulge any information which might assist a person suspected or guilty of a criminal act in escaping arrest or punishment or which might compromise a criminal case.

General Order 215                                                    Page 2

CONFIDENTIAL

9. On-duty members will carry a watch or mobile phone which displays the time as broadcast by the Communications Division (CD).
10. Members will give full attention to all written directives and orders disseminated at roll call.
11. Members will check their WMATA email, at least once during their tour of duty, and are responsible for all email, read and unread, including General Orders and Numbered Memorandums.
12. When reporting to or from a beat, members will use the most expedient route/method and will not use their privately owned vehicle unless approved by an Official.
13. Members will request permission from a supervisor prior to leaving their beat assignment. The member will notify the CD prior to leaving their beat and when returning to their beat. Permission from a supervisor is not necessary when responding to a call for service.
14. Members scheduled to relieve other members, will do so at designated locations and times.
15. When not in full uniform, members who take police action will identify themselves by displaying their shield or credentials, as soon as possible.
16. Members will not congregate while on patrol.
17. Members in full uniform, on or off-duty, will not slouch, lean against partitions, or be seated in Metrorail stations, on Metrorail trains, or on Metro buses.
18. Smoking by members is prohibited in WMATA vehicles and facilities, except in designated areas authorized by the General Manager. On-duty members will not use smokeless tobacco while in public view.
19. Members are required to have a minimum of eight (8) hours off prior to their next tour of duty in every twenty-four (24) hour period, with the exception of court-related matters.
20. Members must pay for all parking and moving violations, other than those resulting from mechanical failure or moving violations when responding to a Code 1 call for service, arising from their operation of a WMATA vehicle. This responsibility includes red light infractions captured by a camera at or near the scene of the violation.
21. Members, while on WMATA property, will not record conversations with other members unless all parties are aware and agree to be recorded. Members conducting official MTPD investigations are exempt. All said recordings will be documented and preserved as evidence.

B. Prisoner Care and Custody:
1. Members will be responsible for safeguarding prisoner's personal property throughout the booking process.
2. Prisoners will be processed without unnecessary delay and afforded an opportunity to make a local telephone call from the detention facility.
3. Members will advise prisoners of their constitutional rights (Miranda Warning) prior to custodial interrogation.
4. Members will not promise immunity, prosecution of a lesser degree or offer any inducement to a suspect for any purpose.

General Order 215                                                                 Page 3

WMATA 0207

CONFIDENTIAL

5.  Members will not suggest, recommend, advise or otherwise counsel anyone concerning the retention of an attorney or bondsman resulting from a MTPD action.

Ronald A. Pavlik, Jr.
Chief of Police

General Order 215

Page 4

WMATA 0208

CONFIDENTIAL

# GENERAL ORDER
## Metro Transit Police

| Subject: Ethical Standards of Conduct and Financial Interest | Number: 217 |
|---|---|
| Next Review Date: August 23, 2014 | Effective: August 23, 2013 |

**I. Purpose**
This Order defines the Department's policy pertaining to members' personal and ethical conduct.

**II. Policy**
Members will maintain the highest standards of conduct. The authority to detain, arrest and seize property constitutes a public trust. Members will avoid conflicts of interest or the appearance thereof, and place ethical principles and compliance with the law before private gain and personal concerns.

**III. Procedures and Responsibilities**
   A. General Personal Behavior:
     1. Members will not conduct themselves in an immoral, indecent or disorderly manner or in a manner that may be construed as such by a reasonable person.
     2. Members, who are arrested, issued a summons or citation for a criminal offense, issued a summons or citation for reckless driving, or who has their driver's license suspended or revoked will notify the Watch Commander without delay. A detailed report concerning the incident will be submitted prior to his or her next regular tour of duty.
     3. Members will promptly report, through the chain of command, to the Chief of Police:
       a. Any disloyalty or suspected disloyalty to the United States Government by members of the Department,
       b. Any criminal conduct engaged in by members of the Department, and/or
       c. Any violation of the General Orders by members of the Department.
     4. Members will respond promptly and truthfully to all inquiries initiated by an official.
     5. Members will not knowingly make a false statement in any written or verbal report.
     6. While on duty, members will not engage in idle conversation concerning, but not limited to, obscene matters or controversial subjects tending to disrupt morale.
   B. Gifts and Gratuities:
     1. Members will not, in connection with services performed within the scope of their official duties, solicit or accept money or anything of value in addition to the compensation paid to them by the Washington Metropolitan Area Transit Authority (WMATA), unless the gift or gratuity is approved by the Chief.
     2. Members will not receive or solicit anything of value as a gift, gratuity or favor for

General Order 217                                       Page 1

WMATA 0213

CONFIDENTIAL

themselves or persons with whom they have family, business or financial ties if acceptance would result in, or give the appearance of resulting in, their loss of complete independence or impartiality in performing their official duties.

