**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| HUGUETTE ULYSSE | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | CASE NO.:  1:19-cv-01465 CJN |
| METRO TRANSIT POLICE OFFICER | : | |
| DERRICK STOKES, *et al.* | : | |
| | : | |
| Defendants. | : | |

_____

**MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................. iv

INTRODUCTION..............................................................................................................1

FACTUAL BACKGROUND ............................................................................................1

LEGAL ARGUMENT........................................................................................................6

    I.    DEFENDANTS' ARGUMENT FAILS TO CONSIDER THE ENTIRE
        SUMMARY JUDGMENT RECORD ..........................................................................6

    II.   THE RECORD PERMITS A REASONABLE JURY TO FIND
        DEFENDANTS LIABLE FOR ARRESTING PLAINTIFF USING
        EXCESSIVE FORCE UNDER 42 U.S.C. § 1983 .......................................................7

        A.  A Reasonable Jury Could Find that Defendants' Actions Were
             Unreasonable Under *Graham v. Connor* ...........................................................7

        B.  There Exist Genuine Disputes of Material Fact Regarding Whether
             Defendants Used Excessive Force in Arresting Ms. Ulysse.............................9

             1. *Defendants Mischaracterize the Conclusiveness of the Video
                Evidence* ................................................................................................9

             2. *Genuine Disputes of Material Fact Pervade Ms. Ulysse's
                Excessive Force Claim* ......................................................................11

              3. *Plaintiff Has Sufficiently Stated a Constitutional Violation* ...............14

              4. *Defendant's Arguments Regarding Plaintiff's Expert
                are Incorrect* ........................................................................................15

    III.  THE RECORD PERMITS A REASONABLE JURY TO FIND DEFENDANTS
        LIABLE FOR ARRESTING PLAINTIFF WITHOUT PROBABLE CAUSE IN
        VIOLATION OF 42 U.S.C. § 1983.........................................................................16

        A.  There Exist Genuine Disputes of Material Fact Regarding
             Whether Defendants Had Probable Cause to Arrest Ms. Ulysse
             for Fare Evasion ..............................................................................................17

B. There Exist Genuine Disputes of Material Fact Regarding Whether Defendants Had Probable Cause to Arrest Ms. Ulysse for Resisting Arrest ........................................................................21

IV. DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY .................26

    A. Factual Disputes Preclude a Decision on Qualified Immunity at the Summary Judgment Stage ........................................................26

    B. On Plaintiff's Facts, Defendants are Not Entitled to Qualified Immunity Because Their Constitutional Violations Violated Clearly Established Law ..............................................................28

V. THE RECORD PERMITS A REASONABLE JURY TO FIND THAT DEFENDANTS VIOLATED PLAINTIFF'S STATE LAW CLAIMS .....................31

    A. Plaintiff's False Arrest Claim Must Go to a Jury ............................................31

    B. There Exist Genuine Disputes of Material Fact that Defendants Committed Common Law Intentional Infliction of Emotional Distress .........32

    C. Plaintiff's Assault and Battery Claims Must Go to a Jury ..............................36

    D. There Exist Genuine Disputes of Material Fact that Defendants Are Liable Under Common Law Negligence ..................................................................38

    E. There Exist Genuine Disputes of Material Fact that Defendants Are Liable Under Common Law Negligent Infliction of Emotional Distress .................44

CONCLUSION ........................................................................................................45

## **TABLE OF AUTHORITIES**

<u>Cases</u>                                                                                                                                    <u>Pages</u>

*Amaechi v. West*, 237 F.3d 356 (4th Cir. 2001)............................................................41

*Amobi v. D.C. Dep't of Corrections*, 755 F.3d 980 (D.C. Cir. 2014) ...............16, 32, 33

*Armbruster v. Frost*, 962 F. Supp. 2d 105 (D.D.C. 2013) ........................................14, 15

*Arias v. DynCorp*, No. 1:01CV01908 (ESH), 2016 WL 6496214 (D.D.C. Nov. 2, 2016) ..........35

*Briggs v. Washington Metro. Area Transit Auth.*, 481 F.3d 839 (D.C. Cir. 2007)......................41

*Campbell v. D.C.*, 245 F. Supp. 3d 78 (D.D.C. 2017) ................................................25

*Coghill v. United States*, 982 A.2d 802 (D.C. 2009) ...................................................22

*Cromartie v. D.C.*, 479 F. App'x 355 (D.C. Cir. 2012) .............................................15

*Cutchin v. D.C.*, 369 F. Supp. 3d 108 (D.D.C. 2019) ...............................................30

*Dauphine v. United States*, 73 A.3d 1029 (D.C. 2013) ...............................................24

*\*David v. D.C.*, 436 F. Supp. 2d 83 (D.D.C. 2006) ...................................................44

*D.C. v. Brown*, 589 A.2d 384 (D.C. 1991) ................................................................39

*D.C. v. Coleman,* 667 A.2d 811 (D.C. 1995) ............................................................43

*D.C. v. Chinn*, 839 A.2d 701 (D.C.2003) ..................................................................42

*D.C. v. Minor*, 740 A.2d 523 (D.C. 1999) ................................................................32

*D.C. v. Peters*, 527 A.2d 1269 (D.C. 1987)..............................................................43

*\*Dormu v. D.C.*, 795 F. Supp. 2d 7 (D.D.C. 2011) ........................................... *passim*

*Etheredge v. D.C.*, 635 A.2d 908 (D.C. 1993)...............................................22, 36, 37

*Evans–Reid v. D.C.*, 930 A.2d 930 (D.C. 2007).......................................................39

*Fenwick v. Pudimott*, 778 F.3d 133 (D.C. Cir. 2015)................................................10

*Florida. v. Harris*, 568 U.S. 237 (2013) ...................................................................16

*Flythe v. D.C.*, 791 F.3d 13 (D.C. Cir. 2015) ...........................................................13

*Flythe v. D.C.*, No. CV 10-2021 (RC), 2016 WL 4506965 (D.D.C. Aug. 26, 2016) ............26, 27

*Gayden v. United States*, 107 A.3d 1101 (D.C. 2014)..................................................................25

*Gerstein v. Pugh*, 420 U.S. 103 (1975) ......................................................................................30

*Goolsby v. D.C.*, 317 F.Supp.3d 582 (D.D.C. 2018) ..............................................................6, 30

*\*Graham v. Connor*, 490 U.S. 386 (1989) .......................................................................... *passim*

*\*Hall v. D.C.*, 867 F.3d 138 (D.C. Cir. 2017)....................................................................... *passim*

*Hargraves v. D.C.*, 134 F. Supp. 3d 68 (D.D.C. 2015).............................................15, 32, 33, 39

*Harris v. U.S. Dep't of Veterans Affairs*, 776 F.3d 907 (D.C. Cir. 2015).......................................7

*\*Halcomb v. Washington Metro. Area Transit Auth.*, 526 F. Supp. 2d 20 (D.D.C. 2007)......19, 27

*\*Halcomb v. Woods*, 767 F. Supp. 2d 123 (D.D.C. 2011)...................................................... *passim*

*Holcomb v. Powell*, 433 F.3d 889 (D.C. Cir. 2006) ......................................................................6

*Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179 (10th Cir. 2001)...................................14

*Howard v. United States*, 966 A.2d 854 (D.C. 2009) ..................................................................22

*Howard Univ. v. Best*, 484 A.2d 958 (D.C. 1984) .......................................................................33

*\*In re C.L.D.*, 739 A.2d 353 (D.C. 1999) ....................................................................................22

*Jiggetts v. Cipullo*, 285 F. Supp. 3d 156 (D.D.C. 2018)..............................................................27

*\*Johnson v. D.C.*, 528 F.3d 969 (D.C. Cir. 2008) ..................................................26, 27, 29, 30

*Jones v. Howard Univ., Inc.*, 589 A.2d 419 (D.C. 1991)..............................................................44

*Kisela v. Hughes*, 138 S. Ct. 1148 (2018).................................................................................26

*Larijani v. Georgetown Univ.*, 791 A.2d 41 (D.C. 2002)..............................................................32

*Lash v. Lemke*, 786 F.3d 1 (D.C. Cir. 2015).................................................................10, 25, 30

*Littlepage v. Quigley*, 69 F. Supp. 3d 136 (D.D.C. 2014) ...........................................................18

*Lynn v. D.C.*, 734 A.2d 168 (D.C. 1999) ....................................................................................43

*Martin v. Malhoyt*, 830 F.2d 237 (D.C. Cir. 1987) ........................................................30

*Mazloum v. D.C. Metro. Police Dep't*, 576 F. Supp. 2d 25 (D.D.C. 2008) ..................30

*McKoy v. D.C.*, No. CV 18-416 (RBW), 2021 WL 270397 (D.D.C. Jan. 27, 2021) .............10, 21

*Miles v. United States*, 181 A.3d 633 (D.C. 2018) ......................................................21

*Muehler v. Mena*, 544 U.S. 93 (2005) .........................................................................14

*Nagy v. Corr. Corp. of Am.*, 79 F. Supp. 3d 114 (D.D.C. 2015) ..................................45

*Oberwetter v. Hilliard*, 639 F.3d 545 (D.C. Cir. 2011) .................................................30

*Paul v. Howard Univ.*, 754 A.2d 297 (D.C. 2000) .......................................................36

*Purcell v. Thomas*, 928 A.2d 699 (D.C. 2007) .............................................................33

*Robinson v. Pezzat*, 818 F.3d 1 (D.C. Cir. 2016)..........................................................22

*\*Ruffin v. United States*, 76 A.3d 845 (D.C. 2013) ......................................................24

*S.H. v. D.C.*, 270 F. Supp. 3d 260 (D.D.C. 2017).........................................................14

*Saucier v. Katz*, 533 U.S. 194 (2001) .......................................................................7, 28

*Scales v. D.C.*, 973 A.2d 722 (D.C. 2009) ...............................................................37, 39

*Scott v. Harris*, 550 U.S. 372 (2007) ...........................................................................10

*Sherrod v. McHugh*, 334 F. Supp. 3d 219 (D.D.C. 2018) ...................................15, 17, 40

*\*Taylor v. Guida*, No. CV 17-123 (RBW), 2019 WL 4750366 (D.D.C. Sept. 30, 2019) .............14

*Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22 (D.D.C. 2016) ......................43

*Turpin v. Ray*, No. CV 19-2394 (RC), 2020 WL 1510412 (D.D.C. Mar. 30, 2020).....................8

*United States v. DiStefano*, 555 F.2d 1094 (2d Cir. 1977) ...........................................41

*Waldon v. Covington*, 415 A.2d 1070 (D.C.1980).........................................................34

*Wannall v. Honeywell Intern. Inc.*, 292 F.R.D. 26 (D.D.C. 2013) ................................13

*Wasserman v. Rodacker*, 557 F.3d 635 (D.C. Cir. 2009) .............................................30

*Williams v. Baker*, 572 A.2d 1062 (D.C. 1990).................................................................44

*Williams v. D.C.*, 268 F. Supp. 3d 178 (D.D.C. 2017) ....................................................8

*Wright v. United States*, 963 F. Supp. 7 (D.D.C. 1997)................................................44

*\*Xingru Lin v. D.C.*, No. CV 16-645 (CKK), 2020 WL 3542253 (D.D.C. June 30, 2020) .........24

*Young v. D.C.*, 322 F. Supp. 3d 26 (D.D.C. 2018) ......................................................26

Record evidence demonstrates that, on the morning of May 21, 2018, Defendants Derrick Stokes and Nadim Al-Hinawi (collectively, "Defendants") forced Plaintiff Huguette Ulysse ("Plaintiff") to the ground, pulled off her shirt, pinned her to the ground with full use of knees and body, wrenched her arms behind her back so forcefully that she required medical attention, and made multiple threats by words and action to kill her. Ms. Ulysse lay on the ground with her bare breasts exposed, a Taser pointed at her back, while a concerned crowd pleaded to no avail for Defendants to cover her up. Defendants later arrested Ms. Ulysse for fare evasion and resisting arrest, misdemeanors for which Defendants lacked probable cause and never attempted to confirm in the first place. Ms. Ulysse's account of that morning is supported by sworn statements by multiple third-party witnesses and by video footage—none of which is addressed in Defendants' opening brief.

