# EXHIBIT

# 8

1

IN THE UNITED STATES DISTRICT

FOR THE DISTRICT OF COLUMBIA

HUGUETTE ULYSSE,          :
                          :
          Plaintiff,      :
                          :
v.                        : CASE NO.: 1:19-CV-01465 CJN
                          :
METRO TRANSIT POLICE      :
                          :
OFFICER DERRICK STOKES,   :
                          :
et al.,                   :
                          :
          Defendants.     :
------------------------

THE Virtual Zoom Deposition of the

WASHINGTON METRO AREA TRANSIT AUTHORITY

30(b)(6) corporate witness,

DEPUTY CHIEF KEVIN P. GADDIS,

the witness being located at Washington Metro Area

Transit Authority, 8100 Professional Place, Lanham,

Maryland, Monday, October 5th, 2020, at 10:08 a.m.

Eastern Daylight Savings Time.


Job No. 49165


Reported by:  Donna A. Peterson, Notary Public

2

1             The Zoom Virtual Deposition of WASHINGTON

2    METRO AREA TRANSIT AUTHORITY 30(b)(6) corporate

3    witness, DEPUTY CHIEF KEVIN P. GADDIS, taken by the

4    law offices of:

5

6                RELMAN, DANE & COLFAX, PLLC

7                Suite 600

8                1225 19th Street, N.W.

9                Washington, D.C.  20036

10

11

12

13           Pursuant to Notice, before Donna A.

14   Peterson, Notary Public in and for the District of

15   Columbia, located in Fairfax County, Virginia, and

16   with all counsel appearing virtually.

17

18

19

20

21

22

1      Q.     But you don't know whether there was any

2   written materials associated with that training?

3      **A.     No, I do not.**

4      Q.     And is that because you didn't review the

5   written materials for any MIR trainings?

6      **A.     No.  That wasn't on the list to review**

7   **and -- but no, it's -- I know, you know, I looked**

8   **when I -- when I observed it, it wasn't here's the**

9   **lesson plan.  Like I said, it was in a defensive**

10  **tactics room and it was actual hands-on training.  So**

11  **there is most likely some type of written lesson on**

12  **it, but it was very hands-on practical app. That's**

13  **how you find that.**

14     Q.     You don't know for sure?

15     **A.     No.**

16     Q.     And on the issue of types of holds that

17  can result in asphyxiation, is it your testimony that

18  an officer would not have received training on that

19  other than in initial basic academy training?

20     **A.     No.  Because it's some of those things**

21  **when things happen across the country, we do, like I**

22  **said, roll call training, we talk about that kind of**

1   stuff, especially in the past couple years.

2       Q.     And where would that training be

3   documented?

4       A.     Oh, it would be covered in roll call.  It

5   would -- it might not -- it might be in a schedule it

6   was discussed in roll call training, that kind of

7   thing.

8       Q.     Did you review any such schedules?

9       A.     No.

10      Q.     We were talking earlier about what

11  constitutes the use of force.  Does the threat of

12  force ever constitute the use of force under MTPD

13  policy?

14      A.     No.

15      Q.     So if an officer unholsters his service

16  weapon and points it at someone, that would not be

17  considered use of force?

18      A.     That would be considered force, yes.  It

19  would be documented in a use of force report.

20      Q.     Okay.  And that would be the threat of

21  force, right?

22             MR. JANEY:  Objection, form, foundation.

1           You may answer.

2           THE WITNESS:  It could.  I guess someone

3   could, or it could be a safety issue.  For an officer

4   to actually unholster, remove his weapon and point it

5   at somebody, he would be in fear of his life or the

6   life of somebody else's, so it would be a safety

7   issue.  So -- and we would document it in a use of

8   force report.

9   BY MS. MILTON:

10      Q.    Okay.  General Order 325 covers contact

11  stops and frisk, correct?  And that is in this

12  exhibit at page 0051.

13          The subject of a contact is free to leave,

14  is that right?

15          MR. JANEY:  Objection, form, foundation,

16  calls for legal conclusion.

17          You may answer.

18          THE WITNESS:  So yes.  A contact, yes, is

19  a consensual[...]

20  BY MS. MILTON:

21      Q.    So the subject of a contact is not

22  required to respond to an officer's questioning, is

1    that correct?

