# EXHIBIT

# 22

Foster Experts, LLC

Randy Foster


Law Enforcement Expert Witness Report


HUGUETTE ULYSSE

Plaintiff,


v.


WASHINGTON METRO TRANSIT POLICE OFFICER DERRICK STOKES, et al.

Defendants.

CASE: 1:19-cv-01465(CJN)

I.     **Qualifications**

I am a longtime military and civilian law enforcement officer whose career spans over 25 years on the federal, state, and local levels.

I retired as a Supervisory Deputy Marshal from the U.S. Department of Justice. My primary duty as a Supervisory Deputy Marshal was to oversee fugitive operations. I was also responsible for federal prisoners and protection of officers of the court and witnesses. I investigated many deputies' use of force incidents as a Supervisory Deputy U.S. Marshal. I also provided preliminary investigation for the U.S. Marshals Service Internal Affairs for my district's use of force incidents. I assumed custody for all prisoners charged with a federal offense, no matter which agency made the arrest. I worked on fugitive task forces and made over 100 arrests during my career with the U.S. Marshals Service. My details as a U.S. Marshal included the protection of Supreme Court Justice Clarence Thomas and Former U.S. Attorney General Michael Mukasey.

Before working for USMS, I worked as a police investigator with the Fayetteville Police Department, in Fayetteville, N.C. There, I conducted hundreds of detentions and arrests over a period of five years.

I have been retained over ten times as an expert in Use of Force, Video Evidence Examination, and Police Procedures. I have served as an expert on the local, state, and federal levels. In 2018, I was qualified as an expert in Police Procedures and Use of Force in a case against the Washington Metro Area Transit Authority in the U.S. District Court for the District of Columbia, *Delphine Taylor v. WMATA, et al.* A list of the cases in which I have testified as an expert in a deposition or trial in the past four years is attached as Exhibit A.

I have been an instructor on topics concerning use of force, including how to determine whether a subject poses a threat to a law enforcement officer during an encounter. That particular course was approved for Continuing Legal Education credit for attorneys in the state of Florida. I also have completed numerous use of force trainings, including Protective Action Response Training, Florida Department of Juvenile Justice, Less Lethal Techniques - OSS Academy, Use of Force & Deadly Force - OSS Academy, and Police Use of Force Course Completion - FDL9003 – FDLE.

A list of the relevant trainings I have led and completed, and the education I have received, is attached as Exhibit B.

II. **Documents and Information Reviewed in Preparation for This Report**

- Metro Transit Police General Order #130 Use of Force (01/19/2012), Defendants' Bates Stamps: 0062-0065
- Metro Transit Police General Order #132 Conducted Electronic Weapons (03/01/2018), Defendants' Bates Stamps: 0056-0061
- Metro Transit Police General Order #325 Contacts, Stop and Frisks (06/01/2001), Defendants' Bates Stamps: 0051-0053
- Metro Transit Police General Order #601 Arrest Policy (06/01/2001), Defendants' Bates Stamps: 0049-0050
- *National Consensus Policy and Discussion Paper on Use of Force*, International Association of Chiefs of Police, et al., October 2017, *available at:* https://www.theiacp.org/sites/default/files/all/n-o/National_Consensus_Policy_On_Use_Of_Force.pdf ("IACP")
- Internal Investigation File, CCP #18-105, Defendants' Bates Stamps: 0001-0048
- Fort Totten Metro Station Surveillance Videos Dated May 21, 2018, FTTO 05212018 0849-0916 CAM K003, M001, M002, M011, X101, X102, X103, X104, X108, X109, X111
- Cell Phone Videos Captured on May 21, 2018, Plaintiff's Bates Stamps: PL_000103, PL_000104, PL_000105, PL_000106
- Fort Totten MTPD Audio May 21, 2018
- Notice to Appear in Court or Post and Forfeit, Superior Court of the District of Columbia, Criminal Division, Plaintiff's Bates Stamp: PL_000095
- Defendant Stokes Answers to Plaintiff's Interrogatories
- Defendant Al-Hinawi's Answers to Plaintiff's Interrogatories
- Plaintiff Ulysse's Responses to Defendant Stokes's Requests for Admission
- Plaintiff Ulysse's Responses to Defendant Al-Hinawi's First Set of Interrogatories
- Plaintiff Ulysse's Responses to Defendant Stokes's First Set of Interrogatories

