**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

HUGUETTE ULYSSE,

       *Plaintiff*,

   v.

METRO TRANSIT POLICE OFFICER
DERRICK STOKES, et al.,

       *Defendants*.

Civil Action No. 1:19-cv-01465 (CJN)

---

<u>**MEMORANDUM OPINION**</u>

On the morning of May 21, 2018, Huguette Ulysse boarded the Metrorail at the Greenbelt Station and rode it to Fort Totten.  When Ulysse exited the station, Washington Metropolitan Transit Officer Derrick Stokes believed he observed Ulysse evade her transit fee by engaging in so-called "piggy-backing."  Officer Stokes's attempt to talk to and then arrest Ulysse escalated into a physical altercation.  Video cameras captured much of what unfolded, including a second Officer, Nadim Al-Hinawi, responding to the scene and numerous onlookers crowding around. Ulysse alleges that both Officers violated her federal constitutional rights under 42 U.S.C. § 1983 and committed various torts under District law.  *See* Compl., ECF No. 1 at ¶ 1.  The Officers have moved for summary judgment on all claims.  *See generally* Defs.'s Motion for Summ. J. ("Defs.'s Mot."), ECF No. 32-1.  The Court grants the Officers' Motion in part and denies it in part for reasons that follow.

## I.  Background

On the morning of May 21, 2018, Ulysse boarded a Metro railcar at the Greenbelt Station wearing "a tube top secured by a tight elastic band around the top."  *See* Compl. ¶¶ 6, 15.  She

rode the rail to the Fort Totten Metro Stop.  *Id.* ¶ 6.  Upon exiting the railcar, Ulysse headed for the lone operative turnstile to make her way out of the station.  *Id.* ¶ 10.

Stokes was on patrol at Fort Totten that morning.  *See* Defs.'s Statement of Material Facts ("Defs.'s SMF"), ECF No. 32-3 at 2.  Stokes is a fourteen-year veteran of the Washington Metropolitan Transit Police Department and has experience with fare evaders.  *Id.*  Stokes claims that he watched Ulysse engage in so-called "piggy-backing," which occurs when someone avoids paying the transit fee by trailing close behind an individual who has swiped her transit card, enabling both riders to exit the fare gates on "one cycle."  *Id.*

Believing that he observed Ulysse piggy-back her way through the only working turnstile that morning, Stokes walked toward her and attempted to get her attention.  *Id.* at 3.  According to Ulysse, she could not hear Stokes because she had headphones on.  Compl. ¶ 13.  Stokes also asked to see Ulysse's SmarTrip card to verify that she had paid her fare.  Defs.'s SMF at 4.  Stokes asserts that Ulysse glanced his way, dismissed his verbal command, ignored his raised right arm, and continued to proceed toward the exits.  *Id.*  This initial interaction was captured on station surveillance cameras, but without audio.

Disagreement abounds over what happened next even though video footage captures much of what unfolded.  In Ulysse's view, Stokes "grabbed her and forced her to the ground" within seconds of demanding her SmarTrip card.  Compl. ¶ 14.  Stokes, by contrast, claims that Ulysse "forcefully pulled against his grasp of her arm," which caused him to become "off-balance" leading both to fall to the ground.  Defs.'s SMF at 5.

Ulysse alleges that, once on the ground, Stokes knelt on her person, twisted her hands behind her back, pushed down on her shoulder, and pinned her to the concrete.  Compl. ¶ 14.  She also contends that Stokes "restrained her in such a way that made her [tube top] come off,"

exposing her breasts to onlookers.  *Id.* ¶ 15.  The experience of having her breasts exposed and pressed against the concrete left her humiliated.  *Id.* ¶ 17.  Under Stokes's version of events, he informed Ulysse that she was under arrest; she nevertheless resisted his command.  Defs.'s SMF at 6.  He also posits that any exposure of her breasts resulted from Ulysse's decision to resist arrest and her tube top inadvertently sliding down her torso.  *Id.*

Bystanders observed the incident.  According to Ulysse's account, onlookers pleaded with Stokes to calm down and to let Ulysse cover her exposed breasts.  Compl. ¶ 18.  Stokes perceived the situation differently, claiming that he heard "multiple people cursing," and that one person wearing a white T-shirt stood over him yelling at him in a threatening tone.  Defs.'s SMF at 6.  Stokes states that he feared for his own safety because of the hostile crowd, and for that reason he unholstered his taser.  *Id.* at 7.

Ulysse claims that because she was pinned to the ground "she could not determine from her position on the ground whether it was a taser or a gun."  Compl. ¶ 19.  She also asserts that for the remainder of the time she laid prone on the concrete, "Officer Stokes kept the taser in his hand, poised above Ulysse or aimed at bystanders.  *Id.*  From the time Stokes drew the taser and throughout the interaction, Ulysse feared for her life.  *Id.*  Stokes, by contrast, claims that he kept the taser at "low ready," never pointed it at Ulysse, and monitored what he considered a hostile crowd until support arrived.  Defs.'s SMF at 7.

Officer Nadim Al-Hinawi is also a seasoned veteran of the Washington Metropolitan Transit Police Department.  He arrived on the scene while Stokes was in the process of subduing Ulysse.  Compl. ¶ 22.  Al-Hinawi knelt next to Stokes to assist with placing Ulysse under arrest.  *Id.* ¶ 21.  Ulysse claims that Al-Hinawi threatened her, "telling her that he had a gun and would shoot her if she said or 'tried' anything."  *Id.* ¶ 22.  Ulysse also asserts that Al-Hinawi twisted her

arm behind her back until she cried out in pain, *id.* ¶ 24, and Hinawi proceeded to handcuff her, applying the cuffs so tightly that she suffered bruises and abrasions. *Id.* ¶ 25. Al-Hinawi disputes that he ever threatened Ulysse, and he claims that he applied a reasonable amount of force. Defs.'s SMF at 9.

Once the Officers had Ulysse subdued, a female placed a shirt over Ulysse's exposed breasts. *Id.* at 10. The police proceeded to escort Ulysse to Providence Hospital to receive treatment for her injuries. Compl. ¶ 31. A doctor diagnosed Ulysse with muscle strain in her torso and shoulder, abrasions on her wrists, and prescribed her a muscle relaxant. *Id.* ¶ 32.

Ulysse raises a number of claims against both Officers for subjecting her to excessive force, exposing her breasts to the public, threatening her with a taser, and arresting her without probable cause. *Id.* ¶ 1. In particular, she seeks relief under 42 U.S.C. § 1983 for the violation of her rights under the Fourth Amendment to the United States Constitution, and under District law for assault and battery, false arrest and imprisonment, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence. *Id.*

## II.   The Summary Judgment Standard

A court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine" dispute about a material fact does not exist unless "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986)). If the moving party has met its burden, the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial" to defeat the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Though the Court "may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 572 U.S. 650, 656

(2014) (citation omitted), the nonmoving party must show more than "[t]he mere existence of a scintilla of evidence in support of" its position, *Anderson*, 477 U.S. at 252.  In other words, "there must be evidence on which the jury could reasonably find for [the nonmoving party]."  *Id.*

"Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (quoting *Anderson*, 477 U.S. at 255).  Yet "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  And when the "nonmovant's account of the facts is 'utterly discredited' by the clear evidence provided by a videorecording, the Court has instructed . . . not to rely on a 'visible fiction but rather 'view [ ] the facts in the light depicted by' the video record."  *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (quoting *Scott*, 550 U.S. at 380–81).  In other words, when videotape footage exists, the reviewing court need not credit the version of a party who asserts facts contradicted by the videotape; rather it should view the facts in the light depicted by the videotape while taking into consideration the reality that "even a video can give a distorted view of a disputed scene."  *Smith v. United States*, 843 F.3d 509, 514 (D.C. Cir. 2016).