3. Members will not solicit for contributions for any reason from other members for a gift or donation from other members equal or subordinate to themselves without the approval of the Chief.

4. Members will not accept personal or business favors which might result in an actual or apparent conflict of interest with their official duties.

5. All duty related rewards, to include monetary rewards and gifts received by members, will be promptly submitted to an immediate supervisor with a detailed report explaining how and why the reward was received.

C. Official Conduct:

1. When referring to or addressing a ranking member, the appropriate title of that member will be utilized (e.g., Chief, Deputy Chief).

2. Members in full uniform, to include an issued hat, will render a hand salute to the National Colors in ceremony and the National Anthem. When in full uniform and a hat is not worn, members will place their right hand over their heart to the National Colors in ceremony and the National Anthem.

3. Members will at all times:
   a. Maintain decorum and command of temper, and
   b. Be patient, discreet and courteous.

4. Members will protect and preserve WMATA property and will not use such property other than for authorized purposes.

5. Members will not engage in illicit gambling or the playing of cards or games of chance while on-duty, or while off-duty on WMATA facilities.

6. Members will not:
   a. Play or toy with any of their issued equipment,
   b. Carry an umbrella while in uniform,
   c. Rest their hands in their BDU or trouser pockets while in uniform,
   d. Be connected with any active duty military organization other than reserve units of the United States Army, Navy, Air Force, Marine Corps, Coast Guard, or National Guard,
   e. Be connected to or a member of any subversive or anti-government organization,
   f. Directly or indirectly seek publicity concerning matters that are or may be involved in any judicial or disciplinary proceeding, or
   g. Use their official position for the purpose of influencing the interests of a particular individual or business entity.

D. Code of Ethics:

1. Members will regard their position as one of public trust and be constantly mindful of their primary obligation to serve the public, safeguard lives and property, keep the peace and ensure the rights of all to liberty, equality and justice.

2. Members will perform all duties impartially, without favor or affection or ill will and without regard to status, sex, race, religion, political belief, or aspiration.

3. Members will use the discretion vested in their position responsibly and exercise it within the law.

4. Members will not employ unnecessary force or violence or engage in cruel,

---

General Order 217                                                      Page 2

CONFIDENTIAL

degrading or inhuman treatment of any person.

5. Members will not disclose or permit others to disclose information obtained through their position with the Department, unless such information is generally available to the public. The release of official information is permitted within the scope of a member's official duties.

6. Members will not engage in, or condone, acts of corruption or bribery.

7. Members will cooperate with all legally authorized agencies and their representatives in the pursuit of justice.

8. Members will be responsible for their own standards of professional performance and will take every reasonable opportunity to enhance and improve their level of knowledge and competence.

9. Members will conduct their professional and private lives, including Social Network Websites, so as to avoid bringing discredit or the appearance of discredit upon themselves or the Department.

10. Members will cooperate with outside police agencies internal investigations if requested. The Office of Professional Responsibilities and Inspections will be notified.

11. Officials will not work any outside employment that involves them reporting to, or working for another member of lesser rank. This does not include military duty.

12. Officials will not directly supervise members of their immediate family. Immediate family is defined as a spouse, brother, sister, father, mother, to include step relatives, legal dependents, and a formalized domestic partner.

13. Officials will not fraternize or have intimate relationships with anyone they directly supervise.

14. Members will not surreptitiously record other members while on duty. This does not include official sanctioned investigations.

E. Standards of Financial Interest

1. Members will not be financially involved, either directly or indirectly, in any contract, sale, purchase, lease or transfer of real or personal property to which the Department or WMATA is a party, unless the involvement is that which is generally available to the public.

2. Members will not conduct themselves in a manner suggesting the appearance of private advantage from employment with the Department.