Simply put, this case involves disputed, material facts that must be resolved by a jury. Yet, in moving for summary judgment (Dkt. 32, Defendants' Motion for Summary Judgment) ("Def. Br."), Defendants ask the Court to credit their own self-serving accounts of what transpired on May 21, 2018, while ignoring substantial evidence to the contrary. The evidence that Plaintiff has amassed is more than sufficient for a factfinder to find that Defendants violated Ms. Ulysse's rights under 42 U.S.C. § 1983 and corollary state law. Defendants' Motion should be denied in its entirety.

## FACTUAL BACKGROUND

Plaintiff Huguette Ulysse is a 27-year-old African-American woman. Ms. Ulysse moved to Washington, D.C. from New York on or around April 9, 2018. Ms. Ulysse does not drive, so the Metro train became her primary form of transportation. Plaintiff's Statement of Material Facts ("PSMF") ¶¶ 1-3.

The incident in question occurred on the morning of May 21, 2018. During rush hour, Ms. Ulysse boarded a train at the Greenbelt station and rode to Fort Totten station. Ms. Ulysse had sufficient money on her SmarTrip card to get from Greenbelt to Fort Totten. At the Fort Totten Metro station, there was only one exit turnstile, so she went to the turnstile and swiped her card. There was sufficient distance (in excess of ten inches) between Ms. Ulysse and the woman who exited before her. PSMF ¶¶ 6-7, 9-10, 14.

Defendant Metropolitan Transit Police Department ("MTPD") Officer Derrick Stokes, who had been standing at the far entrance of the station, walked over to Ms. Ulysse. When Officer Stokes first approached Ms. Ulysse, he did so from some distance away, from the side, through a wave of his hand in her direction. It being rush hour, it was unclear whether he was trying to get the attention of Ms. Ulysse or another person directly to her left. Ms. Ulysse was wearing headphones and was playing music, and she did not hear anything Officer Stokes said, nor did she interact with him before he grabbed her. PSMF ¶¶ 15, 16-20.

Ms. Ulysse was thus shocked when Officer Stokes came from behind and, grabbing her arm and a piece of her shirt, took her to the ground. Ms. Ulysse took a small, involuntary step, and Officer Stokes used his bodyweight to press her body and face into the ground. There were multiple people around Officer Stokes who saw Officer Stokes "slam" or otherwise "force" Ms. Ulysse to the concrete floor. He kept her pinned to the ground with his hand on her left shoulder, using his knee and all of his bodyweight. PSMF ¶¶ 20, 22, 24-26, 35-37, 39-40.

Officer Stokes is significantly larger and heavier than Ms. Ulysse. Officer Stokes weighed 230 pounds. Ms. Ulysse is about 5'4'' with a slim build. Ms. Ulysse posed no danger. She was wearing tight clothing that could not conceal a weapon, and due to how Officer Stokes had her positioned, she was unable to move either of her arms. PSMF ¶¶ 23, 27, 35-39, 47-48.

Ms. Ulysse landed on the ground with her top pulled down, Officer Stokes on top of her, and her breasts exposed. Ms. Ulysse's shirt had come down when Officer Stokes grabbed her arm and shirt, and her breasts subsequently remained exposed for the majority of the period she was held on the ground, including well after Sergeant Al-Hinawi arrived. The crowd repeatedly alerted the officers that she should be allowed to cover up, and a person in the crowd tried to offer his own shirt. Despite multiple members of the crowd alerting Officer Stokes that Ms. Ulysse's breasts were clearly exposed to everyone nearby, and pleading with him to let her cover up, and despite the fact that it was Officer Stokes's actions that caused her breasts to become exposed in the first place, Officer Stokes did nothing to cover her up. PSMF ¶¶ 23, 26-34, 57-59.

Instead, Officer Stokes's temper escalated. Even though Ms. Ulysse was completely subdued by the time Officer Stokes took her to the ground and put his hand on her shoulder, he decided to exert additional, unnecessary force on her. For the duration of the arrest, Officer Stokes kept the Taser in his hand, activated, pointed toward and inches away from Ms. Ulysse. He either placed his knee on Ms. Ulysse's back or applied his bodyweight on her in an unnecessary manner. Ms. Ulysse lay face down, partially naked, pressed against the ground with one arm wrenched behind her back. PSMF ¶¶ 33-37, 39-42, 44, 47.

By that time, multiple eyewitnesses had gathered at the scene. These eyewitnesses, commuters who had never met Ms. Ulysse before, stood close to the scene and observed the officers' and Ms. Ulysse's actions. To these eyewitnesses, Officer Stokes's actions against Ms. Ulysse were excessive and unjustified, given that Officer Stokes already had control over Ms. Ulysse from the start. None saw Ms. Ulysse resisting her arrest at any point; she was terrified and pled for help, but she did not try to escape or otherwise avoid the officers' grasp. Officer Stokes had one of her arms under control, and she was unable to move the other arm because she

was pinned down to the ground by his bodyweight. Nor did the crowd pose a danger to the officers or Ms. Ulysse. They stood a safe distance away from the officers, retreated when Officer Stokes drew his Taser, and did not verbally or physically threaten the officers. The officers turned their backs on members of the crowd at multiple points, and no other officers intervened. No one but Ms. Ulysse was arrested or detained. PSMF ¶¶ 29, 39-40, 47-48, 64-73.

While Officer Stokes sat on top of a fully-subdued Ms. Ulysse, Defendant Sergeant Nadim Al-Hinawi arrived. He immediately knelt down over Ms. Ulysse and joined in her arrest. Like Officer Stokes, Sergeant Al-Hinawi seemed upset that people were recording the arrest. Although Ms. Ulysse's arm was already secured behind her back, Sergeant Al-Hinawi intentionally took her arm and twisted it sharply behind her back, causing her extreme pain. After he twisted her arm, Sergeant Al-Hinawi threatened to physically harm Ms. Ulysse. He told her he had a gun and would kill her. Both officers pulled Ms. Ulysse's arms back to handcuff her. Sergeant Al-Hinawi then applied the handcuffs so tightly that they left visible bruises and abrasions on Ms. Ulysse's wrists, ignoring her pleas that they were too tight. PSMF ¶¶ 49-56.

While Ms. Ulysse was being handcuffed, the crowd continued to plead with both officers to cover Ms. Ulysse up. Sergeant Al-Hinawi ignored entreaties from the crowd to cover Ms. Ulysse. At some point, a WMATA bus driver approached the officers and indicated that a T-shirt was available, but Sergeant Al-Hinawi refused and directed him to move away. PSMF ¶¶ 57-58.

After Sergeant Al-Hinawi completed his painful handcuffing of Ms. Ulysse, both Defendants manually pulled Ms. Ulysse up. When they pulled her torso up, however, Defendants fully exposed her breasts to bystanders. A Caucasian woman finally brought over the shirt that had previously been offered and rejected, and Defendants put Ms. Ulysse back on the ground and allowed the woman to drape the shirt partially over Ms. Ulysse's torso. PSMF ¶¶ 50, 55, 60-61.

4

Ultimately, Defendants roughly dragged Ms. Ulysse into a police car. Although Ms. Ulysse was at that point in the car, handcuffed, Officer Stokes did no independent investigation into whether Ms. Ulysse committed fare evasion. Ms. Ulysse was transported in handcuffs to the emergency room at Providence Hospital to receive treatment for injuries she sustained during her arrest, including acute strain of her neck muscle, sinus tachycardia, and cuts, abrasions, and bruises on her shoulder, chest, and wrists. (Two days later, in pain, Ms. Ulysse sought further treatment at George Washington University.) PSMF ¶¶ 62, 91-93, 108-111, 116-117.

Defendants claimed to have taken a photo of Ms. Ulysse's SmarTrip card to check its transaction history, but that card was not Ms. Ulysse's. That card had the traditional blue logo and was purchased on March 17, 2018, whereas Ms. Ulysse's card was purchased after she moved to D.C. in April 2018 and had a cherry blossom decal on it. The physical card itself is now missing. Officer Stokes claimed to have turned it over to the Metropolitan Police Department (MPD) property clerk, but there is no mention in MPD's logbook. It is not in MPD's possession, nor is it in the possession of Defendants or MTPD. PSMF ¶¶ 94, 97-99.

Ms. Ulysse was booked at the 4th District Jail on charges of fare evasion and resisting arrest, both misdemeanors under D.C. law., and released that same day. The United States Attorney's Office subsequently dismissed both charges. PSMF ¶ 8, 46, 113-114.

Ms. Ulysse continues to suffer emotional distress as a result of her arrest. Throughout the interaction, Ms. Ulysse feared for her life. She sought treatment from a mental health professional over the summer but remained terrified to ride the D.C. Metro after the incident. As a result, to avoid cost-prohibitive cab rides, she had to walk 90 minutes each way to work. Ultimately, Ms. Ulysse gave up and moved back to New York, forfeiting her hopes to work, reside, and otherwise participate in the District community. PSMF ¶¶ 45, 53, 118, 119, 122-125.

## <u>LEGAL ARGUMENT</u>

Plaintiff's claims under 42 U.S.C. § 1983 pertain to two independent constitutional violations: violation of her Fourth Amendment rights by using excessive force, and violation of her Fourth Amendment rights by arresting her without probable cause. *See Goolsby v. District of Columbia*, 317 F. Supp. 3d 582, 591 (D.D.C. 2018) (each § 1983 violation requires a separate inquiry). Plaintiff also presented state common law causes of action of false arrest and false imprisonment; intentional infliction of emotional distress; assault and battery; negligence; and negligent infliction of emotional distress. Defendants have moved for summary judgment on all claims. Defendants' Motion misstates the law and the facts and should be denied in its entirety.

## I.    **Defendants' Argument Fails to Consider the Entire Summary Judgment Record.**

Summary judgment is only appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court's assessment must view the evidence in the light most favorable to the non-moving party, including "the pleadings, depositions, answers to interrogatories, admissions, and affidavits filed pursuant to discovery." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).

On this standard, Defendants' Motion must fail. Ample record evidence supports a finding that Defendants lacked probable cause in arresting Ms. Ulysse and used excessive force in effecting the arrest. Defendants do not even engage with this evidence: Defendants make no mention of the statements of five Fort Totten commuters who happened to be near the incident and provided crucial declarations of what they observed. Nor do they take into account the cellphone video taken by one of the bystanders, which has audio, was taken close-up to the scene, and depicts several minutes of what happened to Plaintiff as Officer Stokes bore down on top of her. And finally, Plaintiff's own testimony clearly and consistently disputes Defendants'

6

account but is also ignored by Defendants. "A plaintiff may defeat a summary judgment granted to a defendant if the parties' sworn statements are materially different. . . . Here, the affidavits, declarations, pleadings, and other evidence show that there are factual disputes that could affect the outcome of the suit." *Harris v. U.S. Dep't of Veterans Affairs*, 776 F.3d 907, 914–15 (D.C. Cir. 2015). Defendants' inability to reconcile their version of the facts to these credible portions of the evidentiary record is fatal to their argument for summary judgment.

## II.     The Record Permits a Reasonable Jury to Find Defendants Liable for Arresting Plaintiff Using Excessive Force Under 42 U.S.C. § 1983.

Under 42 U.S.C. § 1983, individuals may bring suits against individual officers for violations of the Fourth Amendment. The Fourth Amendment's freedom from unreasonable searches and seizures encompasses "the plain right to be free from the use of excessive force in the course of an arrest." *Dormu v. D.C.*, 795 F. Supp. 2d 7, 18 (D.D.C. 2011) (citing *Graham v. Connor*, 490 U.S. 386, 394-95 (1989)). "[I]f an excessive force claim turns on which of two conflicting stories best captures what happened on the street," summary judgment must be denied. *Saucier v. Katz*, 533 U.S. 194, 216 (2001) (Ginsburg, J., concurring in the judgment).

Because Defendants' argument ignores well-settled law and presents a version of events that ignores practically all of Plaintiff's record, their Motion must be denied.

### A.  A Reasonable Jury Could Find that Defendants' Actions Were Unreasonable Under *Graham v. Connor*.

The Supreme Court's holding in *Graham v. Connor*, 490 U.S. 386 (1989), is the key to determining whether an officer's use of force was excessive under the circumstances. *Graham* directs courts assessing excessive force claims to evaluate the following contextual factors: the severity of the crime at issue, whether the plaintiff posed an immediate threat to the officer's or others' safety, and whether the plaintiff was actively resisting or attempting to evade arrest. *Id.* at

396. Though Defendants pay lip service to *Graham*, they do not engage in the requisite inquiry—which should perhaps come as no surprise, as here, all of the *Graham* factors evince in favor of Plaintiff (or, at minimum, implicate factual disputes to be resolved by trial).