2              MR. JANEY:  Same objection.

3              You can answer.

4              THE WITNESS:  Correct.

5    BY MS. MILTON:

6        Q.    So the fact that the subject of a contact

7    walks away or ignores the officer cannot be a basis

8    under which to stop them or arrest them, correct?

9              MR. JANEY:  Same objection.

10             You can answer.

11             THE WITNESS:  In that context, yes.

12   BY MS. MILTON:

13       Q.    But that is correct?

14       **A.    Yes.  It's -- a contact is a face-to-face**

15   **communication with an individual who is free to**

16   **leave.**

17       Q.    Can an interaction with an individual that

18   begins as a contact then become a stop?

19             MR. JANEY:  Objection, form, foundation,

20   calls for legal conclusion.

21             You can answer.

22             THE WITNESS:  Yes.

1   BY MS. MILTON:

2       Q.    And is the officer required to notify the

3   individual that he or she is now the subject of a

4   stop?

5            MR. JANEY:  Same objection.

6            You can answer.

7            THE WITNESS:  They can, yes.

8   BY MS. MILTON:

9       Q.    They can or they must?

10           MR. JANEY:  Objection, asked and answered.

11  And, also, same objection.

12           You can answer.

13           THE WITNESS:  You're saying it started out

14  as a consensual contact and it changed into a stop?

15  BY MS. MILTON:

16      Q.    Right.  In that situation, is the officer

17  required to inform the individual that they are now

18  subject to a stop?

19      **A.    If, during the interaction, it became**

20  **apparent that the person wanted to leave, then the**

21  **officer would have to tell them "at this time, you**

22  **are not free to leave, I'm stopping you" for whatever**

1      A.    No.

2      Q.    Other than the general orders that you

3  have in Exhibit 2, does MTPD have any other written

4  policies, practices, protocols or guidance pertaining

5  to the use of de-escalation tactics?

6      A.    No.

7      Q.    Does MTPD have any written policies,

8  practices, protocols or guidance pertaining to fare

9  evasion?

10     **A.    There is -- I talked about it earlier, a**

11  **slide deck from 2006.**

12     Q.    And would that slide deck continue to be

13  considered relevant as far as the current policies,

14  practices, protocols and guidance regarding fare

15  evasion?

16           I'm sorry, just to correct that, I mean as

17  of May 2018.

18     **A.    It's a dated PowerPoint slide, the slide**

19  **deck.  It's a dated Power -- dated slide deck, so**

20  **it's not a hundred percent accurate.**

21     Q.    Is there -- are there any written

22  materials or policies or procedures or guidance that

1   reflect the current policies at MTPD regarding fare

2   evasion?

3       **A.    No.**

4       Q.    And how do you know that this document is

5   dated?

6       **A.    So first, we're starting with the date,**

7   **it's 2006, and this event was 2018 but now it's**

8   **2020 -- I mean 2018 and now it's 2020.  This slide**

9   **deck, I'm looking at the pictures, they're not the**

10  **best but it's got, looks like paper media, paper**

11  **media that's being used.  We're using technology now**

12  **that, we're in the SmarTrip card technology.  So this**

13  **would be, some of this talks a lot about, this slide**

14  **deck talks about more of the slide media out there,**

15  **D.C. school cards and reduced fare for senior**

16  **citizens and disabled people and other things that**

17  **were just stated.**

18      Q.    Okay.  So as of May 2018, there's no

19  written policies, practices, protocols or guidance

20  governing fare evasion?

21      **A.    No.**

22      Q.    And how about unwritten?

1          MR. JANEY:  Objection, form, foundation,

2    vague.

3          You may answer.

4          THE WITNESS:  It's -- the laws have

5    changed.  In May of 2019, fare evasion was

6    decriminalized in the District of Columbia, but it's

7    still being enforced in Maryland and Virginia.

8    BY MS. MILTON:

9       Q.    So as of May 2018, where would an officer

10   or member look if they wanted to find MTPD's current

11   policies or guidelines regarding enforcement of fare

12   evasion?

13      **A.    Well, May, in May of 2019, it was**

14   **decriminalized in D.C.**

15      Q.    Right.  I'm talking about May 2018.

16      **A.    Well, the -- the code books, it's still**

17   **illegal, it was still illegal in 2018 and the**

18   **procedures manual has the actual charges for what for**

19   **each jurisdiction and what type of paperwork it needs**

20   **filled out.**

21      Q.    And the procedures manual has information

22   specifically regarding fare evasion?