- Declaration of Courtney Alexander, Plaintiff's Bates Stamps: PL_000123-PL_000126
- Declaration of Diane Lowe, Plaintiff's Bates Stamps: PL_000116-PL_000118
- Declaration of Justin Kwasa, Plaintiff's Bates Stamps: PL_000119-PL_000122
- Declaration of Rana Suliman, Plaintiff's Bates Stamps: PL_000113-PL_000115

### III.   **Expert Witness Opinion**

I have been asked to opine on accepted police practices as they relate to Huguette Ulysse's detention and arrest on May 21, 2018 by Officers Derrick Stokes and Nadim Al-Hinawi. My opinions on what constitute established police practices are based upon my specialized experience, training, and knowledge of police practices, as well as my continued law enforcement topic research and my 25 years of work in law enforcement. Based on my training, experience, and knowledge of generally accepted best police practices, it is my opinion that Officer Stokes and Al-Hinawi's treatment of Ms. Ulysse was highly improper. A number of the actions they took in the course of detaining and arresting Ms. Ulysse failed to comply with accepted policing practices, including but not limited to Officer Stokes's initial contact with Ms. Ulysse, and Officer Stokes and Officer Al-Hinawi's use of unnecessary force on Ms. Ulysse.

### A. Initial Approach

Among law enforcement officials, it is well understood that the proper way to approach a subject in order to conduct further investigation is by making face-to-face contact with the individual.

My opinion is based on 25 years of work in law enforcement and the numerous trainings I have attended that cover this topic. There are a number of reasons why face-to-face contact is the generally accepted best practice. First, face-to-face communication is most likely to result in the subject's cooperation in the investigation. Second, the officer will be able to best assess the subject's demeanor and body language. Third, it is the safest approach because the officer will be able to see the individual's hands and be ready to defend himself if the subject poses a danger to him.

MTP General Order #325 even defines a contact as a "face-to-face communication," which is consistent with the generally accepted practices about contact with subjects that I have observed.

It is not best practice for an officer to first put his hands on a subject's body without the subject being aware of the officer's approach. Trainings that I have taken in officer street survival have expressly cautioned against making physical contact with an individual from behind or from the side. Street Survival training, which I took at both the local and federal level, provides insights on the way that officers can use language to influence suspects, calm a situation, and eliminate confusion.

In addition to being unsafe, and more difficult to gain cooperation and conduct further investigation, a touch from behind or from the side can cause its own independent problems. For example, in my experience, it is totally natural for an individual who is grabbed from the side or from behind to have a negative reaction to someone placing their hands on his or her body; it is a shock to the system and it would be natural for an individual to react negatively to being touched without context. This is the case if the individual has already passed by the officer without realizing that the officer is trying to stop him. In that case, the accepted police practice would instruct the officer to either tap him on the shoulder, or otherwise catch up to the individual (and get in front of him) to make a face-to-face communication. Also, best practice is to engage in multiple efforts to give verbal commands before resorting to physical touch.[1] My conclusion is based on my specialized experience, training, and knowledge of police practices, including trainings and academy instruction on proper practices on how to take someone into custody.

I have reviewed Officer Stokes's statement and the video of the incident, and it is my opinion that Officer Stokes's approach of Ms. Ulysse was inconsistent with proper police practices. Officer Stokes did not obtain face-to-face communication with Ms. Ulysse. The Fort Totten Metro Station surveillance video shows that when Officer Stokes spoke in Ms. Ulysse's direction, there was another person who was side to side with Ms. Ulysse, so it is unclear who he was directing his statement to. I also notice from the surveillance video that Ms. Ulysse had something in her ears, either

---

[1] IACP, at p. 12.

headphones or earplugs. These are further reasons why it was improper for Officer Stokes to confront her from the side or back instead of working to make face-to-face contact.