### III.    Unlawful Arrest Claims

In Count One, Ulysse claims that the Officers violated her federal right to be free from unreasonable seizures when they arrested her without probable cause.  *See* Compl. ¶¶ 40–43.

Under the Fourth Amendment, the people are "to be secure in their persons . . . against unreasonable searches and seizures, . . . and no Warrants shall issue, but upon probable cause . . . ."  U.S. Const. Amend. IV.  Section 1983 provides a remedy against any person acting under color

of state law for "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983.[1] An arrest made "without probable cause violates the [F]ourth [A]mendment." *Martin v. Malhoyt*, 830 F.2d 237, 262 (D.C. Cir. 1987). Generally speaking, then, when officers arrest an individual without probable cause, the arrested individual may sue the arresting officers for relief under § 1983. *See Kenley v. D.C.*, 83 F. Supp. 3d 20, 36 (D.D.C. 2015).

To determine whether an officer had probable cause for an arrest, the Court examines "the events leading up to the arrest" to decide "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *D.C. v. Wesby*, 138 S. Ct. 577, 586 (2018) (quotation omitted). This inquiry recognizes probable cause as "a fluid concept," meaning that the analysis into whether probable cause existed is "not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). A finding of probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.* at 243 n.13. All told, "[p]robable cause . . . is not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014).

Whether an officer had probable cause to believe that an individual violated District law requires looking "to District law to identify the elements of" the offenses. *McGovern v. George Washington University*, 245 F. Supp. 3d 167, 184 (D.D.C. 2017) (quotation omitted). At the time of the incident the relevant provision of the D.C. code provided: "No person shall . . . knowingly enter or leave the paid area of a real transit station owned and/or operated by the Washington

---

[1] In 1973, the Supreme Court held that "that the District of Columbia is not a 'State or Territory' within the meaning of" § 1983. *D.C. v. Carter*, 409 U.S. 418, 419 (1973). Congress overturned the Supreme Court's decision in 1979, clarifying that § 1983 also covers action taken under the color of District law. *See* Act of Dec. 29, 1979, Pub. L. No. 96–170, § 1, 93 Stat. 1284; *Brown v. United States*, 742 F.2d 1498, 1500 n.1 (D.C. Cir. 1984).

Metropolitan Area Transit Authority which is located within the corporate limits of the District of Columbia without paying the established fare." D.C. Code § 35-216 (2018). The offense of fare invasion was "not a specific-intent crime, but rather a general intent crime," meaning that the requisite intent required to violate the statute was "the general intent to commit the act that constitutes the crime, not intent to violate the law itself." *Whittaker v. Munoz*, No. CV 17-1983 (EGS), 2019 WL 4194499, at *4 (D.D.C. Sept. 4, 2019). District law also makes it unlawful to resist arrest: "Whoever without justifiable and excusable cause intentionally resists an arrest by an individual who he or she has reason to believe is a law enforcement officer . . . shall be guilty of a misdemeanor." D.C. Code § 22-405.01(b) (2016); *see Sacchetti v. Gallaudet Univ.*, 344 F. Supp. 3d 233, 262 (D.D.C. 2018).

### A. Ulysee's Claim that Stokes Lacked Probable Cause to Arrest Her.

Defendants are entitled to summary judgment on Ulysse's claim that Stokes lacked probable cause to arrest her. As reflected in both Stokes' testimony and the relevant video footage, Defs.'s SMF at 3, Stokes observed Ulysse pass through the lone-operative-exit faregate at the Fort Totten Metrorail Stop by purportedly following behind the woman just in front of her to maneuver through the turnstiles in one cycle. Def.s's Mot, ECF No. 32-4, Ex. 4. Believing that Ulysse had committed fare evasion, Stokes attempted to get Ulysse's attention by waving his right arm in her direction. *Id.* He then proceeded to walk toward her, leaving just a few feet between them. *Id.* The video shows Ulysse glance toward Stokes, but then look away and continue walking out of the station. *Id.* Believing he witnessed Ulysse commit a misdemeanor offense, Stokes grabbed Ulysse's left forearm. *Id.* The video depicts Ulysse pulling against Stokes's grasp. *Id.* The struggle left Stokes and Ulysse unbalanced, causing both to fall to the ground. *Id.*

Ulysse argues that the government cannot establish, for purposes of summary judgment at least, that she actually engaged in so-called "piggy-backing." But that argument is beside the point. Instead, what matters is whether a "reasonable officer" could conclude that there was probable cause to believe that Ulysse committed the crime of fare evasion. *Maryland v. Pringle*, 540 U.S. 366, 372 (2003). Based on the undisputed material facts, a reasonable officer in Stokes's shoes could conclude that there was probable cause to believe that Ulysse committed the alleged crime.

Ulysse points to other factual allegations that support her theory of events, such as the existence of only a single functioning turnstile when she exited the station, to suggest that Stokes has cherry-picked the facts to support his argument in favor of a finding of probable cause. Probable cause, however, "does not require officers to rule out a suspect's innocent explanation for suspicious facts." *Wesby*, 138 S. Ct. at 588. Rather, "the degree of suspicion that attaches to particular types of noncriminal acts" is the proper focus. *Id.* (quotation omitted). Here, plenty of suspicion attached to how Ulysse exited the station. She walked close behind the woman exiting the turnstile in front of her, she ignored Stokes's directions to halt, and she glanced away from his gaze and extended arm. A reasonable officer in Stokes's shoes could conclude that the events generated sufficient suspicion that a crime had been committed.

**B.  Ulysse's Claim that Al-Hinawi Lacked Probable Cause to Assist with the Arrest.**

The record also leads to the conclusion that Al-Hinawi possessed probable cause to assist with the arrest. Under what is known as the "collective knowledge doctrine," an "officer may rely on a fellow officer's assessment of circumstances sufficient to warrant a suspect's arrest." *Barnhardt v. D.C.*, 723 F. Supp. 2d 197, 216 (D.D.C. 2010) (citation omitted); *Rice v. D.C.*, 774 F. Supp. 2d 18, 23 (D.D.C. 2011) ("Probable cause may emanate from the collective knowledge

of the police.").  In other words, "an arresting officer need not have sufficient firsthand knowledge to constitute probable cause; it suffices if the police officer initiating the chain of communication . . . had firsthand knowledge." *Kyle v. Bedlion*, 177 F. Supp. 3d 380, 399 (D.D.C. 2016) (quotation omitted).

Al-Hinawi relied on Stokes's probable cause determination to assist with the arrest of Ulysse.  Though Al-Hinawi did not witness the alleged fare evasion take place, when he arrived at the scene, Al-Hinawi asked Stokes whether Ulysse was under arrest.  Defs.'s SMF at 8.  Stokes responded in the affirmative.  *Id.*  The surrounding situation also provided indicative evidence that Ulysse was under arrest.  The video shows a group of people huddled around Stokes and Ulysse.  A reasonable officer arriving to that scene under the circumstances would assume that Stokes was arresting Ulysse.

What's more, Al-Hinawi testified that upon arrival to the scene he could see Ulysse resisting arrest.  *Id.* at 9.  The video evidence corroborates this account.  The video shows Ulysse resisting both Officers' efforts to place her in handcuffs.  It also depicts Ulysse straining and squirming on the ground.

Ulysse fights this conclusion by asserting that her resistance, if any, did not rise to level of a misdemeanor offense under District law.  But again, whether Ulysse's resistance violated District law, which makes it a misdemeanor to resist arrest, is not the question.  Instead, the proper question is whether a reasonable officer could conclude that there was probable cause to believe that Ulysse committed the crime of resisting arrest.  *Pringle*, 540 U.S. at 372.  And here, based on the undisputed material facts, a reasonable officer could reach that conclusion.