3. Members will not use their position with the Department to coerce, or appear to coerce, another person to provide any financial benefit to themselves or persons with whom they have family, business or financial connections.

4. Members will not use or permit others to use information obtained through their official positions to further their own financial interests or the financial interests of family members, business associates or other organizations, unless such information is generally available to the public.

5. Members will not offer money or anything of value for, or in consideration of, obtaining an appointment, promotion or privilege in their employment with the Department or WMATA.

6. All members will complete and sign a Certification Statement confirming they have received, read and understood the requirements of WMATA Policy/Instruction 7.10, regarding Standards of Conduct.

---

General Order 217                                                                    Page 3

WMATA 0215

CONFIDENTIAL

7. Members whose annual salary rate is $50,000 or more and those who are significantly engaged in procurement activities will submit a Confidential Statement Affiliations and Financial Interests annually and when significant relevant changes occur.


Ronald A. Pavlik, Jr.
Chief of Police

General Order 217                                                                Page 4

CONFIDENTIAL



# M E M O R A N D U M

**SUBJECT:** Revised Metropolitan Police Department(MPD) General Order - Metro Transit Police Department(MTPD)

**DATE:** April 17, 2019

**FROM:** MTPD – Chief Ronald A. Pavlik, Jr.

**TO:** MTPD – All Members (MTPD #19-097)

Over the last several months we have worked with the Metropolitan Police Department (MPD) on updating their *General Order 310, Series 6, Metro Transit Police.*

This particular MPD General Order was previously updated on October 7, 1976, which is only a few months after we were established as a police department. This updated General Order reflects how operations are occurring now between MPD and the MTPD. Members will review the attached General Order for their awareness and should note that Section III E., stipulates that all prisoner's property related to arrests made by members of the MTPD must be retained by the MTPD.

Members will secure all prisoners property in accordance with MTPD General Orders in the MTPD Property Room and not at the respective MPD booking facility. Members will inform arrestees that their property is at JGB, the address of JGB, the hours in which they can retrieve their property and Officer Hall's contact information. Please direct any questions regarding this memorandum to Assistant Chief Michael Anzallo at (202) 962-2154 or via email mlanzallo@wmata.com

Metro
Transit
Police
Department

cc: FOP, D.C. Lodge #1

**LAW ENFORCEMENT SENSITIVE**
**NOT FOR GENERAL RELEASE**

**WMATA 0595**

# GENERAL ORDER



**DISTRICT OF COLUMBIA**

| Title | | |
|---|---|---|
| **Metro Transit Police** | | |
| Topic | Series | Number |
| **RAR** | **310** | **06** |
| Effective Date | | |
| **April 15, 2019** | | |
| Replaces: General Order 310.06 (Metro Transit Police), Effective Date October 7, 1976 Rescinds: SO-80-61 (Metro Transit Police Field Reports), Effective Date September 2, 1980 SO-82-14 (Metro Transit Police Violation Citation Program), Effective Date June 1, 1982 SO-86-30 (Metrobus Security), Effective Date April 15, 1986 | | |

| I. | Background | | Page 1 |
|---|---|---|---|
| II. | Regulations | | Page 1 |
| III. | Procedures | | Page 3 |
| III.A | | Report Processing | Page 3 |
| III.B | | Records Access | Page 3 |
| III.C | | Arrests | Page 3 |
| III.D | | Brooking Procedures | Page 3 |
| III.E | | Property | Page 4 |
| III.F | | Found Property | Page 4 |
| III.G | | Death Notifications | Page 4 |
| III.H | | Juveniles | Page 5 |
| III.I | | Traffic and Towing | Page 5 |
| IV. | Definitions | | Page 5 |

## I.    BACKGROUND

The purpose of this order is to outline the jurisdictional and operational responsibilities of the Metropolitan Police Department (MPD) with respect to the Metro Transit Police Department (MTPD) and Washington Metropolitan Area Transit Authority (WMATA) facilities located in the District of Columbia.

## II.    REGULATIONS

A.    The MTPD and the MPD have concurrent jurisdiction for providing police service on WMATA facilities in the District of Columbia.

    1.    The MTPD shall have primary responsibility for handling incidents and offenses on WMATA facilities with the exception of:

        a.    Missing persons;

        b.    Serious assault where the victim sustains life–threatening injuries;

CONFIDENTIAL

    c.    Homicides; and

    d.    Death investigations other than suicides or obvious, accidental deaths.