First, the severity of the crimes at issue was minor. Ms. Ulysse was arrested for two misdemeanors, fare evasion and resisting arrest, and both charges were subsequently dismissed by the U.S. Attorney's office. Defendants' expert, Charles Key, admitted that he viewed nothing felonious in Ms. Ulysse's behavior. PSMF ¶¶ 8, 46, 66, 106. *See Hall v. D.C.*, 867 F.3d 138, 157 (D.C. Cir. 2017) (low severity where charges involved felony theft); *Turpin v. Ray*, No. CV 19-2394 (RC), 2020 WL 1510412, at *8 (D.D.C. Mar. 30, 2020) (non-violent property crime).

Second, Ms. Ulysse did not pose a threat to Defendants' safety. Officer Stokes candidly admitted during his deposition that there was "nothing that [he] could observe about Ms. Ulysse" that presented her as a danger. Ms. Ulysse was described by Defendants as "5'3, 5'4," with "a slim build;" both Defendants towered over her, and Officer Stokes was close to twice her weight. When detained, Ms. Ulysse was wearing minimal clothing that could not have concealed a weapon, and indeed she had none. PSMF ¶¶ 23, 38.

Third, substantial evidence supports a finding that Ms. Ulysse was not actively resisting her arrest (or that makes this an issue of disputed fact). Multiple eyewitnesses testified that Ms. Ulysse never attempted to escape or strike at the officers. PSMF ¶¶ 47-48. Regardless of whether Ms. Ulysse struggled against Officer Stokes after he pulled her shirt and her arm—and Ms. Ulysse has said that she did no more than take a single, involuntary step—it is clear that Ms. Ulysse was subdued immediately when she was taken to the ground and that Officer Stokes was able to control Ms. Ulysse with just his arm on her shoulder and straddling her back. PSMF ¶¶ 22, 36; *see also Williams v. D.C.*, 268 F. Supp. 3d 178, 190–91 (D.D.C. 2017) (factor in

8

Plaintiff's favor even when Plaintiff had initially resisted their initial attempts to handcuff him but was subdued by the time of other uses of force). A reasonable jury is entitled to conclude that, under the *Graham* factors, Defendants' use of force was excessive and violated § 1983.

**B.  There Exist Genuine Disputes of Material Fact Regarding Whether Defendants Used Excessive Force in Arresting Ms. Ulysse.**

Defendants do nothing at all with *Graham*. Instead, they attempt to convince the Court to discredit Plaintiff's factual allegations, claiming that surveillance video offers conclusive proof otherwise and that the evidentiary record does not support Plaintiff's version of the facts. Failing that, Defendants argue that the force alleged is too insubstantial to state a claim. Finally, Defendants argue that Plaintiff's expert's testimony cannot be credited. Because these arguments involve disputes of fact or incorrect articulations of law, they must be rejected.

### 1.  *Defendants Mischaracterize the Conclusiveness of the Video Evidence.*

First, Defendants devote much of their brief to the purported existence of "clear" video that "utterly discredit[s]" Ms. Ulysse's account of the facts. Def. Br. at 4-5, 19. The Court will plainly see this when it views the videos, but the surveillance footage introduced by Defendants is far from the salvo Defendants make it out to be. Most crucially, it does not clearly depict what happens once Officer Stokes forces Ms. Ulysse on the ground—in other words, the vast majority of Plaintiff's excessive force claims. Material disputes in this case include (but are not limited to): (1) whether Officer Stokes applied his knees to Ms. Ulysse's back, (2) whether he used his bodyweight, (3) whether he pointed his Taser at her, and, of course (4) whether any of these uses of force were necessary to subdue Ms. Ulysse. All of this happens <u>after</u> Officer Stokes gets on top of Ms. Ulysse, substantially obscuring the camera's view.

Moreover, throughout their Statement of Fact (Dkt. 32-3, Defendants' Statement of Material Facts) ("DSMF"), Defendants provide their own characterizations of what the video

shows, even when reasonable watchers of the video/incident could arrive at opposite conclusions. *See, e.g.*, PSMF ¶¶ 19, 25 (eyewitnesses and Plaintiff's expert saw Officer Stokes slam Ms. Ulysse to the ground), ¶ 42 (Defendant's expert saw Taser laser-painted at Ms. Ulysse); *see also McKoy v. D.C.*, No. CV 18-416 (RBW), 2021 WL 270397, at *4–5 (D.D.C. Jan. 27, 2021) (denying summary judgment because "Having reviewed the video, the Court cannot conclude that the District Defendants' interpretation—the video corroborates Ms. Schulz's accusations—is the only defensible interpretation."). The reality is that the surveillance footage is blurry, taken from about 25 feet, and inconclusive. PSMF ¶ 104. Moreover, it lacks sound. Where, as here, Defendants deny Ms. Ulysse's claims that they intentionally left her breasts exposed and threatened to kill her, yet multiple eyewitnesses heard to the contrary, the video footage cannot usurp the role of the jury. PSMF ¶¶ 54, 63.

Neither of the cases cited by Defendants supports their position. Both *Scott v. Harris* and *Lash v. Lemke* involve video footage that conclusively contradicted the plaintiff's account—in the words of the D.C. Circuit in *Lash*, the video established "to a certainty" that what the plaintiff said was not true. *Lash v. Lemke,* 786 F.3d 1, 7 (D.C. Cir. 2015); *see also Scott v. Harris*, 550 U.S. 372, 378 (2007) (invoking video that "quite clearly contradicts the version of the story told by respondent"). In *Fenwick v. Pudimott*, 778 F.3d 133 (D.C. Cir. 2015), the D.C. Circuit considered a video that was "blurry and soundless," and where the key fact in dispute (there, a shooting) occurred where "the officers are obscured by the dark shadow of an adjacent building." *Id.* at 137-38. The court concluded that the videotape "provides no ready answers to the factual dispute and does little to affect our analysis." *Id.*; *see also McKoy*, 2021 WL 270397 at *4–5. Here, too, the surveillance footage cited by Defendants is blurry, soundless, and obscured. And,

as discussed *infra*, Defendants' characterization of the video footage is also belied by the accounts by multiple witnesses who stood within feet from the incident and Ms. Ulysse herself.

### 2. *Genuine Disputes of Material Fact Pervade Ms. Ulysse's Excessive Force Claim.*

Second, Defendants argue that Plaintiff has not met her burden of establishing facts that support her account of what transpired. Def. Br. at 20. But in order to make this argument, Defendants quite literally ignore whole portions of the record Plaintiff developed in discovery.

The reality is that significant testimonial evidence from numerous witnesses exists in support of Ms. Ulysse's account (and in contradiction to Defendants'). This includes no fewer than five impartial witnesses to Ms. Ulysse's arrest: ordinary Metro commuters who have no allegiance to Plaintiff, but who came across the scene, recorded on their cell phones what they saw, and wrote complaints and sworn declarations summarizing what had transpired. *See* PSMF Exhs. 11-15. These witnesses stood within feet of the incident and provided the necessary details that the surveillance footage cannot.

Some of the material facts that remain in genuine dispute include the following:

- Defendants claim that Officer Stokes did not force Ms. Ulysse to the ground, citing to Officer Stokes's testimony and Defendants' characterization of the video. Def. Br. at 19. However, this is directly disputed by two eyewitnesses who observed Officer Stokes slamming Ms. Ulysse to the ground within seconds of his approach. PSMF ¶¶ 24-25 (declarations of Justin Kwasa and Jackeline Stewart).

- Defendants deny that Officer Stokes pulled Ms. Ulysse's shirt off, and argue that Plaintiff was the cause-in-fact of the displacement. Def Br. at 21. The surveillance video depicts Officer Stokes grabbing part of Ms. Ulysse's shirt as he grabbed her arm and took her down, and this is corroborated by an eyewitness who saw Ms. Ulysse's breasts exposed as a result

of being forcibly pushed to the ground. PSMF ¶ 26 (declaration of Jackeline Stewart and screenshot of surveillance footage).

- Defendants deny that Officer Stokes placed his knees or bodyweight on Plaintiff's back and claim that the video "conclusively demonstrates" this. Def. Br. at 20. But the video is blurry or obscured with respect to Officer Stokes's knee and weight placement, and multiple eyewitnesses observed Officer Stokes alternating between using his knee and his full bodyweight to keep Ms. Ulysse on the ground for longer than necessary to effectuate her arrest. PSMF ¶¶ 35-40 (declarations of Justin Kwasa, Jackeline Stewart, Courtney Alexander, and Rana Suliman).

- Defendants claim that Officer Stokes never pointed his Taser at Ms. Ulysse and that he unholstered it to defend against an unruly crowd. Def. Br. at 20. Defendants' theory is contradicted by multiple individuals who saw the Taser pointed at Ms. Ulysse. PSMF ¶ 42, 100 (declaration and written complaint of Rana Suliman, screenshot from Defendants' own surveillance footage, Defendants' expert summary of video). Moreover, significant evidence indicates that there was no justification—from Ms. Ulysse's actions and from the crowd's behavior—for the activation of the Taser. PSMF ¶¶ 47-48, 64-73.

- Defendants claim that Sergeant Al-Hinawi's acts when handcuffing Ms. Ulysse were safe and proper. Def. Br. at 20-21. But Ms. Ulysse testified that Sergeant Al-Hinawi unnecessarily twisted her arm behind her back, applied handcuffs so tightly that they left visible bruises and abrasions on Ms. Ulysse's wrists, and did not make adjustments when she complained. PSMF ¶ 51, 55 (testimony of Ms. Ulysse and photographic evidence of Ms. Ulysse's wrists).

- Defendants claimed that they did not know that Ms. Ulysse's breasts were exposed during the encounter. DSMF ¶ 66-68. But multiple eyewitnesses testified that it was clear that Ms.

Ulysse's breasts were exposed, that they repeatedly alerted the officers, and that the officers

ignored or rejected them. Ultimately, Defendants lifted up Ms. Ulysse's torso so that the

entire crowded Metro station saw Ms. Ulysse's fully-exposed chest. PSMF ¶¶ 26-34, 57-60

(declarations of Justin Kwasa, Courtney Alexander, Diane Lowe, and Rana Suliman;

bystander video footage from Courtney Alexander).

These disputes alone are fatal to Defendants' Motion. *See Flythe v. District of Columbia*, 791

F.3d 13, 21 (D.C. Cir. 2015) (reversing summary judgment in favor of officer based on five

eyewitnesses who disputed the officers' account, credibility questions regarding the defendant's

own testimony, and inconsistencies between testimony).

   In addition to these facts about what acts of force Defendants may or may not have taken,

there is significant dispute about what was necessary to detain Ms. Ulysse under the

circumstances. Plaintiff disputes, for example, Defendants' assertions that Ms. Ulysse refused to

comply with Officer Stokes, *see* PSMF ¶¶ 16-21 (she had her headphones in and could not hear

him); that she was actively resisting, *see* PSMF ¶¶ 47-48 (multiple bystanders testified that she

was not); and that members of the crowd posed a danger to Defendants, *see* PSMF ¶¶ 64-73 (no

one else was arrested that day but Ms. Ulysse). A reasonable jury could easily conclude that the

actions Defendants took were not objectively reasonable because Ms. Ulysse was already under

control and did not pose a danger.[1] *See also* PSMF ¶¶ 74-90 (numerous WMATA policies and

---

[1] At various points in their brief, Defendants assume that the reason they took certain actions is because of a "hostile" crowd that had gathered. Both the hostility of the crowd, and Defendants' claim that their uses of force against Ms. Ulysse are justified by the actions of the crowd, are disputed. *See* PSMF ¶¶ 64-73 (crowd was not hostile, Defendants' actions belied the true degree of their concern about the crowd, nobody was arrested). It is also not at all clear that a concern about third parties can be used as a justification for using unnecessary force on the arrestee herself—*Graham* looks only to the actions of the arrestee and whether she poses a threat to herself or the officers, 490 U.S. at 396—but at any rate, Defendants' characterizations about the crowd are disputed and should go to a jury.

nationwide police practices were violated by Defendants' actions); ¶ 40 (eyewitnesses' testimony that they found officers' acts were "unwarranted" because Ms. Ulysse was clearly subdued).

### 3. *Plaintiff Has Sufficiently Stated a Constitutional Violation.*

Defendants next argue that the force they used does not, as a matter of law, rise to the level of a § 1983 violation. Def. Br. at 20-21. Not so.