1      A.     Yes, with the charges and fines, correct.

2      Q.     And is that a particular section of the

3  procedures manual?

4      A.     Each -- the procedures manual is broken

5  down into numerous sections and when it gets into

6  the -- the laws into each of the three jurisdictions,

7  each one of the three jurisdictions has a spot that

8  discusses or the charges for fare evasion and the

9  appropriate paperwork to use to write the right, to

10 write the ticket.

11     Q.     Okay.  And you mentioned code books, I

12 think.  What were you, what were you referring to

13 there?

14     A.     Each jurisdiction, Maryland, the District

15 of Columbia and Virginia, have code books for the

16 laws that we have to enforce, and I believe in D.C.,

17 it's actually the District of Columbia code book

18 under railroad offenses, and fare evasion is one of

19 them.

20     Q.     By "code books," you weren't referencing

21 an MTPD document, you were referencing the laws of

22 the District of Columbia?

1   BY MS. MILTON:

2       Q.    And I believe you said it's common for the

3   supervisor to begin the investigation.  Does -- is

4   the investigation normally completed by somebody

5   else?

6           MR. JANEY:  Same objection.

7           You may answer.

8           THE WITNESS:  No.  The supervisor that

9   starts the investigation normally finishes it, unless

10  something happens and he cannot, maybe he's on

11  extended sick leave or something like that, and then

12  the investigation would be handed to another

13  supervisor to complete.

14  BY MS. MILTON:

15      Q.    Okay.  So it's MTPD's normal practice to

16  have the officer against whom the complaint was filed

17  to have their investigation handled by their direct

18  supervisor?

19      **A.    Yes.**

20          MR. JANEY:  Objection --

21          THE WITNESS:  Sorry.

22          MR. JANEY:  -- vague.  Same objection.

1          You can answer.

2          THE WITNESS:  Yes.

3    BY MS. MILTON:

4      Q.    Did Sergeant Muller interview the

5    complainant relating to Ms. Ulysse's incident?

6      **A.    No.**

7      Q.    Does MTPD have a policy or practice

8    regarding whether the complainant should be

9    interviewed as part of an internal investigation?

10     **A.    We have a policy on conducting**

11   **investigations.**

12     Q.    And where is that policy located?

13     **A.    We have a general order, General Order 231**

14   **and General Order 416.**

15     Q.    Did Sergeant Muller interview any other

16   witnesses in this investigation?

17     **A.    He interviewed, took statements from**

18   **Officer Derrick Stokes and Sergeant Al-Hinawi.**

19     Q.    And did he -- were those written

20   statements?

21     **A.    Yes.**

22     Q.    Is it MTPD policy or practice to directly

1    interview other witnesses as part of the internal

2    investigation?

3        A.    It can be.  But it's not a requirement

4    that every time, it's done, no.

5              (WMATA 30(b)(6) Gaddis deposition Exhibit

6    Number 4 was marked for identification and attached

7    to the transcript.)

8              MS. MILTON:  Okay.  If you could refresh

9    your share folder, there are two more exhibits now

10   and, once that's open, you can open Exhibit 4.

11       A.    I'm trying to refresh right now.

12       Q.    Okay.  After Sergeant Muller completed his

13   report, was it sent up the chain for review?

14       A.    Yes.

15       Q.    And did the individuals who reviewed the

16   report take any steps to verify the facts or

17   conclusions?

18             MR. JANEY:  Objection, form, foundation.

19             You may answer.

20             THE WITNESS:  Yes.

21             MR. JANEY:  You can answer -- okay.

22   BY MS. MILTON:

1        Q.     And what steps did they take?

2        **A.     Read the written investigative report,**

3    **reviewed the statements.  See if there's anything**

4    **else that's missing that they could add to the body**

5    **of knowledge of the investigative report.  Reviewed a**

6    **video and radio recording and make sure that -- or**

7    **confirm it corroborates what the investigative report**

8    **illustrates.**

9        Q.     And who took those actions with regard to

10   Ms. Ulysse -- the investigation into Ms. Ulysse's

11   incident?

12       **A.     All the --**

13            MR. JANEY:  Objection, form, foundation.

14            You may answer.

15            THE WITNESS:  All the signatories on the

16   investigative report.

17   BY MS. MILTON:

18       Q.     Did any of those individuals request any

19   change to the report?

20       **A.     I know when I reviewed it, I asked for**

21   **some clarification.  I believe I sent an e-mail to**

22   **them asking it.**