According to Officer Stokes's statement, he made one attempt to speak to Ms. Ulysse. The statement says, "Ms. Ulysse was ordered to stop and provide me with the smart trip card she used to exit the system. Ms. Ulysse responded by saying 'No' and then walked past me in an attempt to exit the station. In an attempt to gain compliance from Ms. Ulysse, I grabbed her by her left arm and told her she was not allowed to leave yet."[2] The surveillance video shows that less than three seconds passed between Officer Stokes attempting to speak to Ms. Ulysse and his grab of her arm.[3] As discussed above, best practice would be for Officer Stokes to catch up to Ms. Ulysse (she was not running) before resorting to physical force. Instead, he stood with his feet planted and reached out his arm to grab her. Based on my years of experience as a law enforcement officer and the trainings I have attended that cover this topic, it was not proper for Officer Stokes to put his hands on Ms. Ulysse and push her to stop her. "When verbal commands are issued, the individual should be provided with a reasonable amount of time and opportunity to respond before force is used."[4] Best practice would have been to make more diligent attempts to make face-to-face contact with her, including tapping her on the shoulder or catching up to her, and, if necessary, explain why he believed she had not paid for her ride and why he needed to see her smart trip card.

Based on my review of the video, Ms. Ulysse acted in a natural way from being grabbed from behind. Officer Stokes initiated a violent and excessive contact instead of a face-to-face communication, it is likely that his actions would place an individual in a mental state of confusion. I understand that one of the offenses Ms. Ulysse was charged with was resisting arrest. Based on my experience making citizen contacts and arrests (including charging individuals with resisting arrest) and my training and knowledge of police practices, I do not perceive Ms. Ulysse as having resisted arrest, but instead to have reacted in a natural way to Officer Stokes's use of force.

---

[2] Internal Investigation File, CCP #18-105, Defendants' Bates Stamp: 00013.
[3] Fort Totten Metro Station Surveillance Videos Dated May 21st, 2018, FTTO 05212018 0849-0916 CAM X111 (time stamp 2:02-2:04).
[4] IACP, at p. 12.

Finally, I note that Officer Stokes's statement states that he approached Ms. Ulysse with the intention of conducting further investigation (i.e. to ask that she "provide me with the smart trip card she used to exit the system.")[5] The universally accepted best practice here is for the officer to make sure he has enough evidence of a crime before making an arrest. General Order #601 requires that an officer "conduct a thorough preliminary investigation of facts surrounding the event." It also makes clear that "Members will arrest persons suspected of criminal acts only when lawful authority permits and never because of personal vindictiveness towards a suspect or because of provocation falling short of a criminal violation." WMATA's protocol is consistent with my experience in 25 years of work in law enforcement and the numerous trainings that cover this topic.

If Officer Stokes believed he had enough evidence of a crime before making the arrest, then he would not have needed to further ask for the fare card. That leads me to conclude that whatever "piggybacking" he believed he observed, he did not think that was enough evidence to make an arrest for fare evasion.[6] Universal best practice would be for Officer Stokes to conduct additional investigation before arresting her for fare evasion. So if it turns out he did not conduct any further investigation into Ms. Ulysse's fare evasion before arresting her on that charge, I would conclude that Officer Stokes did not have enough evidence of fare evasion at the time he arrested Ms. Ulysse.

### B. Detention Through Force

It is universally understood among law enforcement officers that officers may apply force but only to the degree that it is necessary to affect a stop or arrest. This is supported by my review of MTP procedures, my experience as a law enforcement officer, and my review of the literature of nationwide best practices. Specifically, General Order #130 states that "unnecessary force is prohibited." Rather, officers "will only use the amount of force necessary to affect an arrest, overcome resistance, or protect themselves and/or others from harm." General Order #325 also makes

---

[5] Internal Investigation File, CCP #18-105, Defendants' Bates Stamp: 00013.
[6] Officer Stokes's statement explains that piggybacking is "following closely behind another patron" through a turnstile. A proper assessment of whether Ms. Ulysse's actions constituted reasonable suspicion (that would give rise to probable cause) would include whether others exiting the turnstiles were leaving more space than Ms. Ulysse did.

clear that officers "will use the <u>least coercive means available</u>." MTP's policies are entirely consistent with the national consensus of policies and procedures.[7] The use of force trainings I have attended at the local, state, and federal level also universally teach this standard.