One last point.  Even assuming that Stokes and Al-Hinawi were mistaken in their assessment that probable cause existed to arrest Ulysse, the undisputed material facts demonstrate

9

that their belief was objectively reasonable based on the totality of the circumstances. That objectively reasonable mistake (assuming one occurred—a fact that has not been established) entitles both Officers to qualified immunity from Ulysse's § 1983 claim for an unlawful seizure without probable cause. *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

## IV.    False Arrest and False Imprisonment Claims

In Count Six, Ulysse claims that the Officers committed the torts of false arrest and false imprisonment when they arrested her without probable cause. *See* Compl. ¶¶ 40–43.

The tort of false arrest and the tort of false imprisonment both anchor themselves to an allegation of "unlawful detention." *Enders v. D.C.*, 4 A.3d 457, 461 (D.C. 2010). To maintain an action for either tort, then, a plaintiff must demonstrate: "(1) the detention or restraint of one against his or her will, and (2) the unlawfulness of the detention or restraint." *Dormu v. D.C.*, 795 F. Supp. 2d 7, 27 (D.D.C. 2011) (quotation omitted). Where, as here, the plaintiff "was arrested without a warrant, a rebuttable presumption arises that the arrest was unlawful, and the burden shifts to the" arresting officers to show the lawfulness of the arrest. *Karriem v. District of Columbia*, 717 A.2d 317, 320 (D.C. 1998). The central issue in actions for false arrest and for false imprisonment therefore becomes "whether the arresting officer was justified in ordering the arrest of the plaintiff." *Id.* (quotation omitted); *Plummer v. D.C.*, 317 F. Supp. 3d 50, 64 (D.D.C. 2018). An officer satisfies that burden by demonstrating "either that probable cause existed to arrest or that the arresting officer believed, reasonably and in good faith, that probable cause existed." *Sacchetti*, 344 F. Supp. 3d at 257 (quotation omitted).[2]

---

[2] Under District law, an officer has probable cause to arrest without a warrant when a person "has committed or is committing an offense in [the officer's] presence." D.C. Code § 23-581(a)(1)(B).

Under District law, an officer may assert two distinct affirmative defenses to avoid liability for the torts of false arrest and false imprisonment: "(1) the probable cause test, which requires an objective showing and is usually harder to meet, or (2) the partially subjective test, which is usually easier-to-meet." *Scales v. D.C.*, 973 A.2d 722, 729 (D.C. 2009) (quotation omitted).  Whether an officer has satisfied the "constitutional probable cause" test "is determined by reference to the objective standard used to determine probable cause in a criminal proceeding." *D.C. v. Murphy*, 635 A.2d 929, 931 (D.C. 1993).  The relevant inquiry focuses not on "what the actual facts may be but rather [on] what the officers could reasonably conclude from what they were told and what they saw on the scene." *Enders*, 4 A.3d at 470–71.  The partially subjective test homes in on whether the officer "can demonstrate that (1) he [] believed, in good faith, that his conduct was lawful, and (2) this belief was reasonable." *Dormu*, 795 F. Supp. 2d at 27 (quotation omitted).

Stokes and Al-Hinawi not only had probable cause in line with the demands of the federal constitution to arrest Ulysse, but the undisputed material facts demonstrate that they also had a good faith (and reasonable) belief to conduct the arrest.  The Officers, in other words, satisfy both the objective test and the partially subjective test.  As to the partially subjective test, Stokes testified that he believed Ulysse committed fare evasion and arrested her for doing so, and that he based that belief on his many years of police experience.  *See* Stokes's Dep., ECF No. 32-5, Ex. 3 at 20–30.  Al-Hinawi likewise assisted with Ulysse's arrest based on his belief that Stokes had probable cause to initiate the arrest.  *See* Al-Hinawi's Dep., ECF No. 32-7, Ex. 5 at 19–29.  Both Officers are therefore entitled to summary judgment on Ulysee's false arrest and false imprisonment claims.

## V.   Excessive Force Claims

In Count One, Ulysse claims that the Officers resorted to excessive force when they arrested her.  *See* Compl. ¶¶ 40–43.

The Fourth Amendment protects against unreasonable searches and seizures and also guarantees "the plain right to be free from the use of excessive force in the course of an arrest." *Dormu*, 795 F. Supp. 2d at 18 (citing *Graham v. Connor*, 490 U.S. 386, 394–95 (1989)); *see also Malhoyt*, 830 F.2d at 261.  Police officers therefore face potential liability under § 1983 when they use "unreasonable" or "excessive" force in seizing a person.  *See Graham*, 490 U.S. at 394–95.  An objective reasonableness standard governs the inquiry, which requires the Court to judge "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," whether the applied force was objectively reasonable.  *Id.* at 394–95.

To prevail on an excessive force claim, "the excessiveness of the force [must be] so apparent that no reasonable officer could have believed in the lawfulness of his actions."  *Garay v. Liriano*, 943 F. Supp. 2d 1, 19 (D.D.C. 2013) (quotation omitted).  That rule stems from the reality that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Id.* (quotation omitted).  The law instead recognizes that "police officers have authority to use some degree of physical coercion when subduing a suspect."  *Id.* (quotation omitted).  Factors like the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether the suspect was actively resisting arrest help guide the Court's analysis of whether an officer has resorted to excessive force.  *Graham*, 490 U.S. at 394–95.

An officer who allegedly violates a person's constitutional rights, say by using excessive force, may have the defense of qualified immunity.  *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).  Qualified immunity, at least as presently reflected in caselaw that is binding on the Court, grants law enforcement officers "breathing room to make reasonable but mistaken judgments

about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).[3]  To lose the defense

and be held personally liable, an officer must (1) violate a statutory or constitutional right that was

(2) clearly established at the time of the challenged conduct.  *Daugherty v. Sheer*, 891 F.3d 386,

390 (D.C. Cir. 2018); *Johnson v. D.C.*, 528 F.3d 969, 976 (D.C. Cir. 2008) (noting that Supreme

Court decisions and a consensus view emanating from the Court of Appeals may create clearly

established law); *Wesby*, 138 S. Ct. at 589–90; *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)

(noting that a court has the discretion to decide "which of the two prongs of the qualified immunity

analysis should be addressed first in light of the circumstances in the particular case at hand").

Only the "plainly incompetent" or the officer "who knowingly violate[s] the law" can be held

liable, *Malley v. Briggs*, 475 U.S. 335, 341 (1986), meaning that officers retain qualified immunity

for mere negligence, *Bloem v. Unknown Dep't of the Interior Emps.*, 920 F. Supp. 2d 154, 164

(D.D.C. 2013).

Ulysse contends that Stokes and Al-Hinawi violated her Fourth Amendment rights through

their use of excessive force.  In particular, Ulysse alleges that Stokes forced her to the ground,

kneeled on her back, pushed her face into the cement, aimed a taser at her while on top of her, and

exposed her breasts to the public.  *See* Compl. ¶ 41.  She charges that Al-Hinawi threatened to kill

her if she said or tried anything, and that he handcuffed her in a harsh and needless manner.  *Id.*

---

[3] The Court acknowledges the growing calls to upend, or at least reconsider, the doctrine of qualified immunity.  *See Hoggard v. Rhodes*, 141 S. Ct. 2421 (2021) (Thomas, J., statement respecting the denial of certiorari); William Baude, *Is Qualified Immunity Unlawful?*, 106 Cal. L. Rev. 45 (2018).  *But see* The Honorable Andrew Oldham, *Official Immunity at the Founding* (manuscript, at 22–23, available at https://ssrn.com/abstract=3824983) (suggesting that the Fourth Amendment's "concept of unreasonableness could bring with it [common-law] official immunities").  This Court must, of course, apply the doctrine in its current form.