2.    Notwithstanding the other requirements of this order, for street crime incidents and offenses (e.g., theft, robbery, assault) occurring at a **WMATA bus stop**:

    a.    The first member from either agency to respond to the scene shall handle the initial investigation (e.g., render first aid; determine if an offense or incident occurred; identify victims, witnesses, suspects; safeguard the crime scene) and complete any required reports.

    b.    Make an arrest when probable cause exists. If an arrest is made, the agency making the arrest shall handle the incident.

    c.    If an arrest is not made, MTPD members shall contact the MPD and MPD shall handle the follow-up investigation.

3.    MPD members shall be responsible for handling incidents and offenses that occur at all non-WMATA bus stops (i.e., bus stops that do not have a WMATA metrobus stop sign.).

4.    Upon mutual agreement by both agencies, MTPD may turn cases over to MPD when the incident appears to be related to a crime pattern or ongoing MPD investigation. The case transfer shall be approved by the MPD Criminal Investigation Division (CID) Watch Commander and the MTPD Watch Commander.

5.    MPD members shall turn incidents and offenses on WMATA facilities over to the MTPD when an MTPD member responds to the scene, with the exception of incidents listed in Part II.A.1.

6.    MTPD is responsible for conducting their own investigations of incidents and offenses that occur on WMATA facilities with the exception of the incidents listed in Part II.A.1.

B.    Continuing Offenses

1.    The MPD shall handle offenses that start outside of WMATA facilities but then continue onto WMATA facilities.

2.    The MTPD shall handle offenses that start on or in WMATA facilities but then continue off WMATA facilities consistent with their jurisdictional authority.

C.    Questions regarding jurisdiction not specifically addressed by this order shall be resolved by the MTPD watch commander and the MPD watch commander in the

CONFIDENTIAL

district of occurrence.

III.    **PROCEDURES**

    A.    Report Processing

        1.    Nothing shall preclude members of either agency from taking reports for incidents and offenses that occur at WMATA facilities should conditions warrant such action. Cases, as described in Part II.A, shall be transferred to the primary designated agency for follow-up.

        2.    The MTPD will complete their reports in the MPD Records Management System (RMS) and will use an MPD central complaint number (CCN) on all reports prepared by that agency.

    B.    Records Access

        1.    Members shall ensure that the MTPD has access to all MPD records that are necessary for that agency to fulfill its responsibilities.

        2.    Members shall be aware that the MTPD shall provide access to the records maintained by the MTPD.

    C.    Arrests

        1.    Members shall be aware that in accordance with WMATA Compact, the jurisdiction of the MTPD shall be limited to all the transit facilities owned, controlled, or operated by the WAMTA, but this restriction shall not limit the power of the MTPD to make arrests in the Transit Zone for violations committed upon, to or against such transit facilities committed from within or outside such transit facilities, while in hot or close pursuit or to execute traffic citations and criminal process.

        2.    When the initial apprehension of a suspect is made by an officer of the MTPD, he or she shall be considered the arresting officer for the purpose of prosecution or the detention journal in accordance with GO-PCA-502.05 (Use of the Detention Journal).

    D.    Booking Procedures

        1.    Members shall be aware that all booking services including fingerprinting and photographing for MTPD arrests shall be provided by the MPD.

        2.    The MPD shall provide detention and confinement facilities for all MTPD prisoners (i.e., adults and juveniles) prior to them being transferred to Central Cellblock (CCB) or the Department of Youth Rehabilitative Service (DYRS) Youth Services Center (YSC).

        3.    It shall be the responsibility of the MPD watch commander of the affected

**WMATA 0591**

CONFIDENTIAL

district or division to arrange for the release of persons arrested by officers of the MTPD, if the arrested person is eligible for release by post and forfeit (i.e., elect to forfeit), citation release, or diversion for juveniles; this includes juveniles released without charge from the Juvenile Processing Center (JPC). Members are reminded that MTPD will process all MTPD non-custodial (i.e., "61-D") arrests.