Precedent in this Circuit makes clear that the types of force Plaintiff alleges here are sufficient to state a claim. In *Hall v. D.C.*, 867 F.3d 138, the D.C. Circuit considered allegations that are quite analogous to the instant case: there, the officers "slammed" the plaintiff against a wall; "handcuffed her;" "yanked [her] handcuffed arms behind her;" and "forced [her] to her knees on the sidewalk, where [her] underwear was exposed to passers-by and her knees scraped and bruised by the concrete." *Id.* at 145. The plaintiff suffered bruises, scrapes, and a wrist injury, but there was no evidence that the plaintiff went to the hospital. *Id.* at 150. The Court found that these facts, if proven, were sufficient to justify a § 1983 claim of excessive force. *Id.* at 169; *see also Taylor v. Guida*, No. CV 17-123 (RBW), 2019 WL 4750366, at *2 (D.D.C. Sept. 30, 2019) (plaintiff was stopped by two MTPD officers for supposed fare evasion, and the only force alleged was defendants' painful application of handcuffs, yet the court found sufficient disputed facts and sent the case to the jury).[2]

The cases that Defendants cite are easily distinguishable. *Armbruster* involved a plaintiff who "pushed herself off the hood of the car, freed herself from Officer Frost's grip, turned

---

[2] Defendants attempt to pick off the allegation that Sergeant Al-Hinawi made a threat to kill Ms. Ulysse, incorrectly claiming that verbal threats are *per se* not excessive. Def. Br. at 29, n.6. *But see S.H. v. District of Columbia,* 270 F. Supp. 3d 260, 293 (D.D.C. 2017) (any action used to detain individual, including threat of use of gun, are never *per se* reasonable, but rather are assessed under *Graham*) (citing *Muehler v. Mena*, 544 U.S. 93, 98-100 (2005)); *see generally Holland ex rel. Overdorff v. Harrington,* 268 F.3d 1179, 1194 (10th Cir. 2001).

around, and pitched herself forward" toward another person in the crowd. *See Armbruster v. Frost*, 962 F. Supp. 2d 105, 114 (D.D.C. 2013). In *Cromartie v. D.C.*, 479 F. App'x 355, 357 (D.C. Cir. 2012), the district court adopted all of defendants' facts as true, including the finding that the plaintiff's "belligerence and disobedience suggested he might try to resist or escape." In contrast, because Ms. Ulysse and multiple witnesses have testified that she did not attempt to resist arrest or escape, this is at minimum a disputed fact that prevents summary judgment.

### 4.   *Defendants' Arguments Regarding Plaintiff's Expert are Incorrect.*

Finally, Defendants make a half-hearted attempt to discredit the testimony of Plaintiff's expert, Randy Foster, a military and civilian law enforcement officer whose career spans over 25 years on the federal, state, and local levels. Def. Br. at 21-24. Defendants' arguments misstate the scope of Mr. Foster's testimony, and they exaggerate the portions of Mr. Foster's testimony that Plaintiff has relied on at this juncture to defeat summary judgment.

Mr. Foster's opinion focused on evaluating Defendants' actions against established, nationally accepted standards of police practices. PSMF ¶¶ 88-90. Unlike the experts in *Hargraves v. D.C.*, 134 F. Supp. 3d 68, 91 (D.D.C. 2015), and *Wannall v. Honeywell Intern. Inc.,* 292 F.R.D. 26, 38 (D.D.C. 2013), Mr. Foster was given certain scenarios that are relevant to the case and was tasked with identifying proper police practices under those circumstances. Importantly, Plaintiff does not need Mr. Foster to offer his opinion on what actually happened on the morning of May 21, 2018. Such testimony is likely to be inadmissible in that it usurps the role of the jury, *see Sherrod v. McHugh*, 334 F. Supp. 3d 219, 271–72 (D.D.C. 2018), and in any event, Plaintiff has not used Mr. Foster to dispute Defendants' factual account of what occurred.[3]

---

[3] Mr. Foster's rebuttal report did offer his impressions of the videos, but Plaintiff does not rely on them here. Mr. Foster offered those impressions to preserve his right to opine at trial in the (unlikely) event that Mr. Key is permitted to do the same.

Defendants' arguments must all fail. First, in addition to setting forth his opinion on proper police practices when making a contact, Mr. Foster also opines on proper police practices if the *Terry* stop or arrest contexts were to apply. *See, e.g.*, PSMF Exh. 22 (Foster Report) at 9-10. All three scenarios may be helpful for a jury. Second, because Mr. Foster was not tasked with opining on what happened on May 21, 2018, but instead was given certain assumptions by Plaintiff as to what occurred, there was no need for him to read Ms. Ulysse's deposition. Finally, throughout his report, Mr. Foster is focused on evaluating Defendants' actions against established, nationally accepted standards of police practices. *See id.* at 4, 8. These established standards are not the type of "aspirational" practices with which the cases Defendants cite are concerned. Mr. Foster's testimony on proper police practices withstands Defendants' critiques and should be considered by the Court.

III.    **The Record Permits a Reasonable Jury to Find Defendants Liable for Arresting Plaintiff Without Probable Cause in Violation of 42 U.S.C. § 1983.**

Ms. Ulysse has also alleged that Defendants arrested her without probable cause in violation of § 1983. Under 42 U.S.C. § 1983, officers are liable in their personal capacities for violating an individual's right to be free from unconstitutional arrests and seizures. The inquiry turns on whether "the facts available to [the officer] would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." *Florida v. Harris*, 568 U.S. 237, 243 (2013). The probable cause inquiry is a mixed question of law and fact, and "only where the facts are undisputed or clearly established does probable cause become a question of law for the court." *Amobi v. District of Columbia Dep't of Corrections*, 755 F.3d 980, 990 (D.C. Cir. 2014) (internal citation omitted). Defendants' arguments seeking summary judgment with respect to Plaintiff's wrongful arrest claims fail for the same reasons as their excessive force

arguments: Defendants disregard the standard for summary judgment, relying on an evidentiary record that is clearly in dispute.

**A. There Exist Genuine Disputes of Material Fact Regarding Whether Defendants Had Probable Cause to Arrest Ms. Ulysse for Fare Evasion.**

Defendants first claim that they had probable cause or reasonable suspicion to detain Ms. Ulysse for fare evasion, D.C. Code § 35-216 (2018), which previously prohibited persons from "knowingly enter[ing] or leav[ing] the paid area of a real transit station . . . without paying the established fare[.]" The charges against Ms. Ulysse were dropped by the U.S. Attorney's Office.

During his deposition, and again in the opening brief, Defendants make clear that Officer Stokes's probable cause derived entirely from his observation of Plaintiff's passage through the turnstile. Def. Br. at 8. Officer Stokes concluded that Ms. Ulysse knowingly committed fare evasion because he believed that she "piggybacked" behind a person in front of her, and, relatedly, that the fare gate barriers did not close between the other woman and her. *Id.*

But on this record, a reasonable jury could choose to disbelieve what Officer Stokes claims to have seen. First, a jury could discredit Defendants' account because it relies on disputed facts that a reasonable officer viewing the same evidence could have seen in a contrary manner. *See Sherrod*, 334 F. Supp. 3d at 241 (because there remained a "material question regarding whether a reasonable officer would have concluded that the security video tended to corroborate or contradict" defendants' allegations, "the jury, not this Court, is the proper mechanism by which that question should be resolved."). For example, even though Defendants urge the Court to accept at face-value their claim that "Plaintiff is seen entering the fare gate just behind the first woman," Def. Br. at 6, a reasonable jury could conclude that there is clear space between Ms. Ulysse and the person in front of her and decline to believe the observations he

testified to after the fact. PSMF ¶ 14 (screenshot of Ms. Ulysse passing through turnstile with clear space between).

Secondly, and critically, Defendants ignore any part of the evidentiary record regarding probable cause that does not please them. "When it comes to the question of probable cause, defendants cannot cherry-pick the facts that arguably support a finding of probable cause and simply ignore the other factual allegations." *Littlepage v. Quigley*, 69 F. Supp. 3d 136, 139 (D.D.C. 2014). Here, Ms. Ulysse testified that she had sufficient money on her card to enter and exit the Metro that day and that she swiped her SmarTrip card at the exit of the Metro station.[4] PSMF ¶ 7, 9. Defendants rely heavily on Officer Stokes's justification that it was suspicious that Ms. Ulysse exited the fare gate so close behind the person in front of her when "it was not a busy rush hour crowd and there were only two individuals in that fare gate at the time[.]" DSMF ¶ 28. But Defendants skip past the fact that when Ms. Ulysse exited the Metro station, there was one single turnstile allowing for exiting passengers—the rest were reserved for entering passengers— so it would have been logical for a reasonable officer to conclude that Ms. Ulysse simply followed the person in front of her because she could not use the other turnstiles, rush hour or not. PSMF ¶ 10. In light of this, a reasonable jury could easily find that Defendants' proffered reasons for approaching Ms. Ulysse were false and lacked justification. *See also* PSMF ¶ 12-13 (Officer Stokes's gates cycle justification unreasonable in light of Defendants' testimony that entirely possible for two people whose SmarTrip cards contain sufficient funds to legitimately

---

[4] Defendants cannot disprove Ms. Ulysse's testimony, because they no longer have possession of the card they claim to be Ms. Ulysse's (PSMF ¶ 91-93, 97), the chain of custody on that card was improper (PSMF ¶ 95), and, in any event, that card did not belong to Ms. Ulysse (PSMF ¶ 98); *see also* PSMF ¶ 99 (Officer Stokes has a history of losing evidence). *See Halcomb v. Woods,* 767 F. Supp. 2d at 136 ("Nor was the jury required to accept the authenticity of the farecard produced by Mr. Woods and identified as that of the plaintiff, since, again, all averments of such authenticity were made by Mr. Woods himself.").

pass through as part of one "cycle."); *see also* PSMF ¶ 14 (Sergeant Al-Hinawi's definition of piggy-backing); *id.* at ¶ 15 (how far Officer Stokes was away from the turnstile when Ms. Ulysse passed through); *see generally Halcomb v. Woods*, 767 F. Supp. 2d 123, 135–36 (D.D.C. 2011).

Defendants' argument to the contrary relies on Officer Stokes's testimony that he saw otherwise, but "since [the officer] was an interested party," a jury is not "required to believe his assertions." *Halcomb v. Woods*, 767 F. Supp. 2d at 135–36 (in Fed. R. Civ. P. 50 context, evidence from plaintiff that she swiped her card into a faregate was sufficient to support § 1983 claim of false arrest); *Halcomb v. Washington Metro. Area Transit Auth.*, 526 F. Supp. 2d 20, 21 (D.D.C. 2007) (denying summary judgment on same facts). Because a jury could find that Officer Stokes did not observe anything that would lead a reasonable officer to believe Ms. Ulysse fare evaded, the claim must go to a jury.

Defendants argue in the alternative that Officer Stokes's actions should be assessed under the *Terry* standard instead. Def. Br. at 8-9. This argument fails, too, for three reasons.

First, there exist genuine, material disputes of fact about whether Officer Stokes even attempted to conduct a *Terry* stop. In other words, it is disputed that Officer Stokes attempted to effectuate a temporary detention of Ms. Ulysse in order to perform a lawful investigation. "Relevant to that inquiry, . . . is whether [during the alleged *Terry* stop] the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *Hall*, 867 F.3d at 153. Officer Stokes does not testify that he undertook a *Terry* stop: to the contrary, he claims that he had probable cause to arrest from the moment he saw her pass through the turnstiles, and that he approached Ms. Ulysse with the intention to write her a citation, not to investigate whether she had committed a crime for which a citation would be

appropriate.[5] DSMF ¶ 19. Moreover, if this was in fact a *Terry* stop, then a reasonable officer would have conducted an investigation to determine whether fare evasion occurred. Officer Stokes did not. PSMF ¶¶ 91-93. Under these circumstances, a reasonable jury could conclude that Officer Stokes did not engage in a *Terry* stop at any point in the encounter.

Second, even accepting the premise that Officer Stokes only had reasonable suspicion (and a reasonable jury could conclude, for the reasons described earlier, that he did not have even that) when he approached Ms. Ulysse, there is no denying that Defendants eventually needed probable cause to make the arrest that they did. Yet Officer Stokes has admitted that, apart from what he witnessed at the outset with regard to her alleged "piggybacking," he did not collect any additional probable cause to arrest Ms. Ulysse. PSMF ¶ 91. For the reasons discussed earlier, genuine disputes of fact exist as to whether that was enough.