There are a number of factors that will be considered to determine whether the force used is more than what is necessary to arrest a person.[8] Some of these factors apply to whether an individual has the ability to threaten the officer. For example, the height and weight difference between the officer and subject is a key consideration; if the subject is comparatively small, it is highly unlikely that the officer needs to use significant force to overcome resistance and/or affect an arrest. Another factor is whether the subject carries something that gives a reasonable officer additional concern of danger, like a weapon. Still other factors apply to whether the person poses an immediate threat to the officer. If the officer has already subdued the subject or is otherwise in control, the subject does not pose a threat, and minimal (if any) force is necessary to affect an arrest or stop, but if the subject's body and demeanor show that he is actively resisting, then the level of force necessary may change. Finally, it is a universally accepted best practice to consider the severity of the crime being charged. If there is a bulge in a subject's pocket that I suspect is a gun, my assessment is different than if I only suspect a subject of loitering. I may be permitted to pull out a Taser or weapon on the subject with a gun, but I can't do it for the person loitering. I draw my conclusions based on my years of experience as a law enforcement officer, training and knowledge of police practices, as well as my continued law enforcement topic research, including trainings I led and took on use of force at the local, state, and federal level.

Based on these factors, it is my opinion that no force was necessary to affect Ms. Ulysse's stop/arrest, overcome resistance, or protect the officers from harm. Among other reasons, Ms. Ulysse is small in size as compared to Officers Stokes and Al-Hinawi. The actions taken by the officers after she was on the ground were taken after she was subdued. She was ultimately charged with fare evasion and resisting arrest, which are minor

---

[7] *See* IACP, at pp. 1-3.
[8] *See* IACP, at pp. 8-9.

crimes. My conclusion is supported by my view of the surveillance videos and witness captured videos, declarations, and court documents.[9]

My opinion that no force was necessary is the same regardless of whether Officer Stokes was affecting a contact, stop, or arrest on Ms. Ulysse. A contact is a "face-to-face communication with an individual who is free to leave."[10] General Order #325 makes clear that "force cannot be used to initiate or maintain a contact." MTP's policy that it is improper to use any type of force to make a contact is consistent with my understanding of national best practices. A stop is still investigatory in nature; an officer uses a stop to determine whether "sufficient probable cause exists to make an arrest." An arrest is the "taking custody of a person," and should only occur when probable cause is already established.[11] To make a stop or arrest, the officer is obligated to "use only the amount of force necessary" to affect a stop or arrest.[12] Again, MTP's policy that an officer may only use necessary force to affect a stop or arrest is consistent with my understanding of national best practices. I base my opinion on my training, experience, and knowledge of generally accepted best police practices, including trainings I have had on *Graham v. Connor*, 490 U.S. 386 (1989).

Officer Stokes's statement that he asked Ms. Ulysse for her smart trip card leads me to believe that the approach was either a contact or a stop. If it was a contact, any use of force would be prohibited; if it was a stop or arrest, the officers must still use the least coercive means necessary.

It is my opinion that the following uses of force would be improper, unnecessary force in light of the context I describe above. In other words, under the circumstances described above, the following uses of force would fall outside of the scope of accepted police practices.

**<u>Violent Grab and Push of Subject to the Ground.</u>** Given the circumstances described above, it is improper, and inconsistent with proper

---

[9] Notice to Appear in Court or Post and Forfeit, Superior Court of the District of Columbia, Criminal Division, Plaintiff's Bates Stamp: PL_000095.
[10] Metro Transit Police General Order #325 Contacts, Stop and Frisks (06/01/2001), Defendants' Bates Stamp: 0051.
[11] Metro Transit Police General Order #601 Arrest Policy (06/01/2001), Defendants' Bates Stamp: 0049.
[12] IACP, at pp. 12-13.

police practices, to violently grab a subject and push the subject to the ground.