**A.  Ulysse's Claims against Stokes for Allegedly Arresting Her in a Rough Manner and for Exposing Her Breasts.**

Ulysse can prevail on her excessive force claims "only when, viewing the facts in the record and all reasonable inferences derived therefrom in the light most favorable to the plaintiff, a reasonable jury could conclude that the excessiveness of the force is so apparent that no reasonable officer could have believed in the lawfulness of his actions." *Wardlaw v. Pickett*, 1 F.3d 1297, 1303 (D.C. Cir. 1993) (citation omitted).  With respect to Stokes, Ulysse must therefore point to case law establishing that an officer who falls with the arrestee to the ground after the arrestee pulls against his grasp, who uses his knees to aid in subduing a resisting arrestee, who inadvertently exposes the arrestee's breasts, and who holds the arrestee in place until backup arrives constitutes a clear violation of federal law.

Ulysse relies heavily on *Hall v. D.C.*, 867 F.3d 138 (D.C. Cir. 2017), as a case demonstrating that Stokes's actions violated clearly established law.  But *Hall* does not stretch nearly as far as Ulysse would suggest.  The allegations in *Hall*—including that the police dragged a drunk individual out of bar and into the back of a police cruiser—are simply not of a piece with the scenario that unfolded in this case.  *Id.* at 169.  Moreover, the arrest here was made in a public environment, where the officers were surrounded by onlookers, some of whom Stokes reasonably perceived as threats to his safety.  The evidence also reflects that Stokes observed Ulysse commit a crime, whereas the officers in *Hall* responded to a call.  *Id.* at 145.  And the district court dismissed the excessive force claim on the pleadings in *Hall*, *id.* at 169, whereas the motion here comes before the Court at the summary judgment stage, where the record includes substantial video footage.

Ulysse's claim that Stokes violated clearly established law by exposing her breasts to the public is also incorrect, in light of the manner of the interaction here.  In *Los Angeles Cty. v. Rettele*, 550 U.S. 609 (2007) (per curiam), the Supreme Court held that the detention and search of a couple standing motionless and naked was reasonable because the officers did not prolong the seizure. Circuits have construed *Rettele* as establishing that "inadvertent" "as well as more limited and brief" exposures do not violate clearly established law.  *Ellison v. Hobbs*, 786 F. App'x 861, 877 n.8 (11th Cir. 2019).  Rather it is prolonged and unnecessary exposures of a naked individual that may violate clear law.  *See Hutchinson v. Lemmon*, 436 F. App'x 210, 216 (4th Cir. 2011).  The undisputed material facts demonstrate that the exposure of Ulysse's breasts was limited and inadvertent.  Both Officers, shortly after handcuffing Ulysse, began to lift her from the ground, but realized that her chest was exposed, and lowered her upper body back to the ground.  The Officers then allowed a woman to assist with covering Ulysse once the Officers took control of the situation. No case has held that such actions, without more, would be clearly unconstitutional.

### B.  Ulysse's Claim against Al-Hinawi for Harsh Handcuffing.

The alleged harshness by which Al-Hinawi handcuffed Ulysse does not give rise to an excessive force claim because no clearly established law governs the scenario.  It appears that some courts have permitted an excessive force claim to proceed when an officer refuses to loosen unreasonably tight handcuffs despite the arrestee's complaints of pain.  *Dormu*, 795 F.Supp.2d at 22–24; *Jackson v. D.C.*, 327 F. Supp. 3d 52, 65 (D.D.C. 2018); *Hughey v. Easlick*, 3 F.4th 283, 289 (6th Cir. 2021) (articulating a three-part test for ascertaining whether unduly tight handcuffing constitutes excessive force: (1) the arrestee complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the arrestee experienced some physical injury resulting from the handcuffing).  This case, however, differs from those cases.  The complaint does not allege that

Ulysse cried out in pain asking either officer to loosen the handcuffs.  *See generally* Compl.  As a result, Ulysse does not point to a case clearly establishing that Al-Hinawi's alleged conduct here violated federal law, which entitles to Officer to qualified immunity.

Ulysse turns to *Taylor v. Guida*, No. CV 17-123 (RBW), 2019 WL 4750366 (D.D.C. Sept. 30, 2019) as clear law showing that Al-Hinawi violated the Fourth Amendment when he allegedly tightened the handcuffs in a harsh, rough manner.  But *Taylor* involved an arrestee who protested to the police that the handcuffs were too tight.  *Id.* at *1.  Here, Ulysse made no similar complaint to either Stokes or Al-Hinawi to loosen up the cuffs.

**C.  Ulysse's Claim against Stokes for Allegedly Aiming his Taser at Ulysee's Body.**

Under certain circumstances, pointing a taser at an arrestee might constitute excessive force.  *See, e.g., McDaniel v. Yearwood*, No. 2:11-CV-00165-RWS, 2012 WL 526078, at *27 (N.D. Ga. Feb. 16, 2012) (noting that the threatened use of taser could be excessive force where the threat was made for "malicious purpose of inflicting gratuitous fear").  But the Court need not decide whether this case presents such a circumstance because Ulysse fails to point to clearly established law establishing that an officer can be liable for excessive force when he unholsters his taser in the presence of a potentially hostile crowd and when he never discharges the taser.  Indeed, substantial case law holds that the "mere pointing of [t]asers" does not amount to excessive force.  *Evans v. Plummer*, 687 F. App'x 434, 442 (6th Cir. 2017) ("[O]ur court has never found that pointing a taser, as opposed to actually discharging one, constitutes the use of excessive force.");  *Shay v. City of Huntington Beach*, 816 F. App'x 47, 50 (9th Cir. 2020) ("We also find that Officer Subia's conduct of pointing a Taser at Nathan's face, and threatening to use it if he did not comply, did not violate clearly established law.");  *Dreyer v. McCall*, No. 19-CV-1265-JES-JEH, 2021 WL 3625053, at *4 (C.D. Ill. Aug. 16, 2021); *Brown v. Moore*, No. 5:13-CV-

03049, 2014 WL 4410178, at *10 (W.D. Ark. Sept. 8, 2014); *Smith v. Charleston Cty. Sheriff's Off.*, No. CV 2:16-0655-BHH-BM, 2018 WL 8263056, at *6 n.8 (D.S.C. Sept. 19, 2018).

Ulysse points to portions of the video evidence in which Stokes, adjusting his position while squatting over Ulysse, appears to move his taser so that the laser dot paints her back. But inadvertently pointing a taser at a resisting arrestee while surrounded by a crowd does not violate clearly established law.

### D. Ulysse's Claim against Al-Hinawi for Allegedly Telling Ulysse that if She Tried Anything that He would Kill Her.

Ulysse claims that Al-Hinawi stated that he would kill her if she tried or said anything while he attempted to place her in handcuffs. At summary judgment, the Court certainly cannot conclude that Al-Hinawi did not make this threat. But assuming the threat was made, Ulysse must still demonstrate that it violated clearly established law.

Several decisions have held that significantly worse conduct did not violate clearly established law. In *Thompson v. Rahr*, 885 F.3d 582 (9th Cir. 2018), for example, the plaintiff alleged that an officer pointed a gun at his head and threatened to kill him. *Id.* at 586. The Ninth Circuit held that, taking the allegations as true, the plaintiff stated a plausible excessive force claim, *id.*, but also decided that the officer was "entitled to qualified immunity because [the plaintiff's] right not to have a gun pointed at him [and threatened with lethal force] under the circumstances [] was not clearly established at the time the events took place." *Id.* at 587. Other courts have determined that alleging a mere threat without more is insufficient to demonstrate the significant injury needed to sustain an excessive force claim. *See Swoboda v. Dubach*, 992 F.2d 286, 290 (10th Cir. 1993); *Hulsey v. State of Tex.*, 929 F.2d 168, 172 (5th Cir. 1991).