4.  The MTPD shall be responsible for the individuals they arrest prior to entering an MPD facility. Once the arrestee enters an MPD facility, the MPD shall be responsible for the arrestee to include any required transportation.

    a.  Once the arrestee enters an MPD facility, the MPD shall be responsible for any guard details (e.g., hospital detail). Members from the district in which the arrest occurred shall be responsible for the guard detail and shall handle the guard detail in accordance with GO-PCA-502.07 (Medical Treatment and Hospitalization of Prisoners).

    b.  Prior to the arrestee entering an MPD facility, the MTPD is responsible for any guard details for the individuals they arrest.

E.  Property

    1.  The MTPD will retain and process all prisoner property resulting from arrests by MTPD members.

    2.  The MTPD will handle items of property taken into custody and classified as suspected proceeds of a crime.

F.  Found Property

    1.  Members shall turn over contraband or weapons recovered from a transit facility to the MTPD. The member will be provided with the MTPD report number generated to document the transfer of custody.

    2.  Members shall be aware that property classified as "found property," recovered from WMATA transit facilities shall be turned over to a WMATA employee in accordance with the procedures contained in GO-SPT-601.01 (Recording, Handling and Disposition of Property Coming into the Custody of the Department).

G.  Death Notifications

    1.  MPD shall make death notifications for all cases in accordance with GO-OPS-401.08 (Notification of Next of Kin in Cases of Serious Injuries or Fatalities), with the exception of suicides and obvious, accidental deaths.

    2.  MTPD shall make death notifications for suicides and obvious, accidental

deaths.

H.    Juveniles

1.    MPD shall provide booking, transportation, and diversion services for juveniles arrested by MTPD.

I.    Traffic and Towing

1.    MPD members shall have primary traffic enforcement responsibility around WMATA facilities to include any traffic fatalities, and all driving under the influence or driving while intoxicated cases.

2.    The MTPD will, however, take action on clear safety violations that come to their attention outside of WMATA facilities. In such cases, the MTPD shall notify the MPD who shall handle the arrest; and the MTPD shall be the complaining witness.

3.    MPD members shall have the responsibility of investigating all traffic crashes and fatalities at WMATA facilities. If a MTPD officer arrives on scene first, the member will initiate first aid, request medical assistance, and secure the scene for MPD.

4.    MTPD will be responsible for impounding the vehicles of persons arrested by MTPD officers, and for all other towing as required by current orders and regulations. MTPD will provide its own crane service for MTPD vehicles.

## IV.    DEFINITIONS

When used in this directive, the following terms shall have the meanings designated:

|    | Term | Definition |
|----|------|------------|
| 1. | Transit Zone (Zone) | Consists of the District of Columbia, the Maryland counties of Montgomery and Prince George's and the Northern Virginia counties of Arlington, Fairfax, and Loudoun and the cities of Alexandria, Fairfax, and Falls Church. |
| 2. | Washington Metropolitan Area Transit Authority (WMATA) | Public transportation agency commonly known as "Metro". |
| 3. | WMATA bus stop | Area within 150 feet of a metrobus stop sign, excluding the interior of any building not owned, controlled, or operated by the WMATA. |
| 4. | WMATA facilities | All real and personal property located in the Zone, necessary or useful in rendering transit service between points within the Zone, by means of rail, bus, water or air and any other mode of travel, including without limitation, tracks, rights-of- |

CONFIDENTIAL

**METRO TRANSIT POLICE (GO-RAR-310.06)**                              **PAGE 6 OF 6**

|  | way, bridges, tunnels, subways, rolling stock for rail, motor vehicle, marine and air transportation, stations, terminals and ports, areas for parking and all equipment, fixtures, buildings and structures and services incidental to or required in connection with the performance of transit service. |

Peter Newsham
Chief of Police

PN:KDO:MOC:JC

## V.   DIRECTIVE CONFORMING AMENDMENTS

| Amendment # | Page | Description of Change | Effective Date of Change | Name and Title of Authorizing Member |
|---|---|---|---|---|
| 1 | 2 | Correct the section referenced in Part II.A.5 | 04/23/19 | Maureen O'Connell, Director, Policy and Standards Branch |
| 2 | 2 | Correct the section referenced in Part II.A.6 | 04/23/19 | Maureen O'Connell, Director, Policy and Standards Branch |
| 3 | 3 | Correct the section referenced in Part III.A.1 | 04/23/19 | Maureen O'Connell, Director, Policy and Standards Branch |