Finally, Defendants' suggestion that Plaintiff provided additional legal justification to arrest when she "turned her head to look at him," "failed to stop and give him her SmarTrip card as requested," and "walk[ed] away from him," Def. Br. at 9, is unpersuasive. First, those are disputed facts. Ms. Ulysse testified that she did not see Officer Stokes, gesture toward him, or interact with him before he grabbed her. PSMF ¶¶ 16, 20. She was wearing headphones during the encounter, and when Officer Stokes approached her from the side, there were multiple people around her, including someone standing directly to her side. PSMF ¶¶ 17-18. A jury could find

---

[5] In their brief, Defendants claim that Officer Stokes "intended to investigate by obtaining [Ms. Ulysse's] SmarTrip card and writing her a citation." Def. Br. at 9. The testimony is clear that when Officer Stokes referred to "investigating," he was not talking about conducting an investigation to determine whether he had accrued probable cause of the underlying offense; instead, he is referring to collecting biographical information he needs to write on the citation. Pl. Opp. to DSMF ¶ 55. Officer Stokes clearly testified that he believed he had all the probable cause he needed before he even approached Ms. Ulysse and that he did not identify any additional information at any point during the detention. DSMF ¶ 19; PSMF ¶ 91.

that a reasonable officer would have concluded that Ms. Ulysse did not stop to engage with Officer Stokes because she simply did not see him, and so this factual question must go to a jury. In addition, because a reasonable jury could find that Officer Stokes had no cause to approach Ms. Ulysse in the first instance, her walking away is not sufficient to support his subsequent arrest. *See, e.g.*, *McKoy*, 2021 WL 270397, at *5 (denying summary judgment on false arrest claim because the court could not conclude that Williams' flight was "indicative of wrongdoing" without weighing disputed material facts); *Miles v. United States*, 181 A.3d 633, 644 (D.C. 2018) (walking away did not corroborate *Terry* detention because, when an individual is "start[led] or possibly frighten[ed]," that is a reason "other than consciousness of guilt" to flee). Summary judgment is inappropriate at this stage.

### B. There Exist Genuine Disputes of Material Fact Regarding Whether Defendants Had Probable Cause to Arrest Ms. Ulysse for Resisting Arrest.

Likewise, a reasonable jury could find that Defendants had neither probable cause nor reasonable suspicion to detain Ms. Ulysse for resisting arrest under D.C. Code § 22-405.01. In relevant part, § 22-405.01 provides that "Whoever without justifiable and excusable cause intentionally resists an arrest by an individual who he or she has reason to believe is a law enforcement officer . . . shall be guilty of a misdemeanor[. ]."[6] Whether Defendants, who both participated in the arrest, had probable cause to believe that Ms. Ulysse resisted arrest is disputed, and summary judgment must be denied.

Despite Defendants' attempts to paint their one-sided interpretation of the video as undisputed fact, there are genuine disputes of material fact about whether Ms. Ulysse resisted

---

[6] Prior to 2016, § 22-405 prohibited "assault[ing], resist[ing], oppos[ing], impede[ing], intimidat[ing], or interfer[ing] with a law enforcement officer . . . engaged in the performance of his or her official duties." Effective June 30, 2016, this statute was amended to prohibit only

arrest. Defendants suggest that they had probable cause to arrest Ms. Ulysse for resisting arrest for just two reasons: because, in their view, Ms. Ulysse (1) walked past Officer Stokes "after turning to look at him," and (2) yelled and "forcefully pulled against him" after he grabbed her arm, resulting in their fall to the ground. Def. Br. at 11. Both of these facts are disputed, and the first is in any event not legally sufficient to provide probable cause for resisting arrest.

First, although Defendants' brief claims that it is undisputed that Ms. Ulysse walked past Officer Stokes after turning to look at him, Def. Br. at 11, Ms. Ulysse in fact testified that she did not notice him before she walked away, until he physically grabbed her, and the video footage does not depict whether she would have seen him as she walked past. PSMF ¶¶ 16-20. A jury could credit Ms. Ulysse's testimony over Officer Stokes's, and a plaintiff's testimony is sufficient to put a fact in issue for the purposes of summary judgment. *Robinson v. Pezzat*, 818 F.3d 1, 8 (D.C. Cir. 2016); *Etheredge v. D.C.*, 635 A.2d 908, 919 (D.C. 1993).

Furthermore, even if Ms. Ulysse <u>had</u> seen Officer Stokes before walking away, a reasonable officer would have known that would be insufficient as a matter of law to qualify as resisting arrest. Even before § 22-405 was amended in 2016 to significantly reduce the scope of its prohibitions, District of Columbia courts have regularly held that § 22-405 is not violated by a mere refusal to obey an order, even a lawful one. Instead, courts distinguish "active and oppositional" conduct from "passive resistance or avoidance" where a person simply wants to remove themselves from a situation. *In re C.L.D.*, 739 A.2d 353, 356 (D.C. 1999). Walking away from police, *id.*, running away from police, *Coghill v. United States*, 982 A.2d 802, 807–08

---

assaulting an officer, while the prohibitions on resisting were moved to the new § 22-405.01 and narrowed to cover only resisting arrest. The rest were eliminated altogether. *Neighborhood Engagement Achieves Results Amendment Act Of 2016*, 2016 District of Columbia Laws 21-125 (Act 21-356).

(D.C. 2009), and refusal to obey an order to remove one's hands from one's pockets, *Howard v. United States*, 966 A.2d 854, 857 (D.C. 2009), have all been held not to violate even the older, more expansive version of § 22-405. As in those cases, Ms. Ulysse's act of continuing to walk away from Officer Stokes was exactly the type of attempt to remove oneself from a situation that the District of Columbia Court of Appeals has held does not constitute resisting arrest—even if she had seen Officer Stokes and/or heard a verbal order to stop, which the record will show she did not.

Second, Defendants claim that it is undisputed that Ms. Ulysse "forcefully pulled" against Officer Stokes after he grabbed her arm, and that her pull was "strong enough to pull them both to the ground." Def. Br. at 10, 11. Neither is true.

There is ample evidence in the record that Ms. Ulysse's initial movement upon being grabbed by Officer Stokes, which Defendants describe as a forceful pull, was in fact an involuntary reflexive reaction to being grabbed and caught by surprise.[7] As Ms. Ulysse had neither seen nor heard Officer Stokes, his sudden seizure of her arm startled and shocked her. PSMF ¶¶ 20-22. Her body stiffened, and she took a small step away, "a natural reaction to me being grabbed and attacked by someone." PSMF ¶ 22; PSMF Exh. 1, Ulysse Dep. at 155:14-156:3. The video footage is consistent with Plaintiff's description and does not depict a forceful pull or other voluntary and active resistance. PSMF ¶ 22. After that initial reflexive motion, Officer Stokes slammed Ms. Ulysse to the ground. PSMF ¶¶ 19, 22-25.

---

[7] Defendants repeatedly suggest to the Court that Ms. Ulysse allegedly admitted that she pulled backward against Officer Stokes's grasp, but this mischaracterizes Ms. Ulysse's testimony. Ms. Ulysse is explicit that she did not pull Officer Stokes. Pl. Opp. to DSMF ¶¶ 46, 59. The portion of the testimony that Defendants cite describes what was happening, involuntarily, as Officer Stokes was taking her to the ground.

The case law in this jurisdiction is clear that this single involuntary, reflexive motion does not constitute resisting arrest. An involuntary reflexive motion cannot satisfy the requirements of the statute, as an involuntary motion by definition lacks the requisite *mens rea* for even a general intent statute. *Cf. Dauphine v. United States*, 73 A.3d 1029, 1032 (D.C. 2013) ("It is well settled that the general intent to commit a crime means the intent to do the act that constitutes the crime."). Furthermore, even if Ms. Ulysse's initial movement upon being grabbed was voluntary, the statute only criminalizes conduct that exceeds a single motion. *See Ruffin v. United States*, 76 A.3d 845, 851 (D.C. 2013) (holding that "as a matter of law, that appellant's ephemeral elbow jerk in response to a police officer reaching towards his shoulder did not amount to 'resisting' a police officer"); *see also Xingru Lin v. D.C.*, No. CV 16-645 (CKK), 2020 WL 3542253, at *8 (D.D.C. June 30, 2020), *overturned on reconsideration on other grounds*, No. CV 16-645 (CKK), 2020 WL 5816235 (D.D.C. Sept. 30, 2020) (summary judgment denied on § 1983 claim involving false arrest for resisting arrest where plaintiff testified that her only voluntary motion was an "initial slight pull away from [the officer];" the court held that surveillance video did not provide sufficient context for the interaction and that probable cause disputes should go to jury).

There is therefore ample evidence in the record for a jury to disbelieve Defendants' explanations of why they believed Ms. Ulysse had resisted arrest, and to conclude that their actions in arresting her based on those descriptions were objectively unreasonable.

Defendants do not suggest in their brief that any of Ms. Ulysse's actions after the pair were on the ground provided probable cause for resisting arrest. Def. Br. at 9-11. Those arguments would in any event be unavailing, as conflicting facts pervade. As an initial matter, the surveillance camera that captured the initial interaction between Officer Stokes and Ms.

Ulysse did not capture the events after they reached the ground, as they were by that point out of its field of view. Ms. Ulysse and eyewitnesses have attested that as soon as she was on the ground, Officer Stokes had full control of her and she was unable to move. PSMF ¶¶ 35-38, 47-48. In addition, the evidence substantiates Ms. Ulysse's claim that she could not produce her arms for Defendants: one of Ms. Ulysse's arms was twisted behind her back by Officer Stokes, and the other was covering her breasts and pinned beneath her body by Officer Stokes's bodyweight. PSMF ¶ 47. Multiple eyewitnesses' declarations indicate that Ms. Ulysse did not resist, attempt to escape, or pose any threat to the officers, even after Sergeant Al-Hinawi arrived. PSMF ¶¶ 36-38, 47-48. Given the absence of complete video footage and the conflicting testimony, whether Ms. Ulysse resisted arrest while on the ground would undoubtedly be a question for the jury. And even if a jury did conclude, despite this evidence, that she had engaged in some pulling, twisting, or squirming while pinned on the ground, that would not legally constitute resisting arrest. *See Gayden v. United States*, 107 A.3d 1101, 1105–06 (D.C. 2014).

The few cases cited by Defendants do not point to a different result. In *Campbell v. D.C.*, the plaintiff, who was much larger than either of the two officers involved, not only jerked away from the officer's initial grasp, but also "us[ed] his hands to break [the officer's] grasp," forcefully pushed the officer's hands away, resisted the two officers' attempts to push him up against a nearby object, and pushed an officer in the chest with both hands. *Campbell v. D.C.*, 245 F. Supp. 3d 78, 83, 88 (D.D.C. 2017). This goes far beyond the single reflexive motion found here. Similarly, in *Lash v. Lemke*, the plaintiff pulled his arms free, apparently successfully, from the officers' attempts to restrain him "twice in succession," strained against the officers' attempts to push him to the ground, and kept his arms extended outward despite the officers' attempts to handcuff him behind his back. *Lash v. Lemke*, 786 F.3d 1, 6-7 (D.C. Cir.

2015). The court made particular note of the fact that although Lash in his opposition to summary judgment claimed that the first pull away from the officers was "no more than a natural reaction to being seized," he did not make any attempt to explain or justify the second. *Id.* at 6. Both cases are therefore inapposite here.

Thus, Defendants are not entitled to summary judgment on Plaintiff's § 1983 claims.

## IV.   Defendants Are Not Entitled to Qualified Immunity.

Defendants claim in the alternative that summary judgment should be granted because their actions are protected under the qualified immunity doctrine. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Young v. D.C.*, 322 F. Supp. 3d 26, 35 (D.D.C. 2018) (citing *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)). Defendants' argument is premature at this stage, as there exist significant disputes of material fact that require resolution prior to an analysis of qualified immunity. If, at trial, the jury credits Plaintiff's version of what transpired, then Defendants will not be entitled to qualified immunity, as Defendants' actions will have violated Ms. Ulysse's clearly established rights under the Fourth Amendment.

### A.   Factual Disputes Preclude a Decision on Qualified Immunity at the Summary Judgment Stage.

A finding of qualified immunity is inappropriate at this stage. It is well-settled that when "the material facts underlying a defendant's claim of qualified immunity are in dispute, it is impossible for the court to determine, as a matter of law, what predicate facts exist to decide whether or not the officer's conduct clearly violated established law." *Flythe v. D.C.*, No. CV 10-2021 (RC), 2016 WL 4506965, at *8 (D.D.C. Aug. 26, 2016); *see also Johnson v. D.C.*, 528 F.3d 969, 977 (D.C. Cir. 2008). As discussed *supra* Sections II-III, genuine disputes of material fact

surround whether Defendants acted with excessive force and without probable cause, and thus the Court must defer a decision on qualified immunity.