If the subject is the target of a contact, then there is no basis to use force to initiate or maintain the contact. If the subject is the target of a stop, then there are intermediary steps that should be taken to maintain the stop that do not rise to the level of violently grabbing the subject and pushing the subject to the ground. Best practices include tapping the subject on the shoulder instead of grabbing the subject, and, if that fails, getting in front of the subject instead of pushing the subject to the ground. In other words, directly escalating to violently grabbing and pushing someone onto the ground is not the least coercive means necessary, especially under the circumstances I discussed above.

If the subject is the target of an arrest, then under the circumstances, it is inconsistent with proper police practices to continue maintaining the arrestee on the ground instead of bringing the arrestee back up on their feet. Two reasons why this is not accepted practice come to mind.

First, it is not safe to be wrestling on the ground. It exposes an officer to potential danger—that a subject may gain access to a weapon, for example—and in any event, the officer is more in control of the situation once he is on his feet. If the officer did not mean to fall to the ground, the best practice is to get back on his feet as soon as possible. It is not best practice to continue sitting on top of the subject for any longer than is needed to affect an arrest, overcome resistance, or protect themselves and/or others from harm. My opinion is based on my specialized experience, training and knowledge of police practices, including numerous police defensive tactics trainings at the local, state, and federal levels that I have taken that covered this subject.

Second, under these circumstances, accepted best practices would have required that the officer practice de-escalation. De-escalation is a well established best practice that helps an officer get a volatile situation under control and minimizes the risk of people getting hurt during an encounter. De-escalation involves using actions and commands (including calm, repeated verbal commands, positioning oneself in a nonthreatening manner, and tactics other than lethal or less than lethal weapons) to help

an officer calm down a situation and bring it back to normalcy.[13] I have taken multiple state and federal trainings on de-escalation practices, regularly practiced these tactics during my 25 years as a law enforcement officer, and reviewed literature on this topic. My opinion is based on all of these experiences, research, and trainings.

Based on my experience, training, and knowledge as a law enforcement officer, Officer Stokes's decision to keep the subject on the ground did not help de-escalate the situation. The circumstances include the fact that a crowd had gathered and was upset at the officers' treatment of Ms. Ulysse. The best practice would be to cover Ms. Ulysse as soon as possible, get off of her, and stand up. By staying for an extended period on the ground with Ms. Ulysse in a vulnerable position, Officer Stokes continued to keep the situation as is, which prevented him from de-escalating the crowd and Ms. Ulysse. This is inconsistent with accepted police practices.

**Exposure of Breasts**. It is improper, and inconsistent with proper police practices, to cause a subject's breasts to become exposed and to refuse to allow the subject to cover herself back up.

There is no reason that makes the exposure of a subject's breasts necessary to affect an arrest, overcome resistance, or protect an officer and others from harm. Exposing someone's breasts will never help an officer fulfill the course of his duties. If anything, there is a high likelihood that an officer's failure to cover up a subject's exposed breasts will cause escalated concern on the part of the subject and a gathering crowd, which is why proper police practices would never permit the extended exposure of a subject's breasts. The basis of my opinion is my 25 years of experience as a law enforcement officer, as well as my training and knowledge of local, state, and federal police practices. I recall one situation when I came across a man who was blocking traffic and who was fully nude. Even though I could have arrested the man on the spot, I followed best practices and covered him up first in an attempt to de-escalate the situation.

---

[13] "An officer shall use de-escalation techniques and other alternatives to higher levels of force consistent with his or her training whenever possible and appropriate before resorting to force and to reduce the need for force." IACP, at pp. 3, 8, 12.