Other courts have permitted excessive force claims to proceed when an officer threatens to kill an individual.  In *Schleig v. Borough of Nazareth*, for instance, the Third Circuit concluded that "it should go without saying that no reasonable officer could think that it was lawful to threaten to injure or kill an employee because of that employee's participation in a labor union."  695 F. App'x 26, 31 (3d Cir. 2017).  The Tenth Circuit has also determined that a plaintiff states a plausible excessive force claim when an officer points a gun at the plaintiff's head and threatens to kill the individual.  *Northington v. Jackson*, 973 F.2d 1518, 1523 (10th Cir. 1992).  The Eleventh Circuit, too, has concluded that an officer loses the protection of qualified immunity when he orders his dog to attack a suspect and threatens to kill the suspect.  *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 927 (11th Cir. 2000).  The Parties have not pointed the Court to an analogous D.C. Circuit decision, and the Court is not aware of one.

Although the question is a close one, the Court concludes that Al-Hinawi was not on adequate notice that his threat, without more (such as pointing a gun at Ulysse), violated clearly established law.  In other words, existing precedent at the time of the incident did not place the constitutional question beyond debate or dispute.  *See Reichle v. Howards*, 566 U.S. 658, 664 (2012).  A reasonable officer in Al-Hinawi's shoes may or may not have understood that making the threat (assuming one was made) under the circumstances here violated the arrestee's rights, *id.*, and Al-Hinawi is therefore entitled to qualified immunity.

## VI.    Assault and Battery Claim

In Count Two, Ulysse claims that the Officers committed the torts of assault and battery against her.  *See* Compl. ¶¶ 44–46.

An individual injured by a District police officer "may sue under one or more common law theories of legal liability such as assault and battery or negligence."  *Blair v. D.C.*, 190 A.3d 212,

222 (D.C. 2018) (quotation omitted).  The torts of assault and battery are "two related but 'conceptually distinct' torts" under District law.  *Jackson*, 327 F. Supp. 3d at 68.  In the case of assault, a plaintiff may recover "by proving intentional and unlawful attempt or threat, either by words or acts, to do physical harm to the plaintiff."  *D.C. v. Chinn*, 839 A.2d 701, 705 (D.C. 2003) (quotation omitted).  In the case of battery, a plaintiff may recover "by proving an intentional act that causes harmful or offensive bodily contact."  *Id.* (quotation omitted).  An officer who effects an arrest commits a battery.  *Id.* at 706.  An unreasonable use of force equates to "an assault and battery" under District law.  *Hundley v. D.C.*, 494 F.3d 1097, 1101 (D.C. Cir. 2007).

When an "officer does not use force beyond that which the officer reasonably believes is necessary, given the conditions apparent to the officer at the time of the arrest, he is clothed with [qualified] privilege."  *Jackson*, 327 F. Supp. 3d at 68; *Ingram v. Shipman-Meyer*, 241 F. Supp. 3d 124, 148 (D.D.C. 2017) ("Just as qualified immunity is a shield against liability in Section 1983 excessive force claims, qualified privilege protects officers in common law claims of assault and battery.").  The standard for qualified privilege under District law "is similar to the excessive force standard applied in the Section 1983 context."  *Dormu*, 795 F.Supp.2d at 28 (quoting *Rogala v. D.C.*, 161 F.3d 44, 57 (D.C. Cir. 1998)).  But it is not the same.  By comparison to the objective qualified immunity test under § 1983, *Hargraves v. D.C.*, 134 F. Supp. 3d 68, 91 (D.D.C. 2015), the "test for qualified privilege in an assault and battery suit is *both* subjective and objective: the officer must subjectively believe that he or she used no more force than necessary, but the officer's judgment is compared to that of a hypothetical reasonable police officer placed in the same situation."  *Scales*, 973 A.2d at 730 (emphasis added); *Etheredge v. D.C.*, 635 A.2d 908, 916 (D.C. 1993) (internal quotation marks omitted); *Evans–Reid v. D.C.*, 930 A.2d 930, 937 (D.C. 2007) ("A police officer has a qualified privilege to use reasonable force to effect an arrest, provided that the

means employed are not in excess of those which the actor reasonably believes to be necessary.").
In other words, "District law provides a government actor with a privilege defense to [] tort claims
[like assault and battery] when '(1) he or she believed, in good faith, that his or her conduct was
lawful, *and* (2) this belief was reasonable.'" *Hargraves*, 134 F. Supp. 3d at 90 (quoting *Doe v.
D.C.*, 796 F.3d 96, 107 (D.C. Cir. 2015)) (emphasis added)).

Ulysse's claims of assault and battery mirror her claims of excessive force against Stokes
and Al-Hinawi in all but one respect. Although the D.C. Court of Appeals has not been clear on
this question, it appears that under District law, their conduct was privileged only if it was
objectively reasonable *and if* they subjectively believed it was lawful. *See Jenkins v. D.C.*, 223
A.3d 884, 902 (D.C. 2020).

### A. Ulysse's Claims against Stokes for Assault and Battery.

In an effort to suggest that Stokes subjectively believed that his actions constituting assault
and battery went beyond what was necessary, Ulysse points to bystander testimony in which
onlookers assert that Stokes pretended not to hear the crowd's pleas to cover Ulysse's exposed
breasts. Pl.'s Mem. in Opp'n to Defs.'s Mot. for Summ. J. ("Pl.'s Opp'n."), ECF No. 41 at 44.
But Ulysee's tube top falling from her torso was a consequence of the struggle. Indeed, her tube
top did not include straps over her shoulders, rendering it particularly susceptible to displacement.
More important, nothing in the record contradicts Stokes's belief that his conduct was necessary
under the circumstances. In fact, Stokes made clear in his deposition that the circumstances
surrounding the arrest precluded him from acting sooner to cover her breasts, which were
uncovered in his view because her tube top inadvertently slid down her torso. Defs.'s Mot., ECF
No. 32-5 at 47, 54. In short, the undisputed material facts demonstrate that Stokes believed that

his conduct was lawful, as would an objectively reasonable officer presented with a similar scenario.

### B.  Ulysse's Claims against Al-Hinawi for Assault and Battery.

Recall that under District law "assault is an intentional act and unlawful attempt or threat, either by words or by acts, to do physical harm to the victim." *Evans–Reid*, 930 A.2d at 937. "Physical contact is not an element of a prima facie claim of assault." *Konah v. D.C.*, 815 F. Supp. 2d 61, 80 (D.D.C. 2011).  The appropriate inquiry, then, focuses on whether Al-Hinawi "committed an intentional act that threatened to subject the plaintiff to physical harm." *Id.*

Here, Al-Hinawi's alleged threat occurred while he was armed and while he assisted Stokes in handcuffing Ulysse.  Al-Hinawi therefore possessed the ability to do physical harm to Ulysse, and he also arguably took an overt act toward carrying out the threat, as he assisted Stokes in pinning Ulysse to the ground.

Al-Hinawi argues that he is entitled to qualified privilege.  But the Court cannot decide one way or the other what Al-Hinawi subjectively believed when he allegedly threatened to kill Ulysse. After all, in his deposition, Al-Hinawi denied ever making the alleged threat to Ulysse, Defs.'s Mot., ECF No. 32-7 at 52, and thus did not attempt to explain why he made the alleged threat.  The Court therefore concludes that a reasonable jury could conclude that Al-Hinawi did not subjectively believe that his alleged threatened use of force was no more than necessary.

### VII.    Negligence Claims

In Count Three, Ulysse claims that the Officers committed the tort of negligence against her.  *See* Compl. ¶¶ 47–50.