In *Johnson*, the plaintiff filed suit under § 1983 alleging that he had been kicked by police officers after he had been subdued. 528 F.3d at 977. The district court had granted the defendants summary judgment based on qualified immunity, but the Court of Appeals reversed. It found that the question of whether the plaintiff's "prone position was threatening or suggested escape . . . can only be resolved by evaluating the conflicting testimony" of the plaintiff and the officer at trial. *Id. Johnson* applies squarely here, and the Court should find that disputed facts preclude a finding of qualified immunity at summary judgment.

Indeed, in cases involving similar fact patterns as this one, courts regularly deny qualified immunity arguments at the summary judgment stage. In *Halcomb v. WMATA*, the plaintiff alleged that the WMATA officer violated her constitutional rights by falsely arresting her on charges of fare evasion and by using excessive force to effect the arrest.[8] 526 F. Supp. 2d at 22–23. Defendants attempted to invoke qualified immunity at summary judgment, but the court rejected the argument. It noted that the plaintiff disputed the officer's account of the events leading up to the arrest as well as his account of the amount of force he used. *Id.* at 21. It held that "the question of what actually transpired between [Plaintiff and Defendant] is unavoidably a question of fact—and one that, at least here, prevents the Court from deciding the legal questions before trial." *Id.*; *see also Halcomb v. Woods*, 767 F. Supp. 2d at 141 (denying qualified immunity even after trial); *Jiggetts v. Cipullo*, 285 F. Supp. 3d 156, 172 (D.D.C. 2018) (citing

---

[8] In *Halcomb v. Woods*, the plaintiff alleged that WMATA officers grabbed two of her fingers and bent them back, put a handcuff on her right wrist, yanked her right arm behind her back to complete the process of handcuffing her, and injured her foot and thighs in the process of searching her. Ultimately, the plaintiff had pain in her shoulder, foot, and hand, and her thighs were bruised. 767 F. Supp. 2d at 127-29.

cases for proposition that "qualified immunity cannot be decided before trial if disputed issues of fact regarding the reasonableness of an alleged seizure are present,"); *Flythe*, 2016 WL 4506965, at *8 (no qualified immunity at summary judgment because "reasonable minds could differ as to the import of the evidence").

As Defendants make clear in their brief, their argument for qualified immunity relies, once again, on disputed facts. Defendants' qualified immunity defense incorporates the same (improper) arguments they previously made, for example that the video wholly discredits Plaintiff's version of the facts. Def. Br. at 26; *see also id.* at 28 (assuming as undisputed that Plaintiff "made more than two efforts to pull away from Stokes;" "continued to struggle on the ground;" and "refused to allow the offers to handcuff her by giving her hands to them willingly."). All of this is heavily disputed. Ms. Ulysse categorically denies, for example, that she intentionally walked away from Officer Stokes or otherwise made efforts to pull away from him. PSMF ¶¶ 16-22. Ms. Ulysse and eyewitnesses at the scene testified that Ms. Ulysse did not resist the officers while on the ground and that she could not get one arm out from under her body due to Officer Stokes's force. PSMF ¶¶ 47-48. Because of the substantial material facts remaining in dispute, this Court should deny qualified immunity at this juncture.

### B. On Plaintiff's Facts, Defendants are Not Entitled to Qualified Immunity Because Their Constitutional Violations Violated Clearly Established Law.

For the above reasons, the Court should defer ruling on qualified immunity until factual disputes are resolved. Following trial, after the jury credits Plaintiff's version of the facts, the Court will have sufficient facts to find that Defendants are not entitled to qualified immunity because Defendants (1) engaged in constitutional violations (2) that were "clearly established [such that] it would be clear to a reasonable officer that his conduct was unlawful." *Saucier*, 533 U.S. at 202.

As described *supra* Sections II and III, Defendants' actions in arresting Ms. Ulysse with excessive force and without probable cause constitute violations of the Fourth Amendment.

These constitutional violations were clearly established under D.C. Circuit law. As to the excessive force violation, this Circuit has specifically held that an officer may not slam arrestees against hard surfaces, forcefully yank their arms when applying handcuffs, or expose their sensitive body parts in public areas, for allegations of theft or other minor crimes and if the arrestee is not posing a threat. To know this, this Court must no look further than *Hall*, 867 F.3d at 157. In *Hall,* the Court of Appeals considered factual allegations that are remarkably analogous to Ms. Ulysse's: there, officers slammed the plaintiff against a wall, yanked her arm behind her, applied handcuffs, dragged her out of a bar, and forced her to her knees on the sidewalk, where her underwear was exposed to passers-by—all for allegations of theft that they did not reasonably investigate. *Id.* at 144-45. The Court of Appeals reversed the district court's decision to dismiss the plaintiff's excessive force claims on qualified immunity grounds. *Id.* at 157. It found that the officers' acts had violated the plaintiff's clearly established rights. In doing so, the court applied the *Graham* factors, noting that the plaintiff had not committed a serious crime and had not been a threat to the officers or others.[9] *Id.*

In *Johnson,* the D.C. Circuit confirmed in no uncertain terms that the level of specificity with which *Hall* described the right at issue easily satisfies the standard. There, "the issue is whether a reasonable officer could have believed that kicking Johnson in the groin after he had surrendered and posed neither a risk of flight nor any danger was a lawful means of effecting a seizure under the Fourth Amendment." *Johnson*, 528 F.3d at 975–76. (It held it was not.) The

---

[9] Here, of course, viewing the evidence in the light most favorable to Plaintiff, Plaintiff was not a threat to the officers or others. PSMF ¶¶ 36-38, 47-48.

*Johnson* court cited to *DeGraff v. D.C.*, in which the D.C. Circuit considered a factual scenario where officers approached an intoxicated woman, mocked her, then proceeded to carry her in a horizontal position down the street. 120 F.3d 298, 300 (D.C. Cir. 1997). In *DeGraff*, the D.C. Circuit held that an officers' use of force had to be justified from the outset, and, since the officers "appear[ed] to have had her fully under their control" when they started to carry her, their decision to use subsequent, potentially embarrassing, force was unlawful. *Id.*

Defendants do not address *Hall, Johnson*, or *DeGraff*. Instead, Defendants cite to district and appellate court cases that hold that "more serious uses of force than the minimal force Defendants use in arresting Plaintiff [can] be objectively reasonable." Def. Br. at 26. But this completely misses the mark. The inquiry is not about whether the specific act is permitted, but rather whether it is reasonable under the circumstances.[10]

Similarly, with regard to probable cause, it is clearly established that an individual has a constitutional right to be free from an unreasonable seizure. *See Martin v. Malhoyt*, 830 F.2d 237, 262 (D.C. Cir. 1987) (citing *Gerstein v. Pugh*, 420 U.S. 103, 112 (1975)). In the qualified immunity context, the "right" at issue is defined as the right to be free from arrest without probable cause. *See, e.g.*, *Dormu*, 795 F. Supp. 2d at 19 (§ 1983 false arrest case involving arrest for disobeying a police officer); *see also Mazloum v. D.C. Metro. Police Dep't*, 576 F. Supp. 2d

---

[10] In *Cutchin v. D.C.*, 369 F. Supp. 3d 108, 125 (D.D.C. 2019), for example, the arrestee had tried to escape, running the length of a bus after he had been handcuffed, and officers retrieved a gun in his waistband; the district court then found that tackling him to the ground was appropriate under the circumstances. *See also Lash*, 786 F.3d at 9 (plaintiff's actions described *supra* pp. 25-26); *Goolsby*, 317 F. Supp. 3d at 587 (arrestee had fled and was suspected of the crime of bank robbery); *see also Oberwetter v. Hilliard*, 639 F.3d 545, 555 (D.C. Cir. 2011) (plaintiff admitted she refused officer's order, only violation alleged was pulling arm behind her back and pushing her up against a stone column); *Wasserman v. Rodacker*, 557 F.3d 635, 641 (D.C. Cir. 2009) (plaintiff refused to obey officer's order, only violation alleged was officer's pressing upward while handcuffing, which did not cause bruising or injury).

25, 39-40 (D.D.C. 2008) (qualified immunity denied because "it is well-established that an officer cannot arrest an individual without probable cause"); *Hall*, 867 F.3d at 156. For the reasons described *supra* Section III, taking Ms. Ulysse's version of the facts as true, a jury could find that Defendants lacked probable cause of fare evasion or resisting arrest; if so, then it is clearly established that they were not authorized to arrest her.

Finally, Defendants contend that, even if they were mistaken in their belief that probable cause existed, they are entitled to qualified immunity because their belief was reasonable under the circumstances. Def. Br. at 26. But Defendants' argument requires the Court to blindly credit Defendants' version of the facts, which the Court cannot do at this stage. Hearing Plaintiff's case—including that there was only one turnstile upon which to exit; that plenty of people pass through turnstiles without the gates closing in between; and that Ms. Ulysse paid her fare by swiping her card and did not piggyback—a jury could easily find that no reasonable officer would have believed that probable cause existed. PSMF ¶¶ 7-15; *see also Halcomb v. Woods*, 767 F. Supp. 2d at 135–36 (evidence from plaintiff that she swiped her card into a faregate was sufficient to deny qualified immunity on false arrest for fare evasion, especially because the jury was "not required to believe [the officer's] assertions" otherwise). Indeed, the critical issues that remain in dispute with respect to the Court's analysis of objective reasonableness serve to highlight why the Court should defer its ruling on qualified immunity at this juncture.

## V.    The Record Permits a Reasonable Jury to Find That Defendants Violated Plaintiff's State Law Claims.

As with the § 1983 claims, Defendants contend that the facts relevant to Plaintiff's state common law claims are undisputed, but they do so by ignoring the parts of the record that do not fit their narrative. Plaintiff's state common law causes of action must go to a jury.

31

### A.  Plaintiff's False Arrest Claim Must Go to a Jury.

In the District of Columbia, the common law tort of false arrest and the § 1983 claim for false arrest "are generally analyzed as though they comprise a single cause of action." *Amobi*, 755 F.3d at 989. Thus, for the same reasons described *supra* Section III, there is a genuine dispute of fact material to Plaintiff's common law false arrest claim.

Qualified privilege attaches to a common law false arrest claim if an officer had probable cause to make the arrest or if he believed "in good faith that the arrest was lawful and this belief was reasonable." *D.C. v. Minor*, 740 A.2d 523, 531 (D.C. 1999). Plaintiff has put forth sufficient evidence for a reasonable jury to conclude that a reasonable officer would not believe that probable cause was met, *see supra* Section III, and that Defendants did not in fact have a good faith belief that the arrest was lawful, *see supra* Section IV.B. *See also Halcomb v. Woods*, 767 F. Supp. 2d at 136 (for false arrest, jury could infer a defendant's lack of reasonable belief based on evidence showing that plaintiff had not fare evaded)*; see also Minor*, 740 A.2d at 531 (jury was not required to credit the defendant's statement of good faith belief). Plaintiff's common law false arrest claims, like their constitutional counterparts, must proceed to a jury.

### B.  There Exist Genuine Disputes of Material Fact that Defendants Committed Common Law Intentional Infliction of Emotional Distress.

Plaintiff has also raised genuine disputes of fact material to her claims of intentional infliction of emotional distress ("IIED"), and those claims therefore must also proceed to a jury.

IIED claims regularly accompany claims of excessive force. *See e.g.*, *Halcomb v. Woods*, 610 F. Supp. 2d 77*; Hargraves*, 134 F. Supp. 3d 68. To establish a state law IIED claim, a plaintiff must show "(1) extreme and outrageous conduct on the part of the defendant which (2) either intentionally or recklessly (3) cause[d] the plaintiff severe emotional distress." *Halcomb v. Woods*, 610 F. Supp. 2d at 80 (quoting *Larijani v. Georgetown Univ.*, 791 A.2d 41, 44 (D.C.