My opinion does not change if the initial exposure was accidental. So long as officers know that a subject's breasts continue to be exposed, then it is improper to cause the exposure to continue without covering the subject up. My opinion also extends to an officer who arrives later on the scene but approaches the subject and makes no attempt to cover her up.[14]

If a subject's breasts are exposed (especially if the subject is surrounded by people), I would expect for that person to be upset and to attempt to cover herself. That is the natural consequence of the arresting officers' decision to allow the subject's breasts to continue to be exposed. My opinion is that it would not be proper to use the subject's attempt to cover herself up as conclusive evidence that the subject was resisting arrest. I base this opinion on my 25 years of experience affecting arrests and my training and knowledge of police practices.

**Repeated Pushing of Subject's Face to Ground.** Given the circumstances described above, it is improper, and inconsistent with proper police practices, for an officer to push a subject's face into the ground.

Based on my experience as a law enforcement officer, and my training and knowledge of police practices, I conclude that Officer Stokes's pushing of Ms. Ulysse's face into the ground at least twice is inconsistent with accepted police practices. My conclusion takes into consideration the context of Officer Stokes's actions. Here, because of the factors I list above (ex. the height and weight differential between Ms. Ulysse and Officer Stokes, the likelihood that she would impose an immediate risk of danger to the officer, and the lack of severity of the charges against her), Officer Stokes's actions were not necessary to affect her arrest, overcome resistance, or protect the safety of the officers.

**Knee Strikes.** Given the circumstances described above, it is improper, and inconsistent with proper police practices, for an officer to apply strikes with his knee on a subject's back.

Based on my experience as a law enforcement officer, and my training and knowledge of police practices, I conclude that Officer Stokes's application of knee strikes against Ms. Ulysse's back is inconsistent with accepted

---

[14] "An officer has a duty to intervene to prevent or stop the use of excessive force by another officer when it is safe and reasonable to do so." IACP, at p. 3.

police practices. Again, given the factors described above (height and weight differential, likelihood that she would impose an immediate risk of danger to the officer, and lack of severity of the charges), the knee strikes are not necessary to affect an arrest, overcome resistance, or protect the safety of the officers. I conclude that Officer Stokes's application of knee strikes on her back is outside the scope of accepted police practices.

**Applying Full Body Weight on Subject's Back.** Given the circumstances described above, it is improper, and inconsistent with proper police practices, for an officer to apply his full body weight on a subject's back. As I discussed earlier, for safety and de-escalation reasons, the widely accepted best practice is for the officer to stand up with the subject and continue the arrest. It is not best practice to stay sitting on top of a subject and applying full weight on the subject's back. I conclude that Officer Stokes's decision to apply his full body weight on Ms. Ulysse's back was improper and contrary to accepted best practices. My conclusion is based on my experience as a law enforcement officer, and my training and knowledge of police practices.

**Verbal Threats and Display of Taser.** Finally, given the circumstances described above, it is improper, and inconsistent with proper police practices, to cause the subject to believe that the subject's life is in danger. This includes an officer's making of verbal threats that the officer will kill the subject and an officer's brandishing and laser-pointing of a subject with a Taser.

If the subject is already subdued, there is no legitimate reason for an officer to issue a verbal threat that the officer may kill the subject. This is especially so given the circumstances I described above (height and weight differential, likelihood that the subject would impose an immediate risk of danger to the officer, and lack of severity of the charges). A death threat in that context is inconsistent with accepted police practices because it is unnecessary and likely to escalate the situation. My opinion is based on my years as a law enforcement officer, and my training and knowledge of police practices.

Under General Order #130, a Taser is a type of Less-Lethal Force, in other words "force that is unlikely to cause death or serious injury, but the

possibility of a fatality, however remote, does exist."[15] Best practice is to practice de-escalation tactics before using a Taser. As with all kinds of force, the universally accepted practice is that officers may only wield a Taser in the amount necessary to affect an arrest, overcome resistance, or protect themselves.[16] I base my conclusion on my years as a law enforcement officer, my review of the MTP policies, and my knowledge of police practices nationwide.

Just like any other weapon, an officer's brandishing of a Taser can cause a subject to believe that the subject's life is in danger, especially when the officer laser-points the subject with it. The display or laser-paint of a subject with a Taser counts as a use of force and it may only be used if justified.