To state a claim of negligence under District law, "the plaintiff must establish that (1) the defendant owed a duty of care to the plaintiff, (2) the defendant breached that duty, and (3) the

breach of duty proximately caused damage to the plaintiff." *Bradley v. Nat'l Collegiate Athletic Ass'n*, 249 F. Supp. 3d 149, 167 (D.D.C. 2017) (quotation omitted).  The plaintiff bears the burden of proof on "the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between the deviation and the plaintiff's injury." *Butera v. D.C.*, 235 F.3d 637, 659 (D.C. Cir. 2001) (quotation omitted).

Generally speaking, even if the plaintiff cannot "show that the defendant officers violated [her] constitutional rights, the defendants could still be liable for negligence." *Hargraves*, 134 F. Supp. 3d at 95.  When a plaintiff, however, alleges a negligence claim arising out of the incident that gave rise to other claims like a battery claim, the negligence claim fails unless it is (1) "distinctly pled," (2) "based upon at least one factual scenario that presents an aspect of negligence apart from the use of excessive force itself," and (3) "violative of a distinct standard of care." *Kelly v. Gaton*, No. CV 19-23 (CKK), 2019 WL 2329464, at *3 (D.D.C. May 31, 2019) (quoting *Chinn*, 839 A.2d at 711).  In deciding whether a negligence claim can survive, the court "is not bound by a plaintiff's characterization of an action." *Rice v. D.C.*, 626 F. Supp. 2d 19, 24 (D.D.C. 2009) (quotation omitted).

Ulysse contends that two series of events during the incident give rise to claims of negligence: (1) Stokes's wielding of his taser and aiming it at her and (2) both Officers exposing her breasts and failing to cover her them in a prompt manner.  Compl. ¶¶ 48–49.  Ulysse set forth in her compliant distinct claims for negligence, assault, and battery.  *Id.* ¶¶ 8–9, 22–23.  She has therefore satisfied the first element of distinctly pleading her negligence claims.

Though a close call, the Court finds that Ulysse has also met the second requirement by alleging "at least one factual scenario that presents an aspect of negligence apart from the use of excessive force itself."  Ulysee's allegations, to be sure, arise from both Officers' efforts to subdue

her.  Yet the allegations that Stokes negligently wielded his taser and that both Officers negligently exposed her breasts are not so intertwined with her excessive force, battery, and assault claims. *See Kelly*, 2019 WL 2329464, at *3.  The Court draws support from *Dormu v. D.C.*, 795 F. Supp. 2d 7 (D.D.C. 2011), where the plaintiff's negligence and excessive force claims were both allowed to proceed because the evidence could support two different factual scenarios: that the officer "either intentionally applied the handcuffs tightly and deliberately failed to lock the handcuffs, or that he recklessly believed that he had properly applied the handcuffs."  *Id.* at 30.  Here, both of Ulysse's negligence claims involve a similar setup:  A jury could reasonably believe that the Officers intentionally committed the acts (laser-painting Ulysse with a taser and exposing her breasts) or that they, through negligence, allowed both to happen.

Ulysse has failed to introduce sufficient evidence of the national standards of care applicable to her negligence claim involving the exposure of her breasts.  But the Court concludes that she has introduced sufficient evidence of a national standard applicable to her negligence claim involving Stokes's taser use.  A plaintiff generally must introduce expert testimony to establish the applicable standard in cases involving police officers, *Smith v. D.C.*, 882 A.2d 778, 788 (D.C. 2005); *Dormu*, 795 F. Supp. 2d at 29.  When expert testimony comes into play, the "expert must clearly articulate and reference a standard of care by which the defendant's actions can be measured." *Briggs v. Washington Metro. Area Transit Auth.*, 481 F.3d 839, 846 (D.C. Cir. 2007) (quoting *Clark v. D.C.*, 708 A.2d 632, 635 (D.C.1997)).  Generalized references to an applicable national standard will not cut it. *Briggs*, 481 F.3d at 846.  The standard of care instead arises from the specific "practices in fact generally followed by other comparable governmental facilities or some nationally-recognized standard." *Dormu*, 795 F. Supp. 2d at 29 (quoting *Evans–*

*Reid*, 930 A.2d at 936).  "Internal guidelines and policies do not establish a standard of care" on

their own, but they may have a "bearing on the standard of care."  *Dormu*, 795 F. Supp. 2d at 29.

Ulysse contends that a report from an expert on police practices, Randy Foster, established

that the Officers deviated from proper police practice.  Pl.'s Opp'n, ECF No. 41 at 47.  In particular,

Foster asserts that when Stokes painted his taser over Ulysse's body with a laser dot, he departed

from a national standard, which Foster claims demands that an officer may wield a taser only to

affect an arrest or protect himself.  *See* Foster's Report, ECF 32-14, Ex. 14 at 14 ("As with all

kinds of force, the universally accepted practice is that officers may only wield a Taser in the

amount necessary to affect an arrest, overcome resistance, or protect themselves.").  Likewise,

Foster claims that the Officers had the duty to refrain from exposing the arrestee's breasts and to

cover them promptly if they became exposed.  *Id.* at 11 ("It is improper, and inconsistent with

proper police practices, to cause a subject's breasts to become exposed and to refuse to allow the

subject to cover herself back up.").

Although Foster claims to base his opinion on his knowledge of local, state, and federal

police practices as well as his lengthy career as a law enforcement officer and on general orders

issued by the Metro Transit Police Department, *see generally id.*, the Court struggles to locate

reference to a national standard of care in his report that specifically governs police practice on the

exposure of breasts.  The Court therefore exercises its broad discretion in this area to exclude

Foster's expert testimony on a national standard of care governing the exposure of breasts.  *See*

*United States v. Gatling*, 96 F.3d 1511, 1523 (D.C. Cir. 1996).[4]  With regards to Foster's report on

---

[4] If Foster's report did establish a national standard on the question of breast exposure, the Court concludes in light of the video evidence that the undisputed material facts show that no breach (i.e., no negligence) occurred.  *See infra*, p. 31 n.7.  The video shows that Ulysse's tube top slid down her torso during the process of effectuating her arrest. Neither Officer had the ability to cover Ulysse's breast in a prompt fashion given the crowd and Ulysse's decision to resist arrest.  No breach of a national standard (assuming one existed) occurred as a matter of law.

Stokes's use of the taser, the Court concludes that Foster's report suffices to show that he has "articulate[d] and reference[d] a standard of care [generally followed by other comparable governmental facilities] by which the defendant's actions can be measured." *Taylor v. Guida*, No. CV 17-123 (RBW), 2019 WL 4750366, at *6 (D.D.C. Sept. 30, 2019) (crediting the same Randy Foster's expert testimony on the applicable standard of care) (quotation omitted).

Having determined that Foster's report suffices to establish a national standard of care on the taser claim, the pertinent question becomes whether a jury could conclude that a breach of that standard resulted in harm to Ulysse. *Bradley*, 249 F. Supp. 3d at 167 (quotation omitted).  On the one hand, the video evidence shows Stokes attempting to restrain an uncooperative Ulysse while surrounded by a crowd, which included individuals Stokes's reasonably perceived as hostile.  On the other hand, it appears that Stokes activated his taser and that its laser may have briefly painted Ulysse while she was prone on the ground.  Though the evidence suggests that no breach occurred given the circumstances Stokes found himself in, the question is close enough for a jury to make the call.  The Court therefore allows Ulysse's claim of negligence against Stokes to proceed past summary judgment.

## VIII.    Intentional Infliction of Emotional Distress Claim

In Count Five, Ulysse claims that the Officers committed the tort of intentional infliction of emotional distress against her.  *See* Compl. ¶¶ 55–59.