32

2002)). In *Halcomb,* the plaintiff alleged that, while she was under arrest based on a false accusation of fare evasion, the arresting officer threatened that he "ought to come out to [her] house and put a bullet in [her] head." 610 F. Supp. 2d at 81. The court found that if a jury believed that the officer had made this statement, this evidence alone would permit it to "conclude that it constituted extreme and outrageous behavior; that it was intended to inflict emotional distress; and that Ms. Halcomb suffered severe emotional distress as a result." *Id.*

Contrary to Defendants' argument, Plaintiff has established ample facts to support her IIED claim. First, Plaintiff can show that Defendants' conduct, if recited to "an average member of the community would arouse his [or her] resentment against the actor, and lead him [or her] to exclaim 'Outrageous!'" *Purcell v. Thomas,* 928 A.2d 699, 711 (D.C. 2007) (quoting *Howard Univ. v. Best,* 484 A.2d 958, 986 (D.C.1984)). Indeed, the numerous bystanders who witnessed these events did just that. *See* PSMF ¶¶ 29-30, 32-33, 57, 60, *citing e.g.* Exh. 11, Kwasa Decl. at ¶ 19 ("I came away from the incident in shock"); Exh. 15, Suliman Decl. at ¶ 15 ("I couldn't shake the event out of my mind"); Exh. 14, Lowe Decl. at ¶ 10 ("we were horrified"). At a minimum, this indicates that at least some reasonable observers would consider the actions sufficiently extreme and outrageous, making this a question for a jury to decide. *Amobi*, 755 F.3d at 995. And Ms. Ulysse's testimony indicates that she faced just the kind of verbal threat on her life that the court in *Halcomb* held required that the case go to a jury. PSMF ¶¶ 52, 119.

*Hargraves*, on which Defendants rely heavily for their proposition that Plaintiff's allegations do not rise to the level of extreme and outrageous, is distinguishable on its facts. The force in *Hargraves* consisted only of a takedown maneuver and subsequent use of a baton, not the other extreme and outrageous conduct that occurred here, including the verbal threat to kill Plaintiff and the exposure of and failure to cover Plaintiff's sensitive body parts. 134 F. Supp. 3d

at 87. *Hargraves* concluded that this use of force was reasonable "under the circumstances presented here, which involved a volatile struggle on a public sidewalk with a suspect whom the officers had reason to believe was in flight, was non-compliant with commands, and had been using marijuana." *Id.* at 94. Those facts are not present here. *See* PSMF ¶¶ 36, 38 (Officer Stokes did not believe Plaintiff posed a threat to his safety or the safety of the crowd).

Second, there is significant evidence that Defendants' actions were taken either intentionally or recklessly. "It is possible to infer the existence of the second element of the tort—intent or recklessness—from the very outrageousness of a defendant's conduct." *Kotsch v. D.C.,* 924 A.2d 1040, 1045–46 (D.C. 2007). Intent can also be inferred where the "circumstances are such that any reasonable person would have known that (emotional distress and physical harm) would result, or when the defendant has information that plaintiff's health is being adversely affected by his actions and nonetheless fails to desist, or from accompanying threats of physical violence." *Waldon v. Covington*, 415 A.2d 1070, 1077 (D.C. 1980).

Ms. Ulysse has presented sufficient evidence for a reasonable jury to find that Defendants engaged in three distinct sets of actions meeting these standards. First, a jury may find that Sergeant Al-Hinawi intentionally inflicted emotional distress on Plaintiff when he threatened to "kill" her while she was pinned to the ground under Officer Stokes and in the process of being arrested. *See* PSMF ¶¶ 52-54, 119. Second, there is sufficient evidence for a jury to find that Officer Stokes intentionally inflicted emotional distress on Plaintiff by unholstering and activating his Taser and pointing the weapon at Plaintiff while she was prone on the ground and under Officer Stokes's control, causing her to fear for her life. *See* PSMF ¶¶ 42-45, 53, 119. Third, a jury could find, based on this record, that Officer Stokes intentionally inflicted emotional distress on Plaintiff by grabbing her shirt, causing her bare breasts to become exposed,

and that both Defendants did so by lifting her up to expose her to the crowd and by failing to cover her up or permit bystanders to do so. PSMF ¶ 19-20, 26-28, 32-34, 57-59, 120. Indeed, a reckless state of mind satisfies IIED, as well. For example, a jury could very reasonably conclude that Defendants' failure to cover Ms. Ulysse's exposed breasts was at a minimum reckless, as any reasonable person would have observed that she was exposed, and that continuing to expose her further and failing to allow her to cover up, in front of a large crowd of people, would cause harm.

Third, the record also provides more than enough evidence which, if credited by the jury, would establish that as a result of these actions Ms. Ulysse suffered severe and verifiable emotional distress "of so acute a nature that harmful physical consequences might be not unlikely to result," *Halcomb v. Woods*, 610 F. Supp. 2d at 81 (internal quotation marks omitted), thus satisfying the high standards of an IIED claim. This level of emotional distress can be found, for example, where "an individual's emotional shock permanently alters their daily activities, changes their personality, destroys their ability to live or sleep comfortably, or overwhelms the person with stress or depression." *Arias v. DynCorp*, No. 1:01CV01908 (ESH), 2016 WL 6496214, at *10 (D.D.C. Nov. 2, 2016).

Ms. Ulysse's testimony shows that she experienced severe and lasting emotional distress as a result of Defendants' actions. During the events, she feared for her life as a result of Defendants' display of the Taser and verbal threats and believed she might die. PSMF ¶¶ 43-45, 52-54, 119. For the remainder of her time in Washington, she was unable to ride the Metro as a result of her traumatic reaction to these events, and she walked 90 minutes each way to get to and from her work. PSMF ¶ 115, 122. Ultimately, this proved too taxing, and she gave up her plans to remain in Washington and participate and learn from the city's vibrant jazz community.

PSMF ¶ 123. Beyond those life-altering permanent changes to her daily activities, Ms. Ulysse continues to experience significant emotional distress as a result of Defendants' outrageous treatment. She continues to have distressing vivid recollections of the events, including traumatic flashbacks when witnessing situations of heavy police presence, which leave her frantic and crying, has experienced changes to her personality, and has sought treatment from a mental health professional. PSMF ¶¶ 121, 124-125. Furthermore, Ms. Ulysse's emotional distress is "verifiable" and so acute that physical consequences would not be unlikely to result. In fact, when Ms. Ulysse was taken to the hospital for medical care just after the arrest, she was found to have sinus tachycardia, a fast heart rhythm which can "occur as part of the body's response to certain conditions, such as intense physical activity or emotional distress." PSMF ¶ 110.

Defendants cite to *Paul v. Howard Univ.*, 754 A.2d 297 (D.C. 2000) to dispute the sufficiency of Plaintiff's emotional distress, but the court's holding was based on a finding that Plaintiff did not meet the first prong (actions did not rise to the level of extreme and outrageous behavior required for IIED). *Id.* at 307-308. In other words, the court in *Paul* did not proceed to consider whether the plaintiff's emotional distress, which resulted in "heightened levels of stress, high blood pressure, and disrupted sleep," was sufficiently severe to support a claim of IIED. *Id.* at 307. *Paul,* therefore, has no bearing or relationship to Ms. Ulysse's IIED claims.

### C.  Plaintiff's Assault and Battery Claims Must Go to a Jury.

Under D.C. law, an assault is "an intentional and unlawful attempt or threat, either by words or by acts, to do physical harm to the victim," while a battery is "an intentional act that causes a harmful or offensive bodily contact." *Etheredge*, 635 A.2d at 916 (internal quotation marks omitted). As a threshold matter, it is undisputed that Defendants engaged in actions that would constitute battery. Def. Br. at 29. Defendants instead argue that their actions fall under the

protection of qualified privilege, and specifically that Sergeant Al-Hinawi's threat to kill, even if true, does not constitute assault. Both arguments fail.

First, Defendants are not entitled to qualified privilege at this juncture. "A police officer has a qualified privilege to use reasonable force to effect an arrest, provided that the means employed are not in excess of those which the actor reasonably believes to be necessary." *Etheredge*, 635 A.2d at 916 (internal quotation marks omitted). Although the standards are similar, the qualified privilege standard is more plaintiff-friendly than the § 1983 qualified immunity standard. By comparison to the more onerous objective qualified immunity test under § 1983, "the test for qualified privilege in an assault and battery suit is both subjective and objective: the officer must subjectively believe that he or she used no more force than necessary, but the officer's judgment is compared to that of a hypothetical reasonable police officer placed in the same situation." *Scales v. D.C.,* 973 A.2d 722, 730 (D.C. 2009).

Accordingly, Plaintiff prevails on the question of qualified privilege for all of the same reasons she prevails on the question of qualified immunity: that an objectively reasonable officer in the same situation would have understood the force to be excessive. *See supra* Section IV.B. Plaintiff can also prevail on her assault and battery claims because the jury may find that Defendants subjectively believed that the actions constituting assault and/or battery went beyond what was "necessary." Although Defendants—predictably—have testified that they subjectively believed their actions to be reasonable, there are sufficient facts in the record from which a jury could decline to credit this testimony. For example, a reasonable jury could conclude that Officer Stokes did not have a subjective belief that his actions were reasonable, based on testimony from bystanders that he "pretended not to hear" the crowd's pleas to cover Ms. Ulysse's exposed breasts. PSMF ¶ 33 (citing Suliman Declaration at ¶ 6). Thus, there are disputes of fact regarding

Officer Stokes's good faith belief that require the question of qualified privilege to go to a jury, even if Defendants were to prevail on § 1983 qualified immunity, which they should not.

Next, Defendants' suggestion that Sergeant Al-Hinawi's threat to kill is not actionable as assault, Def. Br. at 31, is incorrect. Defendants have two bases for this argument: (1) that Sergeant Al-Hinawi did not have the required present ability to carry out his threat, and (2) that an "overt act" was required and lacking. Both are incorrect. Both Defendants were armed with both deadly and less-lethal weapons and had full control over the much smaller Ms. Ulysse. PSMF ¶¶ 4-5, 23, 36-37, 51. Accordingly, both had a present ability to carry out the threatened harm, and Ms. Ulysse's apprehension was reasonable and actionable. *See Hall*, 867 F.3d at 157–58 (on facts described *infra* page 8, allowing an assault claim to proceed to trial where officers were alleged to have engaged in a "course of conduct that conveyed a threat to [plaintiff], reasonably causing her to fear for her safety").[11] Second, Defendants claim that to be actionable there must have been an "overt act." Defendants provide no citation indicating that this is a requirement of D.C. tort law (as opposed to the criminal law of assault), and Plaintiff has not been able to locate any such requirement. Even if it were required, it would be satisfied by Sergeant Al-Hinawi's actions in conjunction with the threat, including grabbing her arm and twisting it sharply behind her back, causing her extreme pain. PSMF ¶ at 51.

Plaintiff has established genuine disputes of material fact that would allow a jury to find that Defendants assaulted and battered Plaintiff and that their assault and battery of Plaintiff was not privileged. Therefore, Plaintiff's assault and battery claims must go to a jury.

---

[11] Similarly, there are disputes of fact regarding whether Officer Stokes pointed an activated Taser at her, causing her to be laser-painted and to fear for her life. PSMF ¶¶ 42-45. Defendants do not appear to dispute that these actions would constitute assault if not privileged.

**D.  There Exist Genuine Disputes of Material Fact that Defendants Are Liable Under Common Law Negligence.**

Plaintiff's negligence claims must go to a jury, as well.

In the District of Columbia, negligence is normally a question of fact for a jury, outside of the limited situations where "there is but one reasonable inference which may be drawn from undisputed facts." *D.C. v. Brown*, 589 A.2d 384, 388 (D.C. 1991) (internal quotation marks omitted). To establish liability for negligence under D.C. law, "a plaintiff must prove 'the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury.'" *Dormu*, 795 F. Supp. 2d at 29 (quoting *Evans–Reid v. District of Columbia,* 930 A.2d 930, 937 n.6 (D.C. 2007)). A plaintiff can prevail on her negligence claims even where she has been unable to prove a constitutional violation. *See Hargraves*, 134 F. Supp. 3d at 95 (citing *Scales*, 973 A.2d at 731).

Here, Plaintiff brings negligence claims against Defendants based on two distinct actions: (1) the wielding and laser-painting of the Taser at Plaintiff, PSMF ¶¶ 41-45, and (2) the act of exposing Plaintiff's breasts to the gathered crowd and refusing to allow her to cover herself, PSMF ¶¶ 26-34, 57-59.[12] Both should survive summary judgment.