I conclude that it is improper for Officer Al-Hinawi to verbally threaten to kill Ms. Ulysse and for Officer Stokes to display or laser-paint Ms. Ulysse with a Taser. Especially taken in combination, it was natural for Ms. Ulysse to believe that she was going to be killed by the officers. This was not necessary to affect an arrest, overcome resistance, or protect the officers and their actions were inconsistent with proper policing practices. The basis of my opinion is my 25 years as a law enforcement officer, and my training and knowledge of police practices, including specifically Taser Training with Taser International and OSS Academy in Electronic Control Device.

I do not perceive Ms. Ulysse as having acted in any way to justify the officers' actions, including Officer Stokes's laser-painting of her back. It is natural for an individual who is grabbed from the side or from behind to react negatively to being touched without context and to having her breasts exposed. Moreover, the height and weight differential, her demeanor, and other circumstances I discussed above lead me to conclude that Ms. Ulysse did not pose an immediate risk of danger to the officer. I base my opinion on my years of experience making citizen contacts and arrests, and my training and knowledge of police practices.

---

[15] Metro Transit Police General Order #130 Use of Force (01/19/2012), Defendants' Bates Stamp: 0062 *See also* IACP, at pp. 10-12.

[16] Moreover, General Order #132 makes clear that CEWs may not be used "on a passively resisting person who posed no risk of danger to themselves or others," and that "fleeing shall not be the sole justification for a member using a CEW." MTP General Order #132 Conducted Electronic Weapons (03/01/2018), Defendants' Bates Stamp: 0059.

I also conclude that the officers' actions were not justified by the actions of the crowd that had gathered in protest of the officers' treatment of Ms. Ulysse. Well accepted customary police practice is that crowd control is only a justification for a use of force if it is necessary to protect the officers from harm—in other words, if the crowd was a threat or hinderance towards the officers during the arrest. To determine whether the crowd did in fact pose a danger, factors include whether members of the crowd were attempting to disrupt the officers' actions (or whether they were trying to help), whether they engaged in violence (or whether they were communicating verbally), whether other officers or crowd members perceived them as threats (or instead stood around passively), and whether any members were ultimately arrested. Based on my years of experience in dealing with unruly crowds in the District of Columbia area, my USMS training, and knowledge of local, state, and federal police practices, if these factors are not present, then I would conclude the crowd was not a threat or hinderance to the officers during this incident and that they had no justification for a use of force. After watching the surveillance videos and witness videos, and reading the declarations, it is my opinion that the crowd that gathered around Ms. Ulysse was not dangerous to the officers and thus cannot justify their uses of force.[17]

For all these reasons, it is my opinion that the actions Officer Stokes and Officer Al-Hinawi took against Huguette Ulysse are inconsistent with well-accepted police practices. I base my conclusion on the documents and videos I mention in Section II, my specialized experience, training and knowledge of police practices, my continued law enforcement topic research, and my 25 years of work in law enforcement.

IV.    **Compensation**

I have been retained by Plaintiff's counsel at an advance retainer fee of $2,500 for 16 hours of work in connection with reviewing materials, providing expert consultation, drafting and revising expert reports; and thereafter shall testify in court or a deposition at $275 an hour.

---

[17] In addition, it is inconsistent with de-escalation tactics for Officer Stokes to draw the Taser. As I said earlier, the proper move to de-escalate would have been to cover up Ms. Ulysse and bring her to her feet, not to take the Taser out of the holster and add tension to the situation.