To establish liability under District law for intentional infliction of emotional distress, a plaintiff must show: "(1) extreme and outrageous conduct on the part of the defendant which (2) either intentionally or recklessly (3) cause[d] the plaintiff severe emotional distress." *Halcomb v. Woods*, 610 F. Supp. 2d 77, 80 (D.D.C. 2009) (quotation omitted); *Klayman v. Jud. Watch, Inc.*, 288 F. Supp. 3d 314, 320 (D.D.C. 2018).  Element one requires conduct "so outrageous in

character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998) (quotation omitted). Element two "requires that the defendant inflicted severe emotional distress in an intentional or reckless manner." *Halcomb*, 610 F. Supp. 2d at 80. And element three requires that the plaintiff suffer severe emotional distress, which amounts to distress "of so acute a nature that harmful physical consequences might not be unlikely to result." *Sere v. Grp. Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C. 1982) (quotation omitted).

Where an officer has probable cause to arrest a plaintiff, "the arrest itself cannot form the basis for a claim of extreme or outrageous conduct." *Cutchin v. D.C.*, 369 F. Supp. 3d 108, 128 (D.D.C. 2019) (quotation omitted). Stated differently, the "existence of probable cause foreclose[s]" a "claim of intentional infliction of emotional distress based on [an] arrest." *Smith v. United States*, 843 F.3d 509, 513 (D.C. Cir. 2016). Likewise, where an officer uses a reasonable amount of force in effecting an arrest and subduing the arrestee to effectuate that arrest, the officer's conduct cannot rise to level of so extreme or outrageous as to generate liability on an intentional infliction of emotional distress claim. *Cutchin*, 369 F. Supp. 3d at 128; *Campbell v. D.C.*, 245 F. Supp. 3d 78, 90 (D.D.C. 2017).

Ulysse contends that three distinct sets of actions give rise to her claims for intentional infliction of emotional distress. First, she argues that a jury may find that Al-Hinawi "intentionally inflicted emotional distress on [her] when he threatened to kill her while she was pinned to the ground under Officer Stokes and in the process of being arrested." Pl.'s Opp'n, ECF No. 41 at 41. Second, she asserts that "there is sufficient evidence for a jury to find that Officer Stokes intentionally inflicted emotional distress on [her] by unholstering and activating his Taser and pointing the weapon at [her] while she was prone on the ground and under Officer Stokes's control,

causing her to fear for her life." *Id.*  Third, she argues that a "jury could find, based on this record, that Officer Stokes intentionally [or recklessly] inflicted emotional distress on Plaintiff by grabbing her shirt, causing her bare breasts to become exposed, and that both [Officers] did so by lifting her up to expose her to the crowd and by failing to cover her up or permit bystanders to do so." *Id.* at 41–42.

Ulysse has put forth facts sufficient to survive a motion for summary judgment on her claim for intentional infliction of emotional distress against Al-Hinawi based on his alleged threat.  First, the recitation of Ulysee's allegations to a reasonable juror could lead that juror to conclude that Al-Hinawi committed an outrageous act.  *Purcell v. Thomas*, 928 A.2d 699, 711 (D.C. 2007).  At a minimum, reasonable jurors could differ here, meaning that "it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability." *Amobi v. D.C. Dep't of Corr.*, 755 F.3d 980, 995 (D.C. Cir. 2014) (quotation omitted).  Second, a reasonable juror could infer intent or recklessness behind Al-Hinawi's alleged threat "from the very outrageousness of [his] conduct." *Kotsch v. D.C.*, 924 A.2d 1040, 1046 (D.C. 2007).  In other words, a reasonable officer could have known based on the circumstances that emotional distress and physical harm might result from the alleged threat. *Waldon v. Covington*, 415 A.2d 1070, 1077 (D.C. 1980).  Third, Ulysse has alleged sufficient facts to suggest that she has experienced severe and lasting emotional distress that has affected her life in concrete ways as a result of Al-Hinawi's purported threat.  *Arias v. DynCorp*, No. 1:01CV01908 (ESH), 2016 WL 6496214, at *10 (D.D.C. Nov. 2, 2016).  All in all, a jury may find that Al-Hinawi intentionally inflicted emotional distress on Ulysse when he allegedly threatened to kill her while she was in the process of being arrested.

The Court draws support from the decision in *Halcomb v. Woods*, 610 F. Supp. 2d 77 (D.D.C. 2009).  There, as here, an officer allegedly threatened to kill the plaintiff, which led the court to conclude that if the officer made "such a statement, a jury could conclude that it constituted extreme and outrageous behavior; that it was intended to inflict emotional distress." *Id.* at 81.  In particular, the officer in that case is alleged to have said "now that I know where you live, I ought to come out to your house and put a bullet in your head, having me to go through all this shit." *Id.* at 81 (quotation omitted).  The alleged threat here is close enough to the alleged threat there that this Court concludes that Ulysse's claim survives the motion for summary judgment.

By contrast, Ulysee's claim against Stokes for "unholstering and activating his Taser and pointing the weapon at [her] while she was prone on the ground and under Officer Stokes's control, causing her to fear for her life" fails for two independent reasons.  Pl.'s Opp'n, ECF No. 41 at 41.  First, these steps did not amount to extreme and outrageous conduct under the circumstances.  The video shows that Stokes was dealing with a noncompliant individual and that a loud and hostile crowd surrounding him as he tried to subdue Ulysse.  Second, the video evidence forecloses a finding that Stokes recklessly or intentionally pointed his taser at Ulysse while she was prone on the ground (though it does not foreclose the possibility Stokes negligently pointed the taser at Ulysse).

Ulysee's claim against both Officers for "grabbing her shirt, causing her bare breasts to become exposed, and [] failing to cover her up or permit bystanders to do so" fails for independent reasons, too. *Id.* at 41–42.  Neither Stokes nor Al-Hinawi intentionally or recklessly exposed Ulysee's breasts to the crowd.  The video makes that much clear.  Ulysee's tube-top instead inadvertently fell down her torso during the course of the arrest.  The time the Officers took to cover Ulysse's breasts also did not amount to extreme or outrageous conduct.  Both Officers faced

a large crowd of people and a hostile environment.  The Officers reasonably prioritized personal safety over covering an exposed arrestee's breasts.

### IX.    Negligent Infliction of Emotional Distress Claims

In Count Four, Ulysse claims that the Officers committed the tort of negligent infliction of emotional distress against her.  *See* Compl. ¶¶ 55–59.

To make out a claim under District law for negligent infliction of emotional distress, a plaintiff must show that (1) she was either in the zone of physical danger or suffered a physical impact, "which was (2) created by the defendant's negligence, (3) the plaintiff feared for his own safety, and (4) the emotional distress so caused was serious and verifiable."  *Harris v. U.S. Dep't of Veterans Affs.*, 776 F.3d 907, 915 (D.C. Cir. 2015) (quotation omitted); *Wright v. United States*, 963 F. Supp. 7, 18 (D.D.C. 1997).[5]  "'Serious and verifiable" means that the distress must have manifested in some form of injury, *Rice*, 774 F. Supp. 2d at 33, though the plaintiff need not always experience a physical manifestation of an injury if it affects mental health to a certain degree.  *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 797 (D.C. 2011).  Generally speaking, courts "have imposed liability for the negligent infliction of emotional distress only in limited situations."  *Id.* at 796.

Ulysse points to two distinct sets of actions that she says give rise to viable claims of negligent infliction of emotional distress.[6]  First, Ulysse posits that she has a claim against Stokes

---

[5] District law recognizes a second path to establish negligent infliction of emotional distress.  *See Kennedy v. Berkel & Co. Contractors*, No. 17-CV-1248 (DLF), 2020 WL 4903896, at *6 (D.D.C. Aug. 20, 2020).  That path requires the plaintiff to "show that (1) the defendant has a relationship with the plaintiff, or has undertaken an obligation to the plaintiff, of a nature that necessarily implicates the plaintiff's emotional well-being, (2) there is an especially likely risk that the defendant's negligence would cause serious emotional distress to the plaintiff, and (3) negligent actions or omissions of the defendant in breach of that obligation have, in fact, caused serious emotional distress to the plaintiff."  *Hedgepeth*, 22 A.3d at 810–11.  Ulysse does not attempt to take this second path, so the Court does not address it.