First, Plaintiff has introduced sufficient evidence of the duty or standard of care that applied to Defendants, and which they violated during the events in question. Plaintiff's expert, Randy Foster, is a well-qualified expert on police practices, with over 25 years of law enforcement experience on the federal, state, and local levels. PSMF ¶ 88. Mr. Foster testified in this matter based on his knowledge of police practices and standards and as employed by

---

[12] Plaintiff's supplemental interrogatory responses made clear that she has two independent theories of negligence/negligent infliction of emotional distress ("NIED"), one based on the breast exposure and one based on the Taser. *See* PSMF Exh. 7, at Interrogatory No. 5.

multiple law enforcement departments and jurisdictions, his years of experience in the field, his review of MPD's General Orders, trainings conducted by national organizations, and his assessment of the principles of police practices as understood by national law enforcement organizations such as the International Association of Chiefs of Police ("IACP")—all of which is well-accepted by courts in this district. PSMF ¶¶ 88-89; *see also Taylor*, 2019 WL 4750366, at *6 (in another fare evasion/excessive force case against WMATA officer, district court permitted testimony of Mr. Foster because "based on Foster's experience . . . as well as his training," Mr. Foster's report is "sufficient to show that he has articulated and referenced a standard of care . . . by which the defendant's actions can be measured."); *Sherrod*, 334 F. Supp. 3d at 259–60; *Butera v. D.C.*, 235 F.3d 637, 660 (D.C. Cir. 2001) (national standard of care where expert relied on "his consultation with police officers in Prince George's County, his review of the MPD's General Orders, and his examination of [two other police manuals]").

Despite Defendants' statements to the contrary, Def. Br. at 35, Mr. Foster did not solely evaluate Defendants' actions against his own experience. Rather, he evaluated whether the allegations against Defendants, if true, would violate widely accepted standards of proper police practice, based on his knowledge of police practices across many jurisdictions and departments and by referencing the IACP's *National Consensus Policy and Discussion Paper on Use of Force*. For example, in describing his expert opinion regarding the duty of care relevant to Officer Stokes's laser painting of Plaintiff, he not only opines that the "universally accepted practice is that officers may only wield a Taser in the amount necessary to affect an arrest, overcome resistance, or protect themselves," but also references both MTPD and IACP policy statements supporting this standard. PSMF ¶ 82, citing Exh. 22, Foster Report at 13-14. Similarly, Mr. Foster's opinion regarding Defendants' duty to refrain from exposing a subject's

breasts, and to promptly cover them if they become exposed, is based not just on his training and

years of experience, as Defendants claim, but also on his "knowledge of local, state, and federal

police practices" across multiple jurisdictions. PSMF ¶¶ 85-87, citing Exh. 22, Foster Report at

11, PSMF Exh. 23, IACP Report at 3, 8, 12 (basis of opinion). Mr. Foster's report is more than

sufficient to establish that he has identified an appropriate standard of care.[13]

Defendants attempt to liken this case to *Briggs v. WMATA*, but the expert in *Briggs*

wasn't able to "even vaguely suggest[]" a standard covering one of the issues, acknowledged that

there was no national standard governing the other, and could not demonstrate that the standards

he did identify had been "implemented by similar entities," as he had apparently never served as

an expert in the relevant industries. 481 F.3d 839, 847–48 (D.C. Cir. 2007).

Second, there are genuine disputes of fact that would permit a jury to find that

Defendants deviated from the recognized standards of care, namely Officer Stokes's actions with

respect to the Taser and Defendants' actions with respect to the exposure of Ms. Ulysse's

breasts. Since multiple witnesses testified that Plaintiff did not pose a threat to herself or others,

PSMF ¶¶ 38, 47-48, pointing an activated Taser at her and laser-painting her with it would

violate established national standards on the use of service weapons, PSMF ¶ 82, citing PSMF

Exh. 22, Foster Report at 13-14. And exposing Plaintiff's breasts and failing to cover them or

---

[13] Mr. Foster's conclusion that this is a national standard of police practice is buttressed by the
fact that courts across the country have recognized in a variety of contexts that officers have a
duty to permit nude or partially nude arrestees to clothe or otherwise cover themselves. *See
Amaechi v. West*, 237 F.3d 356, 364–65 (4th Cir. 2001) (it was clearly established law that
officer violated Constitution when he refused to let arrestee change clothing before handcuffing
her publicly, after she informed him that handcuffing her would cause her naked lower body to
be exposed); *United States v. Di Stefano*, 555 F.2d 1094, 1101 (2d Cir. 1977) (holding that
officers had a duty to find clothing for arrestee or permit her to do so).

allow them to be covered would violate Defendants' duty to refrain from exposing a subject's breasts and to promptly cover them if they become exposed. PSMF ¶¶ 85-86.

Third, these deviations from the standards of care caused direct injury to Plaintiff, including by causing her bare chest to be pressed up against the ground, PSMF ¶¶ 27-28, 49, resulting in contusions to her chest, PSMF ¶ 116, as well as significant and long-lasting emotional distress, PSMF ¶¶ 118-125. Defendants do not dispute this.

Instead, Defendants argue that Plaintiff's negligence claims are barred by the rule established in *D.C. v. Chinn*, 839 A.2d 701 (D.C.2003). The basic requirement of *Chinn* is that a negligence claim against a police officer must include at least one distinct element involving a breach of a standard of care <u>other than</u> the duty to not intentionally inflict excessive force. Under *Chinn,* a plaintiff who simultaneously asserts claims for negligence and assault and battery based on excessive force must ensure that the negligence claim is: (1) "distinctly pled;" (2) "based upon at least one factual scenario that presents an aspect of negligence apart from the use of excessive force itself;" and (3) "violative of a distinct standard of care." *Id.* at 711.

Plaintiff meets these requirements. First, Plaintiff's claims are distinctly pled. *See* Dkt. 1, Complaint, at ¶¶ 8–9, 22–23 (setting forth distinct claims for negligence and assault and battery); *see also Dormu*, 795 F. Supp. 2d at 30–31 (holding that plaintiff had satisfied this requirement where his complaint set forth distinct claims in his complaint). Second, Plaintiff's negligence claims are each based upon "at least one factual scenario that presents an aspect of negligence apart from the use of excessive force itself." *Chinn*, 839 A.2d at 711. Case law is clear that this prong is satisfied where there are two different possible factual scenarios, one of which involves an intentional act and one of which involves a negligent act, often involving a "misperception of fact" on the part of the defendant. *See Dormu*, 795 F. Supp. 2d at 30–31 (quoting *Chinn*, 839

A.2d at 711). For example, in *Dormu*, the plaintiff's negligence and excessive force claims were both allowed to proceed where the evidence could support two different factual scenarios: that the officer "either intentionally applied the handcuffs tightly and deliberately failed to lock the handcuffs, or that he recklessly believed that he had properly applied the handcuffs." *Id.* at 30. Here, both of Plaintiff's negligence claims involve this same scenario: for each, a jury could reasonably believe either that Defendants intentionally committed the act (laser-painting Plaintiff or exposing Plaintiff's breasts) or that they, through negligence, allowed it to happen. Third, Plaintiff's claims are based on distinct standards of care from her assault and battery claims. As discussed above, the relevant standards of care involve the officers' duties to refrain from pointing service weapons, including Tasers, at subjects who are under control and do not pose any threat, and to refrain from exposing a subject's sensitive body parts or preventing them from covering if exposed. *See Dormu*, 795 F. Supp. 2d at 31 (holding that plaintiff satisfied the third prong where the "handcuffing procedure invoked by Dormu [to support his negligence claim] is distinct from the general excessive force standard that applies to MPD officers.").

Finally, Defendants erroneously submit that they are entitled to summary judgment on Plaintiff's negligence claim because Plaintiff was contributorily negligent. Questions of contributory negligence are, of course, clear questions of fact. *See Lynn v. D.C.*, 734 A.2d 168, 172 (D.C. 1999). Furthermore, under D.C. law, the defense of contributory negligence is not available in negligence suits involving violations of "police regulation concerning the use of force." *D.C. v. Coleman*, 667 A.2d 811, 817 (D.C. 1995) (citing *D.C. v. Peters*, 527 A.2d 1269, 1274 (D.C. 1987)); *see also Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 43 (D.D.C. 2016). Indeed, not a single one of the contributory negligence cases Defendants cite arose in the context of an excessive force or false arrest claim or even a claim against a law enforcement

43

officer. Where, as here, Plaintiff's negligence claims concern violations of Defendants' duties as they pertain to the use of service weapons and about arrestees' sensitive body parts, D.C. law precludes Defendants' argument.

### E.  There Exist Genuine Disputes of Material Fact that Defendants Are Liable Under Common Law Negligent Infliction of Emotional Distress.

A reasonable jury could find Defendants liable for negligent infliction of emotional distress ("NIED"). Under D.C. law, a plaintiff can prevail on an NIED claim by establishing "(1) that the [defendant] acted negligently, (2) that plaintiffs suffered either a physical impact or were within the "zone of danger" of the officers' actions, and (3) that they suffered emotional distress that was "serious and verifiable." *Wright v. United States*, 963 F. Supp. 7, 18 (D.D.C. 1997) (emphasis added) (citing *Jones v. Howard Univ., Inc.,* 589 A.2d 419, 424 (D.C. 1991)); *Williams v. Baker,* 572 A.2d 1062, 1067–68 (D.C. 1990).

For the reasons discussed *supra* Section V.D, there is sufficient evidence supporting Plaintiff's claim of negligence, both in Officer Stokes's negligent wielding of his Taser and in Defendants' negligent exposure of and failure to cover her breasts.

As to NIED, Plaintiff has a claim against both Defendants under the "zone of danger" theory for their negligent conduct while effecting Ms. Ulysse's arrest. *See, e.g.*, *David v. D.C.,* 436 F. Supp. 2d 83, 90 (D.D.C. 2006) (upholding a jury verdict on NIED claim, where a "reasonable jury could have concluded . . . that Davis's negligent conduct in effecting the false arrest of David created a zone of danger and caused David to fear for her safety, resulting in emotional distress."). Record evidence indicates that Officer Stokes negligently activated his Taser such that it was pointed at and laser painted Plaintiff while she was under his full control and posed no threat to his or others' safety, and that Defendants caused Ms. Ulysse's breasts to be exposed in public over her express objection. And Ms. Ulysse was directly in the "zone of

44

danger," as the Taser was pointed at her back at a distance of a few inches, while she lay exposed and vulnerable in a crowded Fort Totten metro station. This caused her to fear for her life and caused serious and verifiable emotional distress. PSMF ¶¶ 42, 118; *see supra* Section V.B.

In the alternative, Plaintiff also has a claim for NIED against both Defendants under the "physical injury" theory for their negligent conduct with respect to leaving Plaintiff's breasts exposed. *See, e.g.*, *Nagy v. Corr. Corp. of Am.*, 79 F. Supp. 3d 114, 120–21 (D.D.C. 2015) (allowing NIED claim based on corrections officer's use of excessive force to survive summary judgment where plaintiff was physically injured, resulting in emotional distress). Specifically, Plaintiff has established facts by which a jury could find that Plaintiff suffered a physical impact or injury when her exposed breasts were pressed into the concrete, resulting in chest contusions, and that this caused serious and verifiable emotional distress. PSMF ¶¶ 109, 116, 118; *see supra* Section V.B. This is more than sufficient to satisfy the physical impact or injury prong. See *Asuncion v. Columbia Hosp. for Women,* 514 A.2d 1187, 1189 (D.C.1986) (holding that physical injury need not be substantial).

## CONCLUSION

For all of these reasons, Defendants are not entitled to summary judgment. Although record evidence plainly shows that a reasonable jury could find in favor of Plaintiff on her federal and state common law claims, Defendants' brief presents a version of events that completely ignores the portions of the record that do not favor them. Moreover, precedent in this circuit makes clear that qualified immunity cannot attach to Defendants' actions, and the remainder of Defendants' arguments fail as a matter of law. Plaintiff respectfully requests that Defendants' Motion for Summary Judgment be denied in its entirety.

Dated: March 10, 2021                                        Respectfully submitted,

                                                /s/ Yiyang Wu
                                            Jia M. Cobb (D.C. Bar No. 503340)
                                            Yiyang Wu (D.C. Bar No. 1028799)
                                            Alexa Milton (D.C. Bar No. 155380)
                                            RELMAN COLFAX PLLC
                                            1225 19th St. NW, Suite 600
                                            Washington, D.C. 20036
                                            Tel: 202-728-1888
                                            Fax: 202-728-0848
                                            jcobb@relmanlaw.com
                                            ywu@relmanlaw.com
                                            amilton@relmanlaw.com

                                            *Counsel for Plaintiff*