## V.    Right to Amend

I reserve the right to amend and/or supplement these opinions if additional information becomes available, or in response to expert disclosures of the defendant or plaintiff, or if questions are asked of me that do not relate to information contained in this disclosure. All my opinions are expressed to a reasonable degree of professional certainty.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Randy Foster

Dated: January 31, 2020

# EXHIBIT

# A

## Cases Testified as an Expert in Deposition or Trial From 2017-2020

**Delphine Taylor v. WMATA, et al.**

**U.S. District Court for The District of Columbia**

**Case No:** 1:17-CV-00123

**On Behalf of:** Plaintiff

**Expertise:** Police Procedures and Use of Force

**State of Florida v. Wanda White-Scott**

**19th Judicial Circuit in Indian River County Florida**

**Case No:** 2017mm1766

**On Behalf of:** Defendant

**Expertise:** Police Procedure

**Crystal Jackson v. Inmate Services, Inc., et al.**

**U.S. District of Arizona**

**Case No:** 2:17-cv-01277-JJT-DKD

**On Behalf of:** Plaintiff

**Expertise:** Corrections and Jail procedures

**State of Florida v. Demetric Denario Carter**

**The Circuit Court for ESCAMBIA COUNTY, FLORIDA**

**Case No:** 1717CF006017A

**Expertise**: Use of Force

**On Behalf of:** Defendant

**Rudy Joseph v. City of Tallahassee, Officer Damon Miller**

**Case No:** 2017-CA-908

**Expertise:** Use of Force and Police Procedures

**On Behalf of:** Defendant

**Hattie Reynolds v. City of Daytona Beach**

**Middle District of Florida**

**Case No:** 6:18-cv-01921-JA-KRS - Plaintiff

**Expertise:** False Arrest

**On Behalf of:** Plaintiff

# EXHIBIT

# B

**Law Enforcement Instruction**

Police/Subject Threat Assessment Encounter - Continuing Legal Education for Attorneys, held on April 13, 2019

O.C. Spray: Training for Officers – held in 1988 in Birmingham, Alabama

**Law Enforcement Training**

Restraint Chair Certification: certified to operate Restraint Chair- 2017

Searching Motor Vehicles – Georgia Public Safety Training Center

Vehicle Pullovers - Georgia Public Safety Training Center

Taser Evidence Collection & Analysis - Axon Academy Certified - 2018

Police Use of Force Course Completion - FDL9003 – FDLE -2018

Prison Rape Elimination Act - (PREA) USDOJ – Training - 2012

Law Enforcement Liability - OSS Academy - Certificate of Completion - 2018

Jail Inspection Training - U.S. Marshals Service - 1996

Electronic Control Device - OSS Academy - Certificate of Completion - 2018

Use of Force & Deadly Force - OSS Academy - Certificate of
Completion - 2018

Drug Enforcement for Patrol Officers - NC Justice Academy - 1989

Basic Juvenile Officer Training - NC Justice Academy - 1989

Specialized Legal Concerns in Drug Investigations - NC Justice/
Academy - 1990

Warrantless Searches - NC Justice Academy - 1990

Arson Investigation - NC Justice Academy - 1991

Less Lethal Techniques - OSS Academy - Certificate of Completion
- 2018

United States Marshals Service Supervisory Leadership
Development School – Certificate - 2002

United States Marshals Service Advanced Deputy U.S. Marshal
Training -2008

Video Evidence Examinations for Use of Force Investigator – 2018

Video Examinations for the Police Investigator - 2019

## Specialized Training Academy

United States Marshals Service Training Academy, Deputy U.S.
Marshal Academy (Glynco, GA) -1992

Criminal Investigator Academy, Federal Law Enforcement Training Center (FLETC), (Glynco, GA) - 1991

Northeastern Alabama Police Academy, Jacksonville State University- 1998

Oleoresin Capsicum (O.C.) Instructor Course (Anniston, AL)

Fayetteville, North Carolina Police Academy (Fayetteville, NC) - 1987

Federal Air Marshal Academy (Air Marshal Training) (Atlantic City, NJ) - 2003

U.S. Army Military Police Academy. (Military Police Academy) - 1997

Protective Action Response Training, Florida Department of Juvenile Justice- 2013

North Carolina Justice Academy - Preliminary Criminal Investigation – 1988

## Education

Texarkana College; Major: Criminal Justice - (Undergraduate Certificate) -2001

Community College of the Air Force – Criminal Justice/Police

Science -2013

Udemy: Effective Expert Witnessing Training - Certificate of

Completion – 2017