[6] Ulysse contends in her memorandum in opposition to the Officers's motion for summary judgment that she stated a claim in her complaint for negligence infliction of emotional distress against Stokes for his alleged negligent wielding of a taser.  Pl.'s Opp'n, ECF No. 41 at 51.  But her complaint does not contain such a claim.  In fact, the section

and Al-Hinawi for negligently creating a zone of danger while effectuating the arrest.  *Id.*  Second,

Ulysse asserts that she has a claim against Stokes and Al-Hinawi for subjecting her to physical

impact "when her exposed breasts were pressed into the concrete, resulting in chest contusions,

and that this caused serious and verifiable emotional distress."  *Id.* at 52.

The Court cannot say that the Officers were negligent given the undisputed video evidence

and because Ulysse fails to provide a governing standard of care.[7]  As to the standard of care,

Ulysse has failed to articulate the standard that should govern the Officers' conduct with regards

to how they effectuated the arrest or how they allegedly exposed and failed to cover Ulysee's

breasts, and she also fails to proffer expert testimony on this question.[8]  Assuming Ulysse had

provided such a standard (which she has not), no reasonable juror based on the unconverted video

evidence could conclude that the Officers breached it.  The video makes clear that the Officers did

not negligently expose Ulysee's breasts.  Nor did they negligently create a zone of danger during

the course of the arrest.  And while the District of Columbia Court of Appeals has extended a duty

to avoid negligently inflicting emotional distress to relationships that "necessarily implicate the

---

dedicated to her negligent infliction of emotional distress claims does not even mention the word taser.  *See* Compl. ¶¶ 51–54.  The traditional practice has been to disregard "claim[s] asserted for the first time in a memorandum of law" because those claims "[were] not made in the [plaintiff's] original complaint or advanced in a motion to amend."  *Tunica-Biloxi Tribe of La. v. United States*, 577 F. Supp. 2d 382, 411 (D.D.C. 2008) (quotation omitted); *Hall v. Dep't of Def.*, No. CV 19-2354 (RJL), 2021 WL 1026123, at \*8 (D.D.C. Mar. 17, 2021) (noting that "it is axiomatic that a party may not amend its complaint or broaden its claims through summary judgment briefing") (quotation omitted).  A rule to the contrary "would result in mass confusion, as it would be difficult for a court like this one with approximately 200 cases on its civil calendar at any given point in time to stay abreast of what claims are before it in each individual case."  *Tunica-Biloxi Tribe*, 577 F. Supp. at 412 n.15.  The Court concludes that Ulysse has forfeited the argument that Stokes's alleged negligent wielding of a taser gives rise to a claim for negligent infliction of emotional distress.  *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019).

[7] "Ordinarily questions of negligence [] are to be resolved by the jury. However, in exceptional cases the finding of negligence [] is a question of law to be decided by the court. This situation occurs when undisputed facts, or facts and inferences from them as taken in the light most favorable to the party having the burden of proof on the issue, cannot legally constitute a finding of negligence."  *Montague v. Henderson*, 409 A.2d 627, 628 (D.C. 1979); *Blake v. Securitas Sec. Servs., Inc.*, 962 F. Supp. 2d 141, 146 (D.D.C. 2013); *Whiteru v. Washington Metro. Area Transit Auth.*, No. 15-CV-0844 (KBJ), 2020 WL 4732096 (D.D.C. Aug. 14, 2020) (quotation omitted) ("It is well settled in [the District of Columbia] that negligence and contributory negligence are usually questions of fact and become questions of law only where there is but one reasonable inference which may be drawn from undisputed facts.").

[8] *See supra* p. 24.

plaintiff's emotional well-being," *Hedgepeth*, 22 A.3d at 815, an officer's relationship with an arrestee is unlikely to implicate in most circumstances the arrestee's emotional well-being—and that certainly is the case here. The Court therefore grants the Officers's motion on Ulysse's claims of negligent infliction of emotional distress.

## X.   Motion to Strike Witnesses

One last point. Ulysse has moved to strike three "belatedly disclosed witnesses," namely William Wu, an unnamed employee with the Metropolitan Police Department, and the Police Department's custodian of records. Pl.'s Mot. to Strike, ECF No. 31 at 1. She argues that permitting the witnesses to support claims and defenses would violate discovery rules and would result in substantial prejudice. *Id.* at 4.

The Federal Rules of Civil Procedure establish the ground rules for the disclosure of pertinent information, including witnesses that may be relied upon for support. *See generally* Fed. R. Civ. P. 26. Parties have an obligation to "provide to the other parties . . . the name . . . of each individual likely to have discoverable information . . . that the disclosing party may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A). The Civil Rules also provide that a party "who has made a disclosure under Rule 26(a) . . . [or] has responded to an interrogatory . . . must supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1). If a party fails to identify a witness in conformity with the Civil Rules, "the party is not allowed to use that . . . witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

The three witnesses in dispute were not disclosed during the discovery period, which ended on November 20, 2020. *See* October 29, 2020 Minute Order. They instead were disclosed three

days later on November 23, 2020.  *See* Pl.'s Mot. to Strike, ECF No. 31, Ex. 3.  Ulysse contends

that the circumstances here dictate exclusion of the witnesses.  *See Brooks v. Kerry*, 37 F. Supp.

3d 187, 206 (D.D.C. 2014).  She also asserts that allowing the witnesses to testify without first

permitting an opportunity to depose them would be prejudicial.  In other words, Ulysse "has been

deprived of the opportunity to depose these witnesses to ascertain what they will say in support

of" certain claims and defenses.  *See* Pl.'s Mot. to Strike, ECF No. 31 at 6.

As a general matter, this Court "will not reopen discovery . . . to permit last-minute

depositions of . . . last-minute witnesses."  *Smith v. Ergo Sols., LLC*, No. CV 14-382 (JDB), 2019

WL 3068293, at *1 (D.D.C. July 12, 2019).  With that said, the prejudice to Ulysse in this situation

is easily cured by reopening discovery for a limited period of 30 days.  *Ortega v. City & Cty. of

Denver*, No. 11-CV-02394-WJM-CBS, 2013 WL 1751944, at *2–3 (D. Colo. Apr. 23, 2013); *Hess

v. Reg-Ellen Mach. Tool Corp. Emp. Stock Ownership Plan*, No. 02 C 50007, 2003 WL 21209747,

at *4 (N.D. Ill. May 22, 2003).  Ulysse may depose any of these three witnesses she deems

necessary during that limited period.  To balance the prejudice, this Court also directs the Officers

to cover the cost of Ulysee's depositions "as a sanction for [the] failure to timely disclose."  *See

Dichiara v. Wright*, No. 06 CV 6123(KAM), 2009 WL 1910972, at *3 (E.D.N.Y. June 30, 2009);

*Gentile v. Ingram*, No. 7:13-CV-81-FL, 2016 WL 7429199, at *9 (E.D.N.C. Apr. 29, 2016).

## XI.     Conclusion

For the foregoing reasons, Stokes and Al-Hinawi's Motion for Summary Judgment is

**GRANTED** in part and **DENIED** in part.  Ulysse's Motion to Strike the belatedly disclosed

witnessed is **DENIED**.  An Order will be entered contemporaneously with this Memorandum

Opinion.

It is so **ORDERED**.

DATE:  September 30, 2021

_____
CARL J. NICHOLS
United States District Judge